IN THE IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| WESLEY PHILLIPS | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No.: 2:12-cv-04033-JEO |
| | ) |
| MOZES, INC.; THE COCA-COLA | ) |
| COMPANY; and EPRIZE, INC., | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS
MOZES, INC., THE COCA-COLA COMPANY, AND EPRIZE INC.'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Robert J. Campbell
BRADLEY ARANT BOULT
CUMMINGS LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, Alabama 35203-2104
(205) 521-8975


*Attorneys for defendant Mozes, Inc.*

James S. Witcher III
HAND ARENDALL LLC
1200 Park Place Tower
2001 Park Place North
Birmingham, AL 35203
(205) 502-0113


*Attorneys for defendant ePrize, Inc.*

Harlan I. Prater, IV
Wesley B. Gilchrist
Brooke G. Malcom
LIGHTFOOT FRANKLIN & WHITE LLC
The Clark Building
400 20th Street North
Birmingham, Alabama 35203-3200
(205) 581-0720


*Attorneys for defendant
The Coca-Cola Company*

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

STATEMENT OF UNDISPUTED FACTS ............................................................3

    A. Coca-Cola Hires Mozes to Create and Run Fan-Engagement Text
       Messaging Promotions for Alabama/LSU Football Game..........................3

    B. Plaintiff Attends the November 5, 2011, Football Game and Sends Text
       Messages to Defendants...............................................................................5

    C. The Coke Zero Promotion Was Announced in the Stadium and an Image
       With Coca-Cola Trademarks Was Broadcast on All Four of the Jumbotron
       Screens. .......................................................................................................5

    D. When Plaintiff Saw the Promotion, He Texted Defendants Four Times in
       Two Minutes. ...............................................................................................7

    E. The MozesConnect System Used on November 5, 2011, Only Responded
       to Text Messages Received Through Text-Message Technology. ..............10

    F. Plaintiff Understood How Text-Messaging Technology Works, and He Did
       Not Consider Any of the Texts From the Football Game (If He Received
       Them) an Inconvenience or a Nuisance.....................................................12

    G. Plaintiff Unsubscribed From Coke Zero's Mobile List. ............................13

    H. Plaintiff Filed This Lawsuit, Then Discarded His Cell Phone, So He
       Cannot Prove He Received Any Text Messages on November 5, 2011.....14

PROCEDURAL BACKGROUND........................................................................16

ARGUMENT ......................................................................................................17

I.    Plaintiff Gave Defendants "Prior Express Consent" to Send Him Text
      Messages. .....................................................................................................17

    A. Voluntarily Sending a Text Message From a Cell Phone Releases the Phone
       Number and Provides "Prior Express Consent" to Receive Text Messages
       to That Number. .........................................................................................18

    B. A Cell Phone Number Is Not "Captured" When It Is Released at the Same
       Time a Text Message Is Sent. ....................................................................21

    C. When Plaintiff Provided His Phone Number, He Gave "Prior Express
       Consent" to Receive Subsequent Messages. ...............................................22

II.    The MozesConnect System Was Not an ATDS. ...............................................24

III.   Plaintiff Cannot Prove He Received Any Text Messages Because He
     Destroyed His Cell Phone After Filing This Lawsuit. .....................................28

CONCLUSION ........................................................................................................30

## <u>INTRODUCTION</u>

On November 5, 2011, before the kickoff of the Alabama/LSU football game at Bryant-Denny stadium, plaintiff Wesley Phillips ("Plaintiff") saw an invitation to participate in a Coke Zero text message promotion on the stadium's four Jumbotrons and over the public address system, giving fans the opportunity to text a number ("short code") to vote for their favorite team. Plaintiff accepted the invitation and, in fewer than two minutes, used his cell phone to send four text messages to the Coke Zero short code. In his first three messages, he texted "Bama" to the short code. In response to each of those messages, defendant Mozes, Inc. (now known as Gerzhom, Inc.) ("Mozes") transmitted a response (sent as two simultaneous text messages) on behalf of defendant The Coca-Cola Company ("Coca-Cola") (1) thanking Plaintiff for his vote and (2) inviting him to provide his date of birth to enter a sweepstakes for an autographed football and join the Coke Zero mobile list. In his fourth rapid-fire text message, Plaintiff texted his birthdate to enroll in the free football contest and join the Coke Zero mobile list.

Plaintiff understood that by sending these text messages, he provided his mobile phone number to Defendants. He sent the text messages because he wanted to participate in the Coke Zero promotion. Plaintiff did not consider any texts he may have received in response a nuisance. In fact, Plaintiff testified that he did not remember receiving any response messages. Nevertheless, Plaintiff now contends

that two of the messages Mozes transmitted during the game—which requested a date of birth to enter to win a free football and join the Coke Zero mobile list— violated the Telephone Consumer Protection Act of 1991 ("TCPA"), 47 U.S.C. § 227, *et seq.*, because they allegedly were sent without his prior express consent. The undisputed evidence establishes that his claim fails as a matter of law.

*First,* Plaintiff gave Defendants prior express consent to send him text messages when he voluntarily provided his phone number to them. *See In re Rules and Regulations Implementing the Tele. Consumer Protection Act of 1991*, 7 FCC Rcd. 8752, 8769, 1992 WL 690928, at *11 (Oct. 16, 1992) ("1992 FCC Order"). This undisputed fact, standing alone, entitles Defendants to summary judgment. Plaintiff's expert confirmed that when a person sends a text message, he necessarily provides his cell phone number to the recipient of the message. By knowingly and voluntarily providing Defendants with his cell phone number, Plaintiff consented to receiving text messages from them.

*Second*, the November 5, 2011 system that sent the texts at issue were not transmitted using an automated telephone dialing system ("ATDS"). The system did not randomly or sequentially produce phone numbers, and then dial them. Likewise, the system was not a "predictive dialer" under the FCC's definition. It did not dial telephone numbers *en masse*. The system only transmitted text messages to the mobile aggregator — a company that serves as an intermediary

between a mobile marketing company and a cell phone carrier — in response to, and based upon, data provided by Plaintiff through his text messages to Defendants. This process was triggered only through Plaintiff's human intervention when he initiated text messages to be sent to Defendants.

*Third*, Plaintiff has produced no admissible evidence that he received the two text messages at issue, which is an essential element of his claim. After filing this lawsuit asserting that Defendants violated federal law by sending him text messages, Plaintiff inexplicably discarded the cell phone he used to text Defendants and on which he supposedly received their responsive messages. That phone was the only evidence available to establish whether, and in what order, Plaintiff received the messages — Plaintiff has no recollection of having received the text messages at issue, and he has produced no evidence that he received them. Because Plaintiff discarded the phone after filing suit, the Court should draw an adverse inference that he did not receive the text messages.

<u>**STATEMENT OF UNDISPUTED FACTS**</u>

**A.**      **Coca-Cola Hires Mozes to Create and Run Fan-Engagement Text Messaging Promotions for Alabama/LSU Football Game.**

1.      Coca-Cola contracted with Mozes to design and implement in-venue, fan-engagement, text-messaging promotions. Ex. 1,¶81:11-18; Ex. 2, ¶11:12-20; Ex. 3, p. 5.

2.      These promotions consisted of messages displayed on stadium Jumbotrons before and during football games, and read over the public address systems, that provided fans an opportunity to engage with Coca-Cola by inviting them to text a promotional number. Ex. 2, ¶18:11-20:6.

3.      Mozes was hired to create the fan-engagement text-messaging promotions for the Alabama/LSU football game on November 5, 2011. Ex. 1, ¶25:23-26:16; Ex. 2, ¶11:12-20; Ex. 3, p. 5.

4.      Mozes designed the creative material for the three fan engagements that appeared at the Alabama/LSU football game. Ex. 1, ¶72:5-16; Ex. 4, p. 10.

5.      Coca-Cola reviewed and approved Mozes' creative material for the three fan engagements that appeared at the football game. Ex. 2, ¶29:11-16, Ex. 1, ¶72:5-16; Ex. 4, p. 10.

6.      Mozes configured its proprietary MozesConnect system to receive incoming text messages from participating fans and to send responsive messages to the participants during the promotions on November 5, 2011. Ex. 1, ¶72:1-16; Ex. 14B, p. 3, ¶5; Ex. 14A, p. 2, ¶3; Ex. 4, p. 10.

7.      Mozes hired road technicians to oversee the implementation of the fan engagements and the functionality of the MozesConnect system at the game on November 5, 2011. Ex. 1, ¶¶31:5-10; 35:21-36:2; Ex. 5, p. 2, ¶¶2-3; Ex. 6, p. 2, ¶¶2-3.

**B.  Plaintiff Attends the November 5, 2011, Football Game and Sends Text Messages to Defendants.**

8.  On November 5, 2011, Plaintiff attended a football game between Alabama and LSU. Ex. 7, ¶93:15-18.

9.  At least an hour before kickoff, Plaintiff entered the stadium and went to his seat in the upper section. Ex. 7, ¶103:3-10; 104:5-23, Ex. 5.

10.  Plaintiff recorded a video from his seat reflecting that he had an eye-level view of at least two stadium Jumbotrons. Ex. 7, ¶257:19-258:6, Ex. 8.

**C.  The Coke Zero Promotion Was Announced in the Stadium and an Image With Coca-Cola Trademarks Was Broadcast on All Four of the Jumbotron Screens.**

11.  Coca-Cola sponsored three fan engagements before and during the November 5, 2011 game that were displayed on the four stadium Jumbotrons. Ex. 1, ¶25:23-26:16; Ex. 2, ¶11:12-20; Ex. 6, p. 3-4, ¶7.

12.  The Jumbotron images for the text message promotions bore the unmistakable Coca-Cola trademark. Ex. 1, ¶30:14-31:10; Ex. 10; Ex. 2, ¶42:12-20; Ex. 6, p. 3-4, ¶¶6,8.

13.  Plaintiff was familiar with Coca-Cola's trademark because, among other reasons, he had seen the trademark at the stadium. Ex. 7, ¶¶156:2-18; 279:15-19.

14.  Just before 6:11 p.m. CST, the Jumbotrons prominently displayed an invitation to participate in a Coke Zero "text-to-vote" competition (the "Tug-o-

War" contest), asking the fans to vote for Alabama or LSU via text message. Ex. 7, ¶133:12-134:23; Ex. 6, p. 4, ¶8.

15.     The Jumbotron screen image bearing the number to text prominently displayed the Coke Zero trademark in the bottom left corner; in the bottom right corner was Coca-Cola's trademark phrase, "Enjoy Everything." Ex. 1, ¶30:14-31:10; Ex. 10; Ex. 2, ¶42:12-20; Ex. 6, p. 4, ¶8.

16.     The four Jumbotron screens at the stadium were each approximately 53 feet wide by 20 feet high. Ex. 6, p. 3-4, ¶7.

17.     The Coke Zero trademark and its corresponding trademark phrase on the screens were approximately 10 feet wide by 5 feet high. Ex. 6, p. 4, ¶9.

18.     The promotional number displayed in the center of the Jumbotron screen was approximately 10 feet wide by 2 feet high. Ex. 6, p. 4, ¶10.

19.     At the time the Jumbotrons displayed these images, the public address announcer read a script to introduce the Tug-o-War contest, which stated that "Coke Zero" was giving the fans "a chance to vote for who's going to win today's game." The announcement explained that to participate, attendees needed to "text the word BAMA to the phone number 66937 if you think Alabama will win. . . ." The script also said "[m]essage and data rates may apply." Ex. 2, ¶36:9-37:13; Ex. 11; Ex. 1, ¶34:6-35:14; Ex. 6, p. 4, ¶11.

20. A Mozes road technician took a video of the pre-game promotion for the Tug-o-War contest, which shows the image of one of the Jumbotron screens as well as the announcement introducing the Tug-o-War contest. Ex. 1, ¶35:15-36:2; Ex. 6, p. 3, ¶6.

**D. When Plaintiff Saw the Promotion, He Texted Defendants Four Times in Two Minutes.**

21. Plaintiff saw the promotion on the Jumbotrons and participated by sending the text message "BAMA" to the short code on the screen. Ex. 7, ¶¶133:12-134:23;139:18-22; Exs. 12-13.

22. When he saw the Coke Zero promotion, he decided "to text as much" as he could before the Tug-o-War contest ended. Ex. 7, ¶160:3-15.

23. Plaintiff sent his first text message to Defendants around 6:11 p.m CST. Ex. 7, ¶¶132:17-133:23; 139:14-22; Ex. 12; Ex. 13.

24. Plaintiff had never received any text messages from Defendants before he sent his first text message to them. Ex. 7, ¶195:5-15; Ex. 12; Ex. 13.

25. In response to Plaintiff's first text message, Mozes transmitted a single response in two simultaneous text messages from Mozes' system ("MozesConnect system") to an aggregator: one inviting Plaintiff to enter a contest to win an autographed football and to join the Coke Zero mobile list (the "Free Football Contest"), and one thanking him for his vote and encouraging him to

continue voting for his favorite team. Ex. 1, ¶¶63:18-64:4, 66:13-67:8; Ex. 2, ¶19:16-24.

26. If Plaintiff had not texted the MozesConnect system, he would not have caused the system to transmit text messages to his cell phone number. Ex. 14, p. 29, ¶28(l); Ex. 14A, p. 3, ¶5; Ex. 14B, p. 3, ¶5.

27. The response Mozes transmitted from the MozesConnect system to the aggregator was a sent in two simultaneous text messages (rather than a single text message) because text messages are limited to a certain number of characters. Ex. 1, ¶¶63:18-64:4, 66:13-67:8, 76:2-23; Ex. 14B, p. 3, ¶¶6-9; Ex. 14A, p. 4, ¶¶8-9; Ex. 14, p. 18-20, ¶27(c)-(e),(h).

28. Upon receiving the response, Plaintiff believed that his first text message vote had been received and continued to vote during the promotion. Ex. 7, ¶182:22-183:12.

29. After Mozes transmitted the response, Plaintiff sent a second text message to the same short code to again vote for Alabama. Ex. 1, ¶ 21:3-24:23; Ex. 15.

30. In response to Plaintiff's second text message, Mozes transmitted the same response from the MozesConnect system to the aggregator. Ex. 1, ¶ 21:3-24:23; Ex. 15. Again, if Plaintiff had ceased texting the MozesConnect system, he

would not have caused the system to transmit text messages to his cell phone number. Ex. 14, p. 29, ¶28(l); Ex. 14A, p. 3, ¶5; Ex. 14B, p. 3, ¶5.

31.     Plaintiff then sent a third text message voting for Alabama. Ex. 7, ¶160:16-20 ; Ex. 12; Ex. 13; Ex. 1, ¶ 21:3-24:23; Ex. 15.

32.     In response to Plaintiff's third text message, Mozes transmitted the same response in two simultaneous messages from the MozesConnect system to the aggregator. Ex. 1, ¶ 21:3-24:23; Ex. 15.

33.     In total, Plaintiff sent three text messages to the short code on the Jumbotron within a one-minute period. Ex. 7, ¶¶160:3-20; Ex. 12; Ex. 13.

34.     Plaintiff sent the first three text messages to Defendants approximately 15 to 20 seconds apart. Ex. 7, ¶180:20-181:22.

35.     Less than a minute later, Plaintiff sent a fourth text message to a short code, providing his date of birth, to enter the Free Football Contest, and enrolling in the Coke Zero mobile list. Ex. 7, ¶160:21-161:20; Ex. 12; Ex. 13.

36.     After Plaintiff's fourth text message to Defendants, Mozes transmitted from the MozesConnect system to the aggregator a confirmatory text message informing Plaintiff that he had "joined the Coke Zero mobile list." Ex. 12; Ex. 13; Ex. 1, ¶50:12-18; Ex. 2, ¶¶20:15-21:3.

37.     Plaintiff does not know if he received any text messages from Mozes, or if so, when he received them, the number of text messages that Mozes sent, or

the order in which any text messages were received. Ex. 7, ¶¶160:3-15; 161:3-16; 180:20-181:22. Plaintiff no longer has the phone he used on November 5, 2011, Ex. 7, ¶¶63:13-19; 80:9-18, and Plaintiff's carrier, Sprint, no longer has any record of text messages sent or received by Plaintiff on November 5, 2011. Ex. 21.

**E.    The MozesConnect System Used on November 5, 2011 Only Responded to Text Messages Received Through Text-Message Technology.**

38.    The MozesConnect system communicated via text-message technology in the form of "envelopes" of data that include the sender's cell phone number. Ex. 16, p. 23, ¶56; Ex. 14, p. 14, ¶24(c).

39.    Text messaging technology is different from voice calling technology. Ex. 14, p. 14, ¶24(c)-(e).

40.    Blocking a number from display via Caller ID or the Caller Name (CNAM) database on voice calls does not block a number from transmission to the receiver via text. Ex. 14, p. 14-15, ¶24(c)-(e).

41.    The technology used for "capturing" a telephone number does not capture text messages. Ex. 14, p. 14-15, ¶ 24(c),(e).

42.    The MozesConnect system only transmitted text messages to the aggregator for delivery to Plaintiff based on the data the MozesConnect system received when Plaintiff sent Defendants the initiating text messages. Ex. 14, p. 29, ¶28(l); Ex. 14A, p. 3, ¶5; Ex. 14B, p. 3, ¶5.

43.     The MozesConnect system received incoming text messages through an aggregator from the cell phone carrier. Ex. 1, ¶¶38:7-39:12; 78:3-79:6; Ex. 17, ¶91:9-23; Ex. 14, p. 33-34, ¶29(g).

44.     The cell phone carrier for these transmissions was Sprint. Ex. 1, ¶38:7-39:12; 78:3-79:6; Ex. 17, ¶91:9-23.

45.     When the MozesConnect system transmitted the text messages out, that text message would have to travel through the aggregator and the cell phone carrier before reaching the cell phone subscriber. Ex. 1, ¶¶38:7-39:12; 78:3-79:6; Ex. 17, ¶¶91:9-23; Ex. 14, p. 33-34, ¶29(g).

46.     The MozesConnect system had to process the data in Plaintiff's initial text message before it could send response text messages to the aggregator and then the carrier to transmit text messages to Plaintiff. Ex. 14, p. 29, 31, ¶28(m),(q); Ex. 14A, p. 3, ¶5; Ex. 1,¶¶38:7-39:12; 78:3-79:6; Ex. 17, ¶¶91:9-23.

47.     The MozesConnect system required monitoring by a Mozes road technician during the promotion. Ex. 5, p. 3, ¶6.

48.     The MozesConnect system was not left unmonitored because the MozesConnect system did not run automatically. Ex. 5, p. 3, ¶7.

49.     Mozes road technicians on site during the game monitored the system and intervened in its operation to remove inappropriate content and to initiate the process for choosing a random prize winner. Ex. 5, p. 3, ¶7.

50.     The MozesConnect system used on November 5, 2011, did not produce phone numbers to be called. Ex. 14, p. 29, ¶28(m); Ex. 14A, p. 5, ¶14.

51.     The MozesConnect system used on November 5, 2011, was not a random number generator. Ex. 14, p. 22, ¶28(c); Ex. 14A, p. 5, ¶¶12,13.

52.     The MozesConnect system used on November 5, 2011, was not a sequential number generator. Ex. 14, p. 22-23, ¶28(d); Ex. 14A, p. 5, ¶¶12,13.

53.     The MozesConnect system used on November 5, 2011, was not a predictive dialer. Ex. 14, p. 22, ¶28; Ex. 14A, p. 5, ¶14; Ex. 17 ¶133:18-25.

54.     The MozesConnect system used on November 5, 2011, would require a significant redesign to be an ATDS, including the implementation of new software code. Ex. 14A, p. 5, ¶¶12,13.

**F.      Plaintiff Understood How Text-Messaging Technology Works, and He Did Not Consider Any of the Texts From the Football Game (If He Received Them) an Inconvenience or a Nuisance.**

55.     During the month before the football game, Plaintiff sent and received more than 1,000 text messages. Ex. 7, ¶55:5-13; Ex. 18.

56.     Plaintiff knew when he sent text messages to the Coke Zero short code displayed on the Jumbotrons that he was sending his cell phone number. Ex. 7, ¶¶37:4-39:8, 162:1-11.

57.     Cell phone users reasonably know and expect that their phone numbers are being transmitted along with the message. Ex. 14, p. 14, ¶24(b),(e).

58.     If a phone number was not transmitted when a person sent a text message, then the recipient of the text would not know who sent the message. Ex. 14, p. 16, ¶25(a).

59.     Plaintiff is an attorney who was aware of the TCPA on November 5, 2011 and had represented plaintiffs in multiple TCPA past lawsuits. Ex. 7, ¶¶10:10-11:1; 128:17-129:20.

60.     None of the text messages Plaintiff allegedly received during the Coke Zero promotion was an inconvenience or nuisance to him. Ex. 7, ¶¶204:19-205:3; 249:1-250:10.

61.     Plaintiff left the football game on November 5, 2011, without noticing any text messages from Defendants. Ex. 7, ¶186:3-9.

**G.     Plaintiff Unsubscribed From Coke Zero's Mobile List.**

62.     Mozes transmitted a text message on December 5, 2011, to Plaintiff from the Coke Zero mobile list,  Ex. 7, ¶207:23-208:5; Ex. 12; Ex. 13, and Plaintiff sent Defendants a fifth text message to remove himself from the mobile list. Ex. 7, ¶207:23-208:5; Ex. 12; Ex. 13.

63.     Mozes then sent a message confirming that he had unsubscribed from the Coke Zero mobile list. Ex. 7, ¶207:23-5; Ex. 12; Ex. 13.

64.     Defendants did not send Plaintiff any text messages after December 5, 2011. Ex. 7, ¶¶188:3-7; 196:16-2; 208:6-8.

65.    The text message Plaintiff received on December 5, 2011, prompted him to seek legal advice. Ex. 7, ¶204:19-205:3.

66.    Plaintiff sent a demand letter to Mozes complaining about the December 5, 2011 text message and providing a photo of his cell phone displaying only the December 5, 2011 messages. Ex. 1, ¶96:19-24; Ex. 19.

67.    Mozes responded to Plaintiff's demand letter with an explanation of text messages that Mozes received from Plaintiff through its MozesConnect system and text messages that Mozes transmitted to the aggregator in response to Plaintiff's text messages, letting Plaintiff know that he had joined a list for future messages when he sent with his birth date. Ex. 1, ¶97:23-98:13.

**H.    Plaintiff Filed This Lawsuit, Then Discarded His Cell Phone, So He Cannot Prove He Received Any Text Messages on November 5, 2011.**

68.    Plaintiff filed this lawsuit on December 5, 2012, asserting that Defendants violated the TCPA by responding to the five text messages he sent to Defendants. Dkt. No. 1, ¶58.

69.    Plaintiff seeks to recover statutory damages and to represent a putative nationwide class. Dkt. No. 1, ¶¶47, 61; Dkt. No. 17, ¶¶62, 81.

70.    Plaintiff filed a first amended complaint on February 27, 2013, which added ePrize, Inc. (now known as "HelloWorld") ("ePrize") as a defendant to this action.  Dkt. No. 17.

71. HelloWorld (at the time known as ePrize) purchased the assets of Mozes in or around January 2013. Ex. 1, ¶9:8-19. HelloWorld had no involvement in the promotion.  Ex. 22, p. 8-9.

72. Defendants learned during discovery that Plaintiff discarded the cell phone on which he allegedly received the text messages. Ex. 7, ¶¶62:8-19; 63:13-16; Ex. 20.

73. Plaintiff has not produced any documents or electronic records showing he actually received any text messages from Defendants on November 5, 2011. Ex. 20.

74. The MozesConnect system did not track or retain any data that reflected receipt of any of the text messages that it sent to the aggregator to be sent to the cell phone carrier to then be sent to Plaintiff. Ex. 1, ¶¶104:22-105:12; 105:17-107:4; Ex. 14A, p. 4, ¶10; Ex. 17, ¶ 21:14-21.

75. Other than Plaintiff's cell phone, there is no evidence to demonstrate the fact of receipt, the time of receipt, or the order of receipt of the text messages Plaintiff allegedly received. Ex. 17, ¶93:14-17; Ex. 14, p. 33-34, ¶29(g).

76. Text message transmission can be interrupted, delayed, or prevented altogether because of problems with the aggregator, problems with the carrier, or cell phone tower demand. Ex. 14A, p. 4-5, ¶¶9-11; Ex. 1, ¶38:7-39:12; Ex. 17, ¶112:18-113:3; Ex. 14, p. 33-34, ¶29(g).

77.     It is possible that messages transmitted by Mozes to the aggregator were delayed or never successfully transmitted to Plaintiff. Ex. 14A, p. 4, ¶¶9-11; Ex. 1, ¶38:7-39:12; Ex. 17, ¶112:18-113:3; Ex. 14, p. 33-34, ¶29(g).

78.     Plaintiff does not recall whether he actually received any text messages from Defendants. Ex. 7, ¶158:8-159:4.

79.     Plaintiff does not recall the order of the text messages he received, if any. Ex. 7, ¶163:3-20.

80.     Plaintiff does not know whether the cell phone still had the alleged text messages on it when he turned it in — the phone had "issues with [text] messages disappearing for whatever reason." Ex. 7, ¶¶65:18-66:7; 74:7-11.

81.     The only information Plaintiff produced during discovery regarding the text messages was a chart of the alleged text messages that was created by Plaintiff's attorneys. Ex. 7, ¶138:14-140:11; Ex. 13.

82.     The chart was not based on evidence from Plaintiff's phone; Plaintiff does not know how the chart was created. Ex. 7, ¶138:14-140:11.

83.     The only fact that Plaintiff is "absolutely" sure of is that he texted Defendants. Ex. 7, ¶133:19-23.

## PROCEDURAL BACKGROUND

After Plaintiff filed his first amended complaint, Defendants moved to dismiss. The Court dismissed Plaintiff's third claim (for injunctive relief), and

Plaintiff dismissed his second claim (under § 227(c)) with prejudice. *See* Dkt. Nos. 63 at 3, 67. The only claim remaining is whether the first and third text messages Mozes transmitted out to the aggregator — in response to Plaintiff's text messages and inviting him to enter the Free Football Contest and to join the Coke Zero mobile list — violated the TCPA, 15 U.S.C. § 227(b)(1)(A)(iii). Dkt. No. 62, ¶42:2-43:8; *see also* Dkt No. 63 at 1.

## ARGUMENT

Summary judgment is appropriate where no genuine issues of material fact exist and a party is entitled to prevail in the case as a matter of law. Fed. R. Civ. P. 56. According to the Eleventh Circuit, summary judgment is "mandate[d]. . . against a party failing to establish the existence of an element essential to its case and on which it bears the burden of proof at trial." *Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1241 (11th Cir. 2007).

### I.    Plaintiff Gave Defendants "Prior Express Consent" to Send Him Text Messages.

Prior express consent is an independent basis for summary judgment in Defendants' favor. The Eleventh Circuit has held that courts should grant summary judgment against a TPCA claim if the plaintiff provided prior express consent to receive the communications. *Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1119 (11th Cir. 2014). As the Eleventh Circuit explained, when the

plaintiff's conduct falls under the "TCPA prior express consent exception" the

defendant is "entitled to summary judgment." *Id.* at 1126.

**A.  Voluntarily Sending a Text Message From a Cell Phone Releases the Phone Number and Provides "Prior Express Consent" to Receive Text Messages to That Number.**

By sending text messages *to* Defendants, Plaintiff expressly consented to

receive text messages *from* Defendants. The TCPA does not prohibit calls to cell

phones if the caller has obtained prior express consent from the called party. *See* 47

U.S.C. § 227(b)(1)(A). The Federal Communications Commission, which is

charged with enforcing the TCPA, long ago observed that a person provides "prior

express consent" when he releases his phone number because he has "in effect

given [his] invitation or permission to be called at the number which [he has]

given." 1992 FCC Order *citing* House Report, 102-317, 1st Sess., 102nd Cong.

(1991), at p. 13; *see also Murphy v. DCI Biologicals Orlando*, *LLC*, 797 F.3d

1302, 1308 (11th Cir. 2015) (rejecting dictionary definitions in favor of the FCC's

definition and applying it to text messages). In accordance with the 1992 FCC

Order, a customer who provides his or her number to another party consents to

receive calls or texts from that party. *Pinkard v. Wal-Mart Stores, Inc.*, No. 3:12-

CV-02902-CLS, 2012 WL 5511039, at *6 (N.D. Ala. Nov. 9, 2012); *accord Taylor*

*v. Universal Auto Grp. I, Inc.,* No. C 13-5245 (KLS), 2014 WL 2987395, at *5

(W.D. Wash. July 1, 2014) (plaintiff knowingly released his phone number to the

defendant, "and by doing so gave permission to be called at that number"); *see also Lamont v. Furniture N., LLC*, No. 14-CV-036 (LM), 2014 WL 1453750, at *3 (D.N.H. Apr. 15, 2014) ("By giving her phone number when she bought merchandise, she also gave express consent").

Based on this guidance, district courts have held that sending a text message to a short code releases the sender's cell phone number to the recipient of the text message and conveys prior express consent to receive text messages. *See Ibey v. Taco Bell*, No. 12-cv-0583-H (WVG), 2012 WL 2401972, at *3 (S.D. Cal. June 18, 2012) ("Plaintiff expressly consented to contact by Defendant when he initially texted 91318 to Defendant."); *Derby v. AOL, Inc.*, No. 15-CV-00452 (RMW), 2015 WL 3477658, at *7 (N.D. Cal. June 1, 2015) ("[B]y texting AOL . . . plaintiff knowingly released his phone number to AOL and thereby consented to be texted back at that number."); *Pietzak v. Microsoft Corp.*, No. CV 15-5527-R, 2015 WL 7888408, at *2 (C.D. Cal. Nov. 17, 2015) (Plaintiffs "provided their consent to receive that information through text messaging" when they "initiated the receipt of text messages . . . by voluntarily participating in" a promotion).

Based on that common-sense principle, one federal court has held — in a case analogous to this one—that an attendee at a sporting event who participates in a Jumbotron promotion by sending a text message to a promotional number "expressly consent[s]" to receiving a text from the sponsor of the promotion.

*Emanuel v. Los Angeles Lakers, Inc.*, No. CV 12-9936-GW SHX, 2013 WL 1719035, at *3 (C.D. Cal. Apr. 18, 2013). "To hold otherwise would contradict" not only the law, but "the overwhelming weight of social practice[.]" *Emanuel*, 2013 WL 1719035, at *3.

It also would ignore the way text-messaging technology works. Text messages are envelopes of data that include the sender's cell phone number. Statement of Undisputed Facts ("SOUF"), ¶38. If the phone number were not transmitted with the text message, then the recipient of the text would not know who sent the message. SOUF, ¶58. As a general matter, "cell phone users reasonably know and expect that their phone numbers are being transmitted along with the message." SOUF, ¶57. That is certainly true of Plaintiff. A regular user of text-messaging, Plaintiff knew when he sent text messages to the Coke Zero short code, he was sending his cell phone number. SOUF, ¶¶55-56. Knowing this, Plaintiff "absolutely" initiated his text-message exchange with Defendants the first text message to Defendants. SOUF, ¶83.

The FCC, the case law, and the "overwhelming weight of social practice"— along with the testimony of Plaintiff and both parties' experts—all demonstrate that Plaintiff provided express consent to Defendants to communicate with him by text message. His claim under § 227(b)(1)(A)(iii) fails as a matter of law.

**B.  A Cell Phone Number Is Not "Captured" When It Is Released at the Same Time a Text Message Is Sent.**

As the Court recognized in its order on Defendants' motion to dismiss, the first amended complaint suggested that Plaintiff's phone number was "captured" by Defendants. *See* Dkt. No. 63. Discovery has now confirmed that Plaintiff's allegation has no basis in fact or law: A cell phone number is not captured when it is provided via text message. As discussed above, numerous federal courts have held that a plaintiff who sends an initial text message gives "prior express consent" to receive text messages at that number. Defendants have not found a single instance in which a federal court has reached the opposite conclusion based on the notion that a defendant "captured" a plaintiff's cell phone number upon receiving the plaintiff's initial text message, as Plaintiff contends here. This is not surprising because the technology used for "capturing" a telephone number does not apply to text messages. SOUF, ¶41.

Prior express consent does not exist when "a caller's number is 'captured' *by a Caller ID or an ANI device* without notice to the residential telephone subscriber[.]" 1992 FCC Order at *11 (emphasis added). Because the phone number is included in the envelope of data within the text message, "[i]t would be a misnomer to say that a phone number contained within a text message is 'captured by a Caller ID or ANI device' because that technology applies to voice calls only. Blocking a number from display via Caller ID or the Caller Name

21

(CNAM) database on voice calls does *not* block a number from transmission to the receiver via text." SOUF, ¶40. The MozesConnect system did not "dial" the phone number provided by the incoming text. SOUF, ¶¶38-46,53.

Moreover, cell phone users—including Plaintiff—understand that by sending a text message, they are furnishing their phone number to the recipient of the text message. SOUF, ¶¶56-57. Cell phone users reasonably know and expect that their phone numbers are being transmitted along with the text message and that they may receive a responsive text as a result. *Id.* Accordingly, it is not correct to characterize a telephone number contained within a text message as having been acquired *"without notice to the residential telephone subscriber."* 1992 FCC Order, at *3 (emphasis added). Plaintiff's phone number was not "captured" by Defendants because he initiated text message communications with them and he knew that his phone number was being transmitted to them.

### C. When Plaintiff Provided His Phone Number, He Gave "Prior Express Consent" to Receive Subsequent Messages.

Plaintiff's consent to receive text messages did not expire before December 5, 2011, when he removed himself from the Coke Zero mobile list. Once consent is given, it provides permission to receive text messages that are "closely related to the circumstances under which plaintiff provided his cell phone number." *Aderhold v. Car2go N.A., LLC*, No. C13-489 (RAJ), 2014 WL 794802, at *8 (W.D. Wash. Feb. 27, 2014) (holding that prior express consent was given by checking the boxes

to receive two-part text message); *see, e.g.*, *Roberts v. Paypal, Inc.*, 621 F. App'x 478, 479 (9th Cir. 2015) ("Even if Roberts believed that PayPal would only contact him on his cell phone about problems with his online transactions, that limitation did not apply to PayPal's use of his number because he failed to communicate it to PayPal."); *Baird v. Sabre, Inc.*, No. 14-55293, 2016 WL 424778, at *1 (9th Cir. Feb. 3, 2016) (holding plaintiff gave prior express consent when she provided her telephone number because she thought it was required to book a flight reservation).

Unless a plaintiff expressly revokes consent, it does not expire. *Murphy*, 797 F.3d at 1308 (holding that plaintiff's prior express consent was effective more than two years after he had initially provided his cell phone number, permitting receipt of at least two promotional text messages); *see also Van Patten v. Vertical Fitness Grp., LLC*, 22 F. Supp. 3d 1069, 1071 (S.D. Cal. 2014) (consent extended to receiving at least two text messages more than three years later). This is especially true where the "text included information relevant to Plaintiff's request" because it "demonstrates—in part—why the message challenged here is not the kind of intrusive, nuisance telemarketing call that Congress sought to prohibit in enacting the TCPA." *Emanuel*, 2013 WL 1719035, at *3.

Plaintiff provided Defendants consent to send him text messages about the Alabama/LSU game (and Coca-Cola's promotional activities connected with the game) when he initiated the text-message exchange by responding to the Coke

Zero promotion on the Jumbotrons and then sent three more text messages. SOUF, ¶¶21-35. The promotion prominently bore Coca-Cola's brand in two separate places on the single screen image. SOUF, ¶¶12-17. Every text message sent from the MozesConnect system to the aggregator directed to Plaintiff related to the Alabama/LSU football game and Coca-Cola. SOUF, ¶¶21-35. None of the text messages were intrusive or a nuisance—in fact, Plaintiff sent a fourth text message to Defendants to enroll in the Free Football Contest and sign up for the Coke Zero mobile list. SOUF, ¶¶60-61. The text messages do not implicate the purpose for the TCPA, which is to prohibit "intrusive nuisance calls." *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 744 (2012).

## II.    The MozesConnect System Was Not an ATDS.

Section 227(b)(1)(A)(iii) applies only to calls transmitted using an ATDS. The TCPA defines an ATDS as equipment with the capacity "to store or produce telephone numbers to be called, *using a random or sequential number generator*; and to dial such numbers." 47 U.S.C. § 227(a)(1) (emphasis added). The MozesConnect system used on November 5, 2011, does not meet that definition.

The MozesConnect system used on November 5, 2011, did not use a random or sequential number generator. SOUF, ¶¶51-52. Random number generation "means random sequences of 10 digits, and 'sequential number generation' means (for example) (111) 111–1111, (111) 111–1112, and so on."

*Gragg v. Orange Cab Co.*, 995 F. Supp. 2d 1189, 1193 (W.D. Wash. 2014). The system only sent a response to the aggregator intended for Plaintiff based on the data its system received when Plaintiff sent the initial text message. SOUF, ¶¶42-46. If Plaintiff had not initially sent a text message to the Coke Zero short code, the MozesConnect system would not have had the data necessary to send a response to the aggregator, which, in turn, sent the response to the carrier and then, if transmission was successful, to Plaintiff. SOUF, ¶¶42-46, 77. The MozesConnect system did not send text messages to random people in the stadium, SOUF, ¶42, the system did not produce telephone numbers to be called, SOUF, ¶50; instead, the system read the envelope of data received from Plaintiff's text message and then sent an envelope of data back to the aggregator directed to Plaintiff's mobile phone number. SOUF, ¶¶42-46. The MozesConnect system was not an ATDS.

Other district courts have rejected the contention that similar text-messaging systems met the statutory definition of an ATDS. For example, in *Emanuel*, the court explained that an in-game promotional text sent in direct response to plaintiff's initial text was not "random" and thus could not have been sent by an ATDS. 2013 WL 1719035 at *4, n.3 (noting that it did not need to reach the issue because consent was provided when plaintiff sent the initial text message); *accord Ibey*, 2012 WL 2401972, at *3 (because the text message was sent as a direct response "it did not appear to be random"). Likewise, in *Marks v. Crunch San*

*Diego, LLC*, 55 F. Supp. 3d 1288 (S.D. Cal. 2014), the court found that a similar

text-message system was not an ATDS, where phone numbers were entered into

the system via a text message sent by the consumer to a promotional number

because this was not randomly or sequentially generating numbers. *Id.* at 1292.

The MozesConnect system, which only responded to text messages received on

game day, did not randomly or sequentially generate numbers or dial them.

Even though the FCC extended the definition of ATDS to include

predictive dialers in its 2008 Order, the MozesConnect system used on November

5, 2011 was not a predictive dialer. *In re Rules & Regulations Implementing the*

*Tele. Consumer Protection Act of 1991*, 23 F.C.C. Rcd. 559, 566 (2008), 2008 WL

65485, at *4 ("2008 FCC Order"). "Predictive dialers are automated systems that

call telephone numbers stored in pre-programmed lists or databases in a manner

designed to maximize the efficiency of call centers." *Legg v. Voice Media Grp.,*

*Inc.*, 20 F. Supp. 3d 1370, 1374 (S.D. Fla. 2014). A predictive dialer "works

autonomously until a human voice comes on the line." *Soppet v. Enhanced*

*Recovery Co., LLC*, 679 F.3d 637, 638-39 (7th Cir. 2012). The MozesConnect

system was based on text-messaging technology, which works very differently

than telephone technology. SOUF, ¶38-39. The MozesConnect system did not dial

any phone numbers. SOUF, ¶42. Both experts agree that the MozesConnect

system was not a predictive dialer. SOUF, ¶53. Courts have declined to find that

text-message technology is a predictive dialer. *See, e.g.*, *Gragg*, 995 F. Supp. 2d at 1193 (using a "common sense" approach to hold that a text-message system was not a predictive dialer); *accord Johnson v. Yahoo!, Inc.*, No. 14-2028, 2014 WL 7005102, at *5 (N.D. Ill. Dec. 11, 2014).

Further, as explained in the 2008 FCC Order, a system is only an ATDS if it "dial[s] numbers without human intervention." 2008 WL 65485, *4. Like other text-message based systems, in this case there was human intervention by Plaintiff himself. The MozesConnect system operating on game day required Plaintiff to send a text message to it before it could transmit text messages out to him. SOUF, ¶¶42-46. Further, the MozesConnect system required human monitoring and operation; it was not an automatic system. SOUF, ¶¶47-49. Courts have held that similar systems required human intervention and, thus, were not an ATDS.[1]

To the extent the system's "capacity" is relevant, the MozesConnect system did not have the "capacity" to generate random or sequential numbers or otherwise operate as an ATDS. As configured on November 5, 2011, the system would have

---

[1] *Marks*, 55 F. Supp. 3d at 1292 (responding to a promotional campaign by texting the promotional number "require[d] human curation and intervention"); *see also Johnson*, 2014 WL 7005102, *5 (when a user sends a message, it is clear that the transmission involves human intervention); *accord Derby v. AOL, Inc.*, No. 15-CV-00452-RMW, 2015 WL 3477658, at *4 (N.D. Cal. June 1, 2015) (system that only sent text messages at direction of users required human intervention and was not an ATDS); *McKenna v. WhisperText*, No. 5:14-CV-00424 (PSG), 2015 WL 428728, at *3 (N.D. Cal. Jan. 30, 2015)(text-messaging technology was not an ATDS where only sent text messages at the user's direction); *Luna v. Shac*, LLC, 122 F. Supp. 3d 936, 940 (N.D. Cal. 2015) (text-message system required human intervention); *Legg*, 20 F. Supp. 3d 1370, 1376 (denied plaintiff's motion for summary judgment because system that sent "scheduled broadcasts" via text message required too much human intervention to be an ATDS ).

required a significant redesign to be an ATDS, including the implementation of new software code. SOUF, ¶54. If the system requires writing new code to have ATDS capabilities, then courts have held that it does not have the capacity to be an ATDS. *See, e.g.*, *Gragg*, 995 F. Supp. 2d at 1196 (system did not have "capacity" to be an ATDS if it would require writing new code). In short, the MozesConnect system used on November 5, 2011 lacked all characteristics of an ATDS. Because it was only communicating in response to envelopes of data per text-messaging technology, the MozesConnect system did not produce phone numbers by a random or sequential generator. It was not a predictive dialer. The system required human intervention. The system used to send the texts at issue was not an ATDS.

III.    **Plaintiff Cannot Prove He Received Any Text Messages Because He Destroyed His Cell Phone After Filing This Lawsuit.**

Plaintiff bears the burden of proving that he actually received text messages from Defendants. *See Cunningham v. Kondaur Capital*, No. 3:14-1574, 2014 WL 8335868, at *6 (M.D. Tenn. Nov. 19, 2014) (§ 227(b)(1)(A)(iii) requires plaintiff to prove that "he received a text"). Because his cell phone was destroyed, the only physical evidence of receipt of the alleged text messages was eliminated, and Plaintiff cannot prove an essential element of his claim under § 227(b)(1)(A)(iii). Similarly, because Plaintiff discarded his cell phone, there is no evidence of the order in which Plaintiff allegedly received the messages. Because Plaintiff cannot prove that he received a text message or when he received them, his claim is

subject to summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (movant's burden may be discharged by "pointing out" that "there is an absence of evidence to support the nonmoving party's case").

Plaintiff's disposal of his cell phone not only is fatal to his claim, it also warrants an adverse inference for destroying evidence. An adverse inference is especially appropriate when the only evidence of a particular issue is destroyed. *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005); *Martinez v. Brink's, Inc.*, 171 F. App'x 263, 269, n.7 (11th Cir. 2006). Indeed, an adverse inference is warranted even when a party *negligently* destroys evidence. *Arch Ins. Co. v. Broan-NuTone, LLC*, 509 F. App'x 453, 458 (6th Cir. 2012). Here, Plaintiff knowingly discarded his cell phone containing evidence relevant to his claims. *See Managed Care Sols., Inc. v. Essent Healthcare, Inc.*, 736 F. Supp. 2d 1317, 1322 (S.D. Fla. 2010) (purposeful destruction of evidence indicates bad faith). As an officer of the Court, Plaintiff knew he had a duty to retain evidence during ongoing litigation.

The only documentation that even purports to establish that Plaintiff actually received text messages from Defendants is a chart created by Plaintiff's attorneys. SOUF, ¶81. Plaintiff does not know how the chart was created and does not know whether the chart is accurate, but he does know that it was not created based on evidence from his cell phone. SOUF, ¶82. This lawyer-created chart is not

evidence — but if it were, it would not preclude summary judgment. *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1301 (11th Cir. 2012) (supposed evidence that invites "inferences based upon speculation" cannot be considered by the Court); *see also Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1249 (11th Cir. 2007) ("[e]vidence inadmissible at trial cannot be used to avoid summary judgment").

## **<u>CONCLUSION</u>**

For these reasons, Defendants respectfully request that the Court grant Defendants' motion for summary judgment as to all of Plaintiff's claims.

Respectfully submitted, this 31st day of March, 2016.

/s/ Robert J. Campbell
Robert J. Campbell
BRADLEY ARANT BOULT
CUMMINGS LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, Alabama 35203-2104
(205) 521-8975
(205) 521-6975 (facsimile)


Blaine Kimrey (*pro hac vice*)
Bryan Clark (*pro hac vice*)
VEDDER PRICE PC
222 N. LaSalle Street
Chicago, Illinois 60601
(312) 609-7865
(312) 609-5005 (facsimile)

/s/ Harlan I. Prater, IV
Harlan I. Prater, IV
Wesley B. Gilchrist
Brooke G. Malcom
LIGHTFOOT FRANKLIN & WHITE LLC
The Clark Building
400 20th Street North
Birmingham, Alabama 35203-3200
(205) 581-0720
(205) 380-9120 (facsimile)


L. Joseph Loveland (*pro hac vice*)
S. Stewart Haskins (*pro hac vice*)
Zachary A. McEntyre (*pro hac vice*)
KING & SPALDING LLP
1180 Peachtree Street, NE
Atlanta, Georgia 30309
(404) 572-4600
(404) 572-5139 (facsimile)

*Attorneys for Defendant Mozes, Inc.*

/s/ James S. Witcher III
James S. Witcher III
HAND ARENDALL LLC
1200 Park Place Tower
2001 Park Place North
Birmingham, AL 35203
(205) 502-0113
(205) 397-1314 (facsimile)

Henry Pietrkowski (*pro hac vice*)
REED SMITH LLP
10 S. Wacker Dr., 40th Floor
Chicago, IL 60606
(312) 207-3904
(312) 207-6400 (facsimile)

*Attorneys for Defendant ePrize, Inc.*

/s/ Robert J. Campbell
Robert J. Campbell
BRADLEY ARANT BOULT
CUMMINGS LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, Alabama 35203-2104
(205) 521-8975
(205) 521-6975 (facsimile)

Blaine Kimrey (*pro hac vice*)
Bryan Clark (*pro hac vice*)
VEDDER PRICE PC
222 N. LaSalle Street
Chicago, Illinois 60601
(312) 609-7865
(312) 609-5005 (facsimile)

*Attorneys for Defendant*
*The Coca-Cola Company*

/s/ Harlan I. Prater, IV
Harlan I. Prater, IV
Wesley B. Gilchrist
Brooke G. Malcom
LIGHTFOOT FRANKLIN & WHITE LLC
The Clark Building
400 20th Street North
Birmingham, Alabama 35203-3200
(205) 581-0720
(205) 380-9120 (facsimile)

L. Joseph Loveland (*pro hac vice*)
S. Stewart Haskins (*pro hac vice*)
Zachary A. McEntyre (*pro hac vice*)
KING & SPALDING LLP
1180 Peachtree Street, NE
Atlanta, Georgia 30309
(404) 572-4600
(404) 572-5139 (facsimile)

*Attorneys for Defendant Mozes, Inc.*

/s/ James S. Witcher III
James S. Witcher III
HAND ARENDALL LLC
1200 Park Place Tower
2001 Park Place North
Birmingham, AL 35203
(205) 502-0113
(205) 397-1314 (facsimile)

Henry Pietrkowski (*pro hac vice*)
REED SMITH LLP
10 S. Wacker Dr., 40th Floor
Chicago, IL 60606
(312) 207-3904
(312) 207-6400 (facsimile)

*Attorneys for Defendant ePrize, Inc.*

*Attorneys for Defendant*
*The Coca-Cola Company*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on March 31, 2016, I electronically filed the foregoing **DEFENDANTS MOZES, INC. AND THE COCA-COLA COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF System which will send an electronic notification of such filing to the following counsel of record:

> David L. Selby, II
> John W. Barrett
> Jonathan R. Marshall
> BAILEY & GLASSER, LLP
> One Chase Corporate Center, Suite 400
> Birmingham, Alabama 35244
>
> Ronald A. Marron (*pro hac vice*)
> Alexis M. Wood (*pro hac vice*)
> LAW OFFICES OF RONALD A MARRON
> 651 Arroyo Drive
> San Diego, CA 92103
> 619-696-9006

*/s/ Harlan I. Prater, IV*
OF COUNSEL
