
FILED
2016 Mar-31  PM 07:11
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT 14

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| WESLEY PHILLIPS, individually and on behalf of a class of similarly situated individuals, | |
| Plaintiff, | |
| vs. | No. 2:12-cv-04033-JEO<br>CLASS ACTION |
| MOZES, INC. and THE COCA-COLA COMPANY, and EPRIZE, INC., | |
| Defendants. | |

Now comes Kenneth Sponsler, who declares and states as follows:

**Introduction and Scope of Opinion**

1.     In this case, plaintiff Wesley Phillips has asserted a putative class action against defendants Gerzhom, Inc., f/k/a Mozes, Inc. ("Mozes"), The Coca-Cola Company ("Coca-Cola" or "Coke Zero"), and HelloWorld, Inc. f/k/a ePrize, Inc. ("ePrize") (collectively, "Defendants"), under the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA").  (FAC at ¶¶ 75-81).  Mr. Phillips alleges that Defendants sent him unsolicited text messages using an automated telephone dialing system ("ATDS") during the Alabama vs. LSU football game in Tuscaloosa, Alabama, on November 5, 2011.  (FAC at ¶¶ 36-48).  Mr. Phillips initiated the communication with Defendants by responding to an in-stadium

promotion that encouraged him to text to vote for his favorite team. (FAC at ¶¶ 37-38). The MozesConnect system then sent two text messages, one giving Mr. Phillips the opportunity to sign up for the Coke Zero mobile list and enter a contest to win an autographed football, and the other thanking Mr. Phillips for voting and encouraging him to continue doing so. (Porter Deposition at p. 44, lines 9-13; p. 49, lines 22-24; p. 66, lines 18-24). Mr. Phillips voted two additional times, with the same result. (FAC at Exh. 1). There is no evidence of whether Mr. Phillips actually received all of these messages or in what order he may have received them, but Mr. Phillips did eventually text his date of birth to enter the contest and join the Coke Zero mobile list, either in response to a text message or in response to audio and/or visual promotions in the stadium. (Phillips Deposition at p. 159, lines 4-7 and p. 80, lines 15-17; FAC at ¶ 47). The fact that Mr. Phillips may not have received all of the messages or received them in a different order is relevant because it means Mr. Phillips may have chosen to enter the contest and join the Coke Zero mobile list in response to the first responsive message he received or viewed. *See* Phillips Deposition at p. 177, line 9 to p. 178 line 11 ("I don't actually recall what happened that day. . . . Probably at some point after that third vote I did actually see reply with your date of birth to enter the contest for an autographed football.").

2. I have been engaged to provide opinions regarding:

a.      Whether Mr. Phillips' number was "captured" by the MozesConnect system;

b.      Whether Mr. Phillips voluntarily provided his cell phone number to Defendants in the transmission of his text messages and therefore consented to receive responsive text messages from Defendants;

c.      Whether the guidelines of the Mobile Marketing Association ("MMA") are controlling in the analysis of whether Mr. Phillips consented to receipt of the text messages at issue in this case;

d.      Whether, if the MMA guidelines are in any way relevant, Defendants complied with the guidelines;

e.      Whether the system used to send the text messages contained the components of an ATDS; and

f.      Whether Mr. Phillips has presented evidence of receipt of the relevant text messages that would be considered reliable in the telecommunications industry.

**<u>Relevant Experience</u>**

3.      I am the Vice President and General Manager of CompliancePoint DM, Inc. (CompliancePoint), with offices in Duluth, Georgia.  CompliancePoint is a wholly-owned subsidiary of PossibleNOW, Inc.

4.      I have more than 15 years of operational experience in business-to-

DECLARATION OF REPORT OF KEN SPONSLER

business and business-to-consumer global direct marketing compliance matters, including SMS text compliance. I have personally conducted dozens of onsite compliance assessments, gap analyses, and risk assessment studies of consumer-contact-industry best practices.

5.    My familiarity with direct-to-consumer marketing industry standards began in early 2000. After my transition from 27 years of military service, I worked as a project manager for development of a software product called "The DNCSolution." This product enables sellers and telemarketers to comply with federal and state Do Not Call laws by allowing companies to check calling campaign lists against all federal and state Do Not Call lists, company specific Do Not Call lists, and wireless lists. My work on this project led to my study of federal and state Do Not Call laws as well as exemption criteria. As the "DNCSolution" product evolved to comply with more restrictive state laws, I realized the need for a consultative service, and I started a compliance consulting practice in 2005 to help clients understand how to implement operational processes and technology to comply with the regulatory requirements.

6.    My compliance consulting practice revolves around assisting sellers, service providers, and other related third parties to understand consumer contact standards and regulations and to implement operational procedures to ensure compliance with such standards and regulations. I have developed practices,

systems, and training to ensure such compliance. These include compliance officer training programs, call data compliance audits, call center compliance assessments, and seller-service bureau risk mitigation consulting.

7.     My consulting practice monitors ever-changing federal and state regulatory requirements, as well as civil actions and published materials from industry experts. My years of experience in these matters involve a host of industry verticals such as financial services, insurance, retail, home alarm services, satellite and cable services, tele-services, vacation and cruise lines, lead generation, and the career college industries.

8.     My company is the audit firm of record for the Professional Association for Customer Engagement's (PACE, formerly the American Teleservices Association) Self-Regulatory Organization (PACE-SRO) standards. The PACE-SRO provides the industry with federal and state as well as best practices outbound, inbound, business-to-consumer, and business-to-business operational compliance standards. I assisted in development of these standards and continue to update them as requirements change. Companies that undergo the comprehensive PACE-SRO audit program perform a self-assessment, upload evidentiary compliance documentation into the SRO Web-based tool, and prepare for the audit. CompliancePoint performs the PACE-SRO audit when the company is prepared. Compliance shortfalls revealed during the audit process must be

remediated before CompliancePoint's submission of the SRO audit results for PACE Board of Directors (of which I am a member) consideration and approval. CompliancePoint also performs the required quarterly outbound call audits and re-accreditation events at the three-year mark. The PACE-SRO program establishes industry leading compliance benchmarks and standards.

9.      I have led the development of the Customer Engagement Compliance Professional (CECP) certification program administered by PACE. This is the first personal certification program specifically designed for legal and compliance professionals relative to consumer contact compliance with U.S. federal and state telemarketing, Do Not Call, SMS/text, email, fax and related requirements including Canada's Anti-Spam Legislation (CASL) requirements. The CECP program provides certification candidates with online and hard-copy study materials, a resource guide, regulatory guide, practice examinations, and two days of pre-exam onsite training. CECP certified professionals are trained in the regulatory requirements, operational compliance methods, training, monitoring and enforcement, record-keeping, and audit and other due diligence methods.

10.     I have assisted many clients to implement operational compliance standards in various due diligence areas, including policy and procedure development, training, and other due diligence measures.

11.     I have provided training and instructions related to direct marketing

compliance, including compliance training modules for SMS/text service provider customers.

12.    I provide compliance retainer services for more than five dozen firms, including several Fortune 500 companies. I provided consulting services to government and military organizations implementing U.S. Army modularity design and organizational changes. I have undergone specialized training at the U.S. Army Command Sergeant Major Course (graduated with Honors) and the Advanced Non-Commissioned Officers' Course (Distinguished Graduate). This training represents the highest level of management and leadership studies available to enlisted members of the Army. I retired from the U.S. Military after achieving the highest enlisted rank of U.S. Army Command Sergeant Major, of the 3rd Infantry Division, a 23,400-man elite combat team.

13.    I have been retained as an expert or consultant on various issues relating to SMS/text message marketing. This work has included technical analysis of dialer technology, including whether a dialer may potentially run afoul of the ATDS provisions of the TCPA.

14.    From 2007 to 2014, I published a monthly article included in the PossibleNOW newsletter on compliance-related topics titled "Commentary by Ken Sponsler." This newsletter is widely accepted in the industry as a resource for compliance-related updates and operational analysis. Following are a few of the

pertinent webinars I conducted: *Strategies for Compliance With New TCPA Requirements*, March 2012; *Employment Placement Verification*, February 2012; *2011 Compliance Legislation Review & 2012 Forecast,* January 2012; *2012 Compliance Legislation Review & 2013 Forecast,* January 2013; *2013 Compliance Legislation Review & 2014 Forecast,* January 2014; *2014 Compliance Legislation Review & 2015 Forecast,* January 2015; *Proven Audit & Business Process Techniques for Compliance,* June 2011; *Risk In Admissions & Financial Aid Practices*, October 2010.  I also publish periodic regulatory information charts and monthly regulatory information charts.

15.   I conduct quarterly compliance-related webinar presentations to PossibleNOW and CompliancePoint customers regarding operational compliance subject matter such as compliance with the TCPA rules regarding calls/texts to wireless numbers and trends in the mobile marketplace.

16.   I have been asked to provide presentations and colloquies and am a frequent speaker at industry events, including but not limited to: PACE Annual Convention and Washington Summit, Direct Marketing Association Teleservices Conference, College of Information Assurance Professional's Governance, Risk and Compliance Summit, Noble User's Conference, The Association of Private Sector Colleges and Universities Annual Conference (APSCU), The Customer Engagement Management (CEM) Conference, Dish Network's Annual Retailer

DECLARATION OF REPORT OF KEN SPONSLER

Conference, Campus Management Corporation (CMC) Annual Conference, Life Office Management Association (LOMA), Quarterly Compliance Focused Webinar Presentations, LeadsCon annual conference, the Allied Solutions financial services member conference, and the annual State Do Not Call Law Enforcement Summit.

17. I hold or have held the following registrations, licenses, and certifications: Customer Engagement Compliance Professional (CECP) by the Professional Association for Customer Engagement (PACE), Certified Information Privacy Professional/United States (CIPP/US) by the International Association of Privacy Professionals (IAPP), Certified American Teleservices Association Self-Regulatory Organization Auditor (ATASRO), and Certified Project Management Professional (PMP) by the Project Management Institute (inactive).

18. I have provided expert reports in several TCPA-related matters, including issues related to whether specific systems have the technical attributes that would render them ATDSs.

19. In the last four years, I have been retained to provide deposition testimony as an expert in the following matters: *Manno v. Healthcare Revenue Recovery Group,* Case No. 11-cv-61357 (S.D. Fla.); *United States of America v. DISH Network,* Case No. 3:09-cv-03070 (C.D. Ill.); *Trilegiant Corp. v. Sitel Corp.,* Case No. 1:2009-cv-06492 (S.D.N.Y.); *ADT Security Svcs. v. Security One*

-9-
DECLARATION OF REPORT OF KEN SPONSLER

*International,* Case No. 11-cv-05149 (N.D. Cal.);  *Horton v. Cavalry Portfolio Svcs.,* Case No. 3:13-cv-00307-JAH-WVG (S.D. Cal.);  *Shamann v. Monex Credit Co.,* Arbitration Proceeding JAMS Reg. 1200041941;  *Molnar v. NCO Financial Systems, Inc.,* Case Nos. 3:13-cv-00131 and 3-13-cv-00685 (S.D. Cal.);  *Hooker v. SiriusXM,* Case No. 13-cv-0003 (E.D. Va.);  *True Health Chiropractic, Inc. v. McKesson Corp.,* Case No. 13-cv-02219 (N.D. Cal.); and *Bridge v. Credit One Bank*, Case No. 2:14-cv-01512 (D. Nev.).  I am being compensated at the rate of $500 per hour for my study and analysis in this case, $700 per hour for any deposition testimony in this case, and $1,000 per hour for any trial testimony in this case.

## Documents Reviewed and Assumptions

20.    In forming my opinions, I have reviewed various publicly available documents: the case docket for *Phillips v. Mozes, Inc., et al.*, Case No. 2:12-cv-04033-JEO (N.D. Ala.),  Mr. Phillips' First Amended Complaint (Docket Entry 17, the "FAC"), the Court's Memorandum Opinion and Order dated January 26, 2015 (Docket Entry 63), the 2011 MMA U.S. Consumer Best Practices (Bates No. MOZ_00049-MOZ_00213, the "2011 MMA Guidelines"), and the 2012 MMA U.S. Consumer Best Practices for Messaging (Bates No. MOZ_00977-MOZ_01022, the "2012 MMA Guidelines").  I also reviewed the following documents made available to me by Defendants: the Declaration of Randall A.

Snyder in this case dated October 13, 2015, with all exhibits ("Snyder Declaration"), the Deposition of Wesley Phillips in this case dated August 26, 2015, with all exhibits ("Phillips Deposition"), the Deposition of Kelly Lyemance (Rule 30(b)(6) representative for Coca-Cola) dated September 28, 2015, with all exhibits ("Lyemance Deposition"), the Deposition of Dorrian Porter (Rule 30(b)(6) representative for Mozes) dated October 8, 2015, with all exhibits ("Porter Deposition"), the Deposition of Randall A. Snyder dated December 8, 2015, with all exhibits ("Snyder Deposition"), and the written discovery responses of all parties in the case.  I also spoke to former Mozes Lead Engineer Jason Tokoph regarding the MozesConnect system.  A declaration from Mr. Tokoph addressing the information we discussed is attached as **Exhibit A** ("Tokoph Declaration").  I also spoke to former Mozes CEO Dorrian Porter.  A declaration from Mr. Porter addressing the information we discussed is attached as **Exhibit B** ("Porter Declaration").

21.    I stay current with industry developments — including technology and compliance — and this has also informed my opinions.

22.    I understand that the TCPA defines an "automatic telephone dialing system" as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."  47 U.S.C. § 227(a)(1).

DECLARATION OF REPORT OF KEN SPONSLER

23.     For purposes of forming my opinions, I have assumed that "prior express consent," as that term is used within sections 227(b)(1)(A) and 227(b)(1)(B) of the TCPA, has the following meaning, as explained by the FCC: "Persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary.  Hence, telemarketers will not violate our rules by calling a number which was provided as one at which the called party wishes to be reached.   However, if a caller's number is 'captured' by a Caller ID or an ANI device without notice to the residential telephone subscriber, the caller cannot be considered to have given an invitation or permission to receive autodialer or prerecorded voice message calls.  Therefore, calls may be placed to 'captured' numbers only if such calls fall under the existing exemptions to the restrictions on autodialer and prerecorded message calls."  *See* 7 F.C.C. Rcd. 8752, 8769 at ¶ 31.

## **Statement of Opinions**

24.     **Conclusion No. 1:**  Mr. Phillips' cellular telephone number was not "captured" by the MozesConnect system.

a.     My understanding is that Mr. Phillips has taken the position that Defendants "captured" his telephone number (*i.e.* took his telephone number from him against his will).  This is not correct.

---

DECLARATION OF REPORT OF KEN SPONSLER

b.     Any individual who sends a text message voluntarily provides his or her telephone number along with the text message.

c.     Text messages are not "calls" in the traditional sense of a voice call in that the two parties are not connected to engage in real-time communication with one another.  Rather, each consumer-initiated message is sent as part of a self-contained "envelope" of data.  That envelope contains the sender's telephone number.  This is acknowledged by Mr. Snyder in his declaration.  *See* Snyder Declaration at ¶ 56 ("For each message sent or received by a cellular subscriber, the record contains the calling party number. . . .").  I am unaware of any SMS/text campaigns that have required the consumer who initiates or responds to text-based communications to include their telephone number within the text of the outgoing text message.

d.     The MozesConnect system in this case was set up to respond to consumer-initiated inbound text messages.  (Exh. A at ¶ 7).  Responding to a text message is not analogous to capturing a voice caller's number through caller ID and then calling the original caller back based solely on conveyance of the number through caller ID.  Voice calls and text messages are fundamentally different technologies with different user expectations.

---

DECLARATION OF REPORT OF KEN SPONSLER

e.     While the FCC stated in its 1992 order that a caller cannot be deemed to have given permission to receive autodialed calls if his or her number "is 'captured' by a Caller ID or an ANI device without notice to the residential telephone subscriber," 7 F.C.C. Rcd. 8752, 8769 at ¶ 31, that is not what happens when someone sends a text message.  As explained above, a phone number is necessarily embedded within the data envelope of each text message.  It would be a misnomer to say that a phone number contained within a text message is "captured by a Caller ID or ANI device" because that technology applies to voice calls only.  Indeed, blocking a number from display via Caller ID or the Caller Name (CNAM) database on voice calls does *not* block a number from transmission to the receiver via text.  Likewise, it is not correct to characterize a telephone number contained within a text message as having been acquired "without notice to the residential telephone subscriber." 7 F.C.C. Rcd. 8752, 8769 at ¶ 31. Cell phone users reasonably know and expect that their phone numbers are being transmitted along with the text message and that they may receive a responsive text as a result.

f.     My conclusion is that Mr. Phillips' number was not "captured" by the MozesConnect system.  Phillips' voluntary conveyance of the number in the code packet that comprised his texts amounted to volitional provision

DECLARATION OF REPORT OF KEN SPONSLER

of the number by Phillips (repeatedly), not a "capture" of the number by Defendants. This is quite simply the manner in which all SMS/text communications protocols work, and consumer expectations are commensurate with this fact.

25.    **Conclusion No. 2:** Mr. Phillips provided his cellular telephone number to Defendants when he initiated the text message exchange in this case. (*See* Phillips Deposition at p. 133, lines 19-23) (acknowledging that Mr. Phillips sent the first message in the exchange). In the telecommunications industry, this is generally regarded as providing consent to receive text messages at that number until the user expresses instructions to the contrary. *See also* 7 F.C.C. Rcd. 8752, 8769 at ¶ 31.

a.    In my experience, consumers expect that sending a text message conveys the telephone number of the sender to the person receiving the text message. If this did not occur, the recipient would not know whom the message came from and consumers would have no idea whether sent messages were received. Sending a text message without including the number in the "envelope" would be equivalent to sending an anonymous, unsigned note in the mail without a return address.

b.    In his deposition, Mr. Phillips suggested that his cell phone number may not have been conveyed as part of his initial text message

because he had a "blocking service" on his phone.  (Phillips Deposition at p. 39, lines 9-15).  But as explained above, blocking a number from display via caller ID or the Caller Name (CNAM) database on voice calls does not block a number from transmission to the receiver via text.

c.      There is no question in this case that Mr. Phillips initiated the text message communication with Defendants on November 5, 2011.  (*See* Phillips Deposition at p. 133, lines 19-23 (acknowledging that Mr. Phillips sent the first message in the exchange); FAC at ¶ 38).  The messages sent by Defendants on November 5, 2011, were only sent as responses to messages received from Mr. Phillips.   (Porter Declaration at p. 44, lines 9-13).  Accordingly, it is my conclusion that Mr. Phillips provided his number to Defendants voluntarily by virtue of his initiation of the text communication and Mr. Phillips consented to receive messages from Defendants.

26.      **Conclusion No. 3:** The MMA guidelines do not control whether Mr. Phillips consented to receipt of the text messages at issue in this case.

a.      In asserting that Mr. Phillips did not consent to receive "additional text messages" from Defendants, Mr. Snyder relies extensively on the MMA guidelines.  *See* Snyder Declaration at ¶¶ 41, 44-46.

b.      The MMA guidelines have never had the force of law.  They are a guide used by mobile messaging service providers, aggregators, and

carriers to foster self-regulation and avoid and/or minimize government regulation.   A violation of the MMA guidelines does not equate to a violation of the TCPA, and a violation of the TCPA does not equate to a violation of the MMA guidelines.

c.     My conclusion, therefore, is that the MMA guidelines do not control whether Mr. Phillips consented to receive texts from Defendants.

27.    **Conclusion No. 4:**  Even if the MMA guidelines were in any way relevant, Defendants' actions were consistent with the evolving guidelines and standard industry practice.

a.     Based on my review of the MMA guidelines over time and my experience in the industry, I believe the MMA guidelines have always been intended to be a living, breathing set of suggestions for the industry to follow based on evolving technologies and evolving consumer expectations.

b.     The MMA guidelines published on March 1, 2011, approved of sending a single text message in response to a text message from a consumer.  (MOZ_00059).

c.     By November 5, 2011, it had become a regular practice of SMS/text technology users and service providers to split that single message into two messages sent simultaneously in response to a consumer text

---

DECLARATION OF REPORT OF KEN SPONSLER

because of the character limitations on text messages and in the interests of clarity.   *See, e.g.,* Exh. B at ¶¶ 8-9.

d.     In response to Mr. Phillips' "BAMA" texts, Coke Zero mobile service provider Mozes transmitted two simultaneous text transmissions. (Porter Deposition at p. 66, lines 18-24; Exh. A at ¶¶ 7, 9; Exh. B at ¶¶ 5-6). These messages thanked the voter for his or her vote, encouraged the voter to keep voting, and asked the voter to enter his or her date of birth to win a free football and to join the Coke Zero mobile list.  (Exh. A at ¶ 7; Exh. B at ¶ 5).  The two responsive text messages could not have feasibly and legibly been combined into a single message because of SMS character limitations. (Exh. A at ¶ 8; Exh. B at ¶ 6).  The two messages were a single responsive message, broken into two because of the character limitations and to make the information easier to understand by consumers.  (Exh. A at ¶ 8; Exh. B at ¶ 6).

e.     As of November 5, 2011, the character limit for a single text message was (and remains) 160 characters.   The two messages at issue here require 203 characters if combined.  (Exh. B at ¶ 7).  The MozesConnect system was configured so that responsive messages longer than 160 characters could not be entered into the system.  (Exh. B at ¶ 8).  Because each campaign was unique, Mozes worked with its customers to determine

DECLARATION OF REPORT OF KEN SPONSLER

the best way to legibly convey the full responsive message. (Exh. B at ¶ 8). Sometimes that required breaking the single responsive message into two text messages. (Exh. B at ¶ 8). Additionally, while the Defendants could have considered construction of a single message with abbreviated text, this can produce undesirable results. There is no universal "dictionary" of accepted abbreviations that could be relied upon to convey the intended message correctly and clearly.

      f.     Recognizing what had become an industry standard, the MMA guidelines were revised in 2012 to provide for "one or two" text messages in response to a text message from a consumer. (MOZ_00983). That change merely set forth what already had become an accepted and often necessary practice — one that was viewed as being beneficial to the consumer.

      g.     Moreover, even if the MMA guidelines are relevant, Defendants' conduct in sending two simultaneous text transmissions was consistent with the MMA guidelines and the generally accepted industry practice as of November 5, 2011.

      h.     Mr. Snyder incorrectly suggests that these two messages, sent simultaneously, were separate and distinct messages. *See* Snyder Declaration at ¶ 42 ("[A]fter receiving this single confirmatory text message call, the Plaintiff received an additional unexpected and unsolicited

telemarketing text message call on his cellular phone."). This analysis is misleading and flawed. First, Mr. Snyder makes no mention of the fact that the two text messages were actually part of the same message, sent simultaneously in response to Mr. Phillips' text message. (Exh. B at ¶¶ 5-6). Mr. Snyder may not have been aware of this distinction, however, because he never reviewed the Porter Deposition in which the MozesConnect system was explained. *See* Snyder Declaration at ¶ 3 (listing items relied upon by Mr. Snyder); Porter Deposition at p. 66, lines 18-24. But even without this critical information, the text message flows (*see* Exhibit 48 to Snyder Deposition) demonstrate that the messages were sent simultaneously (Mr. Snyder acknowledged this possibility in his deposition, *see* Snyder Deposition at p. 83, lines 1-9). Moreover, no further messages were sent until another text was received from Mr. Phillips. Thus, there are no facts to support Mr. Snyder's conclusion that the system used here would subject consumers to "continual" text messages after a single vote. (Snyder Declaration at ¶¶ 75-78). The two text messages in this case constituted a single responsive message delivered simultaneously in two parts. The MMA expressly approved of that practice in 2012. Moreover, Mr. Snyder's conclusion that Plaintiff "received" these messages in the order sent (or at all) is unsupported by the facts, as set forth at Paragraph 29, *infra*.

i.   My conclusion therefore is that Defendants' actions were consistent with the guidelines and standard industry practice.

28.   **Conclusion No. 5:**   The SMS delivery technology used by the Defendants in this case did not have the components of an ATDS.

a.   In relevant part, Mr. Snyder opines that "the equipment used by the Defendants to operate automated mobile text message campaigns qualifies as an ATDS."  (Snyder Declaration at ¶ 91).

b.   Based on my understanding of the TCPA, I believe that a system must have the capacity to operate as a random number generator or a sequential number generator and to dial such numbers in order to be an ATDS.  47 U.S.C. § 227(a)(1).

c.   My understanding of a random number generator is a system that produces random numbers to be called.  There is no rhyme or reason to the order of the numbers.  The systems generate numbers much like numbers are generated in a PowerBall lottery.  As it existed on November 5, 2011, the MozesConnect system was not a random number generator under the TCPA and did not have the capacity to produce numbers to be called through a random number generator.  (Exh. A at ¶ 11).

d.   My understanding of a sequential number generator is a system that produces numbers in numerical sequence, such as follows: 1-111-111-

1111, 1-111-111-1112, 1-111-111-1113, etc.  As it existed on November 5, 2011, the MozesConnect system was not a sequential number generator and did not have the capacity to be a sequential number generator of numbers to be called.  (Exh. A at ¶ 12).

e.      In my experience, an assessment of how the dialer technology was used as well as its functional capacity is required before a conclusion about whether an ATDS was used can be definitively made.   This is especially true of SMS/text delivery technology.  My own review of SMS delivery technologies reveals that some may not meet the ATDS definition because they do not send texts except in response to consumer initiated texts and do not "store," "produce," or "dial telephone numbers."   In this case, although Mr. Snyder claims to have analyzed "the Mozes mobile marketing system" (Snyder Declaration at ¶ 90), he did not review the Porter Deposition that explained how the system worked or attempt to obtain information from Mozes' former lead engineer Jason Tokoph.  (Snyder Deposition at p. 13, line 6 to p. 23, line 17).

f.      Modern dialing technology is designed to facilitate live voice or recorded message communications to the intended recipient of the telephone call. A dialing system may provide users with dialing attributes to support variable consumer contact strategies. The general dialing modes are

provided below although specific functionality may vary between manufactures.  In call centers there are several dialing modes depending on how the call is placed.  "Manual Dialing" refers to calls that are placed manually by an agent.

g.     There are generally four different dialing modes depending on how the dialer software selects the consumers who are going to be called and starts making the calls.  Dialing systems can place calls using preview, power (or progressive), predictive dialing and IVR. The dialing modes are defined according to the campaign and type of business.

1.     Preview Dialing

Preview dialing enables agents to first view the available information about the customer and decide when or whether to place the call.  In addition to the information about the customer, agents may also view all the history of the customer with the contact center.  After viewing the information about the customer, the agent requests the system to make the call usually by clicking a dial icon or a hyperlinked telephone number. For example, preview dialing is useful in debt collection campaigns to allow agents to view information about the customer and define a strategy before starting to talk to the customer. The system may delivers preview calls to agents

automatically or the agent may be required to manually retrieve the next customer record.

2. Power Dialing

Also called progressive dialing, power dialing places calls only when an agent is available to handle the call. Power dialing reduces the likelihood of abandoning a connected telephone call (consumer answers the phone but no agent is connected within 2 seconds of the called party's greeting). In power dialing, an agent is always available to talk to the customer. Power dialing may be suitable for all campaigns, from customer care follow-up calls to telemarketing.

3. Predictive Dialing

Predictive dialing is a state-of-the-art pacing mode used to call a large number of customers within a short period of time. Predictive dialing optimizes the time of agents by reducing the idle times between connected calls and freeing agents from dialing calls. Predictive dialing gathers statistics concerning the duration of calls, how long it takes for calls to be answered, and how often are calls answered. When an agent is about to become idle, the system places several calls. Predictive dialing campaigns can achieve agent productivity of 50 minutes per hour and abandoned calls of 3% or less. The system is continually updating predictive dialing

probabilities and monitoring abandonment rates for performance and compliance with legislation.  For example, predictive dialing is useful in sales campaigns to call a large number of contacts and maximizing the working time of agents.  The performance of predictive dialing takes into consideration the accuracy of the contact lists and the policies on nuisance calls. If the contact list is poor, the performance of the predictive dialing campaign is at risk as agents are not connected to live contacts and are not able to do business.

4.      Power IVR

Power IVR is used to deliver a pre-recorded message to a large call list.  When a call is answered, Power IVR will play the audio file, and then collect touch tone key responses or speech command at the end of the message, and then transfer the call to an agent or remove the caller from the call list.  In other words IVR is a technology that allows a computer to interact with humans though the use of voice and tones input via keypad.

All of the above dialer modes were created and are operated to maximize the efficiency of connecting live agents or recorded messages to consumers.  If the called party does not answer the ringing telephone the "conversation" cannot take place.  Some called parties may use a voicemail or answering machine service but in my experience, callers (particularly

DECLARATION OF REPORT OF KEN SPONSLER

telemarketers) rarely leave messages as the ultimate goal is a direct conversation.

      h.    SMS/text delivery systems and in particular the MozesConnect system as it operated during the relevant period associated with this case function in a vastly different way and for a different purpose than voice or recorded message call autodialers.  SMS/text delivery systems do not employ agents or prerecorded or IVR technologies.  There is no concern about agent productivity by keeping them busy with calls. Text delivery mechanisms do not possess variable dialing options and in fact, do not technically "dial" telephone numbers.  Texting campaigns are not concerned with whether or not an agent is available to "speak" with the recipient of the message in real-time.  Unlike call technology where telemarketers rarely leave a message, every text is delivered as a "textual" message that the recipient can choose to respond to or not at a time convenient to him or her. There is no need to "answer" the telephone when it rings (text messages do not cause the recipient's telephone to ring) to determine the purpose of the call.  Unlike typical outbound calling campaigns that are calling party initiated, the MozesConnect system as used in this case responded ONLY to text communications first initiated by the consumer.  Therefore, responsive text messages were anticipated and even expected.

i. SMS technology's purpose and function are vastly different from traditional dialing systems used today in contact center operations. The major difference is that traditional dialing technology is designed to facilitate the telephone or pre-recorded message contact of consumers to deliver a scripted sales or service message. Typical dialing technology facilitates the uploading of a "campaign" list of numbers to be dialed. When used in "predictive dial mode," the technology "predicts" when agents will become available. The system is capable of determining how many numbers to dial to make "X" percentage of live connects in conjunction with anticipated agent availability. The system maximizes cost per sale efficiencies by keeping agents busy with sales calls. The downside of the technology is the likelihood of abandoning calls (connecting to a live person but not having an agent available within two seconds of the called person's greeting). This fact is one of the primary reasons for ATDS restrictions. SMS delivery technology can never "abandon" a call and technically does not place a "call."

j. Typical SMS delivery technology functions in a much different manner and for a different purpose than a traditional dialing technology. The SMS technology I have assessed does not "dial" telephone numbers.

Instead, SMS delivery technology typically sends a self-contained "envelope" of data (code) associated with each message.

k.      The envelopes of data contain code that identifies which wireless provider the message and instructions must be delivered to.  The technology facilitates communications with each of these carriers using their unique code set.  Again the technology does not dial numbers; it delivers the envelopes to one of the wireless providers, which in turn delivers the ultimate SMS to the intended recipient in accordance with the instructions contained in the code set.  The envelope may contain instructions regarding receipt delivery, how long to attempt delivery, billing information, and so on.

l.       On November 5, 2011, the MozesConnect system functioned as a peer-to-peer communication system, transmitting texts out only when texts from attendees of the Alabama v. LSU game were initiated by consumers. (Porter Deposition at p. 38, line 11 to p. 39, line 12; Exh. A at ¶ 14).  As such, I would not characterize that system as a traditional dialing system or as an ATDS.  Rather, the system was "peer-to-peer," sending responsive texts only as a result of actions taken by cellular users.  To that end, it was materially different from a typical autodialer.  Unlike voice call autodialers,

DECLARATION OF REPORT OF KEN SPONSLER

the MozesConnect system did not initiate texts to an uploaded "list" of consumers.

m.      The MozesConnect system did not "store or produce telephone numbers to be called" because the texts transmitted out by the MozesConnect system on November 5, 2011, were merely responsive to the texts initiated and transmitted in by Mr. Phillips.  (Exh. A at ¶ 14).  The MozesConnect system did not transmit messages out to Mr. Phillips from a pre-existing database of numbers.   (Exh. A at ¶ 14).   Nor did the MozesConnect system produce any numbers to transmit texts out to Mr. Phillips.  (Exh. A at ¶ 14).  The MozesConnect system merely responded to texts transmitted by Mr. Phillips on November 5, 2011.  (Exh. A at ¶ 14).

n.      Neither did the MozesConnect system that transmitted out two simultaneous responsive texts to each "Bama" vote by Mr. Phillips on November 5, 2011, have the capacity to "store or produce telephone numbers to be called, using a random or sequential number generator."

o.      Moreover, on November 5, 2011, the MozesConnect system did not "dial" Mr. Phillips' number, but rather transmitted the relevant data through an envelope as described above.

p.      Finally, Mr. Snyder concludes that because the messages at issue were sent to a large audience and in rapid succession, they "must have

been sent by automated computer equipment and without human intervention." (Snyder Declaration at ¶ 85). This is an inappropriately narrow view of the significant human intervention required to receive responsive text messages in this case.

q.     The text messages were initiated in response to the original messages from Mr. Phillips. If Mr. Phillips had not sent text messages, no text messages would have been transmitted back to him. His direct human interaction was necessary for the text messages at issue to be sent. Unlike campaigns that "dial" telephone numbers from an uploaded campaign list, the Mozes system only transmitted out responsive text messages to Mr. Phillips on November 5, 2011. Had Mr. Phillips not initiated the communications, responsive texts would not have been transmitted to him by MozesConnect.

r.     The MozesConnect system on November 5, 2011, was materially different from a traditional autodialer. It also did not have the capacity to randomly or sequentially produce or dial telephone numbers to be called, did not "dial" telephone numbers at all, and was not "automatic" because human intervention was required to facilitate the transmission. My conclusion is that the SMS transmission technology used in this case on

DECLARATION OF REPORT OF KEN SPONSLER

November 5, 2011, did not have the components of an ATDS under the TCPA definition and thus was not an ATDS.

29.     **Conclusion No. 6:** There is no evidence that would be relied on in the telecommunications industry to demonstrate that Mr. Phillips received any text messages.

      a.     Mr. Phillips' claim is based on the alleged receipt of text messages.  (FAC at ¶¶ 75-81).  But based on my review of the record and my experience in the industry, Mr. Phillips has presented no evidence of receipt that would be considered reliable in the telecommunications industry.

      b.     Mr. Phillips testified in his deposition that he did not remember having received any Coke Zero text messages on November 5, 2011: "A. You're asking me do I personally recall actually receiving these texts?  Q. Yes. A. No, I do not."  (Phillips Deposition at p. 159, lines 4-7).

      c.     In an August 8, 2012 letter to Mozes, Mr. Phillips complained only about a text message received on December 5, 2011.  (Exh. 49 to Snyder Deposition at MOZ_00339).  That letter attached a screen shot of Mr. Phillips' cellular telephone displaying the December 5, 2011 message, which appears to be reliable evidence of receipt.  (Exh. 49 to Snyder Deposition at MOZ_00340).

d.    My understanding is that Mr. Phillips is not asserting a claim with respect to the December 5, 2011 message, but rather is proceeding solely on the messages sent on November 5, 2011.

e.    The text message flow attached as Exhibit 1 to the First Amended Complaint reflects transmission out from MozesConnect, not receipt by Mr. Phillips.  (FAC at Exh. 1).

f.    The only evidence I am aware of that would reflect the fact and timing of any Coke Zero text message receipt by Mr. Phillips on November 5, 2011, would be his cell phone at that time (an HTC cell phone).  Mr. Snyder admits this.  *See* Snyder Deposition at p. 93, lines 14-17 ("Q. Other than his cell phone, can you think of anything else that might reflect the actual time of receipt of the messages at issue in this case? A. No."); Snyder Deposition at p. 99, lines 2-10 ("[Q.] All you have looked at is information related to transmission out of those messages, not information related to his actual receipt of those messages, correct? . . . THE WITNESS: Yes.").  But Mr. Phillips no longer has that phone — in his deposition, he testified that "the HTC's destroyed.  I mean, it's been traded in two years ago, so the HTC's gone." (Phillips Deposition at p. 80, lines 15-17).

g.    Based on my experience in the telecommunications industry and my review of the facts and circumstances in this case, there are many

things that could have interfered with receipt of text messages by attendees of the Alabama vs. LSU game, including, but not limited to, MozesConnect system queuing and load limitations, limitations on transmission capacity of the aggregator,[1] limitations on transmission capacity of the carrier, limitations on cell tower capacity on game day, and limitations of cell phone reception in the football stadium.  It is therefore entirely possible that Mr. Phillips never received some or all of the text messages sent by Defendants, and I have seen no evidence in this case to prove receipt of the text messages at issue in this case.  It is also possible that Phillips received some or all of the text messages, but not in the order that he claims he received them.

**Conclusion**

30.    Based on my experience and my review of the materials referenced above, I have reached the following conclusions with respect to the issues I was engaged to address:

a.    Mr. Phillips' cellular telephone number was not  "captured by the MozesConnect system.

b.    Mr. Phillips provided his cellular telephone number to Defendants when he initiated the text message exchange in this case and

---

[1] An aggregator is a company that connects application and content providers with mobile carriers.  The aggregator provides message traffic through multiple wireless operators, provides mobile initiative campaign oversight and administration, and provides billing services.

therefore consented to receive text messages at that number until he instructed otherwise.

c.      The MMA guidelines do not control whether Mr. Phillips consented to receive a text message.

d.      Even if the MMA guidelines were in any way relevant, Defendants' actions were consistent with the evolving guidelines and standard industry practice.

e.      The SMS delivery technology used by Defendants in this case on November 5, 2011, did not contain the components of an ATDS and thus was not an ATDS under the TCPA.

f.      There is no evidence that would be relied on in the telecommunications industry to demonstrate that Mr. Phillips received the November 5, 2011 text messages at issue in this case (or if he did receive any of them, which ones he received or the order in which he received them).

Dated: January 29, 2016

_____
Ken Sponsler