FILED
2016 Jun-17  PM 03:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **WESLEY PHILLIPS, individually and** ) <br> **on behalf of similarly situated individuals,** ) <br> ) <br> **Plaintiff,** ) <br> ) <br> **v.** ) <br> ) <br> **MOZES, INC. and** ) <br> **THE COCA-COLA COMPANY, and** ) <br> **ePRIZE, INC.** ) <br> ) <br> **Defendants.** ) | **Civil Action No. 2:12-cv-04033-JEO** <br> **CLASS ACTION** |

## DECLARATION OF RANDALL A. SNYDER

I, Randall A. Snyder, hereby declare as follows:

1.      My name is Randall A. Snyder. I am an adult over the age of 18 and a resident of the state of Nevada. I have personal knowledge of each of the matters stated herein, and if called to testify I could and would testify competently about them.

2.      I am an independent telecommunications technology consultant and reside at 8113 Bay Pines Avenue, Las Vegas, Nevada, 89128. I have been retained by Bailey & Glasser LLP in the matter *Phillips v. Mozes, Inc. et al.*, 2:12-cv-04033-JEO (N.D. Ala.) to provide my expert opinions relating to technology described within the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* ("TCPA") and the claims by Plaintiff that Defendants employ an Automatic Telephone Dialing System ("ATDS") as defined in the TCPA. In particular, I have been asked to determine whether Defendants operated equipment which has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator, or from a list or database of numbers, and whether Defendant

operated equipment which has the capacity to dial telephone numbers without human intervention.

3.      My opinions in this declaration are based on my knowledge, education, experience, expertise, training and my review of the following documents in this case: First Amended Complaint (February 27, 2013); Defendant The Coca-Cola Company's Answer and Defenses to Plaintiff's First Amended Complaint (March 22, 2013); Defendant Gerzhom Inc.'s Answer to First Amended Complaint (March 22, 2013); Defendants Gerzhom, Inc. and The Coca-Cola Company's Motion to Dismiss Plaintiff's First Amended Complaint and Incorporated Memorandum of Law (March 22, 2013); Plaintiff's Memorandum in Opposition to Defendants' Motions to Dismiss (April 15, 2013); Memorandum Opinion and Order (January 26, 2015); Defendant ePrize, Inc.'s Answers and Affirmative Defenses to Plaintiff's First Amended Complaint (February 9, 2015); Plaintiff's Requests for Production of Documents to Defendant Mozes, Inc., Set One (March 16, 2015); Plaintiff's Interrogatories to Defendant Mozes, Inc., Set One (March 16, 2015); Plaintiff's Requests for Production of Documents to Defendant ePrize, Inc., Set One (March 16, 2015); Plaintiff's Interrogatories to Defendant ePrize, Inc., Set One (March 16, 2015); Plaintiff's Requests for Production of Documents to Defendant The Coca-Cola Company, Set One (March 16, 2015); Plaintiff's Interrogatories to Defendant The Coca-Cola Company, Set One (March 16, 2015); Defendant The Coca-Cola Company's Responses to Plaintiff's Requests for Production of Documents, Set One (April 20, 2015); Defendant The Coca-Cola Company's Responses to Plaintiff's Interrogatories, Set One (April 20, 2015); Defendant ePrize's Answers and Objections to Plaintiff's Interrogatories (April 20, 2015); Defendant ePrize's Responses and Objections to Plaintiff's Requests for Production of Documents (April 20, 2015); Defendants

Gerzhom, Inc.'s Answers to Plaintiff's Interrogatories to Defendant Mozes, Inc., Set One (April 20, 2015); Responses and Objections to Plaintiff's Requests for Production of Documents to Defendant Mozes, Inc., Set One (April 20, 2015); Asset Purchase Agreement among ePrize, Inc., Mozes, Inc., and the Stockholders Named Herein (Bates Nos. EPRIZE 00001 – EPRIZE 00011); email from Jason Tokoph to Aaron Clark providing the text message records regarding cellular telephone number (205) 337-6148 (Bates Nos. MOZ_00308 – MOZ_00310); Mobile Marketing Association, U.S. Consumer Best Practices for Messaging, Version 6.0 (dated March 1, 2011) (Bates Nos. MOZ_00049 – MOZ_00213); Mobile Marketing Association, Global Code of Conduct (dated July 15, 2008); the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* ("TCPA") and regulations promulgated thereunder; the Federal Communications Commission's ("FCC") Report and Order in the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 dated October 16, 1992; the FCC's Report and Order in the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 dated July 3, 2003; the FCC's Declaratory Ruling in the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 Request of ACA International for Clarification and Declaratory Ruling dated January 4, 2008; the Appeal from the United States District Court for the Northern District of California, No. 07-16356, D.C. No. CV-06-02893-CW Opinion, filed June 19, 2009; the FCC's Report and Order in the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 dated February 15, 2012; the FCC's Notice of Proposed Rulemaking in the Matter of the Middle Class Tax Relief and Job Creation Act of 2012, Establishment of a Public Safety Answering Point Do-Not-Call Registry dated May 22, 2012; the FCC's Declaratory Ruling

in the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, SoundBite Communications, Inc. Petition for Expedited Declaratory Ruling dated November 29, 2012; and the FCC's Declaratory Ruling in the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 dated July 10, 2015.

4.     I have over 30 years of experience in telecommunications network and system architecture, engineering, design and technology. I am an expert in the fields of both wireline and wireless telecommunications networking technology. I have been retained as a testifying or consulting expert in over 100 cases regarding cellular telecommunications technology, including over 60 cases regarding Short Message Service ("SMS") technology and over 70 cases regarding the TCPA and associated regulations. In addition, I have been retained as an expert by both plaintiffs and defendants in cases regarding the TCPA.

5.     I have taught many classes and seminars on both wireline and wireless telecommunication network technologies and have been a panelist and speaker at numerous conferences at the Institute of Electrical and Electronics Engineers ("IEEE"), the Personal Communication Society ("PCS"), and the Cellular Telecommunications and Internet Association ("CTIA") as an expert in telecommunication networks. I spent seven years developing standards within the American National Standards Institute's subsidiary organization, the Telecommunications Industry Association ("TIA"), providing technical contributions and authoring and editing telecommunications proposed standards documents. Most notably, I authored and oversaw the standardization of Interim Standard 93, providing interconnection technology between wireline and wireless networks, which is a fully accredited national standard of the American National Standards Institute ("ANSI").

6.        I am the co-author of the McGraw-Hill books "Mobile Telecommunications Networking with IS-41," and "Wireless Telecommunications Networking with ANSI-41, 2nd edition" published in 1997 and 2001, respectively. I have been issued 26 patents myself on telecommunications networking technology and currently have five additional published patents pending. I have also authored several articles on telecommunications technology and have been quoted numerous times in industry trade publications. I have been hired as a consultant by the CTIA, as well as by many wireline and wireless telecommunications companies, including Bell Laboratories, McCaw Cellular, AirTouch, AirTouch International, AT&T Wireless, AT&T Mobility, Lucent, Nokia, Ericsson, Motorola, Samsung, Siemens, Nextwave, MCI, Daewoo, Globalstar, T-Mobile, Sprint, U.S. Cellular, Teleglobe Canada, Teledesic and other telecommunications technology vendors and service providers. I was also nominated in 2006 for a National Television Arts Emmy Award for Outstanding Achievement in Advanced Media Technology for unique wireless content distribution technology I designed while employed at Entriq, Inc.

7.        In addition, in 2002, I was co-founder of m-Qube, Inc., one of the first text message-based mobile marketing companies in North America (now known as Mobile Messenger, Inc.). m-Qube founded and established the Mobile Marketing Association (see http://www.mmaglobal.com) which subsequently established the technology and methodology for the use of text message based short codes as well as mobile marketing guidelines and rules within North America.

8.        Moreover, I have been issued ten patents on SMS technology, including the invention of short code technology, and my books have been cited in four additional issued patents on SMS technology. Still more detail, as well as details of publications that I

-5-

have authored or co-authored within at least the past 10 years, are provided in my attached *curriculum vitae* (a true and correct copy of which is attached hereto as Exhibit A) along with a list of cases where I served as a testifying or consulting expert and my standard rate sheet. I am being compensated at the rate of $450 per hour for my study, analysis and testimony in this case.

## **INTRODUCTION**

9.      The TCPA prohibits unsolicited voice and text calls to cellular telephone numbers using an "automatic telephone dialing system" ("ATDS"), which the statute defines as "equipment which has the capacity – (i) to store or produce telephone numbers to be called, using a random or sequential number generator; and (ii) to dial such numbers." Additionally, it is my understanding that the Federal Communications Commission ("FCC") has issued further regulations that also define an ATDS as including the capacity to dial telephone numbers from a provided list or database of telephone numbers without human intervention.

10.      The FCC has held that prohibitions under the TCPA apply equally to both voice calls and SMS text message calls to cellular telephone numbers. *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* CG Docket No. 02-278, February 15, 2012. Furthermore, the FCC has held that prohibitions under the TCPA apply to equipment that store and dial lists of telephone numbers as well as random or sequentially generated numbers. *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* CG Docket No. 02-278, January 4, 2008. In addition, the FCC recently affirmed this interpretation in *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* CG Docket No. 02-278, WC Docket No. 07-

135, July 10, 2015.

11.     Based on my review of the relevant documents and the facts described above, it is my opinion that the text messages sent to the Plaintiff were sent using an ATDS as defined within the TCPA. I base this opinion on the evidence I have reviewed.

**INDUSTRY BACKGROUND**

12.     The use of Short Message Service, more commonly known as "text messaging" in the U.S., has become ever-present. SMS is a communications system and method that was designed to enable an individual cellular telephone subscriber to send, or originate, a short text message communication (typically no more than 160 characters) from his or her cellular telephone to another individual subscriber's cellular telephone that is the intended destination of the message, *i.e.*, the message recipient. SMS text messages are sent individually from one subscriber to another using a cellular telephone number as the destination address of the message. The message sender's cellular telephone number is automatically sent as part of the message and captured at the destination cellular telephone where the message is received. The message sender does not provide his/hers cellular telephone number to the intended message recipient; rather, it is delivered as part of the telecommunications *signaling* protocol. Signaling is simply the process of sending signals or signaling information throughout a telecommunications network. Electronic signals are special information used to control and operate the communications and components of the network.

13.     The SMS electronic telecommunications signaling protocol automatically appends the message sender's cellular telephone number to the message when it is transmitted—the sender simply performs the act of sending the message to an intended

recipient and the originating cellular number is preserved within the overall text message protocol information sent to the destination.

14.     This mechanism is completely analogous to, and essentially the same as, the way "Caller ID" operates for voice calls. The telecommunications carrier networks always send the calling party's (*i.e.*, the party originating the call) telephone number as signaling data when a call is connected, thereby enabling the called party (*i.e.*, the party receiving the call) to obtain and capture the telephone number of the calling party.

15.     Over the past several years many companies have emerged that provide what is known as value-added text messaging services using SMS technology, meaning that they provide a variety of text messaging services (*i.e.*, SMS) that are not strictly peer-to-peer in the sense of subscriber-to-subscriber manual communications; rather, these companies use automated computer equipment to send and receive text messages using SMS to and from individual cellular telephone subscribers. These "mobile marketing" companies are external entities to the cellular network carriers.

16.     Mobile marketing companies are typically in the business of creating and operating text message-based applications on behalf of other branded companies in order to develop and maintain communication with cellular telephone subscribers for commercial purposes. The automated computer equipment that these mobile marketing companies utilize is used for a variety of text messaging applications, marketing campaigns and dialogs on behalf of the branded company to communicate with cellular subscribers. Common applications are voting (the most popular example being the text message voting used to vote for contestants on the *American Idol* television program) as well as receiving news alerts, informative notifications, coupons and sports scores where short messages are sent to cellular

subscribers on a regular basis.

17.     Moreover, these mobile marketing companies utilize equipment that has the ability to send any number of text messages *en masse* to cellular telephone subscribers as well as receive individual text messages from those subscribers, on behalf of a branded company. Messages sent from the branded company, using a mobile marketing company's computerized messaging platform, to a cellular subscriber are termed "mobile-terminated" and messages sent from a cellular subscriber to a branded company are termed "mobile-originated."

18.     Mobile marketing companies send and receive text messages by connecting to the cellular carrier networks using internet-based connections and communications protocols. The primary protocol used is known as the Short Message Peer-to-Peer ("SMPP") protocol. SMPP is an internet-based communications protocol specifically designed for communications between a mobile marketing company and a cellular network's Short Message Service Center ("SMSC"). SMSCs are network entities that are maintained and controlled within the cellular carriers' networks and are the store and forward repositories for text messages to be both delivered to and sent from mobile subscribers.

19.     Mobile marketing companies' connections to the cellular network operators are internet connections and typically use a special number as the address by which cellular text messages are sent and received in order to communicate with cellular subscribers. All messages sent to a particular subscriber are delivered to that subscriber's "home" SMSC within the subscriber's home cellular network. Since mobile marketing companies are not cellular subscribers, they are not identified by a mobile telephone number; rather, they use a special number as an originating address for text messages sent to cellular

subscribers. This number is known as a "short code." A short code is a special and unique 5- or 6-digit number that is obtained from an independent agency, Neustar, Inc.[1] ("Neustar"), that manages and assigns these number resources in the U.S.

20.     Individual short code numbers are either leased by the mobile marketing companies on behalf of the branded companies for which a text messaging application is being run or they can be leased by the branded companies themselves and provided to the mobile marketing companies. In either case, the mobile marketing companies subsequently request that these numbers be provisioned (*i.e.*, programmatically stored) by the cellular network operators so that mobile-originated messages can be properly sent from cellular subscribers to the correct mobile marketing company platform applications. In this case, the cellular network operators approve the service application that uses an individual short code before it is provisioned in their networks. The process requires that the mobile marketing company draft and submit a detailed written description of the service application that uses the short code. The detailed description typically contains a representation of the text content of messages that are to be sent to and received from cellular subscribers, the precise "opt-in" method to be used by cellular telephone subscribers, the anticipated number of cellular telephone subscribers expected to be involved in the application communication, the anticipated number of text messages expected to be sent and received in the application communication, when the application will start and end, how the subscriber can "opt-out" of the program along with other details.

21.     In many cases, mobile marketing companies do not connect directly to the cellular carrier networks (*e.g.*, Verizon Wireless or AT&T Mobility). Establishing and

---

[1] *See* https://www.neustar.biz/services/sms-marketing.

-10-

maintaining direct connections to individual carrier networks is expensive, time consuming and technically difficult. Because of business and technical barriers, mobile marketing companies such as Mozes, Inc. ("Mozes") connect indirectly to the carrier networks through intermediary companies known as SMS aggregators. Here, it appears that Mozes made such carrier connections through one such aggregator, Mobile Messenger, Inc. (Exhibit B.) These SMS aggregators are in the business of connecting to multiple cellular carrier networks and reselling that connectivity to mobile marketing companies.

22.     Aggregation of multiple cellular carrier network connections into a single connection to a mobile marketing company is highly advantageous. First, it enables a mobile marketing company to send and receive text messages to and from cellular telephone subscribers quickly and easily. Second, it enables the mobile marketing company to send and receive text messages to and from all mobile subscribers in the U.S. at once, regardless of which cellular carrier serves them. And third, SMS aggregators can ensure that any short codes used to access SMS applications are provisioned on all the cellular carrier networks.

23.     Mobile marketers typically provide a software-based application programming interface ("API") or a website based portal that can be used by their branded company clients to develop a software application and connect to their message delivery platform for that application. An API is essentially a programmatic method of communication between two computer systems. These methods enable a branded company to create a template for the content that will appear in the body of the text messages, upload a list of cellular telephone numbers for which the text messages are to be sent and send the messages via the mobile marketing company's platform. Furthermore, a software application using the API or operated via the website-based portal of the mobile marketing company can

be created to send out cellular text messages *en masse* to a stored list of cellular telephone numbers.

24.     Based on my review of the materials and documentation provided to me in this case, Mozes[2] appears to be the mobile marketing company employed by Defendant to automatically transmit cellular text messages *en masse* using the short code 66937. Mozes operates an automated computer equipment system providing SMS-based services that enable text message communications between the automated system and cellular telephone subscribers. The messaging services that Mozes enables, and which can be operated via their website-based portal, are used to form a commercial relationship with cellular subscribers and to use the cellular networks and text messaging technology to form that relationship.

**OPT-IN**

25.     "Opting-in" is a term that describes a method by which a cellular subscriber explicitly and expressly provides individual consent to inform a mobile marketing company that they are willing to receive text messages for a specific text message application or campaign. In my experience, consent is not broadly given for multiple commercial text message applications nor is it given in some "open-ended" fashion (*i.e.*, without limitation) such that a cellular subscriber "opts-in" to receive any and all text messages in perpetuity.

26.     There are two reasons why express and formal "opt-in" techniques are used for automated commercial text messaging applications: (i) to enable cellular telephone subscribers to reliably provide knowing, voluntary, clear, unmistakable, explicit and express consent for a particular commercial text messaging program; and (ii) to inform the mobile marketing company that they are willing to incur appropriate text messaging charges for that

---

[2] *See* http://www.helloworld.com.

DECLARATION OF RANDALL A. SNYDER

application program.

27.     The "opt-in" method requiring a "mobile-originated" text message to be sent by a cellular subscriber as a response to some "call-to-action" is a very reliable means for the mobile marketing company to obtain express and knowing consent to send application text messages to a cellular subscriber. For a given application or text message campaign, this call-to-action can be a commercial advertisement from a website, television, radio, newspaper, magazine, billboard, etc. For instance, the actual call-to-action is usually a read or heard message indicating that the cellular subscriber can send a text message to a particular numeric address along with a keyword or words that make up the body of the message. The cellular subscriber uses this mobile-originated text message that is sent to the mobile marketing company to "opt-in" to the desired application service (such as to receive regular sports updates or to vote for an American Idol contestant).

28.     The call-to-action requires that consumers respond by executing the initial cellular communication first so they can unmistakably and voluntarily provide express consent. Using this method, cellular subscribers must use their own cellular telephones to respond to a given text message application and the response text message automatically contains the cellular telephone number of the cellular subscriber. This provides a very reliable express means for the mobile marketing company to ensure that the cellular subscriber responding to the call-to-action is, in fact, the authorized cellular subscriber who wishes to receive text messages for that application.

29.     When a cellular subscriber responds to a branded text messaging application using a short code address along with a keyword or words that make up the body of the message, the mobile marketing company records and saves the cellular subscribers'

DECLARATION OF RANDALL A. SNYDER

telephone numbers in a database or electronic list. The phone numbers are captured from incoming mobile-originated text messages received by the mobile marketing company. The cellular subscriber phone numbers typically need to be saved and stored in a database by the mobile marketing company for a given application or campaign for a variety of reasons. The application may be based primarily on mobile-terminated messages once a subscriber has "opted-in," such as sending sports scores, news, notifications, reports or alerts on a regular basis, or the application may be based on an ongoing dialog between the mobile marketing company and the cellular subscriber such as trivia questions and responses.

## THE MOBILE MARKETING ASSOCIATION ("MMA")

30.     The MMA is a global non-profit trade organization that issues codes of conduct and best practices for all companies engaged in mobile marketing and mobile commercial activities. As part of their function, they provide industry guidelines for commercial text messaging applications and programs. The MMA is the global authoritative organization providing best practices, guidelines, rules and instructions for all companies involved in communicating with cellular telephone subscribers using SMS-based text messaging technology. Among the goals of the MMA is to ensure that mobile marketers comply with all federal, state and local laws regarding mobile communications with consumers.

31.     The Coca-Cola Company is among the most prominent members of the MMA and is, in fact, a strategic partner of the MMA. (Exhibit C.)

32.     According to the MMA's Global Code of Conduct:

"Mobile Marketers ask for and obtain consent by obtaining an explicit opt-in from the user for all mobile messaging programs. This can be accomplished via an SMS or MMS opt-in process, a voice response, website registration, other MMA recognized methods or other legitimate

-14-

methods."

"Mobile Marketers must implement consent (opt-in) for a specific messaging program. Consent is not carried into other programs unless the user has consented to such communications either 1) when they consented to the initial program or 2) upon the commencement of a subsequent messaging program."

(Exhibit D, p.1.)

33.     Furthermore, according to the MMA's U.S. Consumer Best Practices ("MMA Best Practices"):

"At all times, programs must be in accordance with applicable federal and state laws, rules and regulations."

(Exhibit E, p.11, Bates No. MOZ_00059.)

"Content providers must obtain opt-in approval from subscribers before sending them any SMS or MMS messages or other content from a short code."

(Exhibit E, p.14, Bates No. MOZ_00062.)

"When promoting programs, content providers should ensure that their advertising in all forms is clear and conspicuous regarding all terms and conditions associated with offers and adheres to all state and federal regulations.

"The verbiage around the placement of 'Msg&Data Rates May Apply' should be clear and conspicuous on the call to action/promotion/advertising and should NOT be deceptive in any nature nor lead to an indirect subscription of services. Illegible font sizes or presentment (including scrolling or moving graphics) and obscuring of the disclaimer "Msg&Data Rates May Apply" are prohibited."

(Exhibit E, p.12, Bates No. MOZ_00060.)

"This opt-in applies only to the specific program a subscriber is subscribed to and should not be used as a blanket approval to promote other programs, products, and services. However, after the subscriber has been given the complete details about the opt-in scope, the subscriber may opt-in to receive other messages. A content provider may, however, communicate with existing opted-in subscribers through non-premium

-15-

messages that a) notify subscribers of updates to their existing service or b) are part of a retention program for that particular service. Directions to unsubscribe from these messages must be clearly available with the delivery of each message."

(Exhibit E, p.14, Bates No. MOZ_00062.)

"When the user is not currently subscribed to a recurring program, or the program is one-time program where the subscriber will not receive additional messages, then an MT message may be sent that only confirms that the user is not subscribed to any programs on this short code and indicates that no further messages will be sent."

(Exhibit E, p.12, Bates No. MOZ_00063.)

34.     In addition, the MMA provides clear best practices and instructions to enable cellular subscribers to "opt-out" of receiving any text messages from an automated application program:

"After opt-in to a recurring program, a confirmation Mobile Terminating (MT) message must be sent to the subscriber containing, at minimum, the following information:

    a)    Service description

    b)    Additional carrier costs (e.g. Msg&Data Rates May Apply)

    c)    Frequency of messaging

    d)    Customer support information (HELP)

    e)    Opt-Out information (STOP)"

(Exhibit E, p.14, Bates No. MOZ_00062.)

35.     Opting-out is a term that describes a method by which a cellular subscriber explicitly and expressly revokes individual consent to inform a mobile marketing company that they are no longer willing to receive text messages from for a specific text message application or campaign.

36.     For opting-out, the MMA mandates the following instructions to mobile

marketing companies:

> "Content providers must offer subscribers the opportunity to cancel the service at any time. The following rules govern program opt-out:

> "A subscriber must be able to stop participating and receiving messages from any program by sending STOP to the short code used for that program.

> "END, CANCEL, UNSUBSCRIBE or QUIT should also be opt-out key words for all programs; however, content providers should feature the word STOP in their advertising and messaging."

(Exhibit E, p.12, Bates No. MOZ_00063.)

**FACTS REGARDING THE PLAINTIFF**

37.     According to his complaint, on November 5, 2011 at 4:11PM, the Plaintiff responded to a mobile marketing call-to-action to vote for his favorite college football team. The calls-to-action for this program were a promotion both displayed on the "Jumbotron" scoreboard (Exhibit F, Bates Nos. MOZ_00028 – MOZ_00031) and announced on the public address system (Exhibit G, Bates No. MOZ_00259) at the University of Alabama and Louisiana State University football game. In response, the Plaintiff sent a single text message to the short code 66937 containing the keyword "BAMA" to vote for his favorite college football team. This interactive mobile marketing campaign program was sponsored by Coke and controlled and operated by Codefendants on behalf of Coke.

38.     The Defendants affirmatively state:

> "Subject to and without waiving those objections, Gerzhom states that Plaintiff responded to a clearly advertised Coke Zero promotion by sending a text message containing the word 'BAMA' to the SMS short code provided with the promotion. When Plaintiff sent the message from his phone, his wireless carrier identified the short code as belonging to Mobile Messenger and routed the message to Mobile Messenger. Mobile Messenger's system then recognized the short code as being related to the Coke Zero promotion and sent a data file containing the message, telephone number, date, time, and carrier to Gerzhom. Gerzhom received the data file, which triggered the associated and instantaneous response to

the keyword 'BAMA.'"

(Exhibit B, p.9.)

39. Furthermore:

"Subject to and without waiving those objections, Gerzhom states that it designed the creative material that appeared at the University of Alabama and Louisiana State University football game for Coke Zero, including the Tug-O-War, text-to-win, and text-to-screen promotions, with the direction and approval of Coca-Cola. Gerzhom's proprietary technology was used to manage the messages on the day of the promotion—when a vote (such as Plaintiff's) was received in the Tug-O-War contest, the system added it to the tally that appeared on the Jumbotron, selected the appropriate messages to be run in response, and directed Mobile Messenger to send those messages to the individual who had sent the text message. The Gerzhom system was incorporated into the systems controlling advertising content at the game, and a road technician was present at the game to ensure the system operated successfully."

(Exhibit B, p.10.)

40. Subsequent to texting his vote to the short code 66937, the Plaintiff received a single confirmatory text message call on his cellular telephone (205-337-6148). The content of this text message read:

**"Coke Zero: Thanks for your vote. Keep voting for your favorite team to make sure they win!"**

41. The description of this mobile marketing program provided by both the Plaintiff and the Defendants is entirely consistent with a "one-time program" as described within the MMA Guidelines. As such, the Plaintiff should have received *only* this confirmatory text message and no additional text messages. The MMA Best Practices clearly shows an example of how a one-time program is to operate. (Exhibit E, p.21, Bates No. MOZ_00069.)

42. However, after receiving this single confirmatory text message call, the Plaintiff received an additional unexpected and unsolicited telemarketing text message call

-18-

on his cellular telephone. The content of this text message read:

**"Reply with your DOB (MMDDYYYY) to enter the contest for an Autographed Football & to join the Coke Zero mobile list. Up to10 msgs. Msg&data rates apply"**

43.     The Plaintiff voted two more times by sending individual single text messages to the short code 66937 containing the keyword "BAMA." Each time, he received the identical confirmatory text message as well as the identical extraneous and unsolicited telemarketing text message.

44.     Both the scoreboard and the public address announcement calls-to-action clearly do not comply with the MMA standards for valid "opt-in" techniques allowing the Defendants to send additional text messages such as the unsolicited non-confirmatory telemarketing text messages received by the Plaintiff.

45.     Indeed, the textual content of these additional text messages sent by the Defendants and received by the Plaintiff should have been the call-to-action content to be displayed on the scoreboard and read over the public address system, not delivered as an unsolicited text message. Under the MMA standards, the Defendants had no permission to send this additional message.

46.     According to the MMA, the Plaintiff's initial response to the original call-to-action should not have been used as a blanket approval to promote other programs. The Plaintiff was not given complete details regarding the scope of the program subsequent to his initial response (*i.e.*, voting for his favorite team).

47.     The additional unexpected and unsolicited telemarketing text messages sent by the Defendants are, in fact, a clear example of improper calls-to-action for a text message program. The additional text messages are clearly calls-to-action distinct and

separate from the previous one-time voting program for which the Plaintiff did respond. As such, a call-to-action *cannot* be a mobile-terminated text message from the mobile marketer to initiate the mobile text communications with a consumer—it must be a read or heard advertisement. (Exhibit E, p.20, Bates No. MOZ_00069.) If a call-to-action was allowed to be a mobile-terminated text message rather than a read or heard advertisement, then any mobile marketing company could send mobile-terminated text messages to any consumers at any time requesting that they respond to a particular program, causing annoyance, harassment and privacy invasion of consumers.

**FACTS REGARDING THE DEFENDANTS**

48.     The Coca-Cola Company ("Coke") is among the world's most renowned brands and is a beverage company that manufactures and distributes various nonalcoholic beverages worldwide.

49.     ePrize, Inc. ("ePrize") is a mobile marketing company that provides, among other services, automated text messaging services to branded companies. ePrize acquired Gerzhom, Inc. (formerly known as Mozes, Inc. ("Mozes")) in January 2013 (Exhibit H) and subsequently changed its name to HelloWorld®. (Exhibit I.) ePrize provides and performs mobile marketing services on behalf of Coke. (Exhibit J.)

50.     Mozes provides its mobile marketing services as a "hosted" solution, also known as a "cloud" solution. A hosted/cloud system is a software delivery model whereby software and associated data are centrally hosted in the "cloud," meaning a large, centralized computer equipment system serving multiple remote users in real-time via the Internet. These systems are typically accessed by customer users using a web-based application through a web browser. Hosted/cloud solutions have become a common delivery model for many

business applications because the centralized computer equipment can serve hundreds or thousands of remote customer users from the single hosted platform. In this case, Mozes manages and operates the centralized hosted computerized software and equipment that provides automatic text messaging services to multiple remote branded company clients using real-time internet connections. Mozes is the mobile marketing text message service provider for Coke.

51.     It is evident that the Defendants' computer equipment, used to execute the automated text message voting campaign and entered into by the Plaintiff, captured and stored the cellular telephone numbers of the consumers that responded to the campaign to place a vote. The captured cellular telephone numbers were stored on the Defendants' computer system to subsequently send the confirmatory mobile-terminated text messages as well as the additional unexpected and unsolicited telemarketing text messages to consumers.

52.     Since each mobile-terminated text message sent to the cellular subscribers that engaged in the automated text message campaign contains identical content and these messages are sent to cellular telephone subscribers *en masse* and in rapid succession, they must have been sent by automated computer equipment and without human intervention. The original configured text message body content stored in the Defendants' computer system, automatically replicated and used to create the text messages sent *en masse* to all cellular subscribers that have responded to this program was created manually at some point prior to initiating the campaign. The predefined dialog text, programmed by the Defendants for each automated text message response, was certainly entered into the computer once at some point; however, the replication of this content, placement of the dialog content into the body of the appropriate mobile-terminated text messages within the dialog, creation of the SMS

DECLARATION OF RANDALL A. SNYDER

communications protocol format and the transmission of the SMS messages that were sent *en masse* occurred in a completely automated fashion and without human intervention.

53.     It is my opinion that the Plaintiff received at least one extraneous, unexpected and unsolicited telemarketing text message call on his cellular telephone each time he responded to vote and engage in the aforementioned automated text message campaign. As the Plaintiff voted three times, he received three unsolicited telemarketing text message calls subsequent to each of the automated confirmatory text messages sent by the Defendants.

54.     These unsolicited telemarketing text message calls are not messages that are sent peer-to-peer by a human; rather, they are automated text messages sent from Mozes's computerized mobile marketing text messaging system.

**MESSAGE DETAIL RECORDS**

55.     For TCPA cases involving alleged text message violations, message detail records are often provided by the mobile marketing company. Mobile marketing companies typically record and maintain data regarding the text message communications enabled between the branded company and the cellular subscriber for several years.

56.     For each message sent or received by a cellular subscriber, the record contains the calling party number (*i.e.*, the party originating the message or the short code), the called party number (*i.e.*, the party to whom the message is sent), the date the message was sent (*i.e.*, the month, day, year), the time the message was sent (*i.e.*, the hour and minute) and the body of text message (*i.e.*, the message content).

57.     I have analyzed the message detail records provided by the Defendants for the alleged text message communications occurring on November 5, 2011 and containing the

Plaintiff's cellular telephone number (205) 337- 6148.

58.     These text messages, provided in Exhibit 1 of the First Amended Complaint, are identical to the text message records provided by the Defendants clearly confirming the Plaintiff's allegations. (Exhibit K.)

59.     Based on my review of the relevant documents, it is my opinion that the text messages sent to the Plaintiff and other cellular subscribers by Mozes and on behalf of Coke were automated and sent *en masse* by Mozes's mobile marketing system.

## THE TCPA AND AUTOMATIC TELEPHONE DIALING SYSTEMS

60.     The TCPA prohibits unsolicited calls to cellular telephone numbers using an "automatic telephone dialing system" ("ATDS"), which the statute defines as "equipment which has the capacity— (i) to store or produce telephone numbers to be called, using a random or sequential number generator; and (ii) to dial such numbers." (See *Telephone Consumer Protection – Restrictions on use of telephone equipment 47 U.S.C. § 227(a)(1)*).

61.     The FCC has held that prohibitions under the TCPA apply equally to both voice calls and SMS text message calls to cellular telephone numbers (see *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, CG Docket No. 02-278, February 15th, 2012*).

62.     Furthermore, the FCC recently re-affirmed this interpretation in *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* CG Docket No. 02-278, WC Docket No. 07-135, July 10, 2015:

"Text messages are "calls" subject to the TCPA, as previously determined by the Commission." (*See* page 5).

63.     In addition, the TCPA prohibits any call (other than a call made for

DECLARATION OF RANDALL A. SNYDER

emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other common carrier service, or any service for which the called party is charged for the call.

64.     In the FCC's Report and Order of October 16, 1992, the Commission stated:

> "We emphasize that under the prohibitions set forth in 227(b)(1) and in 64.1200(a)-(d) of our rules, only calls placed by automatic telephone dialing systems or using an artificial or prerecorded voice are prohibited. If a call is otherwise subject to the prohibitions of 64.1200, persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary. Hence, telemarketers will not violate our rules by calling a number which was provided as one at which the called party wishes to be reached. However, if a caller's number is 'captured' by a Caller ID or an ANI device without notice to the residential telephone subscriber, the caller cannot be considered to have given an invitation or permission to receive autodialer or prerecorded voice message calls. Therefore, calls may be placed to "captured" numbers only if such calls fall under the existing exemptions to the restrictions on autodialer and prerecorded message calls." (*See* ¶ 31).

65.     In the FCC's Report and Order of July 3, 2003, the Commission stated:

> "The statutory definition contemplates autodialing equipment that either stores or produces numbers. It also provides that, in order to be considered an "automatic telephone dialing system," the equipment need only have the '*capacity* to store or produce telephone numbers (emphasis added)...' It is clear from the statutory language and the legislative history that Congress anticipated that the FCC, under its TCPA rulemaking authority, might need to consider changes in technologies. In the past, telemarketers may have used dialing equipment to create and dial 10-digit telephone numbers arbitrarily. As one commenter points out, the evolution of the teleservices industry has progressed to the point where using lists of numbers is far more cost effective. The basic function of such equipment, however, has not changed—the capacity to dial numbers without human intervention. We fully expect automated dialing technology to continue to develop." (*See* ¶ 132).

Furthermore:

"[T]o exclude from these restrictions equipment that use predictive dialing software from the definition of 'automated telephone dialing equipment' simply because it relies on a given set of numbers would lead to an unintended result. Calls to emergency numbers, health care facilities, and wireless numbers would be permissible when the dialing equipment is paired with predictive dialing software and a database of numbers, but prohibited when the equipment operates independently of such lists and software packages. We believe the purpose of the requirement that equipment have the "capacity to store or produce telephone numbers to be called" is to ensure that the prohibition on autodialed calls not be circumvented. Therefore, the Commission finds that a predictive dialer falls within the meaning and statutory definition of 'automatic telephone dialing equipment' and the intent of Congress." (*See* ¶ 133).

66.     Moreover, the FCC has held that prohibitions under the TCPA apply to calls automatically dialed from stored lists of telephone numbers or a database of numbers, as well as random or sequentially generated numbers, without human intervention.

67.     In the FCC's Report and Order of January 4, 2008, the Commission noted:

"…that the evolution of the teleservices industry had progressed to the point where dialing lists of numbers was far more cost effective, but that the basic function of such dialing equipment, had not changed—the capacity to dial numbers without human intervention. The Commission noted that it expected such automated dialing technology to continue to develop and that Congress had clearly anticipated that the FCC might need to consider changes in technology." (*See* ¶13).

Furthermore, the Commission found that:

"…calls to emergency numbers, health care facilities, and wireless numbers are permissible when the dialing equipment is paired with predictive dialing software and a database of numbers, but prohibited when the equipment operates independently of such lists, would be inconsistent with the avowed purpose of the TCPA and the intent of Congress in protecting consumers from such calls." (*See* ¶14).

68.     In the FCC's Notice of Proposed Rulemaking of May 22, 2012, the Commission stated:

"Under the TCPA, the term "automatic telephone dialing system" is

-25-

defined as 'equipment which has the capacity– (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers.' Id. at § 227(a)(1). The Commission has emphasized that this definition covers any equipment that has the specified capacity to generate numbers and dial them without human intervention whether or not the numbers called are randomly or sequentially generated or come from calling lists." (*See* page 4, footnote 12).

69.     In the most recent FCC Declaratory Ruling and Order of July 10, 2015, the Commission stated:

"The Commission declined to distinguish between calls to wireless telephone numbers made by dialing equipment 'paired with predictive dialing software and a database of numbers' and calls made 'when the equipment operates independently of such lists and software packages.' Recognizing the developments in calling technology, the Commission found that '[t]he basic function of such equipment, however, has not changed—the capacity to dial numbers without human intervention.' The Commission found it troubling that predictive dialers, like dialers that utilize random or sequential numbers instead of a list of numbers, retain the capacity to dial thousands of numbers in a short period of time and that construing the autodialer definition to exclude predictive dialers could harm public safety by allowing such equipment to be used to place potentially large numbers of non-emergency calls to emergency numbers, a result the TCPA was intended to prevent. The Commission concluded that the TCPA's unqualified use of the term 'capacity. was intended to prevent circumvention of the restriction on making autodialed calls to wireless phones and emergency numbers and found that "a predictive dialer falls within the meaning and statutory definition of 'automatic telephone dialing equipment' and the intent of Congress." (*See* ¶14)

## CONCLUSIONS

70.     Mozes is a mobile marketing company that provides automated text messaging and other mobile marketing services to branded companies. These branded companies use technology provided by Mozes to market their products and services to consumers using cellular technology.

71.     Mozes operated technology to perform an automated text message marketing and promotional campaign on behalf of Coke. This campaign enabled consumers

-26-

attending the University of Alabama and Louisiana State University football game on November 5, 2011 to vote for their favorite college football game.

72.     Coke is a prominent member of the Mobile Marketing Association and, as such, should be fully aware of their extensive mobile marketing rules and guidelines.

73.     Consumers responded to this campaign by texting their votes to the short code 66937. The resulting tally of this consumer voting was displayed on the big-screen Jumbotron at the stadium during the football game.

74.     After consumers responded to this campaign, they would receive a pre-defined and automated confirmatory text message.

75.     Subsequent to consumers receiving this single confirmatory text message call, they received an additional unexpected and unsolicited telemarketing text message call on their cellular telephones.

76.     These additional and unwanted telemarketing text messages were not expressly represented to consumers before they responded to the program.

77.     In my experience and consistent with the MMA guidelines, "opt-in" consent is not broadly given for automated text message campaigns in an "open-ended" fashion (*i.e.*, without limitation) such that a mobile marketing company can send any number of unsolicited and unwanted text messages above and beyond those represented by the campaign program at the time the consumer responds top the call-to-action.

78.     The additional unexpected and unsolicited telemarketing text message sent by the Defendants is a clear example of an improper call-to-action for a recurring text message program. If it were not, consumers would continually be subjected to mobile-terminated text messages sent by mobile marketers instead of read or heard advertisements,

thereby causing annoyance, harassment and privacy invasion.

79.     An analysis of the message detail records provided by the Defendants for the automated text message campaign fully corroborate the Plaintiff's account of the precise automated text messages sent and received.

80.     The Defendants captured consumers' cellular telephone numbers so they could store them on their automated text message system. Storing these telephone numbers enabled the Defendants to automatically transmit the subsequent pre-defined text messages to those consumers.

81.     The Defendants either stored a list of these captured cellular telephone numbers or stored them in a database in Mozes's cloud-based computer system. In either case, lists of cellular telephone numbers were stored within Mozes's computer system.

82.     Mozes used stored text message dialog templates to create the text messages automatically generated and sent by the computer system to the consumers.

83.     Mozes automatically applied both a numeric short code as the origination address and each captured and stored cellular telephone number as the destination address to the appropriate message template. Mozes assembled and created programmatically each complete text message in an automated fashion without human intervention. Mozes then automatically sent those created text messages to its SMS aggregator (*i.e.*, Mobile Messenger) for delivery to the cellular networks and subsequently to cellular telephone subscribers.

84.     In order for Mozes's mobile marketing text messaging system to send automated text messages to cellular telephone numbers for the service, the system must ***store*** cellular telephone numbers to be called.

85.     Each mobile-terminated text message sent on behalf of Coke to the cellular subscribers that engaged in the automated text message campaign contained identical content and these messages are sent to cellular telephone subscribers *en masse* and in rapid succession. Therefore, they must have been sent by automated computer equipment and without human intervention.

86.     In addition to the capacity to dial telephone numbers using a random or sequential number generator, the FCC has determined that computer equipment capable of dialing lists of telephone numbers is also subject to the TCPA's restrictions on the use of autodialers.

87.     The FCC has determined that text messages are calls subject to the TCPA.

88.     The computer system equipment employed by the Defendants has the capacity to automatically dial cellular telephone numbers from a list of numbers without human intervention.

89.     The computer system equipment employed by the Defendants did, in fact, dial cellular telephone numbers from a list of numbers without human intervention, including the cellular telephone number of the Plaintiff.

90.     Based on my analysis of the Mozes mobile marketing system, I conclude that the equipment used by Mozes has the capacity to, and does, store telephone numbers to be called, dials telephone numbers from a stored list or database of numbers and automatically dials those telephone numbers without human intervention.

91.     Therefore, I conclude that the equipment used by the Defendants to operate automated mobile text message campaigns qualifies as an ATDS as defined within the TCPA and associated regulations.

DECLARATION OF RANDALL A. SNYDER

## SUMMARY OF OPINIONS

92.     It is my opinion, based on my review of the relevant documents and the facts described above, that Defendants employed equipment which has the capacity to, and does, store telephone numbers to be called, dials stored telephone numbers from a list or database of numbers and automatically dials those telephone numbers without human intervention.

93.     It is my opinion, based on my review of the relevant documents and the facts described above, that the Defendants employed an ATDS as defined within the TCPA to make automatic calls to cellular telephone numbers, including to the cellular telephone number of the Plaintiff.

94.     It is my opinion, based on my review of the relevant documents and the facts described above, that the Defendants did not comply with the MMA standards regarding valid "opt-in" techniques. The textual content of the additional text messages sent by the Defendants and received by the Plaintiff should have been the call-to-action content to be displayed on the scoreboard and read over the public address system, not delivered as an unsolicited text message. Under the MMA standards, the Defendants had no permission to send this additional message.

95.     My opinions in this declaration are based upon extensive experience in the telecommunications industry, a detailed understanding of telecommunications systems, a detailed understanding of Short Message Service ("SMS") technology, a detailed understanding of mobile marketing employing SMS technology and a detailed understanding of message detail records. I hereby reserve the right to supplement or modify my opinions detailed in this report to the extent that new information is made available through discovery

or other means.

I declare that the foregoing is true and correct subject to the laws of perjury of the United States.

Executed in Las Vegas, Nevada, on this 13th day of October 2015.

_Randall A. Snyder_
Randall A. Snyder

DECLARATION OF RANDALL A. SNYDER