FILED
2016 Jun-17  PM 03:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT C

Page 1

1            UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ALABAMA
2                  SOUTHERN DIVISION
3

WESLEY PHILLIPS, individually
4  and on behalf of similarly
   situated individuals,
5

                   Plaintiff,
6                                        Case No.:
        vs.                              2:12-cv-04033-JEO
7                                        CLASS ACTION
   MOZES, INC. and THE COCA-COLA
8  COMPANY and ePRIZE, INC.
9                  Defendants.
   _____/
10
11
12
13
14        DEPOSITION OF RANDALL A. SNYDER
15          Tuesday, December 8, 2015
16              Las Vegas, Nevada
17
18
19
20
21
22  Reported by:
   Michelle C. Johnson, RPR-CRR
23  NV CCR 771, CA CSR 5962
24  Job No. 2196663
25  Pages 1 - 254

Page 2

```
 1    BE IT REMEMBERED that, pursuant to the laws
      governing the taking and use of depositions, and on
 2  Tuesday, December 8, 2015, commencing at 9:05 a.m.
      thereof, at Fennemore Craig, PC, 300 South Fourth
 3  Street, Suite 1400, Las Vegas, Nevada, before me,
      MICHELLE C. JOHNSON, a Certified Court Reporter in the
 4  states of Nevada and California, personally appeared
      RANDALL A. SNYDER, called as a witness by Defendant
 5  Gerzhom, Inc. f/k/a Mozes, Inc.
 6  APPEARANCES:
 7  For the Plaintiff:
 8    RYAN McCUNE DONOVAN
      THANOS BASDEKIS
 9    Attorneys at Law
      BAILEY & GLASSER LLP
10    209 Capitol Street
      Charleston, West Virginia 25301
11    304/345-6555
      Fax: 304/342-1110
12    rdonovan@baileyglasser.com
      tbasdekis@baileyglasser.com
13
      For Defendant Gerzhom, Inc. f/k/a Mozes, Inc.:
14
      BLAINE C. KIMREY
15    Attorney at Law
      VEDDER PRICE, PC
16    222 North LaSalle Street
      Chicago, Illinois 60601
17    312/609-7500
      Fax: 312/609-5005
18    bkimrey@vedderprice.com
19  For Defendant The Coca-Cola Company:
20    S. STEWART HASKINS, II
      Attorney at Law
21    KING & SPALDING LLP
      1180 Peachtree Street, Northeast
22    Atlanta, Georgia 30309-3521
      404/572-4687
23    Fax: 404/572-5140
      shaskins@kslaw.com
24
25  ///
```

Page 3

```
 1  APPEARANCES (CONTINUED):
 2  For Defendant HelloWorld f/k/a ePrize, Inc. :
 3    HENRY PIETRKOWSKI
      Attorney at Law
 4    REED SMITH LLP
      10 South Wacker Drive
 5    Chicago, Illinois 60606-7507
      312/207-3904
 6    Fax: 312/207-6400
      hpietrkowski@reedsmith.com
 7
      Also Present:  JOEL HIKERT, Videographer
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                    INDEX
 2  WITNESS
    RANDALL A. SNYDER
 3                    PAGE
 4  Examination by Mr. Kimrey              7
 5  Examination by Mr. Pietrkowski       205
 6  Examination by Mr. Haskins           211
 7  Examination by Mr. Donovan           235
 8  Further Examination by Mr. Kimrey   228, 242
 9
10             EXHIBITS
11  NUMBER                      PAGE
12  Deposition
13  Exhibit 44  Declaration of Randall A. Snyder    11
14  Exhibit 45  Deposition subpoena                 32
15  Exhibit 46  Excerpt from Mobile Telecommunications  70
                Networking with IS-41
16
    Exhibit 47  Excerpts from Wireless Mobile Networking  73
17               with ANSI-41, Second Edition
18  Exhibit 48  Text Message Flows                 86
19  Exhibit 49  8/8/2012 letter to Clark from Phillips,  96
                with attachment (MOZ_00339 - 340)
20
    Exhibit 50  MMA US Consumer Best Practices,    120
21               Version 6.0
22  Exhibit 51  MMA US Consumer Best Practices for  122
                Messaging, Version 7.0
23
    Exhibit 52  "Exhibit 4" from Case 2:13-cv-01887-MMB  131
24
    Exhibit 53  Deposition of Randall Snyder, taken  157
25               10/2/13 in Torrey Gragg vs. Orange Cab
```

Page 5

```
 1             EXHIBITS
 2            (CONTINUED)
 3  NUMBER                      PAGE
 4  Deposition
 5  Exhibit 54  47 USCS 227                162
 6  Exhibit 55  FCC 07-232 Declaratory Ruling   166
 7  Exhibit 56  Satterfield vs. Simon & Schuster, Inc.  178
                Opinion
 8
    Exhibit 57  Dominguez vs. Yahoo! Opinion   181
 9
    Exhibit 58  Johnson vs. Yahoo!, Inc. Opinion   185
10
    Exhibit 59  Cecilia Snyder vs. IvisionMobile, Inc.   229
11               docket, First Amended Complaint, and
                joint stipulation for dismissal with
12               prejudice
13
14
15
16
17             INFORMATION TO BE SUPPLIED
18                 (None)
19
20
21
22             INSTRUCTIONS NOT TO ANSWER
23                 (None)
24
25
```

2 (Pages 2 - 5)

1 PROCEEDINGS                        9:05 A.M.
2       THE VIDEOGRAPHER:  Good morning.  We are on
3 the record at 9:05 a.m. on December 8th, 2015.  This
4 is the video-recorded deposition of Randall Snyder.
5       My name is Joel Hilkert, here with our court
6 reporter, Michelle Johnson.  We are here from Veritext
7 Legal Solutions at the request of counsel for the
8 defendant.
9       This deposition is being held at 300 South
10 Fourth Street, in Las Vegas, Nevada.  The caption of
11 the case is Phillips, Wesley vs. Mozes, Inc., et al.,
12 Case 2:12-cv-04033-JEO.
13       Please note that audio and video recording
14 may take -- will take place unless all parties agree
15 to go off the record.  Microphones are sensitive and
16 may pick up whispers, private conversations, and
17 cellular interference.  And I am not authorized to
18 administer an oath; I'm not related to any party in
19 this action, nor am I financially interested in the
20 outcome in any way.
21       If there are any objections to proceeding,
22 please state them at the time of your appearance,
23 beginning with the noticing attorney.
24       MR. KIMREY:  My name is Blaine Kimrey.  I'm
25 with Vedder Price in Chicago.  I represent the

1 defendant Gerzhom.
2       MR. HASKINS:  Stewart Haskins, with King &
3 Spalding in Atlanta.  I represent The Coca-Cola
4 Company.
5       MR. PIETRKOWSKI:  Henry Pietrkowski, with
6 Reed Smith in Chicago.  I represent HelloWorld,
7 formerly known as ePrize.
8       MR. DONOVAN:  Ryan Donovan, with Bailey &
9 Glasser in Charleston, for the plaintiff.
10       MR. BASDEKIS:  Thanos Basdekis, from
11 Charleston, West Virginia, for the plaintiff.
12       THE VIDEOGRAPHER:  Thank you.  The witness
13 can be sworn and counsel may begin the examination.
14             RANDALL A. SNYDER,
15 being first duly sworn to tell the truth, the whole
16 truth, and nothing but the truth, was examined and
17 testified as follows:
18             EXAMINATION
19 BY MR. KIMREY:
20    Q.  Good morning, Mr. Snyder.
21    A.  Good morning.
22    Q.  You are here today, as you know, to testify
23 in the Phillips v. Gerzhom, et al., case.  Is that
24 your understanding of why you are here today?
25    A.  Yes.

1    Q.  And you have been retained as an expert by
2 the plaintiff to testify on various matters in this
3 case.  And I think I see before you a copy of your
4 expert declaration in this case.
5       Is that what that is?
6    A.  Yes.
7    Q.  Is that -- there are a few documents in front
8 of you.  Could you tell me what those are?
9    A.  The first one is the subpoena for me to
10 appear, with the address on it, and including an
11 Appendix.
12       And the other are -- I brought three copies
13 of a potential invoice, since I was prepaid for my
14 appearance here.  And if we do not go the full time,
15 something we can record and I can provide as a final
16 invoice, along with a refund check I have from my
17 business.
18    Q.  Okay.  And below those two documents that you
19 were just handling, that's your expert deposition.  Is
20 that all that is or is there something -- not your
21 deposition, your declaration.  Is that all that's
22 there, or is there something else?
23    A.  Yes, that's all that's there, just includes
24 the exhibits as well.
25    Q.  Okay.  And there's nothing inside that

1 folder?
2    A.  There is nothing inside this folder.
3    Q.  Okay.  You have testified before, correct?
4    A.  Yes.
5    Q.  So I'm not -- how many times would you
6 estimate that you have given a deposition?
7    A.  A few dozen, maybe.
8    Q.  So you're familiar with the rules of the road
9 with respect to giving a deposition, correct?
10    A.  Yes.
11    Q.  This is a little bit redundant of what you
12 already understand, but if you don't understand a
13 question that I ask you, please ask me to rephrase.
14 If at any time you need to take a break, no problem,
15 just let us know.
16       Is there anything that would prevent you from
17 giving truthful testimony today?
18    A.  No.
19    Q.  No medications?
20    A.  No.
21    Q.  Okay.  What did you do in preparation for
22 your deposition today?
23    A.  Couple of tasks.  I reread thoroughly my
24 expert declaration.  I reread and reviewed most of the
25 exhibits, or all of the exhibits, from my declaration,

3 (Pages 6 - 9)

1 including reviewing the Mobile Marketing Association

2 consumer best practices and guidelines document.  I

3 met with plaintiffs' counsel to prepare to potentially

4 provide some questions that I should anticipate in

5 this deposition.  And I reviewed some additional

6 information I actually received recently, which was a

7 video of the stadium while this promotion, the

8 Coca-Cola promotion, was occurring.

9      Q.  Aside from the video of the stadium, which

10 was something new that you had reviewed, have you

11 reviewed anything else that's not listed in your

12 declaration that informs your expert opinion in this

13 case?

14      A.  I have not.

15      Q.  With respect to the video, do you know who

16 shot the video you reviewed?

17      A.  I don't.

18      Q.  What did the video show?

19      A.  It was someone in the stands -- a fan, I

20 assume -- that scanned and recorded the Jumbotron for

21 a few minutes as the promotion was running, as the

22 displays came up, that showed how to -- how to vote

23 for this program, and other information that was part

24 of the advertising.

25      Q.  Did the video include only footage from the

1 November 5th, 2011 game, or did it include other

2 footage as well?

3      A.  I believe it was only the November 11th (sic)

4 game.

5          MR. KIMREY:  I'd like to have marked as

6 Deposition Exhibit 44 in this matter Mr. Snyder's

7 expert declaration.

8          (Deposition Exhibit 44 was marked for

9          identification.)

10 BY MR. KIMREY:

11      Q.  Mr. Snyder, I have provided you a copy of

12 your declaration in this matter.  Does this match the

13 other declaration that you brought in with you today?

14      A.  It appears to.

15      Q.  You had referred to documents that you

16 reviewed and/or relied on in giving this declaration,

17 which is now marked as Deposition Exhibit 44.  And I

18 think that list is at paragraph 3, page 2.  Is that

19 correct?

20      A.  Yes.

21      Q.  And that goes over onto page 4, correct?

22      A.  Yes.

23      Q.  Aside from the video you just testified

24 about, is this everything that you reviewed and/or

25 relied on in rendering your opinion in this case?

1      A.  Yes.

2      Q.  As we sit here today, do you feel any need to

3 supplement this list of materials you relied on in

4 rendering your opinion?

5      A.  No.

6      Q.  Did you review any of the depositions in this

7 case in rendering your opinion?

8      A.  No.

9      Q.  Why not?

10      A.  The information that I required to form my

11 opinions was essentially complete with these documents

12 that I reviewed.

13      Q.  How can you know whether the information was

14 complete without having reviewed the depositions?

15      A.  Essentially, this was -- this was as much

16 evidence as I needed.  The answers to some of the

17 interrogatories provided a great deal of information,

18 so I had no need to look at a deposition from, I

19 assume, employees of these companies.

20      Q.  Do you know what Mozes Connect is?

21      A.  I assume that that's the name of their

22 product that they use to perform their -- their

23 software and applications for text messaging programs.

24      Q.  When you say "they," to whom are you

25 referring?

1      A.  Mozes, Mozes and/or Gerzhom/Mozes/ePrize/I

2 guess today, HelloWorld.

3      Q.  Is Mozes still in operation as far as you

4 know?

5      A.  Not that I know of.

6      Q.  Do you know whether anyone in this case

7 testified about the operability of the Mozes Connect

8 system?

9      A.  I am aware that there was -- at least one

10 deposition was taken, but I don't know who that was

11 by.

12      Q.  Did anyone provide you a summary of that

13 deposition?

14      A.  No.

15      Q.  So as you sit here today, you have no idea

16 what was addressed in that deposition at all, correct?

17      A.  Yes.

18      Q.  What did you rely on in determining the

19 structure and functionality of the Mozes Connect

20 system?

21      A.  Several -- several pieces of information.

22 One was certainly the response of the interrogatories

23 where the defendants described in some details how

24 this automated system operated.

25          The others are the fact that they used a text

1 messaging aggregator known as Mobile Messenger.
2      The other is the fact that I am very familiar
3 with the operation and technology of these mobile
4 marketing companies in this technology space that
5 offer services to branded companies to perform
6 automated text message campaigns and programs. That's
7 primarily the --
8      Q. Is there anything else?
9      A. Well, obviously, there is the description,
10 certainly just the description of how the program
11 operated. I am very familiar with how voting programs
12 work and in detail how these text messaging programs
13 work and how the software operates to provide these
14 automated dialogs.
15      Q. When you say "the description of how the
16 program operated," is that going back to the
17 defendants' responses to the interrogatories, the
18 description that was in there; is that what you are
19 referring to?
20      A. That and also the -- I have screen shots of
21 the Jumbotron large display in the stadium that show
22 from -- from the very beginning in the first call to
23 action how this program was initiated.
24      Q. Is there anything else you relied on in
25 rendering your opinions on the operability,

1 functionality, structure of the Mozes Connect system?
2      A. I also looked at the websites of the
3 defendants that I could find the websites of that
4 still existed. In fact even -- I just recently again
5 looked at the HelloWorld website, which I believe is
6 an exhibit in this document, which has even changed
7 since the first time since I wrote this document.
8 Even says on it, "We used to be ePrize," on the pages.
9 So I looked at the descriptions of the types of
10 automated mobile marketing programs that they operate.
11      Q. Is there anything else you reviewed in
12 rendering your opinion on the functionality,
13 operability, structure of the Mozes Connect system?
14      A. I believe -- I believe that's all.
15      Q. Do you know what a network map is?
16      A. Maybe.
17      Q. What do you think a network map is?
18      A. Well, it depends on the application you're
19 talking about. Network maps can be a design or a way
20 of describing a design or architecture for
21 communications networks. It could be considered a
22 flow diagram for how applications operate and the
23 interactions between the functions in those -- in
24 those applications. So it can be a variety of things
25 out of context. It's difficult for me to give you a

1 firm answer.
2      Q. So the kind of network map I'm referring to
3 was your first description. So in other words, the
4 structure, the computer structure, of a system. And
5 what I'm wondering is whether you actually looked at a
6 network map of the Mozes Connect system as it existed
7 on November 5th of 2011.
8      A. No.
9      Q. Do you know what sorts of servers were
10 incorporated into the Mozes Connect system on
11 November 5th of 2011?
12      A. No.
13      Q. Do you know what software languages were
14 incorporated into the Mozes Connect system on
15 November 5th of 2011?
16      A. No.
17      Q. Do you know to what degree parts of the Mozes
18 Connect system were hosted internally and hosted in
19 the cloud on November 5th of 2011?
20      A. I'm not sure I understand the question, the
21 distinction between internal and cloud.
22      Q. Well, when I refer to internal, I'm talking
23 about servers that would be hosted within the space
24 leased by Mozes Connect or any other equipment. And
25 when I refer to the cloud, I'm essentially

1 referring -- I think you've testified about what the
2 cloud is in other depositions, so you can just assume
3 I'm using the terminology that we were using in prior
4 depositions. So that's hosted with third parties that
5 may, you know, host various solutions for technology
6 companies.
7      So back to my question, do you know to what
8 degree the Mozes Connect system, which you have
9 rendered an opinion on in this case, was hosted
10 internally by Mozes Connect within space it leased and
11 was hosted externally with third-party cloud service
12 providers?
13      A. I'm not sure I can answer that question. I
14 don't recall which specific previous depositions
15 you're referring to. And my use of certain
16 terminology in those depositions, nearly every case I
17 work on is unique, the technology is unique, so I
18 don't quite understand.
19      MR. KIMREY: Could you repeat my question.
20      That's okay, I'll go ahead and say it again.
21      Q. Do you know -- separating yourself from all
22 the other depositions in which you testified about the
23 cloud, do you know in this case to what degree the
24 Mozes Connect system was hosted internally in space
25 leased by Mozes and externally with third-party cloud

5 (Pages 14 - 17)

Page 18

1 service providers?
2    A.  Again, I'm not understanding your
3 terminology.  When a branded company contracts with a
4 mobile marketing company, unless the branded company
5 purchases the software and brings it on premise and
6 operates it themselves, then by definition, it's in
7 the cloud; it's internal to the company you have
8 contracted with.  So I still don't get the distinction
9 when you say internal to Mozes and some other cloud.
10 I don't know what functionality you're trying to get
11 to.
12    Q.  What cloud service providers was Mozes using
13 on November 5th of 2011?
14    A.  What type of cloud?
15    Q.  Anything material to the Mozes Connect system
16 that you have rendered an opinion on.
17    A.  It's -- the terminology doesn't fit.  I mean,
18 there are many players in the ecosystem here.  Mozes
19 provided mobile marketing functionality and
20 applications.  Mobile Messenger provided connectivity
21 from the Mozes system to the carriers.  The carriers
22 provided connectivity to the subscribers.  So when you
23 say "cloud," I don't know where that actually -- what
24 you're referring to.
25    Q.  Other than Mobile Messenger, are you aware of

Page 19

1 any other company Mozes had a third-party contract
2 with on November 5th of 2011?
3        MR. DONOVAN:  Blain, I'm going to object here
4 and just remind you that we are constrained by the
5 court's fairly limited discovery order.  And
6 relationships between -- corporate relationships
7 between the various defendants and others are not part
8 of that.
9        You can answer the question.
10       MR. KIMREY:  Yeah, I disagree, because the
11 structure of the system is material to his opinions
12 regarding the system and how it operated.  And there
13 were components of the system that were third party,
14 and I'm trying to get a sense of the degree to which
15 he's aware of that.  So far he's only said Mobile
16 Messenger.
17    Q.  Are there any other companies you are aware
18 of Mozes having a relationship with related to the
19 Mozes Connect system on November 5th of 2011?
20    A.  That's hard to say.  Mobile marketing
21 companies like Mozes have purchased a lot of
22 third-party -- excuse me -- software to run their
23 equipment, databases, et cetera, off-the-shelf
24 software, software that they don't develop themselves.
25 So many of these companies that are larger in mobile

Page 20

1 marketing space have many, many partners for
2 third-party software.
3        I don't know if you're referring to the
4 specific software modules that they have purchased to
5 put into their system or you're referring to who
6 they've connected to.
7    Q.  I'm referring to any company at all.  Do you
8 know of any company, other than Mobile Messenger --
9 name one --
10    A.  I --
11    Q.  -- that had a contract with Mozes on
12 November 5th of 2011, of any kind to perform any
13 function whatsoever?
14       MR. DONOVAN:  Same objections.
15       THE WITNESS:  I have no evidence to that
16 effect, but I will say they must have had some, even
17 though I cannot name them specifically.
18 BY MR. KIMREY:
19    Q.  You don't know who they are?
20    A.  I don't know who they are.
21    Q.  With respect to code, are you a coder?
22    A.  Used to be.
23    Q.  What did you code in?
24    A.  Mostly assembler and C.
25    Q.  Is assembler a language that is typically

Page 21

1 used, or was used, by mobile marketing companies on
2 November 5th of 2011?
3    A.  No.
4    Q.  Is C a language, a coding language, that
5 mobile marketers typically used on November 5th of
6 2011?
7    A.  No.
8    Q.  Did you code in any languages other than
9 assembler and C?
10    A.  No.
11    Q.  You never coded in XML?
12    A.  I -- some, that's why I didn't say yes to
13 that.  I mean, I wouldn't say I'm a coder.  I
14 understand XML, I can read it, and I've written small
15 modules.  But to characterize myself as a coder is a
16 stretch.
17    Q.  Have you reviewed any XML code in this case?
18    A.  No.
19    Q.  Do you code in PHP?
20    A.  No.
21    Q.  Have you reviewed any PHP code in this case?
22    A.  No.
23    Q.  Is software code in any way material to
24 determining the operability, functionality, and
25 purpose of a mobile marketing system?

6 (Pages 18 - 21)

Page 22

1    A.  Yes.  But I would qualify that in that,
2 regardless of the type of language it's written in,
3 the fact that it was coded on a computer means that it
4 must have been an automated process.  Otherwise, there
5 would be no computer and no software code required.
6    Q.  So it's your position that any device that
7 has any code component to it whatsoever is automated.
8 Correct?
9    A.  I would recharacterize that as supports
10 automated functions, particular automated functions.
11    Q.  Do certain aspects of code sometimes
12 integrate with human activity?
13    A.  Yes.
14    Q.  And could review of the code reveal the
15 degree to which it taps into human activity?
16    A.  Yes.
17    Q.  Do you know what sort of database servers
18 Mozes used on November 5th of 2011?
19    A.  No.
20    Q.  Do you know what kind of Web servers Mozes
21 used on November 5th of 2011?
22    A.  No.
23    Q.  Do you know what kind of file transfer
24 protocol servers Mozes used on November 11th --
25 November 5th of 2011?

Page 23

1    A.  Are you referring to the hardware
2 manufacturer?  I'm not sure what you're referring to.
3    Q.  I'm referring to FTP servers.
4    A.  Well --
5    Q.  Do you know what an FTP server is?
6    A.  Yeah, the file -- I'm very familiar with the
7 file transfer protocol, which is a standard protocol.
8 It operates the same regardless of the type of server
9 it's on.
10    Q.  But do you know what kind of server they were
11 using for file transfer protocol?
12    A.  Again, are you asking me what the make and
13 model of the --
14    Q.  Yes.
15    A.  -- hardware equipment is?
16    Q.  Yes.
17    A.  No, I do not.
18    Q.  You mentioned that one of the components of
19 what you reviewed in rendering an opinion on the Mozes
20 Connect system was the -- were the websites of the
21 defendants.  And then you referred specifically to the
22 HelloWorld website.
23        Did you review just the HelloWorld website,
24 or did you review a website of somebody else in
25 addition?

Page 24

1    A.  I reviewed not a specific website of one of
2 the defendants.  HelloWorld was the only one that
3 currently existed at that time that I was analyzing
4 these systems.
5    Q.  When you say "at that time," what time are
6 you indicating?
7    A.  Over the last few months when I was provided
8 information to provide my analysis and expert report.
9    Q.  I just want the record to reflect that the
10 witness is looking at Exhibit H of his declaration in
11 this case.
12        What is that?
13    A.  Yes.  I actually -- for my own edification, I
14 understand that it can be confusing, the relationship
15 among the mobile marketing companies, as the
16 defendants here: there is Gerzhom; there's Mozes;
17 there's ePrize.  And I had discovered that ePrize was
18 either renamed or acquired and turned into HelloWorld.
19        I wanted to understand just those
20 relationships over time to give me a holistic view.
21 So I discovered some business news stories that
22 discussed acquisitions of these companies.  So it
23 wasn't so much the websites of the defendants, even
24 though HelloWorld provided me with very, very good
25 information --

Page 25

1    Q.  I just want the record to reflect that the
2 witness is looking at Exhibit I of his declaration
3 now.
4        When you say HelloWorld provided you that
5 information, I notice that Exhibit I has no Bates
6 stamp on it.  Is that something that HelloWorld
7 provided to you or something that you obtained from
8 the world about HelloWorld?
9    A.  Well, it's probably a matter of semantics.
10 They provide this information to the public.  I
11 discovered it online, and they have descriptions of
12 how their mobile marketing platform operates.
13    Q.  So it sounds like you looked at a HelloWorld
14 website or HelloWorld websites.  Did you look at any
15 websites of the other defendants or anybody else in
16 rendering your opinion about the Mozes Connect system?
17    A.  No, they were no longer available, if they
18 existed online.
19    Q.  Did you check the Wayback Machine?
20    A.  I did.  But there were certain dates and
21 information missing.  And sometimes in the Wayback
22 Machine, some of the flash information is not
23 preserved well.  If sites are mostly HTML based, they
24 may be fairly well preserved.  But I didn't discover
25 anything that would have helped me on this case.

7 (Pages 22 - 25)

1    Q.  So you were looking at Exhibits H and I of
2  your declaration in this case to refresh your
3  recollection about what you reviewed related to the
4  information that was available via HelloWorld to
5  describe the Mozes Connect system, right?
6    A.  In general, yes.
7    Q.  So those two exhibits, are those the only
8  material that you obtained from HelloWorld that
9  informed your opinion of how the Mozes Connect system
10  operated?
11    A.  Specifically from that source, yes.
12    Q.  I assume that you obtained Exhibit H and
13  Exhibit I at some point in 2015.  Is that fair to say?
14    A.  Yes.
15    Q.  But the game at issue here was on
16  November 5th of 2011, correct?
17    A.  Yes.
18    Q.  So these documents, to the extent they
19  describe the Mozes Connect system, which I am not
20  conceding, don't describe the system that existed on
21  November 5th of 2011, right?
22    A.  Perhaps.
23    Q.  You don't know?
24    A.  Perhaps.  It's possible that they do.  And in
25  fact, because I've been working on these systems since

1  the beginning of the industry, they all have the same
2  general architecture.
3    Q.  Well --
4    A.  So --
5    Q.  -- you were a founder of m-Qube, right?
6    A.  Yes.
7    Q.  Okay.  And that was in 2002; is that correct?
8    A.  Yes.
9    Q.  M-Qube is a mobile aggregator like Mobile
10  Messenger, right?
11    A.  No.
12    Q.  M-Qube is a mobile aggregator, correct?
13    A.  That is one of their functions; that is one
14  of their businesses.
15    Q.  Okay.  Did the technology that m-Qube used
16  evolve every year?
17    A.  Not much, no.
18    Q.  How do you have any awareness of what
19  m-Qube's technology is now?
20    A.  I keep up with the industry.  I have worked
21  on many TCPA cases where Mobile Messenger was either a
22  party to the case or they provided information as part
23  of the case.  I still know people that work there that
24  I am in contact with.
25    Q.  Do you know whether the Mozes Connect system,

1  as it existed on November 5th of 2011, was not changed
2  in any way by 2015?
3    MR. DONOVAN:  Object to the form.  Maybe --
4  I'm having trouble following that question.  Could you
5  maybe try to --
6    THE WITNESS:  Yeah, I agree; I'm having a
7  little bit of trouble following that as well.
8  BY MR. KIMREY:
9    Q.  Do you know whether the Mozes Connect system
10  was changed at all from November 5th of 2011 to the
11  point at which you turned in your declaration in this
12  case?
13    A.  No.
14    Q.  Where in these two exhibits, H and I to your
15  declaration, does it refer to the Mozes Connect
16  system?
17    A.  It does not.  The -- well, let me clarify
18  that.  The page I got from HelloWorld describes or
19  shows a high-level flow diagram of the Mozes Connect
20  system and how it operates with relationship to
21  building and designing a campaign, and then how that
22  is directed to mobile telephones via SMS.
23    Q.  For the record, the witness, Mr. Snyder, is
24  looking at Exhibit I to his declaration, the only
25  page.

1    So you're saying that this HelloWorld Product
2  Overview is part of what you relied on in rendering an
3  opinion as to the Mozes Connect system's operability
4  on November 5th of 2011; is that correct?
5    A.  Yes.
6    Q.  How does this inform your understanding of
7  the Mozes Connect system on November 5th of 2011?
8    A.  In the mobile marketing industry, these
9  companies, those mobile marketing companies that
10  provide automated, computerized telecommunications
11  services to branded companies, all have the same basic
12  architecture.
13    They have a platform that allows users of the
14  platform to define or design a type of program; they
15  enable that program to be initiated; and they connect
16  either directly to the carriers or to an SMS
17  aggregator that connects to the carriers; they have
18  the ability to interpret automatically incoming
19  messages and send outgoing messages based completely
20  on programmatic control.  That is fundamentally and
21  essentially true of every mobile marketing company
22  that does text messaging campaigns.
23    Q.  Is that what it says on Exhibit I?
24    A.  That's what it shows.  I am very familiar
25  with reading these documents; I am very familiar with

8 (Pages 26 - 29)

Page 30

1  writing marketing documents like this for companies in
2  this space. So I fully understand exactly what --
3  what HelloWorld, formerly Mozes, is attempting to
4  convey in this diagram.
5      Q. To whom is HelloWorld attempting to convey
6  anything in this diagram?
7      A. Generally, their market of potentially and
8  most likely branded companies that hire them in order
9  to use their expertise in these automated text
10  messaging communication platforms to run marketing and
11  advertising programs on their behalf.
12      Q. So it's essentially like a commercial for the
13  system that HelloWorld is using?
14      A. Yes.
15      Q. Correct?
16      A. Essentially, yes. It's a marketing document,
17  and its primary purpose is to attract customers.
18      Q. But it's not a technical document, correct?
19      A. Well, there are technical aspects to it, yes.
20      Q. Do you need a math degree to understand this
21  document?
22      A. No.
23      Q. Do you need a minor in astrology to
24  understand this document?
25      A. I'm sorry. Lots of lay people confuse

Page 31

1  astrology and astronomy.
2      Q. I'm sorry. Do you need a minor in astronomy
3  to --
4      A. Astronomy --
5      Q. -- understand this document?
6      A. Astronomy is a science; astrology is -- is
7  phony.
8          No, you don't.
9      Q. Do you need -- is there anything that would
10  be required to understand this document that's
11  reflected in your education background?
12      A. Yes.
13      Q. What is that?
14      A. Experience. My education background is
15  continuing today and has continued since I left
16  college.
17      Q. Do you think the judge could understand what
18  this document conveys?
19      A. I couldn't even guess what the judge would
20  understand.
21      Q. Do you think it's possible that the judge
22  could understand what this document conveys?
23      A. I have no opinion on that; I just don't know.
24      Q. So it's not impossible?
25          MR. DONOVAN: Objection. I think he just

Page 32

1  answered that question.
2          THE WITNESS: Yeah, I just don't -- I -- I --
3  I cannot speak for a hypothetical judge in this case.
4  BY MR. KIMREY:
5      Q. Do you think that you need any special
6  expertise to understand what this document conveys?
7      A. Yes.
8      Q. Okay. Do you think that the jury could
9  understand what this document conveys?
10      A. Again, I don't know. But I would assume that
11  they would not, unless they had some explanation along
12  with this diagram.
13      Q. Okay. Other than what you've testified about
14  here today, is there anything else that you relied on,
15  reviewed to render your opinion on the operability of
16  the Mozes Connect system as it existed on November 5th
17  of 2011?
18      A. I believe I've already answered that. The
19  answer is no.
20          MR. KIMREY: I'm handing to the court
21  reporter a collective exhibit that I'd like marked as
22  Deposition Exhibit 45.
23          (Deposition Exhibit 45 was marked for
24          identification.)
25          MR. KIMREY: And it's actually not stapled

Page 33

1  together, but it will be. I'll represent that -- I'll
2  represent that -- do you guys want to look at this?
3          MR. DONOVAN: Yes. Am I included in that?
4          MR. HASKINS: Is that the subpoena?
5          MR. KIMREY: Yes, and a few other things.
6          MR. DONOVAN: Thank you.
7  BY MR. KIMREY:
8      Q. So I'll represent for the record that what
9  this is, Mr. Snyder -- and correct me if I'm wrong to
10  the extent you know -- it's the subpoena that was
11  served on you for documents and your deposition in
12  this case.
13          The rider that was attached to the subpoena,
14  a cover letter from the plaintiff law firm of Bailey
15  Glasser saying, essentially, here are the documents in
16  response to the subpoena; then a conveyance by
17  somebody who I believe is a paralegal at Bailey &
18  Glasser, Denise Milhoan, saying that these documents
19  are available on a download site; and then an index
20  that my law firm did of the documents that were at
21  that download site.
22          So does that -- some of these, you have never
23  seen before. You have seen the subpoena before. Do
24  you agree that's the subpoena that you were served in
25  this case?

9 (Pages 30 - 33)

Page 34

1    A.  Yes.
2    Q.  And do you agree that this is the rider that
3  was attached to the subpoena in this case?
4    A.  Yes.
5    Q.  Have you ever seen this cover correspondence?
6  You may not have seen these.
7    A.  No.
8    Q.  I'll just represent to you that they are
9  authentic.
10    And then this is, again, the index of
11  documents that you produced in response to the
12  subpoena.  Go ahead and look at that and make sure it
13  correlates to your memory of what you intended to
14  produce in response to the subpoena.
15    A.  (Witness complies.)
16    Yes.
17    Q.  Okay.  So let's turn to the rider.  And
18  you'll see that we asked for "All regulations
19  promulgated under the TCPA relied upon by Mr. Snyder
20  in his declaration in this case."
21    And you in fact produced regulations in
22  response, right?
23    A.  Yes.
24    Q.  And then we asked for "All deposition
25  transcripts from cases in which Mr. Snyder rendered an

Page 35

1  opinion related to or arising out of the TCPA."
2    Did I read that accurately?
3    A.  Yes.
4    Q.  And we did not get any deposition transcripts
5  from you.  Why is that?
6    A.  I don't have any.
7    Q.  So I have seen in other depositions you take
8  the position that you don't have -- you don't keep
9  deposition transcripts in your possession.  Is that
10  right?
11    A.  Yes.
12    Q.  Do you ever receive deposition transcripts?
13    A.  Sometimes in hard copy.  If I don't waive my
14  right for errata, they'll send me a hard copy.  And
15  I'll either return it with errata or not return it at
16  all or throw it away or -- there's a variety of things
17  that happen.  Sometimes there's nothing worth
18  correcting because it's just a typo or something.  But
19  I just don't save them.
20    Q.  So you have no deposition transcripts in your
21  possession, custody, and control from depositions in
22  which you have testified at this time.  Correct?
23    A.  That is correct.
24    Q.  And you take the position that being able to
25  call up the lawyers by whom you were retained and ask

Page 36

1  them for copies of those deposition transcripts is not
2  to be construed as being in your possession, custody,
3  and control, correct?
4    A.  I don't quite understand that.  I don't know
5  what the process is.  I don't -- I don't have any of
6  these documents, either soft copy or hard copy.  How
7  you obtain them is -- I just don't know how that
8  occurs.
9    Q.  Would it be easy for you to contact the
10  lawyers who retained you in the cases in which you
11  testified at deposition and obtain copies?
12    A.  "Easy" is a relative word.  I don't know.
13  And in the past, in at least one occasion, I was asked
14  to do that.  And the attorneys refused my request and
15  they said -- they told me that I would have to go back
16  to the attorneys requesting those documents and have
17  them call.  So they wouldn't just give them to me.
18    Q.  But they indicated that they would provide
19  them directly to the defense counsel seeking --
20    A.  Potentially.  They said, Look, we're not
21  going to give them to you.  We don't release these.
22  Some of these are under seal.  However, if the
23  attorneys call us up, we'll discuss it with them.
24    Q.  Yeah.
25    A.  So I don't know if the answer is affirmative

Page 37

1  or negative to that.
2    MR. KIMREY:  Just for the record, we take the
3  position that the deposition transcripts, even if
4  they're not in his possession, are in his possession,
5  custody, and control, if he can simply call the
6  lawyers who retained him and obtain copies of them.
7  So the response to the subpoena is incomplete, and
8  we'd appreciate any assistance you can provide us in
9  obtaining those deposition transcripts.  And we'll
10  keep this deposition open until we receive those.
11    Q.  The next thing is -- this is No. 3 on the
12  rider, "All expert declarations or reports from cases
13  in which Mr. Snyder rendered an opinion related to or
14  arising out of the TCPA."
15    And you'll see in the index, there are many
16  of those, correct?
17    A.  Yes, but not all.
18    Q.  And it's not all because of why?
19    A.  They are under protective order and my
20  understanding is I'm not permitted to release them
21  publicly.
22    Q.  So is this list on the index at the end of
23  Deposition Exhibit 45 comprehensive as to all cases in
24  which you have rendered a declaration or opinion
25  related to the TCPA except for cases subject to a

10 (Pages 34 - 37)

Page 38

1 protective order?
2   A. Yes.
3   Q. Then we asked for "All patents listed on
4 Mr. Snyder's curriculum vitae in this case."
5       And you provided those, correct?
6   A. Yes, and they are also publicly available on
7 USPTO's site and various international sites.
8   Q. Do any of those patents address automatic
9 telephone dialing systems?
10   A. No.  Except -- let me clarify.  There are
11 several in there that are related to short message
12 service and the novel inventions we created while I
13 was at m-Qube, which is the old version of Mobile
14 Messenger.  So some of them relate to transactions of
15 SMS with an automated system.
16     So without me reading them in detail, my
17 recollection is that they refer to the operation of
18 some of the server side of the mobile marketing
19 operations with respect to transmitting SMS messages.
20   Q. Do any of them use the term, quote, automated
21 telephone dialing system, end quote?
22   A. No.
23   Q. Do any of them use the term, quote, ATDS, end
24 quote?
25   A. No.

Page 39

1   Q. Do any of them deal with technology that
2 randomly or sequentially generates and dials numbers?
3   A. No.
4   Q. Did you review any of these patents in
5 rendering your opinions in this case?
6   A. No.
7   Q. No. 5 in the rider, Appendix A, says, quote,
8 All orders in which Mr. Snyder's opinions have been
9 accepted, rejected, or excluded, either explicitly or
10 by implication where a judge took a position contrary
11 to Mr. Snyder's opinions, end quote.
12     Did I read that accurately?
13   A. Yes.
14   Q. But there is nothing of that nature in the
15 index, correct?
16   A. The only thing I provided was the Satterfield
17 opinion, which was the first TCPA case I worked on.
18   Q. Why did you provide the Satterfield opinion,
19 but no other opinions?
20   A. That's the only one I have.  It's the only
21 one -- just it's the only one I have.
22   Q. Do you have access to Westlaw?
23   A. No, I'm not a subscriber to Pacer or Westlaw.
24 However, I have talked to attorneys that have
25 described these things to me or I have read articles

Page 40

1 online by law firms that publish things about
2 decisions that have occurred.  But I don't actually
3 have those opinions.
4   Q. Do you have a Lexis account?
5   A. No.
6   Q. In Satterfield, did the judge accept your
7 opinion?
8   A. Partially.
9   Q. What part of your opinion did the judge
10 accept?
11   A. That the text messages sent in that case
12 were -- were sent based on a list of cellular
13 telephone numbers that essentially blasted out this
14 template text message to all these telephone numbers
15 in the list and accepted that as qualifying, as a
16 qualifying factor in an ATDS, aside from the cellular
17 telephone numbers being either randomly or
18 sequentially generated for that text message blast.
19   Q. Did the judge find an ATDS in that case?
20   A. The appellate court or the --
21   Q. I'm talking about the district court judge.
22   A. The district court judge.  I don't -- I don't
23 have that opinion.  I know that it was dismissed for a
24 variety of reasons, one being that it wasn't clear at
25 that time that text messages were calls within the

Page 41

1 TCPA, although there had been some prior regulations
2 about that.  And that was the very first -- my
3 understanding is that was the first TCPA case that
4 concerned text messaging calls as opposed to voice
5 calls.
6   Q. Right.  But back to my question.  Do you know
7 whether the district judge found that the system was
8 an ATDS in that case?
9   A. No, I don't know.  I don't know the opinion.
10   Q. Do you know whether the ninth circuit found
11 that the system was an ATDS in that case?
12   A. I know they remanded it back for further
13 consideration.  But I don't recall any statements in
14 the appellate court's decision that said this is
15 definitely an ATDS.
16   Q. Do you know who Jay Emmet is?
17   A. Jay Emmet?
18   Q. E-m-m-e-t.
19   A. Yeah, I didn't understand your pronunciation.
20 The name is familiar to me.
21   Q. Do you know why it's familiar to you?
22   A. No, I can't . . .
23   Q. So the district judge in Satterfield actually
24 adopted, blessed, validated your opinion in that case?
25   A. The district judge?

11 (Pages 38 - 41)

Page 42

1  Q. Correct.
2  A. I don't know what his opinion was. All I
3  know is the case was dismissed and the attorneys
4  decided to appeal. And I got -- around 18 months
5  later, I got this notice that the case was remanded
6  back to the district court.
7  Q. Has a judge ever criticized you for your
8  reliance on the Satterfield opinion?
9  A. No. Well, not that I know of, I should say.
10  Not that I know of. In fact, the Satterfield opinion
11  is the basis for many of the FCC regulations.
12  Q. When judges make decisions in cases in which
13  you've submitted a declaration or given a deposition,
14  do the lawyers who have retained you typically provide
15  you a copy of those decisions?
16  A. No. In a couple of cases, I have gotten --
17  so especially the ones that I think are more
18  meaningful or ones that I happen to be just personally
19  a little more proud of. So the Satterfield was one.
20      I got a call about a month ago about an
21  appellate court decision in the third circuit,
22  Dominguez vs. Yahoo!, that we kind of won that appeal
23  and that was remanded back as well. But I haven't
24  seen that decision.
25  Q. If I told you that your opinions under the

Page 43

1  TCPA have been struck, rejected, or criticized on at
2  least ten different occasions, would that be news to
3  you; would you contest that, or is that something that
4  you would concede?
5  A. I'm not sure it's as high as ten. But it may
6  be, certainly, sure.
7  Q. Do you know why your opinions have been
8  struck, criticized, disregarded, or otherwise
9  rejected, either explicitly or implicitly?
10  A. Only one case that I know of where I had a
11  paragraph struck because the defense counsel convinced
12  the court that that paragraph was a legal opinion that
13  I was not qualified to provide.
14  Q. You're not a lawyer, right?
15  A. I am not a lawyer.
16  Q. Have you received any legal training
17  formally?
18  A. No.
19  Q. In this case, you are providing an
20  interpretation of what an automatic telephone dialing
21  system is under the TCPA, correct?
22  A. No.
23  Q. What are you providing an opinion on?
24  A. My -- what I was asked to opine on and what I
25  opined on was whether the system at issue here, the

Page 44

1  automated computer system at issue here, qualified as
2  an ATDS under the TCPA.
3  Q. Could you explain to me how that differs from
4  what I just said?
5  A. Yeah, I'm not -- I don't interpret statutes.
6  What I do is I read a statute; it has certain
7  technology embedded within it. Part of my job is to
8  bridge that and see if the system meets the listed
9  criteria in the statute.
10  Q. Does the term "automatic telephone dialing
11  system," whose acronym is ATDS, have any meaning
12  outside the TCPA?
13  A. Absolutely.
14  Q. How so?
15  A. There are many, many systems whose actual
16  product name has automatic telephone dialing system as
17  part of it or automatic dialing system. Some of the
18  later versions of those products have shifted away
19  from using that terminology so as not to be -- in my
20  opinion, so as not to be so blatant about their
21  correlation with the TCPA statute.
22  Q. Do those products that you say have been
23  described as automatic telephone dialing systems
24  outside the context of the TCPA and the term
25  "automatic telephone dialing system" within the TCPA

Page 45

1  have a perfect symmetry: are they mirror images of
2  each other?
3  A. No.
4  Q. How do they differ?
5  A. That's a very broad question. Some systems
6  fulfill all the criteria listed in the TCPA statute of
7  what constitutes an ATDS, some do not. So that's my
8  answer.
9  Q. And you are rendering an opinion in this case
10  only to what could amount to an automatic telephone
11  dialing system product outside the TCPA, not an
12  opinion on whether the ATDS definition in the TCPA has
13  been satisfied, correct?
14  A. I'm not sure I understand. Can you repeat
15  that, please?
16  Q. If I understand what you're saying, you're
17  saying that based on your technical background, you
18  are providing an opinion in this case about whether
19  the Mozes Connect system is an ATDS product separate
20  and apart from whether it satisfies the definition of
21  ATDS under the TCPA. Right?
22  A. No.
23  Q. So are you rendering an opinion on whether
24  the Mozes Connect system satisfies the ATDS provision
25  of the TCPA?

12 (Pages 42 - 45)

1    A. Yes.
2    Q. Does that involve any legal analysis at all?
3    A. Probably, but only what's been explained to
4 me by plaintiff's counsel on what -- what that
5 definition means from a legal standpoint.
6    Q. So to the extent you offer legal analysis as
7 to whether the Mozes Connect system qualifies as an
8 ATDS under the TCPA, you are relying on the
9 characterizations of plaintiff's counsel for those
10 parts of your opinion, correct?
11    A. No. In fact, I provide no legal analysis at
12 all. I simply look at the functionality and analyze
13 the system at issue in this case and see if it
14 fulfills some criteria that's listed in a federal
15 statute. And the words in that statute have been
16 explained to me by plaintiff's counsel on how I should
17 understand the English language of that statute.
18    But I am certainly not interpreting the
19 statute or providing a legal analysis of the statute.
20 I am simply providing an analysis of whether a
21 technological system constitutes what's described as a
22 technological system in a statute.
23    Q. So it's your position that within your
24 declaration submitted in this case, there is not a
25 single legal conclusion. Correct?

1    A. That's correct.
2    Q. Okay.
3    MR. DONOVAN: Hey, Blain, we've been going at
4 it for a little bit more than an hour. I don't want
5 to interrupt your line of questioning, but whenever
6 you get to a good stopping point, I would like a
7 break.
8    MR. KIMREY: We can break now.
9    THE WITNESS: Yeah.
10    MR. DONOVAN: Just a short.
11    THE VIDEOGRAPHER: Going off the record at
12 10:09.
13    (Recess taken.)
14    THE VIDEOGRAPHER: We're on the record at
15 10:21.
16 BY MR. KIMREY:
17    Q. Mr. Snyder, let's talk a little bit about
18 your background. We previously talked about your BA
19 in mathematics and your minor, not in astrology, but
20 in astronomy, from Franklin and Marshall in 1984.
21    Did that education that you received at
22 Franklin and Marshall involve telecommunications
23 systems at all?
24    A. No.
25    Q. You say -- and feel free to refer to your

1 declaration, if you want to. This is at page 4,
2 paragraph 4 -- that, quote, I have over 30 years of
3 experience in telecommunications network and system
4 architecture, engineering, design, and technology. I
5 am an expert in the field of both wireline and
6 wireless telecommunications networking technology.
7    Did I read that accurately?
8    A. Yes.
9    Q. As part of that expertise, have you ever --
10 you referred earlier to ATDS products. Have you ever
11 helped a client purchase an ATDS product?
12    A. No.
13    Q. Have you ever --
14    A. Let me clarify. In terms of text messaging
15 systems that are in fact ATDSs, the answer is yes. I
16 have not helped purchase voice calling systems that
17 are considered ATDSs.
18    Q. Have you helped a client purchase a text
19 message system that is not an ATDS?
20    A. No.
21    Q. Is there such a thing as a text message
22 system that is not an ATDS?
23    A. I'd have to think about that. The systems I
24 have generally worked on over the last 10 to 15 years
25 were designed to do text messaging, automated text

1 messaging programs, similar to what's at issue in this
2 case. I am sure that there are other applications or
3 other text messaging functions that may not possibly
4 qualify or may not be considered an ATDS.
5    Q. Can you think of any specific text message
6 system, as you sit here today, that would not be an
7 ATDS?
8    A. I'm not sure whether you're asking me if I
9 can come up with one, or devise one in my head, or
10 provide you one that already exists.
11    Q. Let's do both. Give me an example of one
12 that exists and then give me an example of one you can
13 devise in your head.
14    A. One I can devise in my head would be a system
15 that enables individuals to send out each individual
16 text message, invoke and initiate and actually send
17 the message with their own invocation, a human
18 invocation.
19    Q. So if I sent you a text message with my
20 iPhone 6, would that not be an ATDS under that
21 scenario that you have just described?
22    A. It depends.
23    Q. On what?
24    A. That's a hypothetical. It depends on the
25 software in the device; it depends how it's used. You

13 (Pages 46 - 49)

1  know, ATDSs are not bad things; they just exist. It's
2  a matter if they're used improperly whether there is a
3  problem or not.
4      I have previously testified in two cases that
5  a smartphone was an ATDS in the way it was used, based
6  on the software and the hardware. Again, it depends
7  on the functionality of the individual phone we're
8  talking about.
9      Q. I just want the record to reflect that I'm
10  showing Mr. Snyder my iPhone 6 as the standard battery
11  of items. You can look at it if you want. Based on
12  what you see there, is my iPhone 6 an automatic
13  telephone dialing system?
14      A. It could be potentially.
15      Q. How?
16      A. Well, I have just a -- I'm not an attorney.
17  I have a lay understanding of what the TCPA means in
18  terms of capacity and potential capacity as described
19  in the FCC regulations. I believe that using the
20  plain, ordinary English understanding of what
21  potential capacity is, that this device has the
22  potential capacity to be an ATDS.
23      Q. So does that mean it is an ATDS?
24      A. It could be.
25      Q. But you can't say either way as you sit here

1  today whether an iPhone 6, let's say factory,
2  off-the-shelf iPhone 6, is an ATDS or not?
3      A. All I can say is it could be. Without doing
4  the full analysis, without seeing how it operates and
5  comparing it to these systems, I would have to think
6  about that.
7      Q. But you have testified previously without
8  qualification that an iPhone is an ATDS, correct?
9      A. No, with qualification.
10      Q. What was the qualification?
11      A. The qualification was the specific manner of
12  the software that was stored and added to the
13  smartphone itself. It wasn't off-the-shelf.
14      Q. Have you ever assisted a client with TCPA
15  compliance?
16      A. No. No.
17      Q. Have you ever assisted anybody with TCPA
18  compliance?
19      A. No. And actually, I don't even know what the
20  terminology means.
21      Q. Why do you not know what "TCPA compliance"
22  means?
23      A. If we couch the question in terms of an ATDS,
24  which is primarily what I'm here for to provide my
25  expertise, ATDSs are wonderful machines; they do great

1  things. There's nothing wrong with something being an
2  ATDS; it's the manner in which it's used.
3      So lots of equipment can be an ATDS, and on
4  day one, you could say, Well, what does compliance
5  mean? Well, if you use it improperly, it wouldn't
6  comply; if you use it properly, it would comply. So
7  it depends on how it's used from that point on. It's
8  not a TCPA compliance objectively and for all time
9  once you look at a technology system; it depends on
10  how it's used.
11      Q. So at page 1 of your declaration, which is
12  Deposition Exhibit 44, you say: I am an independent
13  telecommunications technology consultant. I have been
14  retained by Bailey & Glasser to provide my expert
15  opinions related to technology described within the
16  Telephone Consumer Protection Act, 47 USC Section 227,
17  et seq., TCPA, and the claims by plaintiff that
18  defendants employ an automatic telephone dialing
19  system -- upper case -- ATDS, as defined in the TCPA.
20  In particular, I have been asked to determine whether
21  defendants operated equipment which has the capacity
22  to store or produce telephone numbers to be called
23  using a random or sequential number generator or from
24  a list or database of numbers, and whether defendant
25  operated equipment which has the capacity to dial

1  telephone numbers without human intervention, end
2  quote.
3      Did I quote that accurately?
4      A. Yes.
5      Q. So in paragraph 2, that is the scope, at
6  least as characterized in paragraph 2, of the opinions
7  that you are going to provide in this declaration, a
8  summary. Correct?
9      A. Yes. This is what I have been asked to opine
10  on.
11      Q. Where did this language come from?
12      A. It comes from, directly from the statutory
13  definition of an ATDS.
14      Q. And you are determining whether the Mozes
15  Connect system satisfies the statutory definition of
16  an ATDS, correct?
17      A. Um, yes. And let me clarify. Again, not
18  making a legal conclusion, but because the statute has
19  telecommunications technology definitions within it
20  and descriptions within it, I understand what those
21  definitions mean within that, and then I see if the
22  system meets that criteria.
23      And it's actually more aptly worded in
24  paragraph 2. As opposed to making legal conclusion --
25  which I'm not trying to do, or I'm not doing -- I'm

14 (Pages 50 - 53)

1 trying to see if the system at issue here fulfills
2 these requirements, has the capacity to store or
3 produce telephone numbers to be called, et cetera.
4 And my understanding is that terminology is fairly
5 representative of layman's English.
6    Q. So when Congress passed the TCPA in 1991 and
7 it used the terminology with respect to an ATDS, it's
8 your position that Congress had in mind the ATDS that
9 existed as a product out there in the marketplace, and
10 that's what they were intending to refer to in 1991
11 was this ATDS that had a preexisting nomenclature of
12 ATDS. And they said, yeah, that thing that's in the
13 market, that's what we're going to address in the
14 statute?
15    A. No, that's not my understanding.
16    Q. In your declaration, this is at page 4,
17 paragraph 5, you say, quote, I taught many classes and
18 seminars in both wireline and wireless
19 telecommunication network technologies and have been a
20 panelist and speaker at numerous conferences at the
21 Institute of Electrical and Electronics Engineers, the
22 Personal Communication Society, and the Cellular
23 Telecommunications and Internet Association, CTIA, as
24 an expert in telecommunications networks. I spent
25 seven years developing standards within the American

1 National Standards Institute's subsidiary
2 organization, the Telecommunications Industry
3 Association, TIA, providing technical contributions
4 and authoring and editing telecommunications proposed
5 standards documents. Most notably, I authored and
6 oversaw the standardization of Interim Standard 93,
7 providing interconnection technology between wireline
8 and wireless networks, which is a fully accredited
9 national standard of the American National Standards
10 Institute, ANSI.
11       Did I read that accurately?
12    A. Yes. I enjoyed that.
13    Q. So that's a mouthful.
14    A. Yes. I enjoyed you reading that. Thank you.
15    Q. Thank you.
16       Did any of that have anything to do with
17 Telephone Consumer Protection Act compliance?
18    A. Not particularly. However, sometimes, in my
19 opinion, being an expert in a particular technology
20 requires more holistic understanding of not just that
21 particular, individual technology, but how the systems
22 around it work and how those systems use that
23 technology.
24       In that respect, almost all the work I have
25 done in the telecommunications field has informed my

1 knowledge, my education, my experience, and therefore
2 my understanding of the particular technology defined
3 within the TCPA.
4    Q. You referred to the CTIA in this paragraph.
5 Do you know whether the CTIA agrees with you on your
6 interpretation of the TCPA?
7    A. I don't particularly know. I know that --
8 what I can tell you is, as an -- as an industry trade
9 organization, and essentially a lobby group
10 representing the carriers in the United States, they
11 have had many -- excuse me -- they have provided many
12 opinions and written many letters and lobbied Congress
13 and the FCC on issues related to the TCPA, but I can't
14 answer that question in detail of what those opinions
15 specifically were.
16    Q. Do you think there's any chance that the CTIA
17 would ever hire you as an expert in a TCPA case?
18    A. No, they would probably not be a party to a
19 TCPA case, I would assume.
20    Q. Do you know whether the IEEE would ever --
21 agrees with you on your interpretation of the TCPA?
22    A. My -- my estimated guess is they are not
23 concerned with the TCPA or my expertise in that area.
24    Q. Back to what you said about the CTIA. Are
25 you aware that the CTIA is filing an amicus brief

1 before the DC Circuit Court of Appeals related to the
2 July 10th, 2015 FCC order that you have included as
3 one of the things you've relied on in this case in
4 rendering your opinion?
5    A. I'm aware that they are doing that. Again,
6 like I said, they provide their opinions. I have not
7 read that; I don't know what their opinions are. And
8 I did not rely on any of the CTIA's views or opinions
9 or lobbying or trade practices in rendering my opinion
10 here.
11    Q. But you know that the CTIA is becoming a
12 party amici in the DC Circuit, correct?
13    A. I have read that in the news I read on a
14 daily basis about these issue, yes.
15    Q. Does Interim Standard 93 refer to the
16 Telephone Consumer Protection Act?
17    A. No.
18    Q. Does it refer to an automatic telephone
19 dialing system?
20    A. Perhaps.
21    Q. Does it refer to the specific term "automatic
22 telephone dialing system"?
23    A. No, it doesn't.
24    Q. Does it refer to ATDS?
25    A. No.

15 (Pages 54 - 57)

Page 58

1  Q. Does it refer to human intervention as
2 referred to in the TCPA?
3  A. No.
4  Q. Does it refer to consent as referred to in
5 the TCPA?
6  A. No.
7  Q. Does it refer to the notion of capture as set
8 forth in your declaration in this case?
9  A. Yes.
10  Q. How so?
11  A. That standard provides the detailed protocol
12 and technology enabling the wireless telecom network
13 to connect to a wireline network.  As such, it defines
14 all the detailed signaling protocol, both
15 multifrequency pulses along with what's called
16 Signaling System 7, which is a signaling protocol
17 that's out of band for digital channels.  Across all
18 of these protocols, the originating address of a call
19 is -- is preserved when making a call from one party
20 to another.  And that originating address is part of
21 the protocols defined within that standard.
22  Q. So in other words, the packet that's conveyed
23 via the text transmission or wireless call
24 transmission -- well, let's talk about text.  That
25 packet conveys the phone number of the originator,

Page 59

1 correct?
2  A. Yes.  And there's two -- let me describe this
3 just a bit.  There are two technologies included
4 there.  And the formal title of that is AI A-sub-I
5 E-sub-I interfaces; it's analog and digital.  On the
6 digital interfaces that provide Signaling System 7,
7 that is packet-based protocol.  There is a basic
8 message within the protocol that preserves that and
9 maintains that data.  For analog use, there are simply
10 multifrequency pulses that are sent in a certain order
11 at a certain frequency, so it's not a packet, as we
12 would consider a packet communication to be.
13  Q. You go on to say in your declaration, quote,
14 I have been hired as a consultant by the CTIA as well
15 as many wireline and wireless carriers companies --
16 and there's a long list here of these companies;
17 that's page 5, paragraph 6.
18   In that work for any of those companies, have
19 you provided any advice or instruction related to the
20 Telephone Consumer Protection Act?
21  A. No.
22  Q. Then you say -- same page, same paragraph --
23 I was also nominated in 2006 for a National Television
24 Arts Emmy award for outstanding achievement in
25 advanced media technology for unique wireless content

Page 60

1 distribution technology I designed while employed at
2 Entriq, Inc.
3   Did I read that accurately?
4  A. Yes.
5  Q. How is that relevant to your declaration in
6 this case?
7  A. It's -- this is a template I typically put as
8 a standard preface and introduction to all my reports
9 simply as a summary of my qualifications.
10  Q. So this just got cut and pasted from other
11 expert reports?
12  A. Yeah, in fact I do that with many reports.
13 There are certain pieces that I cut and paste and then
14 go through and modify, as needed.  Because the front
15 piece, things like the last paragraph, the last
16 sentence that said my opinions are subject to the laws
17 of perjury in the United States, those types of
18 things, are all standard template items I use.
19  Q. Then you go on to say -- and this is at
20 page 5, paragraph 7 -- In addition, in 2002, I was the
21 cofounder of m-Qube, Inc., one of the first
22 message-based mobile marketing companies in North
23 America, now known as Mobile Messenger, Inc.  M-Qube
24 founded and established the Mobile Marketing
25 Association, CURL, which subsequently established the

Page 61

1 technology and methodology for the use of text
2 message-based short codes as well mobile guidelines
3 and rules within North America.
4   Did I read that accurately?
5  A. Yes.
6  Q. How was -- did your work with m-Qube involve
7 TCPA compliance at all?
8  A. Indirectly.
9  Q. How so?
10  A. Not specifically TCPA compliance, but because
11 my position there at the time was vice president of
12 wireless technology and carrier marketing, because we
13 were a small start-up company so I wore many hats,
14 there are -- there were many requirements that I had
15 designed into the system that anticipated problems,
16 certain problems, when contacting consumers with these
17 text messaging systems.
18   I didn't know until later on, many years
19 later, when I was hired maybe for the first time to do
20 a TCPA case, that I had actually put in some
21 requirements that were good requirements that actually
22 avoided some TCPA violations.
23  Q. So in 2002, when you were the vice president
24 of wireless marketing and carrier technology at
25 m-Qube, were you aware that the TCPA applied to text

16 (Pages 58 - 61)

1 messages?

2    A.  No.

3    Q.  Was there any effort made by you to ensure
4 specifically that m-Qube was in compliance with the
5 TCPA?  Not general compliance, I'm talking about
6 compliance with the statute.

7    A.  Not specifically.  But again, what I can say
8 is, knowing a great deal about how these systems
9 worked, and around this time was the infancy of what's
10 called number portability in the United States today,
11 where you can keep your number and change carriers.
12 At the time when I was designing this system, I
13 actually discovered that, wait a minute, what if
14 you're sending messages to somebody that's part of a
15 program and he relinquishes his phone number and
16 somebody else gets it and then we'd be sending them
17 again.  So I actually addressed some of these issues
18 in the requirements in anticipation that that would be
19 problematic.

20    Q.  But that had nothing to do with the TCPA;
21 that had to do with erroneous transmissions after
22 local number portability, correct?

23    A.  However, that is a large portion of what the
24 TCPA addresses today.

25    Q.  But when you were dealing with that, did the

1 letters TCPA ever spring from your lips?

2    A.  No.

3    Q.  Okay.  When did you learn or understand that
4 the TCPA purportedly applied to text messages?

5    A.  In 2007.

6    Q.  Was that in the context of being retained in
7 the Satterfield case by Jay Adelson?

8    A.  Yes.

9    Q.  Was Darcy Wedd involved with m-Qube back in
10 2002?

11    A.  I am not familiar with the name.

12    Q.  With respect to MMA compliance, were you
13 involved at all in the adaption of the initial MMA
14 standards when you were at m-Qube?

15    A.  Yes.

16    Q.  How so?

17    A.  Since we founded the organization, we had
18 a -- one of our founders was given the task of simply
19 running this as a kind of marketing and trade group.

20    Q.  Who was that?

21    A.  Um, his name escapes me.  I can get it to you
22 later.  I have it in my phone --

23    Q.  I would like that.

24    A.  -- his name escapes me.

25       And I was actually -- he made all the

1 arrangements, and we had contracts -- contacts in the
2 industry for many people, to carriers, from other work
3 we had done in the CTIA.  So we had a meeting,
4 off-site meeting, with a handful of representatives of
5 the carriers at the time and formed this group.  And I
6 was at all the initial meetings the first several
7 months.

8       And we also put together the outline and
9 the -- as the founders of this -- to try and get
10 things rolling, the originator of kind of these best
11 practices, codes of conduct, all that information.  So
12 I was there at the very beginning when they started to
13 define these things.

14    Q.  Were any standards actually adopted based on
15 work product that you were involved in?

16    A.  Oh, yeah, yes.  I'm sure, yes.

17    Q.  Which ones?

18    A.  I'm sure there's a lot -- certainly a lot of
19 the general ones at the beginning.  This was an
20 early --

21    Q.  Can you name them specifically?

22    A.  Not -- I'd have to look at the document to
23 see the specific numbers.

24       Things like, you know, these programs should
25 adhere to all applicable laws, federal regulations,

1 those types of things.  Those were the really general
2 umbrella requirements.

3       And also the goal was to make sure that these
4 types of programs were good marketing programs.
5 Meaning that they weren't an annoyance; they weren't
6 harassment; we didn't bother people.  The last thing
7 the carriers wanted was to turn off their subscribers.

8       So these were the main tenets that formed
9 into these separate requirements.  I'm sure, over the
10 years, the individual wording of some of them have
11 been modified and clarified.

12    Q.  To that point, were these standards intended
13 to be static standards, or were they intended to be
14 standards that would evolve over time because of the
15 evolution of technology, the evolution of law, the
16 evolution of people's expectations, et cetera?

17    A.  The latter.

18    Q.  So they were intended to evolve over time,
19 correct?

20    A.  Yes.

21    Q.  So the standards that existed -- when did you
22 leave m-Qube?

23    A.  2004?  2003, 2004.

24    Q.  So after you left m-Qube in 2003, 2004, did
25 you have any involvement with the Mobile Marketing

17 (Pages 62 - 65)

1 Association at all?

2   A.  Yes.

3   Q.  How so?

4   A.  In 2004, after I left m-Qube, I began working

5 for Entriq in California, right outside San Diego.

6 And I was brought in to design and build a content

7 distribution system for mobile devices.  Along with

8 that, that type of content, were downloads that

9 consumers could pay for that used premium rate text

10 messaging as the billing mechanism and used WAP

11 billing.

12       WAP is the wireless application protocol,

13 which was the standard protocol for very old phones

14 that had very light browsers in them before there was

15 enough bandwidth for data.

16   Q.  And what was your involvement with the MMA at

17 that time?

18   A.  I was always aware and keeping up with all of

19 their requirements, guidelines, and standards.

20   Q.  But were you involved with the MMA?

21   A.  I wasn't specifically involved with the MMA,

22 but I was reviewing and applying all of their

23 standards, as they came out, to our product.

24   Q.  Okay.  So did you have any involvement with

25 the MMA after you left m-Qube?

1   A.  Not as a member, no.

2   Q.  Did you have any involvement of any other

3 kind besides being a member?

4   A.  No.

5   Q.  In rendering your opinions in this case --

6 well, scratch that.

7       You say at page 4, paragraph 4, quote, I

8 have -- this is in your declaration -- I have been

9 retained as a testifying or consulting expert in over

10 100 cases regarding cellular telecommunications

11 technology, including over 60 cases regarding short

12 message service, SMS technology, and over 70 cases

13 regarding the TCPA and associated regulations.  In

14 addition, I have been retained as an expert by both

15 plaintiffs and defendants in cases regarding the TCPA,

16 end quote.

17       Did I quote that accurately?

18   A.  Yes.

19   Q.  How many TCPA cases have you been retained by

20 a defendant in?

21   A.  A handful, maybe five, four, five, six,

22 somewhere in that range.

23   Q.  What are they?  Can you identify them in your

24 CV?

25   A.  Yes.  Actually, in my case list, which is

1 part of my CV, there is a line item under each case of

2 whether it was for the defendants or the plaintiffs,

3 my representation.

4   Q.  Okay, so on our next break, what I'd like you

5 to do is go through your CV and identify -- you don't

6 need to do it right now, but during the next break --

7 identify the cases in which you were retained by a

8 defendant to render an opinion related to the TCPA.

9 So we'll come back to that.

10   A.  Okay.

11   Q.  Have you ever, in a case in which you've been

12 retained related to the TCPA, rendered an opinion that

13 a system is not an ATDS?

14   A.  Yes.

15   Q.  That took you a while to answer.  What case

16 or cases?

17   A.  It was Connelly vs. Hilton Grand Vacations.

18   Q.  Is that the only one?

19   A.  I believe that's the only one.

20   Q.  And what's your estimate of the number of

21 cases in which you've been retained where you found a

22 system to be an ATDS?

23   A.  Most of them, the great majority.

24   Q.  In your declaration, you indicate that,

25 quote, I am the coauthor of the McGraw-Hill book

1 Mobile Telecommunications Networking with IS-41 and

2 Wireless Telecommunications (sic) Networking with

3 ANSI-41, Second Edition, published in '97 and 2001,

4 respectively.  Correct?

5   A.  Yes.

6   Q.  And you'll see that I actually have copies of

7 these books with me here today.

8   A.  Thank you; I get a royalty on those.

9   Q.  Actually, I just checked them out from the

10 library, so sorry.

11       Do these look familiar to you?

12   A.  Very much so.

13   Q.  Okay.  Are these the two books referred to --

14 I'll note for the record that I'm holding the books up

15 in the air.  Are these the two books referred to in

16 your declaration?

17   A.  Yes, they are.

18   Q.  Okay.  Did you rely on anything in these

19 books to render your opinions in this case?

20   A.  Again, that's -- I guess my answer would be

21 similar to what I described before.  Which is, my

22 experience and education with the overall technology

23 and being an expert in text messaging technology

24 overall informed, in a holistic way, my opinions in

25 this case, but nothing specific in those texts was

18 (Pages 66 - 69)

Page 70

1 relied upon specifically for my opinion.
2      MR. KIMREY:  I'm presenting to the witness to
3 be marked as, I believe, Deposition Exhibit 46, a
4 document.
5      (Deposition Exhibit 46 was marked for
6      identification.)
7      THE WITNESS:  I wish you would have gotten
8 books for everybody.
9      MR. HASKINS:  Can't afford it.  Clients have
10 been inundated by frivolous TCPA suits.
11 BY MR. KIMREY:
12      Q.  So as you'll see, Mr. Snyder, Deposition
13 Exhibit 46 is the cover and the copyright page of the
14 book you coauthored with Michael Gallagher, titled
15 Mobile Telecommunications Networking with IS-41.
16      Do you see that?
17      A.  Yes.
18      Q.  And I want to refer you to the last page of
19 that exhibit, which is page 291 of the book.
20      A.  Yes.
21      Q.  And what this says is, quote -- at the top,
22 first bullet point -- Subscribers may roam into areas
23 where SMS is not supported.  The subscriber may not
24 have access to SMS in all cellular coverage areas.
25 Subscribers may not be aware that they have lost

Page 71

1 service, end quote.
2      Did I read that accurately?
3      A.  Yes.
4      Q.  Is that an accurate representation of your
5 understanding of the problems that can occur with
6 roaming and SMS?
7      A.  Well, it's a little out of context.  And
8 because I don't have the introductory paragraph there,
9 I don't specifically recall what this was part of.
10      Q.  Would you like to see the book?
11      A.  Yes, that would be very helpful.
12      Q.  I'm handing to --
13      A.  I hear it's very well written.
14      Q.  -- Mr. Snyder the full book so he can see
15 what's on page 290 to obtain the context of page 291.
16      A.  Yes, okay.
17      I wanted to make sure; I assumed it was under
18 that section.
19      Q.  So anyway, is that an accurate
20 characterization of a problem associated with SMS
21 roaming?
22      A.  It was at the time this book was published.
23      Q.  And that would have been, what, 1997?
24      A.  Yes.
25      Q.  Okay.  When did it resolve?  When did that no

Page 72

1 longer -- when was that no longer a problem?
2      A.  Somewhere around, I believe, 2000, 2001.
3      Q.  Okay.  So that actually -- dropping -- I
4 mean, I read that as a layperson as indicating that
5 there are issues with dropping off a network when
6 you're moving around.  I know that I experience that
7 to this day.
8      Is that a different phenomenon than the
9 phenomenon that you're describing in the book?
10      A.  Not really.  This bullet item is really
11 talking about that in 1997 this particular standard
12 for the use of short message service was in its
13 infancy and many mobile phone manufacturers,
14 particularly Nokia, were the first manufacturer to add
15 SMS as a function into their handsets at the time.
16 However, the very first handsets could actually
17 receive text messages, but not send them, which seems
18 counterintuitive, but that's exactly what the
19 functionality was.  Also at that time, most handsets
20 did not support SMS.
21      So the context of this book is describing the
22 technology in detail, how it operates and how it
23 works.  And this bullet point is particularly talking
24 about the issues that could occur with SMS at the time
25 this book was published.  Which means most people

Page 73

1 didn't use it at that time.
2      Q.  So you're saying that characterization
3 wouldn't be relevant to November 5th of 2011?
4      A.  That's correct.
5      Q.  Okay.  I don't have a copy of this, but do
6 you know whether the Glossary of this book or the
7 Index of this book referred to the telephone
8 communications -- Telephone Consumer Protection Act?
9      A.  Yeah, I can say it does not.
10      Q.  Okay.  Do you know whether they refer to the
11 term "automatic telephone dialing system"?
12      A.  I'm sure it does not.
13      MR. KIMREY:  I'm handing Mr. Snyder
14 Deposition Exhibit 47.
15      (Deposition Exhibit 47 was marked for
16      identification.)
17 BY MR. KIMREY:
18      Q.  This is a select portion of the other book,
19 correct?
20      A.  Yes.
21      Q.  This book also, at page 73, addresses this
22 notion of roaming and it says, quote, at the bottom of
23 page 73, The idea of a seamless and ubiquitous
24 cellular network is a goal that many service providers
25 try to attain, but it is very illusive.  Seamlessness,

19 (Pages 70 - 73)

Page 74

1  a good industry buzzword, refers to the ability of a
2  subscriber to obtain wireless telecommunication
3  services while roaming in the exact same way that they
4  are provided in the home service area; i.e., no
5  apparent seams between network service areas.
6          Did I read that accurately?
7      A.  Yes.
8      Q.  Was that just an issue in 2001 when this book
9  was published or is that an issue to this day?
10     A.  It's an issue to this day; however, it's a
11 much, much smaller issue that affects many, many fewer
12 subscribers.
13     Q.  But it still exists?
14     A.  It still exists, yes.  Particularly among the
15 CDMA carriers, like Verizon and Sprint and many of the
16 smaller carriers that use that technology that have
17 roaming agreements.  So when you move out of your
18 small, rural carrier area, some of these carriers --
19 there's about a thousand of them in the US -- some of
20 them only support 100,000 people in a very small,
21 rural are, but they have roaming agreement, say with
22 Verizon.  They might be offered features that are not
23 seamless when they're roaming because you're on two
24 different networks.
25     Q.  Okay.  I notice in both of these books that

Page 75

1  you address oral wireless communications separately
2  from SMS.  Each book has a chapter dedicated to SMS,
3  right?
4      A.  Yes.
5      Q.  Why do you treat oral and SMS differently in
6  these books?
7      A.  Are you talking about voice calling when you
8  say "oral"?
9      Q.  Yeah, voice calling, when I say "oral."
10         Why do you treat voice calling and SMS
11 differently in these books?
12     A.  These standards are essentially the standards
13 for the signaling communications in the network.  The
14 signaling communications are those communications that
15 happen kind of behind the scenes that you are not
16 really aware of as a user of the services, but do
17 things like set up the circuits for a call -- right --
18 allow you to roam.
19         So when you're in one area or another you
20 just make a phone call, you might not even be aware
21 that you're roaming, but there's things happening in
22 the system and there's all these communications going
23 on that enable you to be able to do that nearly
24 instantaneously.
25         The idea of short message service was a

Page 76

1  follow-on idea.  The standards for ANSI-41 and IS-41
2  started with simply being able to roam, just to get
3  cellular service, when you moved from one area to
4  another, seamlessly.  And then they expanded to add
5  features -- such as three-way calling, call
6  forwarding, call waiting, conference calling, a whole
7  variety of features -- and then they evolved to
8  providing short message service, which was originally
9  a GSM standard which was a European standard that
10 started in 1989.
11     Q.  So is the technology for SMS different than
12 the technology for voice calling?
13     A.  Portions of it are.
14     Q.  Okay.
15     A.  Portions of it are.
16     Q.  And that's why they get treated separately in
17 a separate chapter of the book --
18     A.  Well, let's re- --
19     Q.  -- SMS?
20     A.  I'm sorry.
21     Q.  That's why SMS gets treated separately in
22 your book, correct?
23     A.  Well, it's simply what we would call a
24 supplementary service or a feature.  When we talk
25 about cellular service, even today in general, we're

Page 77

1  really talking about voice service, although that's
2  starting to change now with voice over IP and things
3  like that.  But we're really talking about voice
4  services and the ability to be mobile and to go
5  wherever you can with your phone.
6          SMS is still considered a separate feature
7  that's billed for as part of a bundled package the
8  same as voicemail, for instance, or these other
9  supplementary features.
10     Q.  Is the technological architecture for
11 wireless voice calling different in any way from the
12 technological architecture for SMS?
13         MR. DONOVAN:  I'm going to object to the
14 form.
15         THE WITNESS:  Yeah, if I understand your
16 question correctly, portions of it are.  Portions are
17 the same and portions are different.
18         MR. KIMREY:  Where are we on the tape?
19         THE VIDEOGRAPHER:  We've got ten minutes.
20         MR. KIMREY:  Okay, let's run it out.
21     Q.  In Deposition Exhibit 47, which is the sample
22 from your book, I've included the Index and the
23 Glossary.
24         Do you see any reference in there to
25 Telephone Consumer Protection Act?

20 (Pages 74 - 77)

1    A.  No.

2    Q.  Do you see any reference in there to

3  automatic telephone dialing systems?

4    A.  No.

5    Q.  Are either one of those things addressed in

6  either of your books?

7    A.  Not particularly, no.

8    Q.  Okay.  At page 11, paragraph 22, you -- of

9  your declaration, yeah -- you refer to Mobile

10  Messenger --

11    A.  Yes.

12    Q.  -- as the aggregator for Mozes on

13  November 5th, 2011.

14    A.  Yes.

15    Q.  Did you, in rendering your opinions in this

16  case, review any information or material from Mobile

17  Messenger?

18    A.  I'm not sure.  The reason I say that is I

19  received a log of --

20    Q.  Just want the record to reflect that

21  Mr. Snyder is looking at Exhibit K of his declaration.

22      I'm sorry; go ahead.

23    A.  Yeah.  I was provided with text message logs

24  by plaintiff's counsel that were apparently provided

25  by the defendants in this case.

1    Q.  Do you know whether the defendants provided

2  those?

3    A.  I was -- it was relayed to me that that's

4  where they originated.

5      These messages either came from the mobile

6  marketing company or from the branded company,

7  depending on who produced it.  Or they could also have

8  come from the SMS aggregator.

9    Q.  Okay.

10    A.  So there are two parties that actually store

11  and keep this information.  It could have been one or

12  the other.

13    Q.  Who are the two parties that store the

14  information?

15    A.  It could have been Mobile Messenger and it

16  could have also been Gerzhom/Mozes/ePrize/HelloWorld.

17    Q.  Would the carrier have stored it?

18    A.  No, the carriers typically do not store

19  content of the text messages.  They store, for a

20  period of time, the fact that a text message was sent

21  and the parties that it was sent between, with their

22  phone numbers and the date and time, but not the

23  content.

24    Q.  Okay.  So you are looking at Exhibit K to

25  your declaration, the first page of which is labeled

1  "Exhibit 1 to Plaintiffs' First Amended Complaint,"

2  correct?

3    A.  Yes.

4    Q.  So that's what that is an exhibit to the

5  First Amended Complaint.  But you don't actually know

6  where this information originated from, correct?

7    A.  From the original complaint, I don't know.

8    Q.  Okay.  Then if you flip through, you'll see

9  an email from Jason Tokoph to Aaron Clark, dated

10  8/21/2012, Bates stamped MOZ_308 through MOZ_310.

11      Do you see that?

12    A.  Yes.

13    Q.  Where do you think this document came from?

14    A.  It had one of two sources.  It either came

15  from, directly from Mozes, or one of the entities

16  involved with Mozes, or Mobile Messenger.  Both of

17  those corporate entities save this type of data.

18    Q.  Okay.  And if you look at this -- go back to

19  the First Amended Complaint exhibit, Exhibit 1.  Do

20  you see these times, Time: 4:11, 4:11, 4:11, second

21  column --

22    A.  Yes.

23    Q.  -- all the way down?

24    A.  Yes.

25    Q.  What do those reflect?

1    A.  They reflect the time that these messages

2  were sent.

3    Q.  Okay.

4    A.  Actually, let me clarify that.  They're

5  supposed to represent the time these messages were

6  sent.  Sometimes, if they're sent at the same time and

7  perhaps if seconds are not used, you know, to

8  better -- to provide better granularity on the time --

9  so this is to the minute's basis -- sometimes they are

10  simply stored in a certain order even though they have

11  the same time, but that doesn't necessarily imply that

12  they were sent in that order, if that makes sense.

13    Q.  I think it does.

14      So it could be a storage time stamp or it

15  could be a transmission out time stamp?

16    A.  Well, it's always a transmission out time

17  stamp.  But if the time stamps are the same, because

18  many messages can go within the same minute, and if

19  they're not stored according to the seconds as part of

20  the parameter and the order, then they could be stored

21  in any order having the same date and time stamp.

22    Q.  Okay.

23    A.  Right.  So in fact my understanding is, and

24  my analysis is, that even though, say, these first

25  three are 1, 2, 3, it really went 1, 3, 2, in the

Page 82

1 order that these messages were actually sent and
2 received.
3      Q.  Why do you think it went 1, 3, 2?
4      A.  Because that is what was represented by the
5 plaintiff.  And that's what makes sense to this
6 program.
7      Q.  Is it possible -- we don't have the seconds'
8 basis; we just have to the minute level.  But is it
9 possible that the two messages after the first Bama
10 text were sent simultaneously?
11      A.  It's hard to say.  A simultaneous is a
12 difficult issue when talking about text messages and
13 it's particular to the certain system.  Many of these
14 systems are what's called multithreaded, or use
15 multiple channels.  So that programatically, messages
16 can be actually generated and sent in a certain order,
17 but they go across different channels, which means
18 they can be received in a different order, if the time
19 was close enough -- right -- when they were both sent
20 out.
21      My understanding is that this second message
22 was actually received third; however, for whatever
23 reason, this printout potentially shows that it was
24 received first.  But that doesn't really make sense to
25 the program and the campaign that was being run here.

Page 83

1      Q.  But again, is it possible that the second and
2 third messages -- and again we're referring to
3 Exhibit 1 to Plaintiff's First Amended Complaint, the
4 first page at the top -- is it possible that the
5 second and third messages were sent simultaneously?
6      MR. DONOVAN:  Object to the form.  I think
7 you just answered that.
8      THE WITNESS:  Yeah, it's possible.  It's
9 possible.
10 BY MR. KIMREY:
11      Q.  Okay.  And this time stamp here, do you know
12 what time zone that is?
13      A.  I assume it's -- I believe this was in
14 Central time.  I'm not sure, but I assume it was the
15 local time that the program was being run and where it
16 was being run.
17      Q.  Is it possible that it was the time zone from
18 which the messages were being sent?
19      A.  No.
20      Q.  Why is that?
21      A.  Because I understand that this was a late
22 afternoon game.  Both of these separate files recorded
23 have the same time stamp, either 4:11 or 16:11, from
24 the technology systems.  Because they have the same
25 time stamp and it was a late afternoon game, my belief

Page 84

1 is that it was local time to when this program
2 occurred.
3      MR. KIMREY:  We can go off the record.
4      THE VIDEOGRAPHER:  Going off the record at
5 11:15.
6      (Recess taken.)
7      THE VIDEOGRAPHER:  This begins Disk No. 2 in
8 the Deposition of Randall Snyder on December 8th,
9 2015.  We're on the record at 11:29.
10 BY MR. KIMREY:
11      Q.  Mr. Snyder, during the break you reviewed
12 your list of cases in your declaration in this case to
13 identify which cases you testified on behalf of a
14 defendant that a system was not an ATDS.
15      Have you been able to identify those cases
16 specifically based on your review?
17      A.  Well, my understanding was you asked me for
18 which cases I was retained --
19      Q.  Actually, you're right.  I did.
20      A.  -- for defendant.
21      Q.  That's correct.
22      A.  And I believe there are four of them.
23      Q.  TCPA cases?
24      A.  TCPA cases.  This is Allen vs. Rickenbacker
25 Collection Services.  That was the last one.  Oh,

Page 85

1 yeah, here they are.  I have Connelly vs. Hilton Grand
2 Vacations Company.  I have Kramer, with a K, vs.
3 Autobytel, Incorporated.  I thought I had counted
4 four.  Oh, yeah, here it is.  Cain, C-a-i-n, vs.
5 Monitronics International, Incorporated.
6      Q.  But in none of those cases did you render an
7 opinion that a system was not ATDS, correct?
8      A.  I did in the Connelly vs. Hilton Grand
9 Vacations case.
10      Q.  But in the others, you did not render an ATDS
11 opinion?
12      A.  The others, I did not provide a report or any
13 testimony; I was simply a consulting expert.
14      Q.  Did you provide a report in Connelly vs.
15 Hilton?
16      A.  Yes.
17      Q.  And was that in the materials that you
18 produced in response to the subpoena in this case?
19      A.  I don't know.  That one might have been under
20 protective order.  Do we have the -- that previous --
21      Q.  The subpoena exhibit.
22      A.  These are mine.  That's mine.  I don't have
23 the exhibit.
24      Q.  You have one copy.  Actually, we made
25 additional copies.  So we're looking at the index.

22 (Pages 82 - 85)

1    A. Yeah, it would be in order, so, no, that was
2 under protective order.
3       MR. KIMREY: Handing to Mr. Snyder a document
4 that I would like marked as Deposition Exhibit 48.
5       (Deposition Exhibit 48 was marked for
6       identification.)
7 BY MR. KIMREY:
8    Q. Before we broke, we were looking at text
9 message flows including an exhibit to the First
10 Amended Complaint. Do you remember that?
11   A. Yes.
12   Q. This is a collective exhibit of the flow that
13 was attached to the Jason Tokoph email.
14   A. Okay.
15   Q. So that's tab 1. Then the flow, as reflected
16 as an exhibit to the First Amended Complaint, that's
17 tab 2. Then tab 3 is a PDF and then Excel spreadsheet
18 version of text flow produced by ePrize in this case.
19   A. So I have 3 and then 3A.
20   Q. Right 3A. So all of 3 is first a PDF of text
21 flow produced by ePrize and then Excel spreadsheets
22 printed out.
23   A. Yes.
24   Q. So we'll go into further detail on those.
25   A. Okay.

1    Q. I don't think you -- have you ever seen the
2 text flows that are included in tab 3 of this exhibit?
3    A. I have not.
4    Q. Okay. But you have seen the flows that are
5 tab 1 and tab 2, and those actually informed your
6 opinion in this case, correct?
7    A. Yes.
8    Q. Okay. So I'll represent to you that the
9 information that is at -- we're going to look at tab
10 4 -- is a more complete rendition of information
11 related to the texts at issue in this case --
12   A. Okay.
13   Q. -- out of a database that ePrize has access
14 to.
15   A. And these were automatically recorded in the
16 database, this information? Is that what you're
17 representing to me?
18   Q. This information was pulled from the database
19 that ePrize has.
20      MR. DONOVAN: Just to clarify, none of this
21 has been provided in discovery?
22      MR. KIMREY: It has.
23      MR. DONOVAN: I don't see any Bates numbers.
24      MR. KIMREY: It was produced before Dorian
25 Porter's 30(b)(6) deposition for Gerzhom.

1       MR. DONOVAN: Okay.
2       MR. KIMREY: So John Barrett has a copy.
3 They were exhibits 40 to 43.
4       MR. DONOVAN: I remember it now. I just
5 didn't see any Bates numbers.
6       MR. KIMREY: Yeah, I don't know whether
7 ePrize ever produced them with Bateses.
8       MR. PIETRKOWSKI: Well, I think -- I
9 believe -- this is going on memory. I believe we
10 produced a disk with the electronic version of these
11 documents, and that was Bates numbered. I believe.
12      MR. DONOVAN: Okay, I recall now. I just
13 wanted to clarify.
14      MR. KIMREY: So these have been produced to
15 you previously?
16      MR. DONOVAN: Yes.
17      MR. KIMREY: Okay.
18   Q. So referring to tab 4, I'll explain this to
19 you. So -- are you at the beginning of tab 4?
20   A. Yes, the first page, 1 of 6.
21   Q. Okay. So as you can see in mine -- yours
22 isn't as clear -- but see how this shadow box is here?
23   A. Yes.
24   Q. So that shadow box remains on all pages --
25   A. Okay.

1    Q. -- and the information is provided to the
2 right and changes because the spreadsheet is so big,
3 okay.
4    A. I understand.
5    Q. So the left-hand side is provided for
6 orientation.
7       You can see here that the times we were
8 talking about are reflected. On page 1 of 6, you can
9 see that right -- I'll just go ahead and point to it.
10 Right there, do you see that?
11   A. Yes.
12   Q. So that says 16:11. That would be 4:11 --
13 correct -- which is what we were looking at before?
14   A. Yes.
15   Q. And you were saying that that reflects the
16 time of the locale of Mr. Phillips, correct?
17   A. I said it appeared to. I can't be certain,
18 but it appeared to reflect that that was the time, the
19 local time in the stadium when these messages were
20 sent, but I'm not 100 percent sure.
21   Q. Would that time reflect when he actually
22 received a message or would it reflect the time of
23 either transmission or database writing in the
24 database of Mozes?
25   A. It's typical that this is the time stamp when

23 (Pages 86 - 89)

Page 90

1 the text message was transmitted from Mozes's system
2 to Mobile Messenger. And it would be time stamped and
3 then immediately stored in the database.
4    Q. So these time stamps that go all the way
5 down -- 16:11, 16:11, and so on -- those are not
6 receipt times by Mr. Phillips, correct? They may be,
7 they may not be, but that's not what is being
8 reflected here.
9    A. No, typically these systems don't have access
10 to when the message was received by parties. They
11 only know the information when it was transmitted.
12    Q. So it wouldn't surprise you to learn that the
13 Mozes Connect system didn't record time of actual
14 receipt by the cellular subscriber?
15    A. No, and in fact I don't know of any mobile
16 marking system that does that.
17    Q. Where could you get that information? If you
18 wanted to know when messages were received, is there
19 any way to figure that out?
20    A. It depends on the carrier. Some carriers, I
21 believe -- for instance, if you send a text message to
22 someone and their phone is turned off and they don't
23 turn it on for three days, that is when the short
24 message service center in the network sends them the
25 message: when they turn on their phone and register

Page 91

1 with the network. I believe some carriers may record
2 that information, when it is actually transmitted from
3 their network.
4    Q. But that would be transmission out from the
5 carrier.
6    A. Again, it is transmission from the carrier.
7 I don't believe they record any information on receipt
8 of the message.
9    Q. So is it your understanding that initially
10 Wesley Phillips, the plaintiff, texted Bama. That was
11 the first text in the interaction, correct?
12    A. Yes.
13    Q. So that Bama message would have traveled from
14 his handset to his carrier, which was Sprint, correct?
15    A. Yes, I believe so.
16    Q. Then to Mobile Messenger, the aggregator,
17 correct?
18    A. Yes.
19    Q. And then to Mozes, correct?
20    A. Yes.
21    Q. Then Mozes, in response, would have sent
22 something that went to the aggregator, correct?
23    A. Yes.
24    Q. And then that message would have gone from
25 the aggregator to the carrier, correct?

Page 92

1    A. Yes.
2    Q. And then that message would have gone from
3 the carrier to Mr. Phillips on his device, correct?
4    A. Yes.
5    Q. And the carrier, as far as you know, doesn't
6 retain information related to actual receipt. They
7 may retain when they transmit it out, but they don't
8 know actual receipt time, correct?
9    A. That's correct.
10    Q. So is it possible that the actual handset,
11 the phone, that Mr. Phillips had on November 5th of
12 2011 would have the time of receipt of the messages?
13    A. Yes. Typically, especially on smart phones
14 today, with the text messaging application client on
15 the phone, when a message comes in, it will have the
16 time that the message came in.
17    Q. So the flows, the various flows we have
18 looked at, are time stamped based on transmission out
19 or database writing of the Mozes Connect system?
20    A. It's transmission out.
21    Q. Okay, transmission out from the Mozes Connect
22 system?
23    A. Yes.
24    Q. Does that necessarily mean that the timing
25 and sequence of the messages as received would be the

Page 93

1 same?
2    A. No.
3    Q. Why is that?
4    A. I think I stated before it's possible --
5 these systems are multithreaded and these can go out
6 different channels, and there is lots of
7 communications connections in this chain from the
8 automated Mozes system sending out a response to the
9 incoming message to Mobile Messenger to the carrier
10 and then to the phone. It is conceivable that the
11 Mozes system generated and created these things in one
12 order, but for some reason they were received out of
13 order. That is possible.
14    Q. Other than his cell phone, can you think of
15 anything else that might reflect the actual time of
16 receipt of the messages at issue in this case?
17    A. No.
18    Q. Turning back to tab 4, subtab A, Deposition
19 Exhibit 48, do you see these column headings all
20 across the top: ID, SMS, transaction ID, batch ID, et
21 cetera?
22    A. Yes.
23    Q. Do you know what ID means?
24    A. These are identifiers for individual
25 parameters for the storage of information in the

24 (Pages 90 - 93)

Page 94

1 database. ID stands for identifier.
2    Q. Back to an earlier point, did you look at
3 Mr. Phillips' phone in rendering your opinions in this
4 case?
5    A. Yes, I believe I had images of his device
6 that showed these messages.
7    Q. Are those attached to your declaration?
8    A. I don't know. I don't -- maybe, maybe not.
9      No, I guess not.
10    Q. Is it possible that you didn't look at his
11 phone?
12    A. It is. You know, in a lot of these cases, I
13 do; there's a phone image. I probably didn't, because
14 I didn't add it as an exhibit. But I look at so many
15 phone images of these types of messages, so, yeah, I
16 think in this case maybe I didn't. And I think if I
17 did, I would have certainly added it as an exhibit.
18    Q. So can you opine on the actual timing of a
19 receipt of the messages in this case without having
20 reviewed his phone?
21    A. No.
22    Q. Back to the column identifiers. So ID, that
23 would be some sort of unique ID associated with that
24 particular transmission, I guess?
25    A. Well, it depends. I mean, these are

Page 95

1 internal. This is a database specific to Mozes, and
2 they record information with a certain record scheme,
3 or database schema, for information that is particular
4 to them.
5    Q. So if I were to -- rather than go through
6 each one of these and ask you what they are, you don't
7 know what these column headings mean in the Mozes
8 Connect system, correct?
9    A. Um --
10    Q. You could speculate, but you don't know?
11    A. Some of them -- some of them, I do know;
12 others, I don't.
13    Q. Right. You probably know phone.
14    A. Yes.
15    Q. You know what that is?
16    A. Yes.
17    Q. But many of them you don't?
18    A. Yes. I know operator ID, obviously the
19 Message Text. I know what a Campaign ID is, those
20 types of things.
21    Q. Do you know whether Mr. Phillips remembers
22 the timing in order of the text messages allegedly
23 received by him that are at issue in this case?
24    A. I don't know what Mr. Phillips remembers or
25 doesn't remember.

Page 96

1    Q. Have you ever spoken to Mr. Phillips?
2    A. No.
3    Q. And you didn't review his deposition
4 transcript, correct?
5    A. No.
6    Q. That's confusing the way I asked it.
7      You did not review his deposition transcript,
8 correct?
9    A. Correct, I did not review his deposition
10 transcript.
11    Q. Okay. Is it possible that some of the
12 messages that were transmitted out by the Mozes
13 Connect system were never received by Mr. Phillips?
14    A. I don't think so.
15    Q. Why do you not think so?
16    A. If he never received these messages, he
17 wouldn't know they were ever sent, and therefore he
18 wouldn't have filed a complaint about receiving them.
19    MR. KIMREY: Deposition Exhibit 49.
20    (Deposition Exhibit 49 was marked for
21    identification.)
22    THE WITNESS: Do you mind if I take off my
23 jacket?
24    MR. KIMREY: Go ahead.
25    THE WITNESS: It's a little bit warm in here.

Page 97

1 I'm the only one still wearing it.
2 BY MR. KIMREY:
3    Q. Deposition Exhibit 49 is Bates stamped
4 MOZ_00349 through 40.
5    A. Ah.
6    Q. Have you ever seen this document before?
7    A. I may have; I don't recall. I may have.
8    Q. So this is a letter from August 8th of 2012,
9 correct? Or it appears to be that way to you?
10    A. Yes.
11    Q. From Mr. Phillips, correct? Or at least his
12 signature appears to be down there at the bottom.
13    A. Yes.
14    Q. And it's to Aaron Clark at Mozes, Inc.,
15 correct?
16    A. Yes.
17    Q. Dated August 8th of 2012?
18    A. Yes.
19    Q. And in it you'll see that he complains about
20 receiving a text message on December 5th of 2011. Do
21 you see that?
22    A. Yes.
23    Q. But he doesn't refer to any text messages on
24 November 5th of 2011, which was the day of the
25 Alabama/LSU game at issue in this case, right?

25 (Pages 94 - 97)

1    A.  Yes.
2    Q.  And attached to that is a screen shot of his
3 phone.  Do you see that?
4    A.  Yes.
5    Q.  And it shows on his phone, December 5th,
6 2011, the text message exchange that occurred on that
7 date.  Do you see that?
8    A.  Yes.
9    Q.  And you can actually see the date stamp and
10 the time stamp of those text messages on his phone,
11 correct?
12    A.  Yes.
13    Q.  So in this complaint that he sends to Mozes,
14 he complains only about the December interaction.
15 Have you rendered an opinion as to the propriety of
16 the text messages that form the December interaction?
17    A.  Yes.  It -- it appears, and these are not the
18 messages at issue in this case, my understanding is.
19 But after Mr. Phillips voted three times during the
20 game and received these three confirmation messages
21 and also received three additional messages to join
22 some other program, he actually did join the program
23 later on at some point.  And these appear to be
24 messages that are after these extraneous ones he
25 received from actually participating in some program

1 after the fact.
2    Q.  But going back to the ones you characterize
3 as the extraneous ones he received, you actually have
4 reviewed no evidence in this case of his having
5 received any messages in November.  All you have
6 looked at is information related to transmission out
7 of those messages, not information related to his
8 actual receipt of those messages, correct?
9    MR. DONOVAN:  Objection to the form.
10    THE WITNESS:  Yes.  But my understanding is
11 that's what is at issue here.
12 BY MR. KIMREY:
13    Q.  Right.  So going back to --
14    A.  The initiation of calls, not the reception of
15 calls is the issue.  That is my understanding in this
16 case.
17    Q.  Going back to Exhibit 49, so these text
18 messages that are the December text messages, your
19 understanding is these are not at issue in the case
20 and you have not rendered an opinion that they're
21 improper in any way.  Correct?
22    A.  That's right.
23    Q.  So going back to my question about whether
24 it's possible that he didn't receive some or all of
25 the text messages in November, I'll represent to you

1 that this is the only complaint letter that Mr. --
2 "this" being Deposition Exhibit 49 -- is the only
3 complaint letter that Mr. Phillips ever sent to Mozes.
4    And the information related to the text flow
5 that's attached, for instance, as Exhibit 1 to the
6 First Amended Complaint that I provided you more
7 detail on in Deposition Exhibit 48, that information
8 originated with Mozes.
9    So are you aware -- I'm not saying -- I don't
10 want you to confirm or deny, but are you aware of any
11 evidence in this case that's been presented that is
12 evidence of his having received text messages in
13 November?
14    And to inform your response to that question,
15 it is odd that on August 8th of 2012, he is
16 complaining only about the December text messages.
17 I'm not asking you to speculate about what it is.
18    MR. DONOVAN:  I'll object to the form.  Just
19 stick to questions and not --
20 BY MR. KIMREY:
21    Q.  So is it -- are you aware of any evidence
22 that he actually received any of the November text
23 messages?
24    A.  No, but I wasn't asked to opine on messages
25 that Mr. Phillips received.  I was asked to opine on

1 messages initiated from the mobile marketing company,
2 or Mozes.
3    Q.  Going back to your declaration, you say --
4 and this is at page 28, paragraph 83 -- "Mozes
5 assembled and created programmatically each complete
6 text message in an automated fashion without human
7 intervention.  Mozes then automatically sent those
8 created text messages to its SMS aggregator -- i.e.,
9 Mobile Messenger -- for delivery to the cellular
10 networks and subsequently to cellular telephone
11 subscribers."
12    Did I read that accurately?
13    A.  Yes.
14    Q.  So how does Mozes assemble and create text
15 messages without human interaction?
16    A.  The idea is that it actually sends them
17 without human intervention.  Maybe it wasn't clear
18 enough here.
19    But this is a system that essentially runs
20 standalone.  It is programmed to respond to incoming
21 text messages that come in with a specific short code
22 and a specific key word within the message.  In this
23 case the short code was 69937, something like that,
24 and the key word was Bama, B-a-m-a.
25    When a message is delivered into the system,

26 (Pages 98 - 101)

1  it automatically parses it and determines that this is
2  part of the special -- this particular campaign that
3  is identified by the campaign ID on those records we
4  saw.  That campaign then creates automatically,
5  internal to the machine, a new message with a template
6  that is stored in the machine: a prerecorded message,
7  essentially, stored in the machine.  And they take the
8  originating address of the incoming message, which is
9  the plaintiff's telephone number, store it, and then
10 use that as the new destination message for the
11 outgoing -- or the new destination address for the
12 outgoing message.
13     Q.  So let's unpack that.  You said that the
14 system is programmed in passive voice.  Does a human
15 actually program the system originally?
16     A.  Yes.
17     Q.  So the code is written by a human being,
18 correct?
19     A.  Yes.
20     Q.  The content of the text message responses is
21 written by a human being, correct?
22     A.  Yes.
23     Q.  Then you've referred in your declaration to a
24 Web portal.  A human with the customer, in this case
25 Coca-Cola, has the ability to go onto that Web portal

1  and set various parameters for a particular campaign.
2  Correct?
3     A.  Yes.  They preprogram the campaign and
4  prerecord messages that will then be automatically
5  processed, created, and sent from the machine.
6     Q.  Okay.  So we have the coding, the creation of
7  the text message content, and the setting of the
8  program parameters by human beings --
9     A.  Yes.
10    Q.  -- correct?
11    A.  Yes.
12    Q.  And then on game day, November 5th of 2011,
13 are you aware of any representatives of Mozes being
14 present during that game?
15    A.  Yes.  It was represented to me there was one
16 technician there just to oversee and make sure the
17 computer equipment was operating properly.
18    Q.  Okay.  Would you have any reason to question
19 me if I told you that there were two people there that
20 day?
21    A.  No.
22    Q.  Do you have any reason to question my telling
23 you that one was within the stadium and one was in an
24 AV booth under the basketball court?
25    A.  Do you mean football?

1     Q.  Basketball court.
2     A.  Basketball court.
3     Q.  It's far away from the stadium.
4     A.  Oh, under their --
5     Q.  That's where the AV booth is.
6     A.  Oh, I'm confused; I'm sorry.  Yeah.
7        No, I have no reason to doubt that.
8     Q.  And then -- you've seen the Jumbotron, right?
9     A.  Yes.
10    Q.  Do you know how many Jumbotrons there were in
11 the stadium?
12    A.  I do not.  I think I have only seen images of
13 that one.
14    Q.  Do you have any reason to question me if I
15 tell you that there were four, one in each corner of
16 the stadium?
17    A.  No.
18    Q.  How big would you estimate these Jumbotrons
19 were?
20    A.  I don't know.  They're very large.
21    Q.  So they could be 20-by-30, something like
22 that --
23    A.  Yes.
24    Q.  -- feet?
25    A.  Yes, sure.

1     Q.  They're large so the people could see them,
2  correct?
3     A.  Yes.
4     Q.  Throughout the stadium, right?  That's the
5  idea?
6     A.  Yes.
7     Q.  That's what Coca-Cola would want, right?
8  Right?
9     A.  Yes.
10    Q.  So they project on the Jumbotron, text the
11 short code to vote for your favorite team, whether it
12 be Alabama or LSU, correct?
13    A.  Yes.
14    Q.  And Wesley Phillips is sitting in the stands
15 at that time, right?  Right?
16    A.  Yes.
17    Q.  And he sees on the Jumbotron that call to
18 action, correct?
19    A.  Yes.
20    Q.  He then -- and does that call to action say
21 anywhere on it Coca-Cola Zero or Coca-Cola; do you
22 recall?
23    A.  I do.  I believe it did.  It changed -- it
24 was kind of animated, so it changed video.  But it was
25 clear that this promotion was sponsored by Coke Zero.

27 (Pages 102 - 105)

1   Q.  Okay.  And so he, an Alabama fan, texts to
2  the short code that correlates with the program,
3  "Bama," correct?
4   A.  Yes.
5   Q.  So the first text message that occurs on
6  November 5th of 2011 between the plaintiff and one or
7  more of the defendants is Wesley Phillips' Bama text,
8  correct?
9   A.  Yes.
10   Q.  So he's a human being, correct?
11   A.  Yes.
12   Q.  So he would have received -- setting aside
13  what he received, he would have received nothing
14  related to this campaign on November 5th of 2011
15  unless he had texted "Bama," correct?
16   A.  Yes.  He voted.  He responded to the campaign
17  by voting, yes.
18   Q.  And in response, there were two text messages
19  that were transmitted out, correct?
20   A.  Yes.
21   Q.  One of those -- and I'm going to use
22  shorthand to refer to these because we're going to be
23  talking about them a lot in this deposition -- but one
24  was the thank you text, which is a text that says
25  thank you for your vote, keep voting, essentially.

1   A.  That's typically referred to as a
2  confirmation, yes.
3   Q.  But it says thank you, doesn't say
4  confirmation?
5   A.  No, but that's the point of it.
6   Q.  But the other is the, if you'd like to win a
7  free football and join the Coke Zero mobile list, text
8  us your date of birth message.
9   A.  Yes.
10   Q.  So and you don't know, as you sit here today,
11  what order those were actually transmitted out of the
12  system: whether one came before the other, the other
13  came before the other, or whether they came out
14  simultaneously?
15   A.  That's correct.
16   Q.  Okay.  And he then voted two more times,
17  Bama, correct?
18   A.  Yes.
19   Q.  He could have been voting Bama fast, right?
20  "Bama," "Bama," "Bama," like that, in quick
21  succession?  Do you want to see the text flow?
22   A.  I'm looking at it here.
23      Yeah, in fact it appears that he voted three
24  times within about a minute or so.
25   Q.  And it could have been less than a minute,

1  right, just because -- what are the time stamps on his
2  Bama votes?  Are they all the same minute?
3   A.  Yeah.
4   Q.  Yeah.
5   A.  So each -- the first nine messages contain
6  his three votes, the three confirmation messages, and
7  the three extraneous extra program call-to-action
8  messages.
9   Q.  And again, these times are just transmission
10  out, correct?
11   A.  Yes.
12   Q.  Okay.  So those are all, on the transmission
13  out time stamp, during the same minute, right?
14  They're all at 4:11 p.m., correct?
15   A.  Yes.
16   Q.  So we don't know, based on that, how close
17  together they were in seconds, correct?
18   A.  I would say they were within 60 seconds.
19   Q.  60 seconds or less?
20   A.  Yes.
21   Q.  Okay.  So is it possible that he voted
22  "Bama," "Bama," "Bama," because he's trying to stack
23  the vote to make his team win, and he didn't actually
24  receive an invitation to enter his date of birth to
25  win the football and join the Coke Zero mobile list

1  until after he had voted Bama three times?
2   A.  Yes, that's possible.
3   Q.  Okay.  Do you know, as the text messages
4  travel from subscriber to carrier to aggregator to
5  marketing company, back and forth, do you know whether
6  there are any systems in place to deal with
7  escalations?  In other words, problems in the
8  transmittal of text messages of a campaign.
9   A.  Yes.
10   Q.  And what are those; how do they work?
11   A.  Typically, the systems, I know that they are
12  implemented within the carriers and within the SMS
13  aggregators.  It's essentially a traffic-flow control
14  or overload control or what's called message throttle.
15  So for instance, there is a finite number of messages
16  that any of these systems can handle as throughput at
17  any given point in time.  Typically, those messages
18  are not dropped --
19   Q.  They're queued.
20   A.  -- they're stored for a period of time and
21  queued up until such time as the traffic overload
22  abates or is alleviated.  So certainly they do.  I do
23  not know if the Mozes system had its own such
24  throttling capability.
25   Q.  But so -- and I'm sure you have seen this

28 (Pages 106 - 109)

Page 110

1  sort of thing, with respect to carriers and
2  aggregators, maybe you saw this at m-Qube, there are
3  representations typically made to clients about what
4  the service provider will do if things aren't
5  transmitting the way the service provider wants them
6  to transmit.  Right?
7      A.  They typically provide what's called a --
8  well, it's basically a service agreement with the
9  carriers.  They talk about their max -- maximum --
10  amounts of throughput for messaging.  And you may
11  potentially have to pay more money to connect to them
12  to get higher bandwidth.  That's similar to the
13  aggregators.
14      Q.  And people -- in those service-level
15  agreements, are there representations about when
16  human beings will actually get involved because the
17  automatic process is not functioning the way it was
18  designed to function or the way people want it to
19  function.  Right?
20      A.  Well, those service-level agreements are
21  based on, typically -- and I don't recall seeing one
22  in this case -- typically based on an escalation of a
23  failure situation, usually from 1 to 4.  1's usually
24  an alarm.  These are alarms that are set off.  1 is
25  usually informative, and all the way up to 4, which is

Page 111

1  critical, which means the system has essentially
2  failed.
3      Q.  And at certain failure levels, people may
4  actually get involved in a campaign to resolve the
5  problem, correct?  Either at the aggregator level or
6  at the carrier level.
7      A.  That's actually not the right way to
8  characterize.
9      Q.  How would you characterize it?
10      A.  This is complex software.  It has basically
11  functionality, which I have described.  But because
12  it's complex software, these failures can occur in a
13  variety of places.  That does not mean necessarily
14  that anybody was involved in changing the
15  functionality of the campaign.
16      Q.  But somebody may have been?
17      A.  Well --
18      Q.  It's possible?
19      A.  -- somebody may have come and thrown the
20  machine off a roof and it all stopped.
21      MR. DONOVAN:  I'm trying to be patient with
22  this, but two or three times in the last few minutes,
23  you have interrupted Mr. Snyder while he is answering
24  the question.  So can we please just -- when I go back
25  reading through this, I want to make sure I can

Page 112

1  understand what answer is to what question.  Please
2  try and wait --
3      MR. KIMREY:  I think I have been very liberal
4  in allowing him to elaborate and go on, and I don't
5  really think that --
6      MR. DONOVAN:  Well --
7      MR. KIMREY:  -- my questioning has been
8  unduly interruptive.
9      MR. DONOVAN:  -- I just want a clean record,
10  that's all.
11      MR. KIMREY:  And I'll note that the court
12  reporter has not complained.
13      Q.  Okay, so let's -- there are various ways in
14  which the system can break down.  Correct?
15      A.  I -- I assume so.  I have no evidence at all
16  that it broke down.  I assume -- it's computer
17  equipment, it can break down.
18      Q.  So delays or throttling or queueing of
19  messages could happen on the Mozes end of things with
20  its own Web server, database server, code problems,
21  whatever, correct?
22      A.  Possibly.
23      Q.  Delays could occur at the aggregator level,
24  correct?
25      A.  Yes.

Page 113

1      Q.  Delays could occur at the carrier level,
2  correct?
3      A.  Yes.
4      Q.  And then you could have delays associated
5  with a large event like the LSU/Alabama game on
6  November 5th of 2011 because of cell tower load,
7  correct?
8      A.  Typically not for text messaging.
9      Q.  You say "typically."  Is it possible there
10  could be some delay associated with text messaging --
11      A.  It's --
12      Q.  -- because of demand?
13      A.  Yeah, it's possible, but not probable.
14      Q.  Do you -- scratch that.
15      So back to your declaration, page 22,
16  paragraph 53.  You say -- I'll wait for you to get
17  there.
18      A.  Okay.
19      Q.  Page 22, paragraph 53, "It is my opinion that
20  the plaintiff received at least one extraneous,
21  unexpected, and unsolicited telemarketing text message
22  call on his cellular telephone each time he responded
23  to vote and engage in the aforementioned text message
24  campaign.  As the plaintiff voted three times, he
25  received three unsolicited telemarketing text message

29 (Pages 110 - 113)

1 calls subsequent to each of the automated confirmatory
2 text messages sent by the defendants."
3        Did I read that accurately?
4     A.  Yes.
5     Q.  So now that we've talked about this a little
6 bit, is the use of the word "received" perhaps not
7 quite accurate?
8     A.  No.
9     Q.  How do you know that he received anything on
10 November 5th, any text message on November 5th, 2011?
11     A.  When I'm retained as an expert in a legal
12 case, the first thing I look at is the Complaint.  It
13 is not up to me.  I don't make the judgment or the
14 opinion that the Complaint is false, that the
15 plaintiff is falsifying information, they're lying,
16 they're describing situations that did not happen.  I
17 guess, you know, that's for the attorneys to figure
18 out.  I give the benefit of the doubt to this
19 Complaint is legitimate.  And then my job is to do an
20 analysis to see what occurred.
21        The only reason that I could see that he did
22 not receive these messages is that if the complaint
23 was not valid, and I have no reason to make that
24 judgment.
25     Q.  Okay.  So is this paragraph based on the text

1 flow that you were provided that was Exhibit 1 to the
2 First Amended Complaint?
3     A.  Well, it's based on that as well as the other
4 text flows from -- that were provided by Mozes.
5     Q.  But again, Mr. Phillips -- well, scratch
6 that.
7        So let's look at the first exhibit to the
8 First Amended Complaint, which is in front of you
9 somewhere.
10     A.  That is this one, J, J, K?  It's this one,
11 Exhibit K.
12     Q.  So we're now looking at Exhibit K of
13 Mr. Snyder's declaration in this case.
14     A.  Yes.
15     Q.  So the first message is one from
16 Mr. Phillips: "Bama."  That's not a problem as far as
17 you're concerned.  That's not something that you deem
18 to be violative of the TCPA or of the MMA guidelines,
19 correct?
20     A.  It's not -- my job was not to determine if
21 these messages were violative of any law.  I'm not a
22 lawyer; those are legal conclusions.  I was hired to
23 opine on whether the system that sent these messages
24 constituted an ATDS.  That's number one.  And number
25 two, a secondary opinion on whether they followed the

1 correct best practices and guidelines --
2     Q.  Okay, so let's --
3     A.  -- of MMA.
4     Q.  Let's talk about the MMA guidelines then.
5 Does his text of Bama at the top of this exhibit
6 violate the MMA guidelines at all?
7     A.  No.  That was a standard one-time vote
8 program.
9     Q.  Okay.
10     A.  Yes.
11     Q.  And then let's go to the third text message,
12 at least in the order on this exhibit it's the third.
13 And that says, "Coke Zero: Thanks for your vote.  Keep
14 voting for your favorite team to make sure they win."
15        Did I read that accurately?
16     A.  Yes.
17     Q.  Did that text violate the MMA guidelines?
18     A.  No.  The MMA guidelines allow for an optional
19 message after a vote.  That is simply a confirmation
20 message or a message to say that you won't be
21 receiving any other messages from the system.
22     Q.  Okay.  And that would be the guidelines
23 related to standard rate messages; is that right?
24     A.  Standard rate messages and the one-time
25 voting, exactly, yes.

1     Q.  With respect --
2     A.  There was no expectation for him to receive
3 that one at all; that's just allowed.
4     Q.  Okay.  The other message that's right after
5 "Bama" says, "Reply with your DOB, mmddyyyy" -- four
6 y's -- "to enter the contest for an autographed
7 football and to join the Coke Zero mobile list.  Up to
8 ten messages.  Message and data rates apply."
9        Did I read a accurately?
10     A.  Yes.
11     Q.  And it's your opinion that that violated the
12 MMA guidelines, correct?
13     A.  Yes, absolutely.
14     Q.  Okay.  And then going down, we see another
15 "Bama."  So let's just summarize this.  You don't
16 have -- you did not render an opinion that any of the
17 thank you messages, or what you have characterized as
18 the confirmatory messages, are violative of the MMA
19 guidelines?  Those are consistent, in other words,
20 with the MMA guidelines, correct?
21     A.  That is correct.
22     Q.  So you take issue only with the three reply
23 with your date of birth text messages, correct?
24     A.  Yes.
25     Q.  In other words, you believe that those are a

1 violation of the MMA guidelines, correct?
2    A.  Yes.
3    Q.  Did the MMA guidelines constantly keep up
4 with the evolution of the mobile marketing industry?
5 Were they always in sync, as far as you know, or was
6 there kind of a catchup where the MMA guidelines
7 would -- you know, the industry would evolve, then the
8 MMA guidelines would catch up?
9    A.  I don't have an opinion on that.  I don't
10 know.  However, even in the face of these MMA
11 guidelines being available for years and being the
12 authoritative body for these things, there were many,
13 many, many companies -- hundreds of thousands -- that
14 did not follow these requirements, separate and apart
15 from whatever we would say the industry is doing, what
16 the MMA is doing.
17        So even though there were portions of the MMA
18 following these things and doing the right things as
19 far as the goals of the MMA were concerned, there were
20 many, many companies doing that as well; other
21 companies were just ignoring them.  But it's hard to
22 say which one was representative of the industry at
23 the time.
24    Q.  Have the MMA guidelines ever had the force of
25 law?

1    A.  No.  But they're -- they are viewed as the
2 governing body, especially in the United States and
3 Canada, and now globally, as really the authoritative
4 trade group.  They do not -- they do not have the
5 force of law behind them; however, they're really the
6 only organization that provides these -- these
7 guidelines and rules.
8    Q.  Is it possible to violate the MMA guidelines
9 but not violate the TCPA?
10    A.  It depends on what guidelines you're
11 violating.
12    Q.  Are -- is the M -- are the MMA guidelines
13 essentially a recasting or summarization of what's
14 required under the TCPA?
15    A.  No.
16    Q.  So are there guidelines proscribed by the MMA
17 that aren't set forth in the TCPA?
18    A.  Yeah, they're two completely separate issues.
19 The TCPA talks about the definition of an ATDS and how
20 people or corporations aren't allowed to send text
21 messages or automatically call or automatically send
22 text messages to persons without consent.
23        The MMA guidelines are rules and requirements
24 that are really the good practices for mobile
25 marketing companies to ensure that they're not

1 harassing people, they're not annoying people, and
2 that these are good guidelines so that subscribers are
3 happy with what occurs in these programs.
4    Q.  So with respect to the MMA guidelines, you
5 used the word "rules."  Are they rules or are they
6 guidelines?  Are there any teeth to the MMA
7 guidelines; if you don't comply with the MMA
8 guidelines, is there a consequence?
9    A.  There could be.
10    Q.  What would the consequence be?
11    A.  The CTIA works in concert with the Mobile
12 Marketing Association, and the CTIA also provides
13 their rules and guidelines for testing these
14 applications to run on the carrier networks.
15        If there are shown to be many violations,
16 then the carriers actually turn these guys off, don't
17 allow them to connect anymore, tell the aggregators to
18 turn them off or they'll actually turn off the
19 aggregators.  So the teeth is more like commercial,
20 punitive relief and issues as opposed to legal.
21        MR. KIMREY:  Okay.  Deposition Exhibit 50 --
22 I think we're at 50.  Sorry, I have only two copies.
23 This was a lot to carry.
24        (Deposition Exhibit 50 was marked for
25        identification.)

1 BY MR. KIMREY:
2    Q.  These are the Mobile Marketing US Consumer
3 Best Practices guidelines, Version 6.0, from
4 March 1st, 2011 effective April 1st of 2011.
5        Can you see that, Mr. Snyder?
6    A.  Yes.
7    Q.  Marked as Deposition Exhibit 50.
8        Turn to page 11.  Page 11 has the cross
9 carrier standards standard rate guidelines on it.  Do
10 you see that?
11    A.  Yes.
12    Q.  And at 1.1-2 on page 11, it says, with
13 respect to messaging frequency guidelines, "A one-time
14 message program results in only one message being
15 delivered to the user."
16        Do you see that?
17    A.  Yes.
18    Q.  That's the guideline, isn't it, that has
19 enabled you to conclude that the thank you messages,
20 or what you have referred to as the confirmatory text
21 messages, did not violate the MMA guidelines, correct?
22    A.  Yes and no.  In addition to this is the
23 actual voting program where voting may not necessarily
24 be one time; you may just vote and get no response,
25 you're just voting.  It's not required to send a

31 (Pages 118 - 121)

Page 122

1 response. The fact that a response was provided back
2 to the subscriber is really a courtesy that's allowed
3 by the MMA.
4    Q. Under --
5    A. But the intentions of this program may or may
6 not have been to be a one-time message, but it's
7 allowed.
8    Q. So in other words, the thank you message, the
9 three thank you messages, were allowed by 1.1-2,
10 correct?
11    A. Yes.
12    Q. Okay. Were you involved at all in drafting
13 the April 1st, 2011 MMA guidelines that are Deposition
14 Exhibit 50?
15    A. No. I'm sure there are some words in some
16 sentence in here that I was involved with that are
17 carryover. But I was not particularly involved with
18 drafting this document.
19    MR. KIMREY: Deposition Exhibit 51.
20    (Deposition Exhibit 51 was marked for
21    identification.)
22 BY MR. KIMREY:
23    Q. This is MOZ_977 Bates stamp through MOZ_1022
24 Bates stamp. And the cover page says that this is the
25 Mobile Marketing Association US Consumer Best

Page 123

1 Practices for Messaging guidelines, Version 7.0, which
2 reflects an effective date of October 16th, 2012.
3    Do you see that, Mr. Snyder?
4    A. Yes.
5    Q. And if you turn to page 7, which is MOZ_983,
6 you can see that standard rate provision 1.1-2 -- hold
7 on. Okay, so let's go -- I'm sorry.
8    1.1-1 of Deposition Exhibit 51 says, "A
9 one-time message program results in only one or two
10 messages being delivered to the user at the time the
11 interaction is initiated."
12    Do you see that?
13    A. Yes.
14    Q. So it looks like the numbering changed. In
15 the earlier version, that language or similar language
16 at 1.1-2, it then goes to 1.1-1. The earlier one says
17 one responsive message is okay; the later one says one
18 or two messages are okay. Do you see that?
19    A. Yes.
20    Q. Do you know why that changed?
21    A. I don't. I'd have to look at the examples
22 that were probably brought up within the MMA of valid
23 examples of when additional messages are sent that are
24 not considered extraneous.
25    Q. So SMS by its nature has a character

Page 124

1 limitation, correct?
2    A. Generally speaking.
3    Q. So it may be 140 characters or 160
4 characters, something along those lines, correct?
5    A. Both standards of GSM and ANSI-41 specify 160
6 characters.
7    Q. Okay. Are you aware of any discussions among
8 the members of the consumer best practices committee
9 of the MMA regarding how that limitation could affect
10 a responsive message and so the responsive message
11 could be broken into two rather than truncated into a
12 bunch of incomplete words so that the one-time
13 response is actually two text messages that could have
14 been crammed into a single text message, but for
15 readability, they were made two? Do you -- are you
16 aware of any discussions like that?
17    A. No.
18    Q. Is it possible that discussions like that
19 resulted in the change that's reflected in the 2012
20 guidelines at 1.1-1?
21    A. Possibly. But I didn't analyze this document
22 for my analysis, you know, what's possible or what's
23 not possible regarding this document. I would have to
24 study it, and more of the complete document rather
25 than these few excerpts.

Page 125

1    Q. What you have, I believe, is a complete
2 document. See the last page says 46 of 46?
3    A. Yes, I agree.
4    So really, I would have to read this and see
5 how it applied to this case. These certainly weren't
6 considered at the time Mozes performed this text
7 messaging program, but I can't really render an
8 opinion on what's possible or what's not possible
9 hypothetically with regard to this document.
10    Q. Were you involved at all in the adoption by
11 the MMA of Version 7.0, which is Deposition Exhibit
12 51?
13    A. No.
14    Q. Do you know, as you sit here today, why any
15 of the changes were made in that document?
16    A. From a general sense, I do.
17    Q. What changes do you have a general sense of
18 their basis?
19    A. These -- these requirements evolve over time
20 to be more in line sometimes with local, state, and
21 federal statutes; they evolve over time based on
22 carrier technologies; they evolve over time based on
23 subscriber behavior. So there are lots of general
24 reasons why these evolve.
25    The reason why one particular requirement has

32 (Pages 122 - 125)

1 been expanded, I don't know that unless it's
2 documented here or somebody that attended the meeting
3 could talk about that.
4     Q. If Mr. Phillips had texted Bama and had in
5 fact received on his handset both the thank you
6 message and the date of birth message, and then he
7 texted Bama again after receipt of those two messages,
8 and he received the same two messages again, and then
9 he texted Bama again and he received those two
10 messages, is it possible that his perception of
11 receipt of these two messages and his ongoing votes of
12 Bama amount to consent?
13     A. I -- I -- I have no opinion on that. I'm not
14 qualified to opine on what the meaning of consent is.
15     MR. KIMREY: Okay. We can take a break.
16     THE VIDEOGRAPHER: Going off the record at
17 12:32.
18     (Lunch recess taken at 12:33 p.m.)
19
20
21
22
23
24
25

1 AFTERNOON SESSION                    1:16 P.M.
2     THE VIDEOGRAPHER: We're on the record at
3 1:16.
4         EXAMINATION (RESUMED)
5 BY MR. KIMREY:
6     Q. Mr. Snyder, could you refer to page 7 of your
7 declaration. At paragraph 12 you say, quote, The
8 message sender's cellular telephone number is
9 automatically sent as part of the message and captured
10 at the destination cellular telephone where the
11 message is received. The message sender does not
12 provide his/her cellular telephone number to the
13 intended message recipient; rather, it is delivered as
14 part of the telecommunications signaling protocol.
15     Did I read that accurately?
16     A. Yes.
17     Q. Isn't it the case that anytime you text
18 somebody, your cellular telephone number is captured
19 regardless of the nature of the text?
20     A. Yes. That's the same as a voice call,
21 exactly the same.
22     Q. That wasn't my question.
23     A. No, no. The answer is yes. And it's true of
24 voice calls as well.
25     Q. Yeah, but I'm not asking about voice calls

1 right now.
2     A. Okay.
3     Q. So that's part and partial -- parcel -- of
4 the transition of text message, no matter what the
5 nature of its content is, that the number is conveyed
6 or captured by the recipient, conveyed to/captured by
7 the recipient. Correct?
8     A. Yes, it's part of the SMS protocol, standard
9 protocol.
10     Q. So there are instances in which a number
11 would be captured, but that would not be a violation
12 of the MMA guidelines, correct?
13     A. I don't quite understand --
14     Q. Well, in other words --
15     A. -- the question.
16     Q. -- let's talk about November 5th of 2011.
17 Wesley Phillips texted Bama, and according to I think
18 what is your opinions, his number was captured by
19 Mozes when he texted Bama, and that's how Mozes then
20 said thank you, in what you have referred to as the
21 confirmatory text. Right?
22     A. Yes.
23     Q. And that transmission of the Bama plus the
24 thank you confirmatory text was not violative of the
25 MMA guidelines, correct?

1     A. Yes.
2     Q. So there are situations in which a number is
3 captured via text message that are not a violation of
4 any standard, correct?
5     A. Correct.
6     Q. And that would include situations in which
7 the capturing of the number would not be a violation
8 of the TCPA, right?
9     A. Correct.
10     Q. So it's not your position that Mozes did
11 anything wrong by capturing the number to transmit the
12 three thank you text messages, correct?
13     A. Can you repeat the question.
14     MR. KIMREY: Could you reread my question,
15 please. Or read my question.
16     (Record read by the reporter as follows:
17     "QUESTION: So it's not your position
18     that Mozes did anything wrong by capturing
19     the number to transmit the three thank you
20     text messages, correct?")
21     THE WITNESS: Yes, there is nothing, in my
22 opinion, that was wrong about the confirmatory text
23 messages.
24 BY MR. KIMREY:
25     Q. And there is nothing inherently nefarious

33 (Pages 126 - 129)

1 about capturing a telephone number via receipt of a
2 text message, correct?
3    A. Correct.
4    Q. I mean, that's just how it works, right?
5    A. Well, it's part of the SMS communications
6 protocol.
7    Q. So moving on. You mentioned voice calls. In
8 your declaration, this is page 8, paragraph 14, you
9 say, quote, This mechanism is completely analogous to,
10 and essentially the same as, the way caller ID
11 operates for voice calls. The telecommunications
12 carrier networks always send the calling party's --
13 i.e., the party originating the call -- telephone
14 number as signaling data when the call is connected,
15 thereby enabling the called party -- i.e., the party
16 receiving the call -- to obtain and capture the
17 telephone number of the calling party.
18    Did I read that accurately?
19    A. Yes.
20    Q. And you said a moment ago that voice calls
21 and SMS messages were perfectly analogous in this
22 regard, right?
23    A. Yes, information is always sent.
24    Q. Didn't you testify in the Vivint case that
25 SMS and voice calls are vastly different?

1    A. I don't recall. You would have to show me
2 the report and the context.
3    Q. Is it possible that you testified that way?
4    A. I don't recall. I don't know how many years
5 ago that was. I don't recall.
6    MR. KIMREY: Deposition Exhibit 51.
7    THE REPORTER: 2.
8    MR. KIMREY: What was 51?
9    MR. DONOVAN: There was one.
10    MR. KIMREY: So Exhibit 52.
11    (Deposition Exhibit 52 was marked for
12    identification.)
13 BY MR. KIMREY:
14    Q. Were you retained as an expert in the Benzion
15 vs. Vivint case?
16    A. Yes.
17    Q. Am I pronouncing that right: "Vi-vint"?
18    A. I think it's "Vie-vint."
19    Q. Did you give a deposition in that case?
20    A. Yes.
21    Q. I just provided you with a copy of at least a
22 portion of your deposition transcript in that case,
23 which is now marked as Deposition Exhibit 52. And
24 this is in Case 13-cv-01887, docket entry 47-1.
25    Do you recognize this transcript?

1    A. I guess I saw it at some point a couple years
2 ago.
3    Q. If you could turn to page 42.
4    A. Okay.
5    Q. Were you -- were you asked this question and
6 did you give this answer during your deposition in
7 this case, starting at line 16 of paragraph (sic) 42:
8    Question: I understand that there are ATDS
9 machines that send text messages and then there are
10 ATDS machines that make calls. What is the difference
11 between those two, end quote.
12    And you answered, quote, Oh, it's massive.
13 It's massive. It's almost like the difference between
14 a helicopter and an airplane. They're both flying
15 machines, but from a technology standpoint, they
16 look -- they work in completely different ways.
17 Right? There are different types of physics
18 involved -- right -- different ways the air pressure
19 is provided. They are just two completely different
20 animals although both fly, machines that fly.
21    Text messaging, if it's computerized, if a
22 text message is sent out by a machine and not a
23 peer-to-peer text message like I would send out to
24 you, then by definition it's an automatic telephone
25 dialing system, simply coming from a computer system.

1    There are multiple ways to make voice calls,
2 but only one way to send out a computerized text
3 message from computerized equipment, right? There's
4 no such thing as predictive dialing with text. It
5 doesn't use a circuit switch telephone network; it
6 uses the packet switch network and Internet protocols
7 and other protocols, although they are overlaid in a
8 cellular network, so it includes a different path, the
9 way they are delivered.
10    You know, the way people can respond to them,
11 they are not in real time. There's just a variety of
12 different criteria involved that make them completely
13 separate systems, end quote.
14    Were you asked that question and did you
15 respond in that fashion in the deposition in the
16 Vivint case?
17    A. Yes.
18    Q. By the way, is it your opinion that Mozes
19 Connect is a predictive dialer?
20    A. No.
21    Q. So it is not a predictive dialer?
22    A. No.
23    Q. I'll do that again. It is not a predictive
24 dialer, correct?
25    A. No, it is not a predictive dialer.

34 (Pages 130 - 133)

Page 134

1    Q.  Okay.  Have you ever -- has a judge ever
2  rendered an opinion indicating that you are an expert
3  on anything related to the TCPA?
4    A.  I don't --
5      MR. DONOVAN:  Object to the form.
6      THE WITNESS:  I don't know.
7  BY MR. KIMREY:
8    Q.  You testified in your declaration at page 8
9  (sic), paragraph 18, that the primary protocol used
10  for text message communications is short message
11  peer-to-peer protocol?
12    A.  No, I did not.
13    Q.  Page 9, paragraph 18.
14    A.  That's right.  I think you asked -- maybe
15  you're confused about the question you're asking me.
16  That's not the primary protocol for short message
17  service.
18    Q.  Okay, mobile market -- it says, quote, Mobile
19  marketing companies send and receive text messages by
20  connecting to cellular networks by using
21  internet-based connections and communications
22  protocols.  The primary protocol used is known as the
23  short message peer-to-peer, SMPP, protocol.  SMPP is
24  an internet-based communications protocol specifically
25  designed for communications between a mobile marketing

Page 135

1  company and a cellular network's short message service
2  center, SMSC.  SMSCs are network entities that are
3  maintained and controlled within the cellular
4  carriers' networks and are the store-and-forward
5  repositories for text messages to be both delivered to
6  and sent from mobile subscribers.
7      Did I read that accurately?
8    A.  Yes, you did.
9    Q.  What are you describing there?
10    A.  I'm describing a protocol that was added long
11  after the short message service standard
12  communications protocols were developed for the
13  cellular networks.
14      And this protocol was designed to be a single
15  link between a computerized system and a short message
16  service center for the express purpose of value-added
17  text messaging services.  It's not really part of the
18  overall SMS standards; however, the SMPP protocol is
19  becoming standard for that single link from a short
20  message service center to a mobile marketing company.
21    Q.  Is that what was used here on November 5th of
22  2011?
23    A.  Yes.
24    Q.  How do you know that?
25    A.  Because that's what Mobile Messenger uses and

Page 136

1  that is the standard technology connection between any
2  of the aggregators and the mobile marketing companies.
3    Q.  And that's what Mobile Messenger was using in
4  2011?
5    A.  Yes.
6    Q.  How do you know that?
7    A.  Because it's the only protocol that's used
8  for that.
9    Q.  With respect to the text message flow on
10  November 5th, 2011, Wesley Phillips originally texted
11  Bama.  Do you know that in response to that first text
12  message of Bama, any data related to him was written
13  to a database by Mozes Connect?
14    A.  Yes.
15    Q.  How do you know that?
16    A.  It's apparent that they stored his mobile
17  phone number that came in as part of the SMS protocol.
18  If they had not, they would not have been able to send
19  him additional text messages.
20    Q.  Couldn't it be a ping so that the ping is the
21  Bama text message, and then a pong from the system
22  that basically through the coding, the system is told,
23  when you receive the ping, you pong, without any sort
24  of storage?  Is that possible?
25    A.  Not in this case.  And in fact, that's what

Page 137

1  they should have done.  And in fact they didn't, and
2  they ended up storing his mobile phone number to send
3  him additional text messages with additional calls to
4  action for this program, and the message was stored in
5  their system for some period of time after that.
6    Q.  Isn't it possible that the ping -- the
7  pong -- so the ping is Bama and the pong, in my
8  scenario, is the two text messages: the thank you and
9  the date of birth text messages.  Isn't it possible
10  that in response to the ping of the Bama message, the
11  system just shot out two simultaneous text messages
12  without actually storing anything related to Wesley
13  Phillips?
14    A.  No.
15    Q.  Why is that not possible?
16    A.  It's not how these systems work.  I've been
17  developing and designing these systems for many years;
18  I'm familiar with how they operate.  And in fact, the
19  fact that you have call logs and record logs show that
20  these numbers are stored, right?  So it's even being
21  demonstrated by Mozes that they have stored these
22  numbers in perpetuity even in their call logs.  So
23  these systems simply just don't work that way.
24    Q.  Is the storage a necessary component of
25  sending the responsive thank you and give us your date

35 (Pages 134 - 137)

Page 138

1  of birth, or is it just an ancillary functionality of
2  the system?  Could they have sent those two messages
3  without storing anything?
4      A.  Yes, they could have.  And like I said, in
5  fact they should have only sent the first confirmatory
6  message, or not even sent that confirmatory message,
7  and not saved the mobile phone number at all.  And
8  then there would be no issue here.
9      Q.  There are several references in your
10 declaration to the transmission of messages en masse.
11 Here there's the ping of the Bama message and then the
12 two messages come back, the thank you message and the
13 date of birth message.  Then nothing happens until
14 another ping of Bama, then there are two more
15 transmissions out, another ping of Bama, and two more
16 transmissions out.  Correct?
17     A.  Yes.
18     Q.  Do you characterize that as en masse
19 transmission?
20     A.  No.  I'm looking at the overall program that
21 Coke Zero had sponsored here.  So I don't know how
22 many attendees there were in the stadium that day; I'm
23 assuming it was full, maybe 80-90,000 people in a
24 stadium like that.
25        These systems are typically designed with

Page 139

1  some marketing expertise in forecasting so that when
2  you build a program, you are going to anticipate some
3  percentage, just like any direct marketing program, of
4  respondents.  They probably overengineered the system,
5  if they did it properly, to respond to tens of
6  thousands as soon as they put up the call to action to
7  vote.  So that there could easily be 10,000 people
8  texting Bama to that short code at the same time, and
9  the system, en masse, would have sent those two text
10 messages to each of 10,000 people in a very short
11 period of time automatically.
12     Q.  In response to Bama or in response to
13 whatever the vote was --
14     A.  Or the other team.
15     Q.  -- LSU.
16     A.  Yes, yes.
17     Q.  But that would have only happened in response
18 to the incoming text, correct?
19     A.  Yes.  The system is designed to receive text,
20 individual text messages, from thousands of people at
21 a time and also to send out that same automated
22 response to all those thousands of people.
23     Q.  Do you know whether, in writing to a database
24 related to the transmission of the Bama in, which had
25 as part of the packet the telephone number of the

Page 140

1  various subscribers, including Wesley Phillips, the
2  same database was written in to as writing in to the
3  database in response to the provision of a date of
4  birth?
5      A.  I do not know.
6      Q.  So is it possible that two completely
7  separate databases were used for purposes of tracking
8  the thank you -- the votes in, the thank yous out, and
9  the date of births out, and the transmission in of the
10 date of births and the responsive text messages to
11 that, could that have been two separate databases?
12     A.  Yes.
13     Q.  Would it have made sense for them to have
14 been two separate databases?
15     A.  It depends on the internal architecture of
16 the system.
17     Q.  Okay.  And again, you don't know what the
18 internal architecture of this system is?
19     A.  Yeah, I haven't been provided that evidence.
20     Q.  Have you asked for it?
21     A.  Yes.
22     Q.  You did?
23     A.  Yes.
24     Q.  To whom did you ask for the internal
25 architecture?

Page 141

1      A.  My attorneys.  I understand that's still
2  awaiting to be produced, that information.
3        MR. KIMREY:  Really?
4        MR. DONOVAN:  Yes.  That is correct.  That
5  information would be responsive to discovery requests
6  that we have served.
7        MR. KIMREY:  Okay.
8      Q.  What would the significance be of there being
9  two separate databases on your opinions in this case?
10     A.  It's hard to say without seeing a functional
11 description or description of the architecture.
12 There's lots and lots of reasons why you would
13 architect it one way or another.
14     Q.  At page 24, paragraph 64 of your
15 declaration --
16     A.  Yes.
17     Q.  -- it says, In the FCC's report and order of
18 October 16th, 1992, the Commission stated:  If a call
19 is otherwise subject to the prohibitions of 64.1200,
20 persons who knowingly release their phone numbers have
21 in effect given their invitation or permission to be
22 called at the number which they have given, absent
23 instructions to the contrary.  Hence, telemarketers
24 will not violate our rules by calling a number which
25 was provided as one at which the called party wished

36 (Pages 138 - 141)

1 to be reached.
2       However, if a caller's number is captured by
3 a caller ID or an ANI device without notice to the
4 residential telephone subscriber, the caller cannot be
5 considered to have given an invitation or permission
6 to receive autodialer or prerecorded voice message
7 calls.  Therefore, calls may be placed to captured
8 numbers only if such calls fall under the existing
9 exemptions to the restrictions on autodialer and
10 prerecorded message calls, end quote.
11       Did I quote that accurately?
12    A.  Yes.
13    Q.  At the time that the FCC was opining on this
14 in 1992, do you know whether the FCC was considering
15 the application of the TCPA to text messages?
16    A.  No.  However, it was my understanding, and
17 from reading the regulations -- again, I'm not an
18 attorney and I'm not here to interpret them -- that
19 the statute was written with the future in mind, like
20 many Congressional laws.  So my understanding is that
21 the statute wasn't written to be static only for the
22 technology available at the time.
23    Q.  Do the terms "caller ID" or "ANI device" have
24 any sort of relevance when referring to text messages?
25    A.  Yes.

1    Q.  How so?
2    A.  As I said before, caller ID is analogous to
3 the originating telephone address in a text message.
4 As far as signaling protocols go, the signaling
5 protocol for voice calls has an origination address
6 and a destination address.  So does a text message and
7 text message call have an origination address and a
8 destination address.
9       Both those addresses, in both voice circuit
10 switch calling and text message packet switch
11 communications, are preserved across the length of the
12 communication's link.  In some cases, if some
13 subscribers don't subscribe to caller ID, it's simply
14 not displayed on their phone, but the information is
15 still traversed across the network.  In some cases,
16 the caller ID might be blocked by a person making a
17 call.  It's still traversed across the network; it's
18 still, again, not displayed on the recipient's phone.
19 But those two addresses are always sent in both types
20 of calls.
21    Q.  Do you know whether Mr. Phillips knew, when
22 he texted Bama on November 5th, 2011, that his number
23 would be conveyed to whoever was on the other side of
24 that transmission?
25       MR. DONOVAN:  Objection to the form.

1       THE WITNESS:  Yeah, I can't -- I can't
2 respond to what the plaintiff was thinking.
3 BY MR. KIMREY:
4    Q.  Do you know that he was a TCPA plaintiff's
5 lawyer at that time?
6    A.  I was told that by . . .
7    Q.  Had you been -- you were told that by?
8    A.  By counsel.  By counsel, plaintiff's counsel.
9    Q.  Had you been at the game on November 5, 2011
10 and you had texted Bama, would you have assumed that
11 your number would have been conveyed to whoever was on
12 the other side of that Bama transmission?
13    A.  I would have known that, but again, I'm an
14 expert in this technology.
15    Q.  Do you think it requires an expert to know
16 that or it required an expert to know that on
17 November 5th of 2011?
18    A.  Potentially, yes.
19    Q.  Is it possible to capture someone's number
20 when they've consented to your having their number?
21    A.  I don't really understand the question.
22    Q.  If Mr. Phillips said, I'm going to give
23 you my number, and he texted Bama, and Mozes had
24 obtained his number, would you still characterize that
25 as a capture of his number?  His consent is clear.  So

1 if consent is clear, are you still capturing the
2 number because of the nature of text message
3 technology?
4    A.  I'm not qualified to opine on the legal issue
5 of consent.  But I think what you're asking me is --
6 is kind of confusing because you're -- you're relating
7 a technology mechanism with kind of a legal mechanism
8 that are asynchronous: they don't necessarily go
9 together.
10    Q.  So just because you captured a number doesn't
11 mean you obtained it without content?
12    A.  Or with consent.
13    Q.  But just because you captured a number does
14 not mean that you obtained it without consent,
15 correct?
16    A.  Yeah, that's a double negative, so it works
17 both ways.  You can capture a number.  Somebody might
18 have provided consent or they may not have.  Again,
19 they're two separate issues.  The technology of
20 capturing a number is not related to what a person's
21 behavior is.
22    Q.  Were you an expert in Baird v. Sabre?
23    A.  Yes.
24    Q.  Did you render an opinion in Baird v. Sabre
25 that included the following quote in your declaration:

37 (Pages 142 - 145)

1 Quote, Sabre automatically captures airlines --
2 airline passengers' cellular telephone numbers from
3 airline reservation websites, end quote?
4    A. Yes.
5    Q. Did the court agree with you?
6    A. Yeah, they did not -- my understanding is --
7 I haven't read the opinion.  My understanding was that
8 that particular fact didn't go into the judgment in
9 the case.
10    Q. Did the defendant win in that case or did the
11 plaintiff win in that case?
12    A. The defendant won.
13    Q. You were an expert for the plaintiff,
14 correct?
15    A. Yes.
16    Q. What is an ATDS?
17    A. Are you asking me as defined by the TCPA, or
18 are you asking me about technology in general separate
19 and distinct from the TCPA?
20    Q. I'm asking you however you understand it as
21 an expert in this case.
22    A. Typically, they're -- they're similar.  A --
23 a dialing system may or may not qualify as an ATDS
24 within the TCPA; that depends on the system.  So in
25 general, they're the same.  If a system has the

1 ability to automatically dial numbers and call them
2 from a list of numbers or call them from randomly
3 generated numbers or call them from sequentially
4 generated numbers and it dials them without --
5 automatically within the system without human
6 intervention, then I would consider that system to be
7 an ATDS.
8    Q. An ATDS from a lay perspective or an ATDS
9 from a legal perspective?
10    A. It's hard -- I can't -- it's hard for me to
11 talk from a lay perspective: I know how these systems
12 work.  Again, my job is to analyze a system at issue
13 to see if it fulfills certain technology criteria
14 listed in a statute.
15    Q. If I were using Salesforce -- do you know
16 what Salesforce is?
17    A. Yes.
18    Q. So it's a CRM system, correct?  Customer
19 relationship management system, correct?
20    A. Yes, basically.
21    Q. Have you been involved in any cases involving
22 Salesforce?
23    A. No, but I know quite a bit about the company.
24    Q. Okay.  And say I'm looking at a graphical
25 user interface of Salesforce.com and I have a

1 database, say a back-end SQL database of numbers, and
2 I want to place a call to a customer via Salesforce.
3 So I pull up the database, I hover over the number I
4 want to call, and I click and then I call.  Is that an
5 automatic telephone dialing system?
6    A. I don't know.  Based on your description,
7 it's very hard for me.  It's just a hypothetical; I
8 don't know, I'd have to --
9    Q. But you can answer hypotheticals.
10    A. I can.  I prefer not to because I don't see
11 the relevance.  You've asked me a question that -- are
12 you talking about voice call or you're sending text
13 messages through the system?
14    Q. Let's say it's a voice call.  So graphical
15 user interface; I can call the database up off of the
16 SQL database server.  I then hover my cursor over the
17 number I want to call; I click, and it calls.  Is that
18 an ATDS?
19    A. Honestly, I don't have enough information to
20 answer the question.
21    Q. That's all the information you need.
22    A. No, it's not.  I disagree.
23    Q. So you can't say, based on the description
24 that I have provided you, whether that is an ATDS or
25 not?

1    A. That's correct.
2    Q. But it possibly is an ATDS?
3    A. Possibly is not.
4    Q. In what scenario would it be an ATDS?  Like
5 what would render that scenario --
6    A. Again, I would have to analyze the system;
7 look at the details; see how it operated end to end;
8 look at call records; look at how the machine
9 operated: was it able to send multiple calls at the
10 same time; automatically dial lists of numbers without
11 human intervention; all that criteria I have already
12 stated which may render it an ATDS.  But your
13 hypothetical description provided me none of that
14 information.
15    Q. What is a random or sequential number
16 generator?
17    A. Well, I think there's two questions there.
18    Q. What is a random number generator?
19    A. It is a software function or a hardware
20 function designed to generate either true random
21 numbers or what's called pseudo random numbers.
22    Q. What's a random number?
23    A. A random number, it typically -- are you
24 talking in the computer science space; are you talking
25 in the technology space?

38 (Pages 146 - 149)

1      MR. DONOVAN:  You're asking a math major
2 this.  We could be here for hours.
3 BY MR. KIMREY:
4      Q.  I'm talking about how you used it.
5      A.  In the area of computer science, there --
6 random numbers are meant to be numbers that are
7 essentially either truly random or they appear as
8 random for the purposes of some function that requires
9 that.
10     Q.  Is a random number generator at issue in this
11 case?
12     A.  Could be.
13     Q.  How so?
14     A.  It depends.  Some of the latest FCC
15 regulations as well as some court opinions have
16 discussed that a system could be an ATDS even if it
17 does not have that capability, but it has the
18 potential capacity to have that capability.
19     Q.  How would a system have the potential
20 capacity to be a random number generator?
21     A.  In my experience, most computer systems
22 already have random number generators built in for a
23 variety of functions.  Certainly, you could run
24 programs on them that provide random number
25 generation.  Something as simple as Excel that you can

1 run on any Windows server has RAND, R-A-N-D, function
2 to generate random numbers.  Those all can potentially
3 be something that fulfills potential capacity.
4      Q.  Is my iPhone a random number generator?
5      A.  It has a random number generator in it, yeah.
6      Q.  So because my iPhone has a random number
7 generator, does that mean it's an ATDS?
8      A.  It depends.  It could be; it may not be.
9      Q.  What would it depend on?
10     A.  Depends on the software you have and how that
11 software is -- operates internal to the machine.
12     Again, ATDS isn't a bad thing.  There's ATDSs
13 everywhere.  The analogy I always make is to a gun.
14 You can buy a gun -- I'm not a gun person -- you can
15 buy a gun, but you can use it legally or illegally.
16 Than doesn't mean the gun is not legitimately a gun.
17     And that's the same with an ATDS.  You can
18 have an ATDS that is used, and is used fine with no
19 complaints by anybody, and then you can use an ATDS in
20 a bad way that potentially violates the TCPA.
21     Q.  What is a sequential number generator?
22     A.  That's an interesting question, because the
23 definition of sequence means different things to
24 different people, and some courts have defined it as
25 meaning one, two, three, four.  But I'm a little bit

1 biased because I am a math guy.  So what's wrong with
2 four, three, two, one or one, three, five, seven or
3 two, four, six, eight, or having a sequence of random
4 numbers, even, is a legitimate technology.
5      Q.  So if I had a machine that generated the
6 following numbers in the following sequence, would it
7 be a sequential number generator: 1, 5, 1,052, 72, 86,
8 907?
9      A.  Potentially.  And again, I think it depends
10 on who has an opinion on what that definition means.
11     Q.  Have any courts ever disagreed with you on
12 what your opinion is of a sequential number generator?
13     A.  Yes.
14     Q.  Which courts?
15     A.  I remember in the Dominguez vs. Yahoo! case,
16 I believe.
17     MR. DONOVAN:  Can I just interpose an
18 objection and ask for a clarification.  Are you asking
19 if courts in cases he's testified in or provided a
20 report in, or just if there's a court out there that
21 has rendered an opinion that would differ from what he
22 just stated?
23     MR. KIMREY:  His answer suggests that he
24 understood the question.  And I was referring to cases
25 in which he served as an expert, one of which is

1 Dominguez.
2      THE WITNESS:  Okay.  So, yeah, I believe the
3 judge said a sequential number generator has to be
4 like one -- like -- I think he provided an example
5 that was really not in the language of the statute.
6 But he provided an example that had an algorithm, an
7 incremental algorithm, of incrementing a number by
8 one.
9 BY MR. KIMREY:
10     Q.  Was it this; it was 111-111-1111 --
11     A.  Right, something like that.
12     Q.  -- next 111-111-1112, next 111-111-1113, and
13 so on.  Is that the example he gave?
14     A.  That's the example he gave.  Personally, I
15 don't agree with it.  But the -- that decision by that
16 court was for the most part overturned by the
17 appellate court and remanded it back.  And I provided
18 information to the attorneys in that case describing
19 the potential capacity of a random and sequential
20 number generator.
21     Q.  Are you sure that the third circuit
22 overturned the district court in Dominguez?
23     A.  I'm potentially overstating because of my
24 lack of correct legal terminology, as I'm not a
25 lawyer.

39 (Pages 150 - 153)

Page 154

1    The -- I think the decision said something
2 like, if you can demonstrate that the potential
3 capacity of that system had a random number generator
4 or sequential number generator, that would be enough
5 to fulfill the definition of an ATDS.
6    Q. So you are referring to the third circuit
7 opinion that remanded to the district court, correct?
8    A. Right. Which essentially, in my
9 understanding, negated a lot of the district court's
10 opinions about my report and left that open to say
11 that, if this ATDS had this potential capacity -- and
12 again the word "potential" -- then it would constitute
13 an ATDS within the TCPA.
14    Q. Didn't the third circuit agree with the
15 district court, the Pennsylvania district court, that
16 the district judge's opinion that there had to be a
17 capacity to randomly or sequentially generate was
18 correct? The third circuit agreed with the district
19 court on that, didn't it?
20    A. But the district court expanded -- I mean,
21 I'm sorry, the appellate court expanded.
22    Q. Just answer my question. Did the third
23 circuit agree with the district court on the point
24 that, in order to have an ATDS, you had to have the
25 capacity to randomly or sequentially generate numbers?

Page 155

1    A. No. They did not agree.
2    Q. And you base that opinion on having read the
3 third circuit opinion?
4    A. I've read it; I don't have it. I read it
5 online. And I think the appellate court specifically
6 used terminology called latent capacity or potential
7 capacity.
8    Q. How did you access the opinion?
9    A. I have Google alerts set up for TCPA. And so
10 every time something with the four characters TCPA is
11 posted on the Web, I get a Google alert. And one came
12 through a month, month and a half ago or longer, that
13 there was a decision by the appellate court. So I
14 clicked on it and I read it.
15    Q. In the Dominguez case, you provided a
16 deposition, correct?
17    A. Yes.
18    Q. And in that deposition, you were asked this
19 question and you responded in this fashion:
20 Question -- quote -- So -- so is it fair to say, then,
21 that every text message sent to mobile phones in use
22 today in the United States would necessarily have to
23 be sent from an automatic telephone dialing system, in
24 your opinion?
25    Answer: Typically, yes.

Page 156

1    A. What was the preceding questions and
2 sentences? That's taken out of context. So obviously
3 that was referring to automated computerized systems
4 that send and receive text messages, not humans and
5 peer-to-peer text messages.
6    Q. But did you -- were you asked that question
7 and did you give that response?
8    A. The question is out of context. The question
9 doesn't refer to whether the text messages at issue
10 were sent by a human or by a machine.
11    Q. Were you asked that question and did you give
12 that response?
13    MR. DONOVAN: Randy, you can answer his
14 question, and then we can ask him to clarify.
15    THE WITNESS: Oh. I must have you. I must
16 have, if it's in the transcript. It probably
17 mischaracterizes my opinion because the rest of the
18 language isn't -- is not stated.
19 BY MR. KIMREY:
20    Q. Did you give a deposition in the Gragg case?
21    A. Yes.
22    Q. And did you testify in the Gragg case that
23 the ATDS definition under the TCPA made no sense to
24 you?
25    A. I don't recall that. And again, that would

Page 157

1 have to be in context of the rest of the discussion.
2    MR. KIMREY: 53. Deposition Exhibit 53.
3    (Deposition Exhibit 53 was marked for
4    identification.)
5 BY MR. KIMREY:
6    Q. Deposition Exhibit 53 is the deposition
7 transcript for Mr. Snyder's deposition in Torrey Gragg
8 vs. Orange Cab Company, which is in the United States
9 District Court for the Western District of Washington.
10    Please turn, Mr. Snyder, to page 51. Were
11 you asked this question and did you give this response
12 in this deposition? I'm at line 20 of page 51.
13    Question: So humor me for a moment.
14 Assuming your construction isn't accepted by the
15 court, is it fair to say that in your opinion, it
16 simply is impossible for equipment to have the
17 capacity to store telephone numbers to be called using
18 a random number generator?
19    Answer: No. My opinion is that the
20 definition of an ATDS makes no sense whatsoever.
21    Were you asked that question and did you give
22 that response?
23    A. Yes. But if you look at the rest of the
24 response to qualify your truncated question, "Without
25 the ability to store numbers, whether they're produced

40 (Pages 154 - 157)

Page 158

1 with a random number generator or sequential number
2 generator or whether stored from some externally
3 provided list, if the numbers are not stored in some
4 fashion, then they can't be called."
5         The issue there is -- is that today, or in
6 the last 15, at least 15 years, these types of calls
7 have been dialed from a list of numbers.  It just
8 simply is not beneficial, cost-effective or efficient
9 for marketing companies to try and reach out to people
10 by calling random numbers or sequentially generated
11 numbers, if they don't know who those people are.
12        So the direct marketing industry has changed
13 quite a bit to using lists of numbers of people of a
14 given demographic that you intend to call, rather than
15 just calling any old person.
16        And that's what I was referring to here.  The
17 fact is that the ATDSs today for debt collections,
18 telemarketing, or for text messaging programs do not
19 specifically use numbers that are randomly or
20 sequentially generated to contact people.
21    Q.  Did the judge in Gragg accept or reject your
22 opinion?
23    A.  That's hard to say.  I think the -- in
24 general, he did not agree with my opinion.  But this
25 was a complex case.  There were many types of

Page 159

1 technology involved, and I think he extended from what
2 a cab driver did in his car to what was automatically
3 done by the machine to mean something else.  So, yes,
4 he disagreed with my opinion.
5    Q.  In Connelly vs. Hilton, did you submit a
6 declaration?
7    A.  Yes.
8    Q.  And was that provided to opposing counsel in
9 that case?
10   A.  Yes.
11   Q.  And again, you said in that declaration that
12 the system at issue was not an automatic telephone
13 dialing system, correct?
14   A.  Yes.
15   Q.  How did that system differ from Mozes
16 Connect?
17   A.  It's a completely different system.  It was a
18 voice-calling automatic dialer to call people over the
19 circuit search network on their phone.  Again, two
20 completely separate systems, as we discussed before,
21 but analogous in the type of signaling information
22 that is sent.
23   Q.  When did you submit that declaration?
24   A.  I don't recall the date.  Two years ago,
25 three years ago.

Page 160

1    Q.  Can you estimate the year that it was
2 submitted?
3    A.  2012, 2013.
4    Q.  Please turn to page 89 of the Gragg
5 deposition transcript.
6    A.  Okay.
7    Q.  Were you given this question and did you
8 provide this response in the Gragg deposition?  Page
9 89, line 6:
10        Question:  Serving in the capacity as a
11 testifying expert, have you ever expressed the opinion
12 that a text delivery system was not an automatic
13 telephoning dialing system under the Telephone
14 Consumer Protection Act?  End question; begin
15 response:
16        No, I have not.  In fact, my opinion is that
17 all of these automated systems fall within the
18 definition of an ATDS within the TCPA.  End quote.
19        Was that question asked and did you provide
20 that response?
21    A.  Yes.  Again since I was making here was that a TCPA
22 the primary point I was making here was that a TCPA
23 violation is something above and beyond fulfilling the
24 ATDS definition.
25        All of these text message systems are

Page 161

1 designed to store telephone numbers and send out text
2 messages, either autonomously or in response to an
3 incoming message.  Based on that functionality, all of
4 those systems fulfill the definition of an ATDS, in my
5 opinion.
6         Again, nothing is wrong with an ATDS; they
7 are great machines.  If you use them incorrectly and
8 send out you messages without consent, you are
9 potentially violating the TCPA.  But I think ATDSs are
10 great things and these text message systems that are
11 ATDSs work fine.
12    Q.  You said here that all of these automated
13 systems fall within the definition of an ATDS within
14 the TCPA, correct?
15    A.  Yes.
16    Q.  You said that?
17    A.  Yes.
18    Q.  Were you rendering a legal opinion of the
19 application of the TCPA, or was that a lay opinion?
20    A.  I don't -- my intent is to never render a
21 legal opinion; I'm not qualified to do that.  Once
22 again, my job is to look at -- look and analyze
23 certain technology and to see whether that technology
24 fulfills the criteria of technology defined within the
25 statute of the TCPA.  And if I find that it does

41 (Pages 158 - 161)

Page 162

1 fulfill that criteria, I render an opinion whether
2 it's an ATDS or not.
3     Q. Under the TCPA, correct?
4     A. Based on the definition of an ATDS within the
5 TCPA.
6     Q. And it's not just the TCPA. You base your
7 understanding of several FCC orders, right?
8     A. Yes. My understanding is that the FCC has
9 the authority to interpret the TCPA statute.
10     Q. Does the TCPA itself have any reference to
11 storage of numbers in the auto dialer section?
12     A. Yes.
13     MR. KIMREY: 54.
14     (Deposition Exhibit 54 was marked for
15     identification.)
16     MR. DONOVAN: I see this when I close my
17 eyes. I don't need a copy.
18     MR. HASKINS: Wait until your eyes are as old
19 as mine.
20 BY MR. KIMREY:
21     Q. I've provided as Exhibit 54 a copy of the
22 TCPA, 47 USCS 227. What part of this statute is
23 material to the opinions you have rendered in this
24 case?
25     A. 227(a)(1)(A) and (B).

Page 163

1     Q. Okay. So the definition says: As used in
2 this section, the term "automatic telephone dialing
3 system" means equipment which has the capacity to
4 store or produced telephone numbers to be called,
5 using a random or sequential number generator, and to
6 dial such numbers.
7     Did I read that accurately?
8     A. Yes.
9     Q. So that is 227(a)(1)(A) and (B), correct?
10     A. Yes.
11     Q. Is, in your opinion, the use of a random or
12 sequential number generator essential to the finding
13 of an ATDS under the TCPA?
14     MR. DONOVAN: Object to the form.
15     THE WITNESS: I don't know. My understanding
16 is that different courts have ruled differently. But
17 that's potentially one of the criteria that's used;
18 there are others.
19 BY MR. KIMREY:
20     Q. What are the others?
21     A. Dialing from a list of stored numbers.
22     Q. And what is that based on?
23     A. That's based on several FCC regulations that
24 were issued over the last 10 or 15 years.
25     Q. Does 227(a)(1)(A) or (B) refer to dialing

Page 164

1 from a list of stored numbers?
2     A. Yes.
3     Q. Where?
4     A. "To store," 227(a)1(A), the first two words.
5     Q. So does "to store" -- is that modified by
6 "comma using a random or sequential number generator"?
7     A. It couldn't possibly. You don't use random
8 number generators to store information. That's
9 incongruous in the areas of computer science.
10     Q. So grammatically, what does "using a random
11 or sequential number generator" modify?
12     MR. DONOVAN: Object. He's neither a
13 grammatical expert nor a lawyer. This is not
14 appropriate for his deposition.
15     MR. KIMREY: His declaration is full of legal
16 conclusions, so I think it is appropriate.
17     Q. Can you answer the question?
18     A. No. In fact, look, I'm not an expert in
19 statutory construction. The legal portions I put in
20 my declaration are purely for background. I don't
21 interpret them; I don't base conclusions on them; I
22 don't make legal conclusions. They're there for
23 background. And they also help me -- give me an
24 understanding of how I should analyze the equipment.
25     If it wasn't for certain words in the

Page 165

1 statute, I wouldn't be able to determine whether a
2 given system qualified or had the criteria to fulfill
3 the statute. So I have to know what a random number
4 generator is; I have to know what a sequential number
5 generator is; I have to know what "to store" means; I
6 have to know what "produce telephone numbers" means.
7 I'm not interpreting that; I'm simply looking and
8 analyzing a system and seeing if it does these things
9 that are in the statute. That's all.
10     Q. So you don't know what "using a random or
11 sequential number generator" modifies in the statutory
12 provision, correct?
13     A. I have -- from a legal standpoint, I have no
14 idea.
15     Q. You say in your expert report in this case
16 that the FCC said in 2008 that -- okay, let's switch.
17     THE VIDEOGRAPHER: Going off the record at
18 2:12.
19     (Recess taken.)
20     THE VIDEOGRAPHER: This begins Disk No. 3 in
21 the Deposition of Randall Snyder on December 8th,
22 2015. We're on the record at 2:21.
23     MR. KIMREY: I want to go back to Connelly
24 vs. Hilton. We would like a copy of Mr. Snyder's
25 declaration in that matter and would be happy to have

42 (Pages 162 - 165)

Page 166

1  it be subject to a protective order or whatever other
2  kind of confidentiality you guys want in this matter.
3  So we just make a request that, to the extent you can
4  help facilitate that, we appreciate it.
5      MR. DONOVAN:  We can talk about the details
6  afterwards.
7      MR. KIMREY:  I will let you know that my
8  office is trying to contact the lawyers in that matter
9  now to obtain a copy of that.  We can't see any
10  evidence of a declaration on the docket.  So we
11  definitely want to see that because it appears to be
12  the only opinion in which he said something is not an
13  ATDS.
14      Q.  So back to this notion of a random and
15  sequential number generator potentially being part and
16  parcel of the definition of an ATDS under the TCPA.
17      In your declaration, Mr. Snyder, you refer to
18  what I am providing to the court reporter to be marked
19  as Deposition Exhibit 55.
20      (Deposition Exhibit 55 was marked for
21       identification.)
22  BY MR. KIMREY:
23      Q.  In saying that the FCC had extended the
24  definition of an ATDS to a system that stored numbers
25  and then called them, does this Deposition Exhibit 55,

Page 167

1  which is the declaratory ruling of the FCC under the
2  TCPA docket released on January 4th of 2008, does this
3  look familiar to you?
4      A.  Yes.
5      Q.  And this is, from what I understand, what you
6  use as the bridge from the TCPA passed in 1991 to the
7  recognition by the FCC related to storage of numbers
8  and calling from those numbers constituting an ATDS,
9  right?
10      A.  Yes.
11      Q.  This opinion or declaratory ruling, though,
12  is directed at the notion of a predictive dialer,
13  right?
14      A.  Yes.  Generally speaking, yes.
15      Q.  And the Commission, at footnote -- scratch
16  that -- at paragraph 13 at page 8 says -- this is the
17  second sentence in paragraph 13 -- The Commission
18  found that, based on the statutory definition of
19  automatic telephone dialing system, the TCPA's
20  legislative history, and current industry practice and
21  technology, a predictive dialer falls within the
22  meaning and definition of autodialer in the intent of
23  Congress.  The Commission noted that the evolution of
24  the teleservices industry had progressed to the point
25  where dialing lists of numbers was far more

Page 168

1  cost-effective, but that the basic function of such
2  dialing equipment had not changed the capacity to dial
3  numbers without human intervention.  The Commission
4  noted that it expected such automated dialing
5  technology to continue to develop and that Congress
6  clearly anticipated that the FCC might need to
7  consider changes in technology, end quote.
8      Did I read that accurately?
9      A.  Yes.
10      Q.  So that's the language that you rely on to
11  say, in your expert report here and other expert
12  reports in other cases as well, that a system can be
13  an automatic telephone dialing system if it stores
14  numbers and calls those numbers, correct?
15      A.  Yes.
16      Q.  You have faced criticism on that point in at
17  least one case where it was argued that this is
18  specific to predictive dialers, and if a case does not
19  involve a predictive dialer, then this opinion is in
20  opposite, inapplicable, it's irrelevant to what is
21  going on in the case.
22      What is your response to that claim?
23      A.  That there is a general misunderstanding of
24  what the term "predictive dialer" means.  Predictive
25  dialers are automatic dialers that, once the dialing

Page 169

1  function is complete -- automatically dialing from a
2  list of numbers, once its complete -- the predictive
3  nature applies to how it -- how the system responds
4  once the call is answered.
5      That is completely distinct and separate from
6  the actual dialing portion of what these systems do.
7  The fact that someone answers and the system predicts
8  an available agent to complete the call to is
9  extraneous to the TCPA.  The TCPA talks about dialing
10  numbers and initiating calls.  It doesn't talk about
11  what happens if someone answered the call.  It doesn't
12  say, if somebody answers and does this, what's
13  supposed to happen.
14      So the nature of predictive dialers to me
15  means really any automatic dialer because the
16  predictive nature of it is separate and distinct from
17  initiating calls from a list of numbers and dialing
18  them, regardless of what happens after the call is
19  dialed.
20      Q.  Is it your opinion that the FCC, in
21  Deposition Exhibit 55, this declaratory ruling,
22  rendered an opinion on anything other than a
23  predictive dialer?  Is this limited to predictive
24  dialers or is it broader?
25      A.  I believe it's broader based on the

43 (Pages 166 - 169)

1 definition of predictive dealers.
2   Q. Elaborate on that for me. How is it broader?
3   A. I think I just did. It could have just said
4 dialers and it would mean the same thing. Because
5 it's called predictive dialer, that definition refers
6 to what happens after a call is answered.
7   Q. Why do you think they put that qualifier in,
8 "predictive," when it's unnecessary?
9   A. Because that was the request of the ACA,
10 that's why. This is a declaratory ruling and not a
11 report and order.
12   Q. Okay. But in interpreting Deposition Exhibit
13 55 and what the FCC was doing with respect to its
14 interpretation of the TCPA, you believe that you're
15 not rendering a legal opinion?
16   A. I am not rendering a legal opinion. I'm just
17 here to talk about the technology, and it just happens
18 to be technology definitions in these documents.
19   Q. Did text messages exist in 1991?
20   A. Yes.
21   Q. How so?
22   A. In Europe. The first very GSM systems
23 started sending text messages in 1991.
24   Q. Did text messages exist in the US in 1991?
25   A. No.

1   Q. When did text messages become a reality in
2 the United States?
3   A. Started probably around 1996.
4   Q. You say in your declaration, page 6,
5 paragraph 10, quote, The FCC has held that
6 prohibitions under the TCPA apply equally to voice
7 calls and SMS text message calls to cellular telephone
8 numbers.
9     Did I read that accurately? Page 10 (sic),
10 paragraph 10.
11   A. Yes.
12   Q. You're not rendering a legal opinion on the
13 applicability of the TCPA to text messages; you are
14 merely parroting what the FCC has said; is that what
15 you're doing here?
16   A. That's exactly what I am saying in any of the
17 sections on here. I have simply copied and am
18 parroting the sections of the FCC regulations that I
19 believe apply to this analysis.
20   Q. Okay. And then you go on to say, paragraph
21 23, later -- I'm sorry, page 23, paragraph 61 -- so
22 that's page 23, paragraph 61 -- The FCC has held that
23 prohibitions under the TCPA apply equally to both
24 voice calls and SMS text message calls to cellular
25 telephone numbers.

1     So you essentially say the same thing again,
2 right?
3   A. It's just reiteration for this section.
4 Again, it's just literally copying --
5   Q. Right.
6   A. -- what's in the regulation.
7   Q. And in both quotes, you cite to a
8 February 15th, 2012 FCC order, correct?
9   A. I believe that's correct. I cite to that
10 order; I believe it's the right document.
11   Q. Had the FCC held before February 15th of 2012
12 that the TCPA applied to text messages?
13   A. Yes, I believe they first discussed it
14 earlier on, maybe in the 2003 report and order. I'd
15 have to review that. In my declaration, it is listed
16 as the FCC's report and order of July 3rd, 2003. I
17 think that may be the first place where text messages
18 are --
19   MR. DONOVAN: What are you pointing to,
20 Randy?
21   THE WITNESS: This is paragraph 3 of my
22 report in the listing of documents and specifications
23 I reviewed. And this was one of the regulations. I
24 believe this July 3rd, 2003 is the very first one that
25 addresses text messaging.

1 BY MR. KIMREY:
2   Q. Do you know whether in your declaration you
3 cite to the 2003 order for that proposition?
4   A. Let's see. Yes, I do.
5   Q. And where is that?
6   A. Paragraph 65 on page 24.
7   Q. Okay, so paragraph 65 on page 24 says, In the
8 FCC's report and order of July 3rd, 2003, the
9 Commission stated, quote, The statutory definition
10 contemplates autodialing equipment that either stores
11 or produces numbers. It also provides that in order
12 to be considered an automatic telephone dialing
13 system, the equipment need only have the capacity to
14 store or produce telephone numbers. It's clear from
15 the statutory language and the legislative history
16 that Congress anticipated that the FCC, under its TCPA
17 rulemaking authority, might need to consider changes
18 in technologies. In the past, telemarketers may have
19 used dialing equipment to create the dial -- and dial
20 ten-digit telephone numbers arbitrarily. As one
21 commentator points out, the evolution in the
22 teleservices industry has progressed to the point
23 where using lists of numbers is far more
24 cost-effective. The basic function of such equipment,
25 however, has not changed the capacity to dial without

44 (Pages 170 - 173)

Page 174

1 human intervention. We fully expect automated dialing
2 technology to continue to develop.
3       Did I quote that accurately?
4   A. Yes.
5   Q. Is that the quote in which you say that the
6 TCP -- that the FCC found that the TCPA applied to
7 text messages?
8   A. No. But I believe, and I haven't reviewed
9 the entire -- that entire specification, that entire
10 document of regulations recently -- but I believe it
11 makes mention of text messages.
12      However, the point of me putting this --
13 copying this paragraph as background information into
14 the document was to demonstrate that -- that a list of
15 numbers also satisfies the definition of an ATDS.
16   Q. Right. But I'm focused on applicability of
17 the TCPA to text messages. Because if you look at
18 your declaration, in your CV, when you refer to the
19 Satterfield case --
20   A. Yes.
21   Q. -- and this is page 2 of your CV?
22   A. Yes.
23   Q. It says, Personally cited by United States --
24 are you there?
25   A. Yes.

Page 175

1   Q. Page 2, Satterfield. Quote, Personally cited
2 by United States Court of Appeals for the Ninth
3 Circuit, Satterfield vs. Simon & Schuster -- yada yada
4 yada, the case caption is there -- the result of
5 expert opinion greatly expanded the TCPA and was
6 followed by formal FCC declaratory rulings citing this
7 case that text messages or calls as used -- as defined
8 by the TCPA in dialing numbers from a stored
9 electronic list of telephone numbers falls within the
10 definition of an automatic telephone dialing system.
11      Do you see that?
12   A. Yes.
13   Q. So given that your work, your retention
14 occurred in January of 2007 in the Satterfield case,
15 and you're saying that the work that you did in that
16 case led to the FCC's applying the TCPA to text
17 messages --
18   A. Partially.
19   Q. -- could that have occurred in the 2003 FCC
20 order?
21   A. No. The point of this was the list of
22 numbers, specifically dialing from a list of numbers,
23 whether it was applied to voice calls or text
24 messages, the fact that in this appellate ruling, the
25 court essentially agreed that text messages that were

Page 176

1 sent from a list of numbers fulfilled the criteria.
2   Q. Let's go back to the applicability of the
3 TCPA to text messages. Does the FCC say in the
4 July 3rd, 2003 report and order that the TCPA applies
5 to text messages?
6   A. I don't know. And as I have answered before,
7 I said I believe so. I believe that's the first
8 regulation to mention it. However, I haven't,
9 again -- I said this before -- I haven't read that in
10 a long time. I would probably have to have it
11 electronically and search through it or read through
12 the whole thing now --
13   Q. If --
14   A. -- to find the statement.
15   Q. If the FCC said for the first time in 2012
16 that the TCPA applied to text messages --
17   A. No.
18   Q. -- should -- just assume this for purposes --
19 it's a hypothetical.
20   A. It's wrong.
21   Q. If they had said that --
22      MR. DONOVAN: Let him finish his question.
23      THE WITNESS: Okay.
24 BY MR. KIMREY:
25   Q. If they had said that -- how is it wrong?

Page 177

1 You just that you don't whether they it in 2003.
2   A. No, they definitely said it in the 2008
3 regulations. I thought 2003 was the first time they
4 said it. But the 2008 FCC regulations clearly talk
5 about text messages.
6   Q. Okay.
7   A. That's well before this case and the facts of
8 this case occurred.
9   Q. So going back to Satterfield. You say in
10 your CV, as I noted, that the result of your opinion
11 greatly expanded the TCPA. Right?
12   A. Yes.
13   Q. So the TCPA was narrower before your opinion
14 and then became broader afterwards?
15   A. No, my point there -- and of course my CV is
16 not a legal document and I don't mean it to be read as
17 such. The point there was to emphasize that that was
18 the very first text messaging case litigated under the
19 TCPA.
20      And because of the ninth circuit essentially
21 agreed with a lot of my opinion and remanded it back
22 to the district courts and then it settled for a large
23 amount of money, that was the basis, kind of opened up
24 the floodgates for text-messaging based TCPA
25 litigation.

45 (Pages 174 - 177)

Page 178

1       MR. KIMREY: I think we're on Exhibit 56.
2  Actually, that's the wrong one.
3       (Deposition Exhibit 56 was marked for
4       identification.)
5  BY MR. KIMREY:
6    Q.  Deposition Exhibit 56 is the Satterfield
7  opinion by the ninth circuit, dated June 19th of 2009.
8       Do you see that, Mr. Snyder?
9    A.  Yes.
10   Q.  And if you flip to the ATDS section, which is
11 on page 5 of 8.
12   A.  Yes.
13   Q.  The second column.  It says, Reviewing the
14 record, we find that there is a genuine issue of
15 material fact to whether this equipment
16 has the requisite capacity.  Satterfield's expert,
17 Randall A. Snyder -- that's you, correct?
18   A.  Yes.
19   Q.  -- opined that this telephone system stored
20 numbers to be called and subsequently dialed those
21 numbers automatically and without human intervention.
22 The use of stored numbers, randomly generated numbers
23 or sequentially generated numbers used to
24 automatically originate calls is a technical
25 difference without a perceived distinction.  He later

Page 179

1  opined that this is the primary automated function
2  within the platform that constructs text messages and
3  individually enters them into a message queue for
4  subsequent delivery to the cellular networks.  The
5  cellular telephone numbers residing in the cellular
6  phone number database with a specific application are
7  applied in sequence, as they are stored in the
8  database, to serve as the destination cellular phone
9  number for each individualized text message, end
10 quote.  However, Snyder never specifically declared
11 that this equipment has the requisite capacity.  On
12 the other hand, Jay Emmet, president of mBlox, company
13 responsible for the actual transmission of the text
14 messages and a nonparty in this case, testified that
15 the system used was not capable of sending messages to
16 telephone numbers not fed to the system by mBlox, nor
17 was it capable of generating random or sequential
18 telephone numbers.
19      Therefore, this limited record demonstrates
20 that there is a genuine issue of material fact whether
21 this telephone system has the requisite capacity to be
22 considered an ATDS under the TCPA.  Given the
23 conflicting testimony and this limited record, we hold
24 that summary judgment on this issue was inappropriate.
25 We therefore remand to the district court to determine

Page 180

1  whether the equipment used by Simon & Shuster --
2  Schuster -- had the requisite capacity.
3       Did I quote that accurately?
4    A.  Yes.
5    Q.  So do you read that as the court agreeing
6  with your opinion in this case?
7    A.  To an extent.  Now I know who Jay Emmet was.
8  Jay Emmet was simply -- this is a side note -- he
9  simply -- he was -- mBlox was a party to the
10 litigation as well, and he was simply saying that as
11 the SMS aggregator, they only sent messages out that
12 were sent to it.  So that's really not applicable to
13 this definition.
14      However, it is true that I never came out
15 with a statement that said the system had the capacity
16 to do this; however, I did say the system actually did
17 do this, right?  So even though I didn't use the term
18 capacity, I said the system actually did do this.
19      It -- I don't know the facts of what occurred
20 after it was remanded back to the district court, but
21 my understanding of the words here is that they --
22 they made a point of agreeing that dialing lists
23 from -- dialing numbers from a list of -- from a list
24 or electronic database really has no impact on the
25 perceived issues with the consumer or the subscribers.

Page 181

1    Q.  You rendered an opinion in this case that an
2  ATDS was used, correct?
3    A.  Yes.
4    Q.  Did the court agree with you, either the
5  district court or the ninth circuit, that an ATDS was
6  used?
7    A.  Portions, I think.  Again, I'm not an expert
8  at reading legal opinions, nor am I trained in reading
9  and applying and interpreting legal opinions.  My
10 understanding from the words here is that the court
11 tended to agree that dialing from a list of stored
12 numbers applies in this case.  However, they do make a
13 point that says, we're remanding this back because
14 we're not sure that it's an ATDS or not.
15      And then I assume after that it was
16 determined to be an ATDS, as they settled the case for
17 a large sum.
18   Q.  I may have asked you this already; I
19 apologize if I have.  But has a court ever criticized
20 your characterization of what happened in Satterfield?
21   A.  Not that I know of, but I don't know.  I
22 really don't know.
23      MR. KIMREY:  Deposition Exhibit 57.
24      (Deposition Exhibit 57 was marked for
25      identification.)

46 (Pages 178 - 181)

Page 182

BY MR. KIMREY:

1 BY MR. KIMREY:
2   Q. You were an expert in Dominguez vs. Yahoo!
3 for the plaintiff, correct?
4   A. Yes.
5   Q. You continue to serve in that role, correct?
6   A. Yes.
7   Q. In Deposition Exhibit 57, you'll see footnote
8 6. Do you see that? And it says, Mr. Snyder's
9 declaration reflects -- and this is at 8 F. Supp. 3d
10 637. Mr. Snyder's declaration reflects a
11 misunderstanding of statutory requirements, which
12 require more than simply that the system store
13 telephone numbers and send messages to those numbers
14 without human intervention. Mr. Snyder's declaration
15 references the ninth circuit in Satterfield, which
16 quoted from Mr. Snyder's expert report as follows:
17 The use of the stored numbers, randomly generated
18 numbers or sequentially generated numbers used to
19 automatically originate calls is a technical
20 difference without a perceived distinction.
21       This citation to Satterfield is deceptive.
22 The ninth circuit, in Satterfield, quoted Mr. Snyder's
23 report only to recount his opinions, which were in
24 dispute, and specifically noted that Mr. Snyder's
25 report had not declared that the equipment had the

Page 183

1 requisite capacity. In fact, the court made clear
2 that the district court had not focused on the proper
3 inquiry regarding the system's capacity, thus
4 resulting in conflicting testimony and a limited
5 record, which prevented the circuit court from
6 reversing the district court's grant of summary
7 judgment and, instead, required a remand to the
8 district court. The court did not adopt Mr. Snyder's
9 views. And it goes on.
10   A. Okay.
11   Q. Have you ever seen that before?
12   A. I have read portions of this before, yes.
13   Q. Do you disagree with the Dominguez judge
14 about your characterization of Satterfield and your
15 role in it being deceptive?
16   A. Yes.
17   Q. Do you think that the judge's
18 characterization here is inaccurate, other than the
19 reference to deception?
20   A. This -- as far as I understand, this court
21 decision is an outlier in the litigation industry in
22 the TCPA. This judge found all kinds of issues that
23 conflict with other -- other court opinions, other
24 federal district court opinions and appellate
25 opinions. Hence, it was appealed and remanded back on

Page 184

1 appeal.
2       So I don't -- I personally don't put a lot of
3 weight into this opinion. For whatever reason, this
4 judge also thought the FCC had no authority to
5 interpret the TCPA as well, and that's certainly not
6 my understanding. So to me, this is an outlying
7 decision that I don't agree with.
8   Q. Is the authority of the FCC to interpret the
9 TCPA a legal question or a lay question?
10   A. It's -- I think it's a legal question, but it
11 has been related to me that there is something called
12 the Hobbs act, which gives the FCC this authority
13 legally. But I don't know that; I'm not a lawyer.
14   Q. Were you an expert in Johnson vs. Yahoo!?
15   A. Yes.
16   Q. You were an expert for the plaintiff in that
17 case, correct?
18   A. Yes.
19   Q. The court in that case issued an opinion at
20 2014 US District Lexis 171325. That's the Northern
21 District of Illinois, December 11 of 2014.
22       Do you have any reason to think that that's
23 inaccurate, what I just said?
24   A. No.
25   Q. In that opinion, the judge, it was Judge Shah

Page 185

1 in Chicago, said, quote, Yahoo! also complains that
2 Snyder's report opinions are legal opinions in
3 disguise. As an example, Yahoo! finds it improper for
4 Snyder to opine that even if numbers are stored for
5 just a millisecond in temporary cache or random access
6 memory, RAM, that would be sufficient storage under
7 the TCPA. I agree with Yahoo! and thus consider
8 Snyder's opinions only with regard to the fact of
9 storage and not as to whether the numbers are stored
10 long enough to implicate the Act.
11       Did I read that accurately based on your
12 understanding of that opinion or do I need to put that
13 in front of you?
14   A. I'd like to see it, please.
15   MR. KIMREY: 58.
16   (Deposition Exhibit 58 was marked for
17 identification.)
18   MR. DONOVAN: Let's go off the record for a
19 second while we clean this up.
20   (Discussion off the record.)
21   THE VIDEOGRAPHER: On the record at 2:52.
22   MR. KIMREY: Okay, we just had a coffee spill
23 that's been cleaned up.
24   Q. So Deposition Exhibit 58, Mr. Snyder, is the
25 court's opinion, Judge Shah in Chicago, December 11,

47 (Pages 182 - 185)

1 2014 in Johnson vs. Yahoo!.  At star 16 is the quote
2 that I just gave.  So that would be page 5 of 6, the
3 first full paragraph in the left-hand column.
4         Is that what I just read?
5     A.  Which section?
6     Q.  Page 5 of 6.
7     A.  Yeah.
8         MR. DONOVAN:  Star 16?
9         THE WITNESS:  Star 16.  I see 14, 15, and 17.
10        MR. KIMREY:  Your pagination is different
11 than mine.
12    Q.  Okay, so the paragraph I'm talking about is
13 here (indicating).
14    A.  Okay.
15    Q.  It's page 5 of 6, but it's the last paragraph
16 beginning in the left-hand column.
17        So it fair to say that Judge Shah was
18 rejecting at least part of your opinion based on its
19 being a legal conclusion.  Is that correct?
20    A.  It seems that way.  This is certainly an
21 interpretation.  And if you read the whole thing, it's
22 really a matter of, you know, what does the word
23 "storage" mean and for how long is something stored
24 for it to be storage.  I -- I'm sorry; I should have
25 that off.

1         (Interruption for ringing phone.)
2         THE WITNESS:  I -- I think that that was the
3 only issue was the amount of time stored that he had
4 an issue with.  However, for the most part, he agreed
5 with my opinions that this was an ATDS overall, and
6 these messages were sent out without human
7 intervention from a list of numbers.
8 BY MR. KIMREY:
9     Q.  Are you familiar with Legg vs. Voice Media
10 Group?
11    A.  Yes.
12    Q.  There were three opinions issued in this
13 case -- one on May 2nd of 2014 and then one later in
14 May and then another later in May -- all of which
15 criticized your opinions.  This is Case No. 13-620440.
16 This is the US Southern District of Florida.
17        And you served as an expert for the plaintiff
18 in that case, right?
19    A.  Yes.
20    Q.  For instance, the court says that, in
21 reference to you, An expert witness, however, may not
22 offer legal conclusions; only the court may instruct
23 the jury as to the state of law.  When an expert
24 offers an opinion as to the legal implications of the
25 facts, that testimony also encroaches on the

1 responsibilities of the jury, and is inadmissible
2 because Snyder may not offer conclusion as to the
3 legal definition of an automatic telephone dialing
4 system or the legal implication to VMG's systems in
5 relation to that definition.  The court will exclude
6 his proposed testimony that VMG used an automatic
7 telephone dialing system within the meaning of the
8 TCPA.
9         Do you remember that?
10    A.  Yes.
11    Q.  And if we had the same judge in this case
12 with the same brain, the same conclusion may be
13 reached, correct?
14    A.  Or if you had two dozen other judges that
15 disagreed with that.
16    Q.  I'm just driving at you're saying that this
17 is an outlier because --
18    A.  Well, then --
19    Q.  -- I'm going to keep -- there are a bunch of
20 these that I'm going to go through.
21    A.  There's about five.  No, there's about five.
22    Q.  There are more.
23    A.  I know what they are.
24        But out of, you know, 70 or 75 cases, my
25 opinions, there are going to be judges that agree with

1 me and don't agree with me.  It's just going to
2 happen.
3     Q.  It says -- then the judge in Legg v. Voice
4 Media case says, Snyder's testimony that VMG used an
5 automatic telephone dialing system also lacks adequate
6 factual foundation.  Fast 2's client handbook,
7 standing alone, provides an insufficient basis for
8 Snyder's opinion regarding the capabilities of VMG's
9 systems.  Snyder does not know whether VMG actually
10 used the systems discussed in the handbook or in the
11 manner provided in the handbook.  Indeed, Snyder
12 cannot even say whether Fast 2's own equipment
13 conforms to the specifications discussed in the
14 handbook.  Snyder's conclusion upon review of the
15 handbook that VGM employed and operated an automatic
16 telephone dialing system as defined within the TCPA is
17 therefore too attenuated from the underlying materials
18 to be of use, with a gap filled only by Snyder's
19 speculation.  The court therefore will exclude that
20 aspect of Snyder's testimony for the additional reason
21 that it bears an insufficient relationship to the
22 underlying data.
23        Do you remember the court holding that?
24    A.  Generally.  I don't remember the full
25 opinion.

Page 190

1    Q.  Do you -- do you have a vague recollection
2  that that says -- do you have any reason to believe
3  that I'm --
4    A.  Oh, no.
5    Q.  -- inaccurately quoting the opinion?
6    A.  No, not at all.  Not at all.  As I said,
7  there are some judges agree with me and some don't.
8    Q.  And the judge went on to say, Snyder's
9  conclusion that VMG's rapid transmission of text
10  messages suggests the use of automated system,
11  however, does not implicate matters outside the
12  understanding of an average layperson.  Snyder's
13  opinion, therefore, offers no more than what Legg's
14  attorneys could argue to the jury and does not assist
15  the factfinder in understanding the evidence to the
16  application of technical expertise.
17      Do you remember that from the judge in --
18    A.  I don't.
19    Q.  -- that case?
20    A.  I don't remember any of the specifics that
21  you're reading.  I have no reason to not believe that
22  you're reading something accurate.  I just don't
23  recall all that stuff.
24    Q.  And you also made a conclusion about the
25  records fully and completely corroborating the claims

Page 191

1  in the class action complaint.  You make a similar
2  statement in your declaration in this case.
3      And the court said that that was an
4  impermissible use of an expert to bolster the
5  plaintiff's credibility.  Do you remember that?
6    A.  Again, I don't remember the specifics of that
7  opinion.
8    Q.  Do you disagree with that?
9    A.  Of course I do, yes.  Absolutely do.
10    Q.  Is that a legal question, whether you're
11  qualified to be an expert or not?
12    A.  I don't know.
13    Q.  We talked about Dominguez vs. Yahoo!, which
14  is Case No. 13-1187 out of US Eastern District of
15  Pennsylvania.  There, the court definitely disagreed
16  with you on what a sequential number generator was,
17  correct?
18    A.  Yes.
19    Q.  Baird vs. Sabre, the court rejected your
20  opinion that an ATDS was used, correct?
21    A.  No.  Not as far as I know.  Their opinion was
22  based on consent.
23    Q.  So you provided an opinion that consent had
24  not been given in that case?
25    A.  Yeah.  It wasn't -- it wasn't opinion based

Page 192

1  on consent; it was an opinion based on the
2  technological flow of the website that forced the
3  plaintiff -- actually, in order to make a reservation
4  going through the whole system, before you got to the
5  page where you actually clicked, okay, I want to buy
6  this now, it forced her to put in a cellular telephone
7  number or it wouldn't let her get the reservation.  So
8  she put in the cellular telephone number thinking
9  that, okay, if there's something wrong with the
10  flight, maybe they'll call me.  She was forced to do
11  that, bought her ticket, and then started receiving
12  marketing messages.  And the judge basically said she
13  should have taken another airline.  So I kind of
14  disagree.
15    Q.  So you testified, or gave an opinion, at
16  least, in that case, that because they used her number
17  beyond the scope of what you perceived to be her
18  consent, they inappropriately captured the number and
19  didn't have consent to send the messages that they
20  sent her, right?
21    A.  Or what was -- what was conveyed to me by the
22  attorneys of what that meant by consent.  So I wasn't
23  opining on the consent issue.  I was saying that she
24  was forced to put her number in, and unbeknownst to
25  her, she started receiving text marketing messages.

Page 193

1    Q.  But the court found -- this is at D45,
2  documentary 45, Under the FCC's definition, it is
3  undisputed that Baird knowingly released her cell
4  phone number to Hawaiian Airlines when she booked her
5  tickets, and by doing so gave permission to be called
6  at that number by an automated dialing machine.
7      Defendant's evidence established that Baird
8  provided her cell phone number to Hawaiian Airlines
9  voluntarily.  Under the FCC's interpretation of the
10  TCPA, Baird consented to be contacted on her cell
11  phone about flight-related matters.  Hawaiian Airlines
12  then used its vendor Sabre to offer to provide Baird
13  with flight information on her cell phone.  The single
14  text message sent to Baird's cell phone fell within
15  the scope of prior express consent.
16      Do you remember that from the opinion?
17    A.  Generally.
18    Q.  So if you had that judge in this case, then
19  judge may not agree with you, correct?
20    A.  I have no idea.
21    Q.  Okay.
22    A.  I really have no idea.
23    Q.  You were an expert in Emanuel vs. The
24  Los Angeles Lakers, right?
25    A.  Yes.

49 (Pages 190 - 193)

Page 194

1   Q.  For the plaintiff?
2   A.  Yes.
3   Q.  Case No. CV-12-9936?
4   A.  Yes.
5   Q.  Central District of California.
6       And you offered an opinion in that case, at
7   docket entry 18-5, that an ATDS had been used,
8   correct?
9   A.  Yes.
10  Q.  And you also offered an opinion about opt-in
11  and consent, correct?
12  A.  Mostly opt-in.  But opt-in as being a
13  technical methodology that may convey consent.
14  Q.  Okay.  But the court didn't agree with you,
15  correct?
16  A.  Um --
17      MR. DONOVAN:  I want to stop here and object.
18  Throughout this entire line of questioning, you used
19  the word "reject," "didn't agree."  We all know these
20  words have different meanings to different people.
21  Courts' decisions are rarely black and white --
22      MR. KIMREY:  I'll quote it.
23      MR. DONOVAN:  -- as you demonstrated.  To the
24  extent that you want to go through and cite chapter
25  and verse and read the court's finding and discuss

Page 195

1   those with Mr. Snyder, go ahead.  I don't see how it
2   helps you.  But I'm not going to object to that --
3       MR. KIMREY:  You're now testifying, by the
4   way.
5       MR. DONOVAN:  -- but --
6       MR. KIMREY:  It's a speaking objection, which
7   I object to.
8       MR. DONOVAN:  -- I am going to object and
9   continue to object, as many times you do it, to use of
10  the phrase "reject," "didn't agree with," et cetera,
11  because we don't know --
12      MR. KIMREY:  He doesn't know what "reject"
13  means?
14  Q.  Do you know what "reject" means?
15  A.  Depends on the context.
16  Q.  Do you have an understanding as you sit here
17  today what "reject" means?
18  A.  Depends on the context.
19  Q.  This is the context.  You are sitting here
20  for a deposition today in a case in which you have
21  rendered opinions relating to the TCPA.  And I'm
22  asking whether judges have rejected or accepted your
23  opinions.
24      You indicated that one decision that I
25  highlighted was outlier.  I am now demonstrating, as a

Page 196

1   matter of reliability and bias, that it's not.  So you
2   can rely on what whatever sense of rejection you want.
3       Did the court, in the Lakers case say, Here
4   the court concludes that the challenged text message
5   is not actionable under the TCPA.  Plaintiff admits
6   that he voluntarily sent a text to the Lakers seeking
7   to display the contents of that message on the
8   scoreboard at the Staples Center; that the Lakers
9   allegedly failed to warn plaintiff that he might
10  receive a response, a common sense reading of the TCPA
11  indicates that by sending his original message,
12  plaintiff expressly consented to receiving
13  confirmatory text message from the Lakers.  Indeed,
14  when plaintiff sought to display his love for Facie on
15  the Staples Center Jumbotron via text, it is difficult
16  to imagine how he could have been certain that the
17  Lakers received his message without a confirmatory
18  response.
19      Though we need not reach the issue to decide
20  this motion, the court would similarly conclude that
21  the FAC failed to adequately plead that the defendant
22  used an ATDS system.  In fact, much of plaintiff's FAC
23  suggested that defendant does not use a system that
24  has the capacity to generate or to sequentially or
25  randomly dial numbers.  As defendant points out,

Page 197

1   plaintiff does not allege that he received the Lakers
2   text randomly, but rather in direct response to
3   plaintiff's initiating text.
4       Does that seem consistent what you recall
5   regarding the Lakers decision?
6   A.  Generally.
7   Q.  So do you think that the court accepted your
8   opinions on opt-in and on ATDS in that case?
9   A.  Here's -- I guess the general point here is,
10  in many of these cases, I render multiple opinions:
11  one, two, three, or four.  In some cases, the great
12  minority of cases, the court did not agree with me on
13  one or more of the opinions I have rendered in my
14  reports.  I think it's disingenuous for you to
15  represent each of these cases to me as being a full
16  rejection by the court to try to discredit me.
17      MR. KIMREY:  Could you reread my question.
18  Because he didn't answer it.
19      (Record read by the reporter as follows:
20      "QUESTION:  So do you think that the
21      court accepted your opinions on opt-in and
22      ATDS in that case?")
23      THE WITNESS:  Yes, but without -- without
24  seeing -- rereading my full report, rereading the full
25  court's opinion, I don't necessarily accept your

50 (Pages 194 - 197)

Page 198

1 premise that the court fully rejected everything.
2 They may have. I can't agree with you without looking
3 at these two documents side by side.
4 BY MR. KIMREY:
5    Q. I didn't say everything; I just said the
6 opt-in and the ATDS opinions.
7       Did the court reject or accept your opinions,
8 number one, that there wasn't a proper opt-in; and,
9 number two, that an ATDS was used in the Lakers
10 decision?
11   A. That there wasn't a proper opt-in?
12   Q. That there was not a proper opt-in for the
13 messages that were received, and that a ATDS was used.
14 Did the court agree with either one of those opinions
15 of yours?
16   A. Apparently not.
17   Q. And in Gragg, the court again -- you rendered
18 an opinion in Gragg that an ATDS was used, correct?
19   A. Yes.
20   Q. That's 2:12-cv-00576.
21      But the court disagreed with you, right?
22   A. The court, as I recall, said something about
23 somewhere in the process of this message being created
24 and generated by several computer systems, along with
25 the ones in the taxicab or sent over radio, that there

Page 199

1 was some human agency involved in the sending of the
2 message. But I disagree with that.
3    Q. Okay. But the court found that an ATDS had
4 not been used, correct?
5    A. I don't recall the exact wording. If the
6 court opinion says we rejected Mr. Snyder's
7 supposition that an ATDS was used, I assume that's
8 what it means.
9    Q. It says, The telephone numbers utilized by
10 the system are those provided directly by customers or
11 captured using caller ID and inputted by the
12 dispatcher. Plaintiff has submitted no evidence that
13 the Taxi Magic program can auto -- autonomously,
14 randomly or sequentially generate numbers to be dialed
15 as required to fulfill the statutory definition of an
16 ATDS. Additionally, the court can find no evidence in
17 the modem's manual that the device can be programmed
18 to generate numbers in this fashion. The court
19 therefore finds that defendant's Taxi Magic program
20 does not constitute an ATDS. 12-cv-00576, Docket
21 entry 113, Pacer pages 5 -- or 6 through 7.
22      So did the court agree with you that an ATDS
23 had been used?
24   A. Apparently not.
25   Q. Are you familiar with the case of Dobbin vs.

Page 200

1 Wells Fargo?
2    A. Yeah. That was a long time ago.
3    Q. That was in the Northern District of
4 Illinois, in Chicago before Judge Kennelly.
5    A. Okay.
6    Q. You offered an expert opinion regarding the
7 use of an ATDS in that case?
8    A. Yes.
9    Q. And do you recall that the court rejected
10 your opinion?
11   A. I think in that case, if I recall, the
12 defense argued that all the calls were manually dialed
13 from telephone handsets, yet there was no evidence for
14 that. But the court still agreed with the defendant,
15 even though they provided no evidence that that
16 occurred.
17   Q. And you represented the plaintiff, right?
18   A. I did.
19   Q. Okay. And you offered an opinion that was
20 contrary to what the court ultimately said --
21   A. Yes.
22   Q. -- was the reality, correct?
23   A. No, I offered an opinion, and the court
24 didn't agree with me. I didn't offer an opinion that
25 was contrary to what the court said.

Page 201

1    Q. But you would still characterize courts
2 disagreeing with your opinions under the TCPA as
3 anomalies?
4    A. Generally, yeah. They're the great minority,
5 maybe one-tenth of all the cases I have done. You can
6 list 20 or 30 other cases where the courts have agreed
7 with my opinions on essentially some of the same
8 issues.
9    Q. Could you take your declaration that's been
10 submitted in this case and circle for me every single
11 TCPA decision in which a court agreed with your
12 opinion?
13      MR. DONOVAN: Object to the form.
14      THE WITNESS: I can't do that. I don't know
15 each one for a fact. Although I guess I would
16 represent that those cases that settled in the
17 plaintiff's favor for statutory damages were
18 essentially cases where my expert testimony impacted
19 the positive state of that case.
20 BY MR. KIMREY:
21   Q. Do you remember the Criswell vs. Yahoo! case?
22   A. That was a long time ago as well.
23   Q. Okay, I was lead counsel for MySpace in that
24 case.
25   A. Okay.

51 (Pages 198 - 201)

Page 202

1  Q. So you list that in your CV.
2  A. Yeah.
3  Q. And you say that that case settled.
4  A. That was my understanding.
5  Q. Based on what?
6  A. Oh, I don't know. That's been in there for
7  years.
8  Q. Okay, if I told you that was false, would you
9  be able to dispute?
10  A. No. I would -- in fact, I'll make a note of
11  it and correct it.
12  Q. Okay. So are there perhaps other instances
13  in which you said cases have settled where they didn't
14  settle; they just resolved and you said they settled?
15  A. Not that I know of.
16  Q. Is it possible?
17  A. Not that I know. I mean, anything is
18  possible. But I try and be as accurate as possible.
19  Q. How much would you say you've made this year
20  serving as a TCPA plaintiff's expert?
21  A. It's hard to say. I don't know exact
22  numbers.
23  Q. Estimate?
24  A. I'd have to give you a large range. Probably
25  anywhere from $150- to 250,000.

Page 203

1  Q. And what percentage of your overall income
2  for 2015 does that represent?
3  A. Two-thirds maybe.
4  Q. To what degree have you been retained or
5  served as a TCP expert -- TCPA expert -- for a
6  defendant in 2015?
7  A. Hmm, I don't know that I have. I'd have to
8  look at my case list.
9  Q. Okay. In 2014, how much money did you make
10  serving as a TCPA plaintiff's expert?
11  A. I don't know. It's -- generally about
12  two-thirds of my work in a given year is TCPA work.
13  Q. And the vast majority of that is plaintiff's
14  work, if not all of it, correct?
15  A. Yes. But that's not because I'm not trying.
16  I have defendants actually call me up all the time
17  that are being sued. And I ask them what the nature
18  of the case is, and they describe it to me, and I say
19  I can't testify for you because you described to me
20  exactly that you're using an ATDS.
21  So I don't reject defendant's work and it's
22  just -- and I get called for them just as often; I
23  just can't testify on their behalf because I don't
24  agree.
25  Q. What's your estimate of what you made off of

Page 204

1  TCPA expert work in 2014? And you can give me a broad
2  range, if you want, that's fine.
3  A. 150- to 250,000.
4  Q. What percentage of your overall income in
5  2014 was that?
6  A. About two-thirds.
7  Q. What about 2013; how much money did you make
8  off of serving as a TCPA expert in 2013?
9  A. That, I really don't know. Probably a little
10  less than 2014 and 2015.
11  Q. What percentage of your income in 2013 was
12  related to doing TCPA plaintiff's expert work?
13  A. Again, about the same: two-thirds or so.
14  Q. Other than the system in the Connelly vs.
15  Hilton case, have you ever seen a system or been
16  presented with a system in the context of a potential
17  retention, that you thought was not an ATDS?
18  A. I don't think so. I always ask those
19  questions when I get calls from defendant's counsel
20  who are being sued under the TCPA. I always try and
21  ask the right questions. But I don't want to mislead
22  them that I can testify for them if I don't think I
23  can, and therefore I don't get all the materials I
24  would normally ask for if I agree to take a case.
25      MR. KIMREY: Can we take a break?

Page 205

1      MR. DONOVAN: Sure.
2      THE VIDEOGRAPHER: Going off the record at
3  3:15.
4      (Recess taken.)
5      THE VIDEOGRAPHER: Back on the record at
6  3:24.
7      MR. KIMREY: Mr. Snyder, I'm going to go
8  ahead and pass you as a witness to one of the other
9  lawyers for the other defendants.
10      I want to be clear that we're keeping this
11  deposition open because of various items pending,
12  including, but not limited to, the deposition issue
13  and the possession, custody, and control issue that I
14  had mentioned. So with that --
15      MR. DONOVAN: Let me respond to that and say
16  I'd like to make it equally clear on the record, that
17  we take an opposite opinion and we don't agree to
18  leave the deposition open.
19      MR. KIMREY: And I will pass it to
20  Mr. Pietrkowski.
21      MR. HASKINS: We drew straws.
22          EXAMINATION
23  BY MR. PIETRKOWSKI:
24  Q. Mr. Snyder, I think we've met once before.
25  My name is Henry Pietrkowski. I represent ePrize,

52 (Pages 202 - 205)

1 which is now known as HelloWorld.  I honestly just
2 have a couple questions for you.
3      A.  Okay.
4      Q.  And so this first question just focuses on
5 the text messages that Mr. Phillips alleges were sent
6 to him in November and December of 2011.
7      Are you aware of any evidence that ePrize,
8 which is now known as HelloWorld, as opposed to Mozes,
9 had any involvement in sending the text messages in
10 November and December of 2011?
11      MR. DONOVAN:  Henry, I hate to cut you off.
12 Let me remind everyone at the outset of this that we
13 haven't been allowed to do any discovery on the
14 relationship between any of the defendants and
15 that's -- keeping that in mind when he answers that
16 question, you can answer it.
17      THE WITNESS:  Yes.  All of the information
18 I've been presented specifically talks about Gerzhom
19 and Mozes.  My understanding was that Mozes was
20 acquired by ePrize.  But I don't know the corporate
21 situation involved throughout the history of this case
22 and since the incidents with plaintiff occurred.
23 BY MR. PIETRKOWSKI:
24      Q.  Do you know when Mozes's assets were acquired
25 by ePrize?

1      A.  Yeah, the news article I found was from early
2 2013.
3      Q.  And so assuming that the asset transaction
4 happened in 2013, you would agree that ePrize was not
5 involved in 2000 -- in November and December of 2011
6 with these text messages that were sent by Mozes?
7      A.  Yeah.  But I don't understand the legal
8 implications of when you sue a company that's then
9 acquired and who's a party to the suit and who's
10 responsible.
11      Q.  Right.  I'm not asking about the legal -- so
12 let me just ask the original question again.
13      Are you aware of any evidence that ePrize,
14 now known as HelloWorld, was involved in sending the
15 text messages in November and December 2011 to
16 Mr. Phillips?
17      A.  No.  My understanding was at that time it
18 seemed to be Gerzhom/Mozes.
19      Q.  And then what is a predictive dialer?
20      A.  A predictive dialer is a term used in
21 automated voice dialing systems.  And it's -- it's
22 become quite a misnomer among people that are not
23 well-versed in the technology.
24      A predictive dialer is essentially a machine
25 that automatically dials numbers that are loaded into

1 it, either for debt collection calls or telemarketing
2 calls.  And the idea is that it's supposed to make
3 more efficient use of your contact center agents that
4 are there to actually handle calls that are answered
5 by the consumers.
6      So what happens is the -- an automated call
7 is made or thousands at a time are made.  If the call
8 is actually answered by a human, it is redirected back
9 to an available agent in the contact center.  And so
10 the system predicts what agents are available to take
11 the call.
12      So again, that process happens long after the
13 automatic dialing is done -- right -- so there's
14 really special about predictive dialing or automatic
15 dialing -- right -- this is all after the fact.
16      But these systems are characterized by what's
17 called a pacing algorithm.  And the pacing algorithm
18 is really the rate at which the calls are made from
19 the system based on the number of available agents;
20 the areas, the geographic areas where you're calling;
21 the time of day; what day is it.  Lots of other
22 factors are built into this algorithm.  And it's
23 really a true analytics algorithm with many, many
24 parameters that can be changed and tweaked to make the
25 most efficient use of the calls going out and being

1 answered and being responded to by contact center
2 agents.
3      Q.  Your explanation of a predictive dialer, is
4 that consistent with the way the FCC views a
5 predictive dialer?
6      A.  Somewhat.  Even though there is the sections
7 on predictive dialer in the FCC regulations, the
8 textural content of what they are talking about is
9 really about the first part of the dialing.  They
10 don't really put rules or descriptions around what
11 happens after the call is dialed.
12      So for instance, if someone answers, that's
13 when the predictive nature of predictive dialing comes
14 in.  So they don't really discuss any of that.
15 They're really talking about a predictive dialing from
16 the perspective of the call being initiated.  And
17 that's the same with any automatic dialer, regardless
18 of whether it's a predictive dialer or not.
19      Q.  Well, tell me if you agree with this quote
20 from the January 4th, 2008 FCC report or order:  A
21 predictive dialer is equipment that dials numbers, and
22 when certain computer software is attached, also
23 assists telemarketers in predicting when a sales agent
24 will be available to take calls.
25      Is that consistent with your understanding of

53 (Pages 206 - 209)

1 a predictive dialer?

2   A. Yes, it is.

3   Q. And I think you testified before that a

4 predictive dialer is limited to voice calls, not text

5 messages, correct?

6   A. Yes. Because a voice call is a real-time

7 connected interaction between two humans that are

8 talking. A text message is simply like a datagram;

9 it's simply a packet that goes out as an insynchronous

10 message that someone reads. So the idea of predictive

11 dialing itself doesn't really, you know, refer to what

12 happens when someone receives a text message.

13      However, again, I would emphasize that the

14 sections related to the FCC are all about that first

15 part of the dialing in predictive dialing. It's all

16 about what happens as these numbers are dialed by the

17 system, the calls are initiated. And that's where the

18 relationship is to text messaging, where the calls are

19 initiated.

20   Q. Well, how do you know that the FCC is focused

21 on that first part and the not the entire definition

22 of a predictive dialer?

23   A. I don't. It's not my job to interpret these

24 regulations. But from reading the descriptions under

25 these sections, they don't -- they don't mention the

1 criteria about an ATDS occurring after a person has

2 answered an automatically dialed call.

3      So the ATDS definition, and that they're

4 apparently trying to interpret or clarify or explain

5 better in these regulations, are all about that first

6 part. They're not trying to clarify that once someone

7 answers the call and an agent is predicted to -- to

8 have redirected and predicted to answer it, that that

9 is criteria for an ATDS.

10   Q. What the FCC means in its 2008 order, that's

11 a legal issue, isn't it?

12   A. Yes, it is.

13   Q. And I can only read the English language and

14 have a layperson's understanding of the English

15 language. Some of it is clear. Some of it is

16 certainly legalese and I can't understand some of it.

17      MR. PIETRKOWSKI: That's all the questions I

18 have. I'm going to pass it on to Stewart.

19          EXAMINATION

20 BY MR. HASKINS:

21   Q. Good afternoon, Mr. Snyder.

22   A. Good afternoon.

23   Q. I too just have a few questions. I'll do my

24 best not to repeat any of the questions that these

25 other gentlemen have asked you.

1      But I'll start by saying that it is my

2 recollection that you testified in response to

3 questions from Mr. Kimrey that you spent -- that you

4 received approximately two-thirds of your income from

5 your work as an expert witness. Is that right?

6   A. In TCPA cases.

7   Q. In TCPA cases.

8   A. Yes.

9   Q. And do you do other work that's not related

10 to TCPA cases from which you derive income as an

11 expert witness?

12   A. Yes.

13   Q. What percentage of your income would you say

14 you earn through your service as an expert witness?

15   A. Today, 100 percent.

16   Q. And so it's fair to say that you spend all of

17 your time as an expert witness?

18   A. Yes.

19   Q. So it would be fair to say that you, at this

20 point in your career, are just a professional witness?

21   A. Yes.

22   Q. Now, if we look at your expert report, does

23 that report identify all the cases where you have

24 testified at trial or by deposition in the last four

25 years?

1   A. Yes.

2   Q. Nothing that you need to supplement or add to

3 the case list, is there?

4   A. No, excepting that, you know, sometimes I

5 have a typo or an error, as in -- as in what was

6 mentioned in the Criswell vs. Yahoo! case, which I'll

7 amend as soon as I get home. But in case there is

8 just a mistake, the representations in here are

9 correct.

10      MR. DONOVAN: Stewart, are we talking about

11 the report or the exhibits?

12      MR. HASKINS: The exhibits to the report.

13      MR. DONOVAN: Yeah. What he provided.

14   Q. The information that you provided,

15 Mr. Snyder.

16   A. Yes.

17   Q. Did you understand that be to my question?

18   A. Yes.

19   Q. And are there cases in the last few years

20 where you prepared a report, but did not end up

21 testifying?

22   A. I'm not sure I understand the question.

23 Usually my reports are testimony.

24   Q. Exactly. That's my question.

25   A. I know of one case where the case was

1 withdrawn by the attorneys for whatever reason after I
2 had written a report.  As far as I know, aside from
3 that, I think all of my expert reports have been
4 submitted as part of official testimony.
5      Q.  So just to make sure I am clear, you haven't
6 prepared reports, provided them to clients, and then
7 they decided not to submit them in the case?
8      A.  Right.  In the case I'm talking about that
9 was withdrawn, I don't know if that was before or
10 after my report was submitted as testimony.
11      Q.  Okay.  Of the TCPA cases where you have
12 provided an expert report, are any of those previous
13 cases cases that you would consider similar to the
14 allegations in this case?
15      A.  Somewhat.  Each case has its own unique
16 characteristics, but there are similarities to other
17 cases.
18      Q.  And which ones do you think this case is
19 similar to?
20      A.  Oh.  Most of -- there's been several text
21 message cases where extraneous messages were sent or
22 there wasn't an opt-in or it was a text message blast.
23 So there are many.  I mean, I have to go through each
24 individual case and then try and recall what I wrote
25 in the report to truly answer that question.

1      Q.  Are there any that come to mind?
2      A.  Well, certainly the Satterfield case, which
3 is similar but different, because that was what was
4 considered a text message blast -- right -- where a
5 bunch of numbers were loaded into the automated text
6 message system, and they just fired out messages to
7 these numbers.
8      Q.  And that's not what happened here, is it?
9      A.  It is to a point.  Once -- once the initial
10 vote was cast by the plaintiff, that should have been
11 the end of it.  And then the system was programmed to
12 send out these other messages that were marketing
13 messages trying to get the plaintiff, or generally the
14 consumers, to opt-in for other programs.
15      So it was similar in that sense where, once
16 the vote was completed and that program was completed,
17 the system initiated another program by blasting out a
18 text message requesting people to opt-in to this
19 program where there would be recurring messages.
20      Q.  So it's your opinion that there were two
21 separate programs that were executed by Mozes in
22 connection with the delivery of the text messages to
23 the plaintiff in this case?
24      MR. DONOVAN:  Object to the form.
25      THE WITNESS:  Yes.  Based -- and especially

1 based on the MMA guidelines.  It seemed like there was
2 a call to action, the consumers voted based on that
3 call to action --
4 BY MR. HASKINS:
5      Q.  Mr. Snyder, I hate to interrupt --
6      MR. DONOVAN:  Please let him finish -- can he
7 please finish his answer.  Please.
8      MR. HASKINS:  Well, I wanted --
9      MR. DONOVAN:  Because he's getting to an
10 important point.
11      MR. HASKINS:  No, because he didn't answer
12 the question.
13      MR. DONOVAN:  Let me finish -- let him finish
14 that one and then ask him another one.
15 BY MR. HASKINS:
16      Q.  Go ahead and say what you want to say and
17 then I'll re-ask the question.
18      A.  Okay.  My understanding was that you asked if
19 there were really two separate programs there.  And my
20 explanation --
21      Q.  Can you answer that question?
22      A.  I believe so, yes.
23      Q.  Okay.  Now please give your explanation.
24      A.  Okay.
25      Q.  Thank you.

1      A.  There was a call to action to vote.  A vote
2 is really a single-step text message transaction where
3 you simply vote.  Now, as a common courtesy, and also
4 what was ruled in the Emanuel vs. Lakers case that I
5 was on as well, that it's acceptable to, as a courtesy
6 to give subscribers a feeling of comfort and a normal
7 interaction, to say thank you, here's a confirmatory
8 text, we got it, so you don't think the message went
9 off into the ether and you're not part of this
10 program.  And that's all okay, and the MMA guidelines
11 say that's okay.
12      What's not okay is then, once that
13 transaction is complete sending out a mobile
14 terminated message as a new call to action to opt-in
15 to this new recurring program.  In fact, it states
16 that; that this is a recurring program, you will
17 receive up to ten messages if you opt-in.  By voting,
18 there was no opting in to that new recurring program.
19      Q.  So it's your opinion that there were two
20 programs here.  And can you tell me, have you looked
21 at any of the Mozes Connect software or other
22 materials?
23      A.  Other materials, I'm not sure of.  Again, I
24 haven't looked at the software.
25      Q.  And you said you didn't read the depositions

55 (Pages 214 - 217)

1 of the Mozes employees in this case, right?
2    A.  Yeah, they were not provided to me.
3    Q.  And you have never testified in a case
4 involving Mozes before, right?
5    A.  That's correct.
6    Q.  And you have never testified in a case
7 involving Coca-Cola before, right?
8    A.  That's correct.
9    Q.  And you have never testified in a case
10 involving ePrize or HelloWorld before, right?
11    A.  That's correct.
12    Q.  And you have never expressed an opinion
13 before on any of these companies' in-venue promotions
14 before, right?
15    A.  Correct.
16    Q.  Mr. Snyder, are you represented by counsel
17 here today?
18    A.  Personally, my counsel?
19    Q.  Yes.
20    A.  Well, I understand that the plaintiff's
21 counsel that's sitting here today, I don't know what
22 the formal terminology is, but they're essentially
23 there to assist or somehow in this case.  I don't know
24 if that's called official representation.  I haven't
25 hired them.

1    Q.  Fair enough.
2       Have you performed any additional work
3 related to your report since it was prepared?
4    A.  Very little, except for preparation for this
5 deposition.  And again, I said this morning, I viewed
6 this video that was taken in the stadium of the
7 promotion going on.
8    Q.  And as a result of that work that you have
9 done, is there anything in your report that you feel
10 like you need to change?
11    A.  No.
12    Q.  And do you intend to do any additional work
13 and make any revisions to your report?
14    A.  I don't know.
15    Q.  Let's take a look at your report.  Take a
16 look at paragraph 2, if you will.  I believe you --
17 I'll give you a second to look at that.
18    A.  Yes.
19    Q.  I'm sorry, for the record, can you tell me
20 what -- can you state for the record what exhibit that
21 is?
22    A.  44.
23    Q.  Okay, so we're all on the same page.
24       We're looking at paragraph 2.  And I believe
25 you previously testified that this paragraph reflects

1 what you were asked by the plaintiff in this case to
2 provide opinions on.  Is that correct?
3    A.  Yes.
4    Q.  And this paragraph doesn't mention anything
5 about MMA guidelines, right?
6    A.  No.  That was just another opinion rendered
7 throughout the document.  Perhaps I should have added
8 a sentence here as an introduction to that as well.
9    Q.  Take a look with me, if you will, at page 5
10 of your report.  And this is the last paragraph.
11    A.  Okay.
12    Q.  I'm sorry; it's paragraph 7, last full
13 paragraph.  You point out here that you were one of
14 the cofounders of m-Qube and that m-Qube was one of
15 the founders of the MMA, the Mobile Marketing
16 Association.  Is that right?
17    A.  I was one of the founders of m-Qube and
18 m-Qube was the founder of the MMA.
19    Q.  Now, during the time, though, that you were
20 employed by m-Qube, or at any other time, did you ever
21 serve on MMA's advisory committee that drafted the
22 best practices guidelines?
23    A.  No.  And I believe at the time, during these
24 early meetings the first several months when we were
25 building up this trade group, we didn't have an

1 official advisory board at that time.
2    Q.  Specifically with respect to the 2011
3 guidelines that we have taken a look at here today and
4 have been an exhibit to your deposition, you didn't
5 have any role in the drafting or revising of those
6 2011 MMA guidelines, correct?
7    A.  Correct.
8    Q.  And so the opinions that you're offering in
9 this case, based upon whether or not the defendants'
10 text messaging program complied with those MMA
11 guidelines are based solely your reading of those MMA
12 guidelines and not your service on the MMA advisory
13 committee?
14    A.  Correct.
15    Q.  Turn with me, if you will, Mr. Snyder, to
16 page 12 of your deposition.  And I'm going to direct
17 your attention --
18    A.  Declaration.
19    Q.  I'm sorry; your report, declaration.
20       And specifically I want to direct your
21 attention to paragraph 24.
22    A.  Okay.
23    Q.  I'll read this, and then I'm going to ask you
24 a few questions about it.  It says, "Based on my
25 review of the materials and documentation provided to

56 (Pages 218 - 221)

Page 222

1  me in this case, Mozes appears to be the mobile
2  marketing company employed by defendant to
3  automatically transmit cellular text messages en masse
4  using the short code 66937."
5        Did that I read correctly?
6  A. Yes.
7     Q. My first question is, you reference
8  "defendant" here. Who are you referring to?
9     A. Oh, I should have said employed by Defendant
10 Coca-Cola, possibly, as the branded company that
11 retained the marketing company to run this
12 program on their behalf.
13    Q. And you understand that Coca-Cola is not the
14 only defendant in this case, right?
15    A. Correct. That's just kind of a typo of
16 sorts.
17    Q. Now, my broader question is, can you tell me
18 on what you base this statement in paragraph 24?
19    A. Yes.
20    Q. And what was that?
21    A. The responses to the interrogatories, a
22 description of what Mozes does as a business, looking
23 at the website. And I believe at the time -- I think
24 it's changed. At the time I drafted the report, the
25 HelloWorld website said formerly Mozes or something

Page 223

1  like that, said something about Mozes. And I think
2  now it says we used to be ePrize. So I think it
3  changed over time.
4        But it was obvious from the reading of the
5  situation that occurred here, the descriptions by -- I
6  assume, the defendants responded to the
7  interrogatories -- of how this system worked and what
8  Gerzhom did. Again, my -- I think my understanding of
9  the relationship of Gerzhom and Mozes is a little
10 fuzzy. It seems like there was an acquisition there
11 too, but it was the same basic system that was used.
12 And certainly that is entirely consistent with the
13 operation of a mobile marketing company and what they
14 do on behalf of branded companies.
15    Q. Have you ever reviewed the contract between
16 Coca-Cola and Mozes?
17    A. I have not.
18    Q. And have you ever reviewed a statement of
19 work between Mozes and Coca-Cola that relates to the
20 November 5th, 2011 Alabama/LSU in-game promotion?
21    A. The only thing I remember reading are some
22 text -- some email messages back and forth regarding
23 the program probably after the contract was signed, I
24 think. But certainly those emails referred to certain
25 details about the program.

Page 224

1     Q. But you did not review the statement of work?
2     A. That's correct.
3     Q. And are you aware of any document in which
4  Coca-Cola specifically asked Mozes to automatically
5  transmit cellular text messages en masse using the
6  short code 66937?
7     A. No.
8     Q. The MMA guidelines aren't law, are they?
9     A. No.
10    Q. And if I handed you a copy of the TCPA and
11 asked you to show me where the MMA guidelines are
12 mentioned in the Act, they're not mentioned anywhere
13 in there, are they?
14    A. No, they're not.
15    Q. And the MMA guidelines don't define consent
16 under the TCPA, do they?
17    A. No, but my understanding is, from keeping up
18 with the MMA, is that their intent is to also write
19 guidelines that are consistent with law, although laws
20 aren't specifically mentioned in the TCPA guidelines.
21 I mean, I'm sorry, the MMA guidelines.
22    Q. So a person can provide consent that is -- to
23 receive text messages -- that is sufficient under the
24 TCPA, even if the program in which they provided
25 consent does not comply with the MMA guidelines?

Page 225

1     A. That would take some thought and analysis to
2  answer that. The MMA guidelines have many, many,
3  many -- or I should say that the group of requirements
4  listed there are -- many are related to methods of
5  properly opting in and opting out.
6        In order to relate that to what's possible
7  under the TCPA and also what's consistent under the
8  MMA and see if there is a disconnect -- which I think
9  is what you're asking me, if it's okay for one, not
10 the other -- I'd have to analyze the specific
11 requirement that we're talking about and look at a
12 program under that requirement and see whether you
13 could -- you could, I guess, whatever consent means,
14 consent within the TCPA, and see if that was
15 consistent with the MMA guideline. So I can't answer
16 that in a general sense; I'd have to look at the
17 individual guidelines, individual requirements.
18    Q. Let me ask it this way, then, Mr. Snyder. Is
19 it your testimony that every violation of the MMA is a
20 violation of the TCPA?
21    A. No, certainly not.
22    Q. Take a look with me, if you will, at
23 paragraph 36 of your report.
24    A. Okay.
25    Q. This paragraph deals with requirements of --

57 (Pages 222 - 225)

Page 226

1 or at least the guidelines or suggestions from the MMA
2 with respect to opting out?
3     A. Yes.
4     Q. Are you offering an opinion in this case that
5 the text message program here did not comply with
6 those guidelines?
7     A. Let me look to my report; one second. I am
8 not -- I am not offering opinion in my report related
9 to that opt-out.
10    Q. Okay, thank you.
11    Turn with me, if you will, to paragraph 45 of
12 your report, sir.
13    A. Yes.
14    Q. The last sentence of paragraph 45 says,
15 "Under the MMA standards, the defendants had no
16 permission to send this additional message."
17    Can you tell me where in the MMA guidelines
18 the term "permission" is defined?
19    A. I'd have to look through that. I think we
20 have it in one of the exhibits here. That's the wrong
21 one. Is it this one? Exhibit 50.
22    I don't know if there is a place where
23 "permission" is defined in here, but certainly the MMA
24 does not condone the sending of automatic text
25 messages as the initial portion of a dialogue with

Page 227

1 consumers.
2     So that is my understanding and my
3 interpretation of the MMA guidelines that I'm very
4 familiar with, that they never condoned sending text
5 messages out as the first initiation of a dialogue.
6 And they would tell you that they would not have
7 condoned that and that would not be permitted.
8     Q. Did they tell you that?
9     A. No. I understand that from being in the
10 industry and reading all of these requirements that --
11 look, if the opposite were true, let's say that was
12 allowed, then any mobile marketer can send any number
13 of messages to any number of subscribers at any time
14 asking them to opt-in to a recurring program, if that
15 was allowed to initiate the dialogue in that way.
16    Q. That's not what happened here, right? So
17 that wasn't my question.
18    I just want to make sure that the record is
19 clear here. The MMA guidelines don't speak to the
20 term "permission," right? They don't use that term,
21 they don't define the term. That's your
22 interpretation of those guidelines, correct?
23    A. Yes. And I would couch that in saying that,
24 if there is a requirement that says not to do that, I
25 would interpret that as saying you're not permitted to

Page 228

1 do that. Or if a requirement says you can do that, I
2 would say you are permitted to do that.
3     Q. The term "permission" is not used in the TCPA
4 either, is it?
5     A. I'd have to look, but not that -- not in the
6 portions relevant to my technology analysis, no.
7     Q. So let me make sure I'm clear, then. You are
8 not offering the opinion that in this case defendants
9 did not have prior express consent under the TCPA to
10 send these text messages, are you?
11    A. No. I'm saying that under the MMA, that the
12 second program was not properly executed. And that
13 may or may not relate to a legal conclusion made by
14 the people here at this table or a judge of whether
15 that's consistent with TCPA consent requirements.
16    Q. Are you aware of any court cases where the
17 term "permission" has been interpreted as used by you
18 consistent with the MMA guidelines?
19    A. No.
20    MR. HASKINS: No further questions for me.
21    (Discussion off the record.)
22         FURTHER EXAMINATION
23    MR. KIMREY: Blain Kimrey back on the record.
24    Q. Handing to Mr. Snyder what should be marked
25 as Deposition Exhibit 59.

Page 229

1     (Deposition Exhibit 59 was marked for
2     identification.)
3 BY MR. KIMREY:
4     Q. This is a docket from a California case that
5 is styled Cecilia Snyder vs. IvisionMobile and
6 Textopoly, 5:13-cv-05946, as well as the First Amended
7 Complaint in that case, class action complaint, and
8 the joint stipulation for dismissal with prejudice.
9     Do you recognize these materials, Mr. Snyder?
10    A. Yes.
11    Q. What are they?
12    A. This was a case my wife filed essentially on
13 behalf of our son, who at the age of 11, we first got
14 him an iPhone, and he instantly started receiving
15 offensive text messages from this company
16 IvisionMobile. So I referred my wife to one of the
17 attorneys I know. And I was not involved in the case.
18    Q. Why were the text messages offensive?
19    A. One was religious in nature and not a kind
20 religious statement; and one was a coupon for
21 something -- I don't know; I forget what it was.
22    And I basically said, look, this was
23 literally an hour after my son -- after we activated
24 his phone. So he had gotten a phone number that was
25 previously used by another subscriber who had

58 (Pages 226 - 229)

Page 230

1 apparently been involved in other text messaging
2 programs.
3       And I simply wanted them to stop, I wanted to
4 know what companies were involved.  So my wife spent
5 the time talking with one of the attorneys I know who
6 did the research.
7       Q.  Is that Miles McGuire?
8       A.  Yes.  And he basically discovered who these
9 companies were and decided to sue them.
10      Q.  And did Miles McGuire enter his appearance in
11 this matter?
12      A.  I really don't know.
13      Q.  His firm McGuire Law did?
14      A.  Yes.  I guess I know Evans Meyers.  This was
15 out of my hands.  I left it up to my wife.  I said
16 certainly I can't be involved in this.  We just wanted
17 the text messages to stop coming to my son.
18      Q.  And this case included a ATDS claim under the
19 TCPA much like this case does, right?
20      A.  Yeah, I assume so.  I remember reading the
21 Complaint when it was originally drafted.
22      Q.  The First Amended Complaint was filed on
23 April 15th, 2015, correct?
24      A.  This one?
25      Q.  Yes.

Page 231

1       A.  2014.  I think you said '15.
2       Q.  Right.  2014, that's right.
3       And then the case was dismissed on
4 November 3rd of 2014?
5       A.  Yeah.  I think they ended up settling it on
6 an individual basis.
7       Q.  Do you know what it settled for?
8       A.  I'm thinking -- I know that we got a few
9 thousand dollars out of it.  I think it was something
10 like $50- or 60,000 for the attorneys.
11      Q.  You said that you told your -- say that
12 again, it was how much?
13      A.  Somewhere around $50- to 60,000 for
14 attorney's fees that they settled for.  They gave us a
15 few thousand dollars as part of that settlement.
16      Q.  Got it.  You said that you told your wife you
17 couldn't have anything to do with the case?
18      A.  Yeah, I said it's up to you.  I said, look, I
19 work on this stuff professionally; I don't want this
20 to reflect poorly on me.  We probably wouldn't have
21 even -- I probably wouldn't have even advised her to
22 go talk to somebody if it wasn't -- if she had gotten
23 the messages and my son hadn't.  This was an issue for
24 an 11-year-old and it was very off-putting to me.
25      Q.  Was it your concern that if you were deemed

Page 232

1 to have some involvement in this TCPA punitive class
2 action that your wife filed that it could give rise to
3 an appearance of bias in the cases in which you were
4 an expert?
5       A.  That's right.  And I even -- I talked to
6 the -- I talked to Miles McGuire after my wife talked
7 to him, and I said, look, I don't want to pursue this.
8 He said, look, you have every right to.  This is
9 something that bad happened --
10      Q.  Actually, don't tell me what he said to you.
11      A.  Okay.  So what -- so that was my -- so I
12 said, okay --
13      Q.  Well, let me back up.  Were you a client of
14 his in this case --
15      A.  No, I wasn't --
16      Q.  -- your wife filed?
17      A.  I wasn't involved at all in this case.
18      Q.  Did -- was it your understanding that
19 attorney-client privilege attached to you as the
20 husband of the lead plaintiff?
21      A.  I don't recall any -- any information.
22      Q.  Just to be safe, I don't need to know --
23      A.  Okay.
24      Q.  -- what Mr. McGuire said.
25      A.  Okay.

Page 233

1       Q.  And ultimately, the payment that was made to
2 your wife, did that go into your common bank account?
3       A.  No, it went into our son's account, our son's
4 college account.
5       Q.  Got it.  Is your son in college?
6       A.  No, he's now 13.  He was 11 at the time this
7 occurred.
8       Q.  Who will be paying for him to go to college?
9       A.  Hope he gets a scholarship.
10      Q.  On the husband -- on the son's college
11 account, who has authority over that account?
12      A.  My wife and I jointly.
13      Q.  Okay.  So you have the power to withdraw
14 money from that account?
15      A.  Yeah.  It's a 529(b), so we're essentially
16 penalized if we withdraw money before he goes to
17 college.
18      Q.  So you are the accountholders of the 529 with
19 him as the beneficiary?
20      A.  Yes.  Actually, yes.
21      Q.  And that's where the money for the
22 settlement --
23      A.  That's right.
24      Q.  -- went in this case?
25      A.  That's right.

59 (Pages 230 - 233)

Page 234

1    Q.  So you're benefiting from the settlement to a
2  certain degree because it's your account, correct?
3    A.  Yes.  But really the main benefit was my son
4  stopped receiving these text messages.  So that was
5  the primary.  The fact that money was involved was
6  always secondary to me to making these things stop.
7    Q.  Is there anything else you'd like to add to
8  your testimony here today, anything you'd like to
9  clarify, change in your testimony or in your report or
10  any of the work product that you have shared in this
11  case?
12    A.  No, not unless -- I understand the attorneys
13  have an opportunity to ask me questions.  Unless they
14  want clarification, I don't have anything personally.
15    MR. DONOVAN:  Could we go off the record for
16  just a couple minutes.
17    MR. KIMREY:  Sure.
18    MR. DONOVAN:  And we can talk about whether
19  we can wrap up.
20    THE VIDEOGRAPHER:  We are off the record at
21  4:05.
22    (Recess taken.)
23    THE VIDEOGRAPHER:  We're on the record at
24  4:16.
25  ///

Page 235

1         EXAMINATION
2  BY MR. DONOVAN:
3    Q.  Ryan Donovan coming on the record.  Just a
4  few questions; I know it's been a very long day.
5      At the outset of your deposition this
6  morning, Mr. Kimrey asked you a series of questions
7  about the specifics of the Mozes Connect system.  And
8  he asked if you had the following information:  He
9  asked about what you knew about the servers, what you
10  knew about the software language, what you knew about
11  whether the information was hosted internally or in
12  the cloud, what you knew about the code, the database
13  servers, the FTP servers.
14      My question to you is, first, who has the
15  information?
16    A.  My understanding would be that the mobile
17  marketing company would have that information, or
18  Gerzhom/Mozes/ePrize/HelloWorld.
19    Q.  If you had that information, would it likely
20  change your opinion in this case, the opinions you
21  have rendered?
22    A.  No.
23    Q.  Why not?
24    A.  What we're discussing here regarding an ATDS
25  is really functional in nature:  Does this system

Page 236

1  provide these functions; does it support these
2  functions; does it do these things.
3      The forensic evidence and my analysis of what
4  resulted from these programs leads me to conclude that
5  this was an ATDS.  Knowing the specific operating
6  system that this -- that it was run on or the specific
7  servers wouldn't change the actual function of what
8  occurred here, that these messages were automatically
9  created and sent and received by the system.
10    Q.  Earlier, Mr. Kimrey asked you if you had ever
11  spoken to Mr. Phillips, and you answered no.
12    A.  That's right.
13    Q.  Would you like to clarify that?
14    A.  Yeah.  So counsel reminded me that -- I
15  thought the question was in reference to this case.  I
16  have never spoken to Wes Phillips, as a plaintiff,
17  regarding this case at all.  I have had conversations
18  with him in the past, long before I was retained for
19  this case, about other issues, as he is a TCPA
20  attorney.  So I misunderstood the question; this is my
21  clarification.
22    Q.  You were asked a series of questions about
23  failure-escalation issues by Mr. Kimrey?
24    A.  Yes.
25    Q.  As I understood the questions, you were

Page 237

1  basically asked, was there an opportunity for human
2  intervention based on the failure of the system to
3  work as it was intended.  Is that a fair
4  characterization of the issue?
5    A.  I believe so.
6    Q.  Have you seen any evidence or has any
7  evidence -- have any of the documents or anything else
8  you have reviewed given you any indication that there
9  was a failure in this case that would have led to that
10  kind of human intervention?
11    A.  No, I have no evidence to that effect.  In
12  fact, on the contrary, the logs or the messages show
13  that the message was sent in by the plaintiff,
14  processed, and the three messages came out -- or the
15  additional two messages came out as a response.  And
16  that happened three times.  It seems like that worked
17  perfectly and consistently and quickly.  And I have no
18  other evidence of a failure or problem or any issues
19  with the system.
20    Q.  Take a look at your declaration, and
21  specifically paragraph 41.  I think it's Exhibit 44.
22  Is that right?
23    A.  Yes, 41, okay.
24    Q.  The paragraph talks about MMA best practices
25  with respect to a one-time program.  Is there anything

60 (Pages 234 - 237)

1 you would like to clarify about what you said in
2 paragraph 41?
3    A.  Yes.  I should have said really that this
4 was, you know, an attempt at a one-time program.
5 There is a slight nuance here.  This was what was
6 called a voting program, which means the consumers, or
7 the subscribers, simply vote.  There is not
8 necessarily any expectation that any messages will be
9 received.  However, the MMA allows for a courteous
10 confirmation message saying thank you or whatever.  So
11 that was an input and a response by the system.
12       A one-time program is really the same, an
13 input and a response.  However, the one-time program
14 is based upon what's called on opt-in, where there is
15 an expectation of receiving messages back.  And the
16 one-time programs have to -- if you're opting in to
17 receive messages back, they are supposed to inform you
18 ahead of time, at the time you sent the initial
19 message in, that you are actually opting in and you
20 agree to receive these additional messages and you
21 will incur charges for these additional messages.
22       But the voting program is similar, again
23 input and response, but there was no expectation on
24 the subscriber's part that he should be receiving
25 messages back.

1    Q.  So a one-time program under 1.1-2
2 contemplates expressly that the consumer will be told
3 up-front, you send me a message -- you send us a
4 message and we'll send you a message back one time.
5 That's what they mean by one-time program?
6       MR. HASKINS:  Objection.
7       MR. KIMREY:  Object: mischaracterizes the
8 evidence.
9       MR. BASDEKIS:  You can answer the question.
10 BY MR. DONOVAN:
11    Q.  You can answer it.
12    A.  Yeah, the vote program, there was disclaimer
13 at the bottom which was partially correct at the time,
14 that said message and data rates applied.  That's for
15 the message you're sending in.  So if you're -- you
16 know, if you don't have a bundled plan or whatever, it
17 might cost you 10 cents a message, and they're telling
18 you that.
19       In these other one-time programs, when there
20 is an expectation of receiving messages back, you're
21 supposed to inform the subscriber that data -- text
22 message and data rates will apply, and you will be
23 receiving this many messages in response or expect
24 messages in response.
25 BY MR. DONOVAN:

1    Q.  And just --
2       MR. KIMREY:  I also object because you are
3 repeatedly leading the witness and he's not adverse to
4 you.  So you are feeding testimony to him and then
5 he's affirming it.
6       MR. BASDEKIS:  State your objection.
7 BY MR. DONOVAN:
8    Q.  You can keep answering.
9    A.  Okay.
10    Q.  So to make sure I understand, a one-time
11 program, you're telling me that a one-time program
12 involves some kind of express statement in the call to
13 action that says, if you text us, you will receive a
14 message back?
15       MR. KIMREY:  Objection: mischaracterizes the
16 evidence, leads a nonadverse witness.
17       MR. DONOVAN:  You can answer.
18       THE WITNESS:  Yeah, I mean, the MMA
19 guidelines are clear when they refer to this, to
20 one-time text message programs, that you are supposed
21 to have informed the subscribers at the call to action
22 that these events will occur.
23 BY MR. DONOVAN:
24    Q.  And with respect to the Jumbotron and the
25 promotion at issue here, did the Jumbotron inform an

1 individual who casts a vote that he or she would be
2 receiving any text message in response?
3       MR. KIMREY:  Objection: lack of foundation.
4       THE WITNESS:  No, the -- the Jumbotron simply
5 said vote and text message rates may apply.  And I
6 assume that was meant to be describing the cost of you
7 sending a text -- a subscriber sending a text message
8 in to the system.
9 BY MR. DONOVAN:
10    Q.  Have you ever opined that calls and texts are
11 different with respect to the way that number -- the
12 numbers are transmitted as signaling data?  What I
13 mean is with respect to the capture issue that we
14 discussed.
15       MR. KIMREY:  Objection: asked and answered.
16       THE WITNESS:  No, I haven't opined on that
17 before this case.
18 BY MR. DONOVAN:
19    Q.  And your opinion in this case was that, with
20 respect to the way information is captured -- I think
21 this is in paragraph 14 -- that calls and texts are
22 analogous?
23       MR. KIMREY:  Objection: leading the witness.
24       THE WITNESS:  Yeah, the real issue there
25 is -- there is many things true about SMS versus voice

1 calling systems. They are completely different; they
2 use different technologies. However, there are
3 similarities, and the similarities are that when a
4 transmission occurs of a voice call or a text message,
5 both the origination and destination addresses are
6 passed as signaling/meta data along with the
7 transmission.
8        That is true for both systems, although one's
9 package switched and one's circuit switched, and they
10 are what I would say different animals, they still
11 have some similarities.
12        MR. DONOVAN: Thank you. I don't have
13 anything else.
14        MR. KIMREY: I do. Blain Kimrey back on the
15 record.
16        FURTHER EXAMINATION
17 BY MR. KIMREY:
18    Q. So you have spoken to Wesley Phillips before?
19    A. Before this case came on, yes.
20    Q. Has Wesley Phillips talked to you about
21 serving as a potential expert witness in any of his
22 TCPA cases that he's prosecuting?
23    A. A previous one, I believe. I think he was
24 co-counsel with Bailey & Glasser in something, so I
25 had talked to him about a previous case.

1    Q. Okay. And were you retained in that case?
2    A. Yes.
3    Q. What case is that?
4    A. Let me see if I can find it. Yeah, Jones vs.
5 FMS, I think -- I was retained by Bailey & Glasser,
6 but I think he was involved.
7    Q. Jones v. what?
8    A. FMS Corp.
9    Q. I just want to note for the record that
10 Mr. Snyder is looking at page 3 of his CV attached to
11 his declaration in this case.
12        And the expert engagement says, Type of
13 Matter: Telephone Consumer Protection Act, 47 USC
14 227, related to unlawful cellular telephone calls.
15 The law firm is listed as Bailey & Glasser.
16        However, I'm correct, am I not, Mr. Snyder,
17 that the plaintiff is not listed as counsel in this
18 listing. Is that correct?
19    A. What do you mean "the plaintiff"? In the
20 case like Jones --
21    Q. I'm sorry; the plaintiff in this case. So
22 where it says law firm --
23    A. Yeah.
24    Q. -- does it say Bailey & Glasser and whatever
25 law firm --

1    A. Yes.
2    Q. -- Wesley Phillips is at?
3    A. In this case, yeah, there's one here. You're
4 talking about the Coke case, this case?
5    Q. No, I'm saying, you have listed as a case in
6 which you have been retained as an expert witness the
7 Jones vs. FMS case, correct?
8    A. Yes.
9    Q. On page 3 of your CV, correct?
10    A. Correct.
11    Q. And you list as the law firm that has
12 retained you only Bailey & Glasser, correct?
13    A. Yes.
14    Q. You do not list Wesley Phillips as also
15 having retained you here, correct?
16    A. That's correct. But I don't know what the
17 relationship is. So for instance, I'll get a call
18 from an attorney, they'll engage me; they send me a
19 retainer check from their law firm. Right? I'm
20 working with them. But in many cases, there is, I
21 guess, what's called of counsel and others involved,
22 and they may be all counsel in the case, but I
23 typically only list the entity that actually retained
24 me that I have the business relationship with that has
25 signed my retainer agreement.

1    Q. But, again, Mr. Phillips is serving as
2 co-plaintiff's counsel in the Jones vs. FMS case,
3 correct?
4    A. Yes, I understand that, yes.
5    Q. Who is paying you in that case?
6    A. Bailey & Glasser paid me.
7    Q. Okay. What sort of work have you done in
8 that case with Mr. Phillips?
9    A. We had phone discussions and conference
10 calls. I don't think I even wrote a report for that
11 case before it settled. But I was hired as a
12 testifying expert, but I never ended up writing a
13 report because it settled before that.
14    Q. And you were paid in that case, you actually
15 made money off of serving as a plaintiff's expert in
16 that case, correct?
17    A. Yes.
18    Q. How much money did you make?
19    A. I think it was -- my usual retainer was
20 $4,000.
21    Q. Was that all you were paid in that case?
22    A. I think so. There was a lot of work that led
23 up to that. I have a lot of cases that end up being
24 less than that. But my standard rate is $4,000
25 nonrefundable retainer. So if it's below that point,

Page 246

1 that's it. So -- and I have a time sheet for that. I
2 may have used up $3,000 in time out of the 4,000 in
3 that case.
4       Q. Because it goes to bias in this case, we'd
5 like whatever communications there are related to the
6 retention of Mr. Snyder in the work that he performed
7 in conjunction with both Bailey & Glasser and Wesley
8 Phillips.
9       I will also note for the record that I think
10 it's inappropriate that Mr. Phillips wasn't listed in
11 this CV entry.
12      Why -- so you just didn't list Mr. Phillips
13 because he wasn't what you perceived to be the lead
14 counsel in that case?
15      A. In most every case, I only have one counsel
16 unless they're relating to me that they are both on
17 this, please list this. I get requests to list things
18 in different ways on here as well or not just things.
19      Q. So you don't have a policy that you won't
20 serve as an expert for a plaintiff in one case while
21 also being retained by that plaintiff as an expert in
22 another case where that plaintiff is counsel, correct?
23      A. I don't have a policy. As far as I know,
24 that situation has never occurred. This case was over
25 before I was retained for the Coke case. So it's not

Page 247

1 a policy thing; I just never noticed it. But I don't
2 think that situation has actually ever occurred. I
3 don't believe.
4       Q. Has Mr. Phillips talked to you about serving
5 in any capacity in any other case?
6       A. No.
7       Q. Is the Jones vs. FMS case the only case in
8 which you've had discussions with Mr. Phillips?
9       A. Yes.
10      Q. So you have had no other discussions with
11 Mr. Phillips at any other point in time other than in
12 connection with your expert retention in Jones vs.
13 FMS?
14      A. That's correct.
15      Q. I think this was confused a little bit in
16 questioning by plaintiff's counsel. To reiterate, you
17 have no evidence of actual receipt of the text
18 messages at issue in this case, correct?
19      A. No, that's not typically evidence I require
20 for any TCPA case.
21      Q. So do you think that if Mr. Phillips had
22 never received these messages on November 5th, 2011 he
23 would still have a claim under the TCPA?
24      MR. DONOVAN: Object to the form.
25      THE WITNESS: Well, he wouldn't have known

Page 248

1 about them, and I don't think he would have had any
2 reaction. The fact is, it shows that he responded to
3 the vote; he received at least one of the messages
4 because he joined that date of birth program at some
5 later point, so we know he received at least that.
6       So based on his Complaint and taking that as
7 truthful, and the fact that he actually responded to
8 some of these extraneous messages, I have no reason to
9 believe he did not receive them.
10 BY MR. KIMREY:
11      Q. But you have you no proof that he did,
12 correct?
13      A. Right.
14      MR. DONOVAN: Object to the form.
15      THE WITNESS: I also have no proof that he
16 did not.
17 BY MR. KIMREY:
18      Q. With respect to the Mozes Connect system and
19 the associated server, software, hosting in the cloud,
20 hosting internally, the code, et cetera, have you
21 ever, in rendering an opinion related to an ATDS, an
22 alleged ATDS in any case, reviewed the servers, the
23 software, the nature of the hosting, the code, the
24 database servers, and/or the system architecture,
25 and/or network map associated with the system?

Page 249

1       A. In some cases, I have. But typically, those
2 aren't -- that's not information that informs my
3 opinion. It gives me information about the overall
4 system, but again, it's the functionality involved.
5 It's the fact that there is evidence that numbers are
6 stored. The fact whether it's stored in an Oracle
7 database or a Microsoft SQL database or some other
8 database or just in a simple electronic table, doesn't
9 change the fact that the evidence clearly shows that
10 the number was stored.
11      Q. Why would you review that material to render
12 an ATDS opinion if it doesn't matter to the opinion?
13      A. Just to give me a more holistic view of the
14 system and how it operates. More information is
15 always better, but that doesn't mean that I can't
16 deduce from the evidence I do have, without knowing
17 the specific servers and software and the language
18 that the source code was written in, I can't deduce
19 the actual functionality of what those servers
20 performed.
21      Q. In rendering your opinion in this case, did
22 you review any documents that were written by
23 VeriSign?
24      A. VeriSign?
25      Q. VeriSign.

63 (Pages 246 - 249)

1        MR. DONOVAN:  Object to the form.

2        THE WITNESS:  No, I didn't realize VeriSign

3 was involved in this case.

4 BY MR. KIMREY:

5        Q.  Did you know that VeriSign, on November 5th

6 of 2011, or -- VeriSign is the mobile aggregator that

7 preceded --

8        A.  Mobile Messenger.

9        Q.  -- Mobile Messenger for Mozes.  Did you know

10 that?

11        A.  I did know that.  They acquired my company.

12        Q.  And did you know that there were -- there was

13 an RFP response related to VeriSign that was produced

14 in this case by Mozes.  Did you know that?

15        A.  I did not know that.

16        Q.  Did you know that there are escalation

17 procedures set forth in that document?

18        A.  I don't know that for a fact.  But that's

19 very typical of these documents, that they are

20 escalated.

21        Q.  And did you know that in that document, there

22 are provisions for people getting involved if receipt

23 of transmissions are not occurring as desired?

24        A.  Yeah, I assume that's one of the provisions

25 for the definition of what an escalation event would

1 be, whether it's critical, minor, major.

2        Q.  So that would be typical, right?

3        A.  That's very typical.

4        Q.  Regardless of the mobile aggregator?

5        A.  Regardless.  And that's true of almost all

6 software systems that you contract with:

7 communications systems, database systems, third-party

8 software, stuff that you purchase in-house.  It's very

9 standard information.

10        Q.  Okay.  So with respect to the testimony you

11 just gave regarding the MMA guidelines, when you're

12 speaking about message and response to a message,

13 you're talking only about the 2011 guidelines,

14 correct?  Because you did not review the 2012

15 guidelines in rendering your expert opinion in this

16 case, right?

17        A.  Right.  In this case, because of the date

18 that the programs operated, that program was

19 essentially -- I don't want to say the word

20 "governed," but the 2011 guidelines and rules were the

21 ones that would have applied at that point in time to

22 this program, as the 2012 guidelines had not been

23 released yet.

24        Q.  Is it possible that the 2012 guidelines

25 caught up to what was recognized to be accepted in the

1 industry before that point?

2        A.  It's possible.  Certain things change, so

3 it's certainly possible, yes.

4        Q.  Okay.  I don't have any further

5 questions, although I do want to keep this open for

6 purposes of the various pending homework assignments

7 that I have noted on the record.

8        Does anyone have anything else?

9        MR. DONOVAN:  Just another objection to

10 keeping the deposition open.

11        MR. HASKINS:  Nothing further from Coca-Cola.

12        MR. PIETRKOWSKI:  Nothing further.

13        THE VIDEOGRAPHER:  Going off the record at

14 4:40.

15        (Thereupon, the taking of the

16        deposition was adjourned

17        at 4:40 p.m.)

18

19             * * * * *

20

21

22

23

24

25

1        REPORTER'S DECLARATION

2 STATE OF NEVADA      )

                                )  ss:

3 COUNTY OF CLARK      )

4        I, Michelle C. Johnson, CCR 771, declare as

5 follows:

6        That I reported the taking of the deposition

7 of the witness, RANDALL A. SNYDER, commencing on

8 Tuesday, December 8, 2015 at 9:05 a.m.

9        That prior to being examined, the witness was

10 by me duly sworn to testify to the truth, the whole

11 truth, and nothing but the truth.

12        That I simultaneously transcribed my said

13 shorthand notes into typewriting via computer-aided

14 transcription, and that the typewritten transcript of

15 said deposition is a complete, true, and accurate

16 transcription of said shorthand notes taken down at

17 said time.  That prior to completion of the

18 proceedings, review of the transcript pursuant to

19 FRCP 30(e) was not requested.

20        I further declare that I am not a relative or

21 employee of any party involved in said action, nor a

22 person financially interested in the action.

23        Dated:  December 18, 2015.

24

25        Michelle C. Johnson, RPR-CRR, CCR No. 771

| & |
| --- |
| **&**  2:9,21 5:7 7:2,8 |
| 33:17 52:14 175:3 |
| 180:1 242:24 243:5 |
| 243:15,24 244:12 |
| 245:6 246:7 |

| 0 |
| --- |
| **00339**  4:19 |
| **00349**  97:4 |
| **00576**  198:20 |
| 199:20 |
| **01887**  4:23 131:24 |
| **04033**  1:6 6:12 |
| **05946**  229:6 |
| **07-232**  5:6 |

| 1 |
| --- |
| **1**  1:25 52:11 80:1,19 |
| 81:25,25 82:3 83:3 |
| 86:15 87:5 88:20 |
| 89:8 100:5 110:23 |
| 110:24 115:1 152:7 |
| 162:25 163:9,25 |
| 164:4 |
| **1's**  110:23 |
| **1,052**  152:7 |
| **1.1-1**  123:8 124:20 |
| **1.1-1.**  123:16 |
| **1.1-2**  121:12 122:9 |
| 123:6,16 239:1 |
| **10**  3:4 48:24 163:24 |
| 171:5,9,10 239:17 |
| **10,000**  139:7,10 |
| **10/2/13**  4:25 |
| **100**  67:10 89:20 |
| 212:15 |
| **100,000**  74:20 |
| **1022**  122:23 |
| **10:09**  47:12 |
| **10:21**  47:15 |
| **10th**  57:2 |
| **11**  4:13 78:8 121:8,8 |
| 121:12 184:21 |
| 185:25 229:13 |

231:24 233:6
**111-111-1111**
  153:10
**111-111-1112**
  153:12
**111-111-1113**
  153:12
**113**  199:21
**1180**  2:21
**11:15**  84:5
**11:29**  84:9
**11th**  11:3 22:24
**12**  127:7 199:20
  221:16
**12-9936**  194:3
**120**  4:20
**122**  4:22
**12:32**  126:17
**12:33**  126:18
**13**  131:24 167:16,17
  233:6
**13-1187**  191:14
**13-620440**  187:15
**131**  4:23
**14**  130:8 186:9
  241:21
**140**  124:3
**1400**  2:3
**15**  48:24 158:6,6
  163:24 186:9 231:1
**150**  202:25 204:3
**157**  4:24
**15th**  172:8,11
  230:23
**16**  132:7 186:1,8,9
**160**  124:3,5
**162**  5:5
**166**  5:6
**16:11**  83:23 89:12
  90:5,5
**16th**  123:2 141:18
**17**  186:9
**171325**  184:20
**178**  5:7

**18**  42:4 134:9,13
  253:23
**18-5**  194:7
**181**  5:8
**185**  5:9
**1984**  47:20
**1989**  76:10
**1991**  54:6,10 167:6
  170:19,23,24
**1992**  141:18 142:14
**1996**  171:3
**1997**  71:23 72:11
**19th**  178:7
**1:16**  127:1,3
**1st**  121:4,4 122:13

| 2 |
| --- |
| **2**  11:18 53:5,6,24 |
| 81:25,25 82:3 84:7 |
| 86:17 87:5 131:7 |
| 174:21 175:1 |
| 219:16,24 |
| **2's**  189:6,12 |
| **20**  104:21 157:12 |
| 201:6 |
| **2000**  72:2 207:5 |
| **2001**  69:3 72:2 74:8 |
| **2002**  27:7 60:20 |
| 61:23 63:10 |
| **2003**  65:23,24 |
| 172:14,16,24 173:3 |
| 173:8 175:19 176:4 |
| 177:1,3 |
| **2004**  65:23,23,24 |
| 66:4 |
| **2006**  59:23 |
| **2007**  63:5 175:14 |
| **2008**  165:16 167:2 |
| 177:2,4 209:20 |
| 211:10 |
| **2009**  178:7 |
| **2011**  11:1 16:7,11 |
| 16:15,19 18:13 19:2 |
| 19:19 20:12 21:2,6 |
| 22:18,21,25 26:16 |

26:21 28:1,10 29:4
29:7 32:17 73:3
78:13 92:12 97:20
97:24 98:6 103:12
106:6,14 113:6
114:10 121:4,4
122:13 128:16
135:22 136:4,10
143:22 144:9,17
206:6,10 207:5,15
221:2,6 223:20
247:22 250:6
251:13,20
**2012**  97:8,17 100:15
123:2 124:19 160:3
172:8,11 176:15
251:14,22,24
**2013**  160:3 204:7,8
204:11 207:2,4
**2014**  184:20,21
186:1 187:13 203:9
204:1,5,10 231:1,2
231:4
**2015**  1:15 2:2 6:3
26:13 28:2 57:2
84:9 165:22 203:2,6
204:10 230:23
253:8,23
**205**  4:5
**209**  2:10
**211**  4:6
**2196663**  1:24
**22**  78:8 113:15,19
**222**  2:16
**227**  5:5 52:16
162:22,25 163:9,25
164:4 243:14
**228**  4:8
**229**  5:10
**23**  171:21,21,22
**235**  4:7
**24**  141:14 173:6,7
221:21 222:18
**242**  4:8

**250,000**  202:25
  204:3
**25301**  2:10
**254**  1:25
**28**  101:4
**290**  71:15
**291**  70:19 71:15
**2:12**  1:6 6:12 165:18
  198:20
**2:13**  4:23
**2:21**  165:22
**2:52**  185:21
**2nd**  187:13

**3**

**3**  11:18 37:11 81:25
  81:25 82:3 86:17,19
  86:20 87:2 165:20
  172:21 243:10
  244:9
**3,000**  246:2
**30**  48:2 87:25
  104:21 201:6
  253:19
**300**  2:2 6:9
**30309-3521**  2:22
**304/342-1110**  2:11
**304/345-6555**  2:11
**308**  80:10
**310**  80:10
**312/207-3904**  3:5
**312/207-6400**  3:6
**312/609-5005**  2:17
**312/609-7500**  2:17
**32**  4:14
**340**  4:19
**36**  225:23
**3:15**  205:3
**3:24**  205:6
**3a**  86:19,20
**3d**  182:9
**3rd**  172:16,24 173:8
  176:4 231:4

**4**

**4**  4:23 11:21 48:1,2
  54:16 67:7,7 87:10
  88:18,19 93:18
  110:23,25
**4,000**  245:20,24
  246:2
**40**  88:3 97:4
**404/572-4687**  2:22
**404/572-5140**  2:23
**41**  4:15,17 69:1,3
  70:15 76:1,1 124:5
  237:21,23 238:2
**42**  132:3,7
**43**  88:3
**44**  4:13 11:6,8,17
  52:12 219:22
  237:21
**45**  4:14 32:22,23
  37:23 193:2 226:11
  226:14
**46**  4:15 70:3,5,13
  125:2,2
**47**  4:16 5:5 52:16
  73:14,15 77:21
  162:22 243:13
**47-1**  131:24
**48**  4:18 86:4,5 93:19
  100:7
**49**  4:19 96:19,20
  97:3 99:17 100:2
**4:05**  234:21
**4:11**  80:20,20,20
  83:23 89:12 108:14
**4:16**  234:24
**4:40**  252:14,17
**4th**  167:2 209:20

**5**

**5**  39:7 54:17 59:17
  60:20 144:9 152:7
  178:11 186:2,6,15
  199:21 220:9
**50**  4:20 120:21,22
  120:24 121:7

122:14 226:21
  231:10,13
**51**  4:22 122:19,20
  123:8 125:12 131:6
  131:8 157:10,12
**52**  4:23 131:10,11
  131:23
**529**  233:15,18
**53**  4:24 113:16,19
  157:2,2,3,6
**54**  5:5 162:13,14,21
**55**  5:6 166:19,20,25
  169:21 170:13
**56**  5:7 178:1,3,6
**57**  5:8 181:23,24
  182:7
**58**  5:9 185:15,16,24
**59**  5:10 228:25
  229:1
**5962**  1:23
**5:13**  229:6
**5th**  11:1 16:7,11,15
  16:19 18:13 19:2,19
  20:12 21:2,5 22:18
  22:21,25 26:16,21
  28:1,10 29:4,7
  32:16 73:3 78:13
  92:11 97:20,24 98:5
  103:12 106:6,14
  113:6 114:10,10
  128:16 135:21
  136:10 143:22
  144:17 223:20
  247:22 250:5

**6**

**6**  49:20 50:10,12
  51:1,2 59:17 87:25
  88:20 89:8 160:9
  171:4 182:8 186:2,6
  186:15 199:21
**6.0**  4:21 121:3
**60**  67:11 108:18,19
**60,000**  231:10,13

**60601**  2:16
**60606-7507**  3:5
**61**  171:21,22
**637**  182:10
**64**  141:14
**64.1200**  141:19
**65**  173:6,7
**66937**  222:4 224:6
**69937**  101:23

**7**

**7**  4:4 58:16 59:6
  60:20 123:5 127:6
  199:21 220:12
**7.0**  4:22 123:1
  125:11
**70**  4:15 67:12
  188:24
**72**  152:7
**73**  4:16 73:21,23
**75**  188:24
**771**  1:23 253:4,25

**8**

**8**  1:15 2:2 130:8
  134:8 167:16
  178:11 182:9 253:8
**8/21/2012**  80:10
**8/8/2012**  4:19
**80-90,000**  138:23
**83**  101:4
**86**  4:18 152:7
**89**  160:4,9
**8th**  6:3 84:8 97:8,17
  100:15 165:21

**9**

**9**  134:13
**907**  152:8
**93**  55:6 57:15
**96**  4:19
**97**  69:3
**977**  122:23
**983**  123:5
**9:05**  2:2 6:1,3 253:8

| a |
| --- |

**a.m.** 2:2 6:1,3 253:8
**aaron** 80:9 97:14
**abates** 109:22
**ability** 29:18 74:1
　77:4 102:25 147:1
　157:25
**able** 35:24 75:23
　76:2 84:15 136:18
　149:9 165:1 202:9
**absent** 141:22
**absolutely** 44:13
　117:13 191:9
**aca** 170:9
**accept** 40:6,10
　158:21 197:25
　198:7
**acceptable** 217:5
**accepted** 39:9 40:15
　157:14 195:22
　197:7,21 251:25
**access** 39:22 70:24
　87:13 90:9 155:8
　185:5
**account** 40:4 233:2
　233:3,4,11,11,14
　234:2
**accountholders**
　233:18
**accredited** 55:8
**accurate** 71:4,19
　114:7 190:22
　202:18 253:15
**accurately** 35:2
　39:12 48:7 53:3
　55:11 60:3 61:4
　67:17 71:2 74:6
　101:12 114:3
　116:15 117:9
　127:15 130:18
　135:7 142:11 163:7
　168:8 171:9 174:3
　180:3 185:11

**achievement** 59:24
**acquired** 24:18
　206:20,24 207:9
　250:11
**acquisition** 223:10
**acquisitions** 24:22
**acronym** 44:11
**act** 52:16 55:17
　57:16 59:20 73:8
　77:25 160:14
　184:12 185:10
　224:12 243:13
**action** 1:7 6:19
　14:23 105:18,20
　108:7 137:4 139:6
　191:1 216:2,3 217:1
　217:14 229:7 232:2
　240:13,21 253:21
　253:22
**actionable** 196:5
**activated** 229:23
**activity** 22:12,15
**actual** 44:15 90:13
　92:6,8,10 93:15
　94:18 99:8 121:23
　169:6 179:13 236:7
　247:17 249:19
**adaption** 63:13
**add** 72:14 76:4
　94:14 213:2 234:7
**added** 51:12 94:17
　135:10,16 220:7
**addition** 23:25
　60:20 67:14 121:22
**additional** 10:5
　85:25 98:21 123:23
　136:19 137:3,3
　189:20 219:2,12
　226:16 237:15
　238:20,21
**additionally** 199:16
**address** 8:10 38:8
　54:13 58:18,20 75:1
　102:8,11 143:3,5,6
　143:7,8

**addressed** 13:16
　62:17 78:5
**addresses** 62:24
　73:21 143:9,19
　172:25 242:5
**adelson** 63:7
**adequate** 189:5
**adequately** 196:21
**adhere** 64:25
**adjourned** 252:16
**administer** 6:18
**admits** 196:5
**adopt** 183:8
**adopted** 41:24 64:14
**adoption** 125:10
**advanced** 59:25
**adverse** 240:3
**advertising** 10:24
　30:11
**advice** 59:19
**advised** 231:21
**advisory** 220:21
　221:1,12
**affect** 124:9
**affirmative** 36:25
**affirming** 240:5
**afford** 70:9
**aforementioned**
　113:23
**afternoon** 83:22,25
　127:1 211:21,22
**age** 229:13
**agency** 199:1
**agent** 169:8 208:9
　209:23 211:7
**agents** 208:3,10,19
　209:2
**aggregator** 14:1
　27:9,12 29:17 78:12
　79:8 91:16,22,25
　101:8 109:4 111:5
　112:23 180:11
　250:6 251:4
**aggregators** 109:13
　110:2,13 120:17,19

136:2
**ago** 42:20 130:20
　131:5 132:2 155:12
　159:24,25 200:2
　201:22
**agree** 6:14 28:6
　33:24 34:2 125:3
　146:5 153:15
　154:14,23 155:1
　158:24 181:4,11
　184:7 185:7 188:25
　189:1 190:7 193:19
　194:14,19 195:10
　197:12 198:2,14
　199:22 200:24
　203:24 204:24
　205:17 207:4
　209:19 238:20
**agreed** 154:18
　175:25 177:21
　187:4 200:14 201:6
　201:11
**agreeing** 180:5,22
**agreement** 74:21
　110:8 244:25
**agreements** 74:17
　110:15,20
**agrees** 56:5,21
**ah** 97:5
**ahead** 17:20 34:12
　78:22 89:9 96:24
　195:1 205:8 216:16
　238:18
**ai** 59:4
**aided** 253:13
**air** 69:15 132:18
**airline** 146:2,3
　192:13
**airlines** 146:1 193:4
　193:8,11
**airplane** 132:14
**al** 6:11 7:23
**alabama** 1:1 97:25
　105:12 106:1 113:5
　223:20

**alarm** 110:24
**alarms** 110:24
**alert** 155:11
**alerts** 155:9
**algorithm** 153:6,7
  208:17,17,22,23
**allegations** 214:14
**allege** 197:1
**alleged** 248:22
**allegedly** 95:22
  196:9
**alleges** 206:5
**allen** 84:24
**alleviated** 109:22
**allow** 75:18 116:18
  120:17
**allowed** 117:3
  119:20 122:2,7,9
  206:13 227:12,15
**allowing** 112:4
**allows** 29:13 238:9
**amend** 213:7
**amended** 5:11 80:1
  80:5,19 83:3 86:10
  86:16 100:6 115:2,8
  229:6 230:22
**america** 60:23 61:3
**american** 54:25
  55:9
**amici** 57:12
**amicus** 56:25
**amount** 45:10
  126:12 177:23
  187:3
**amounts** 110:10
**analog** 59:5,9
**analogous** 130:9,21
  143:2 159:21
  241:22
**analogy** 151:13
**analysis** 24:8 46:2,6
  46:11,19,20 51:4
  81:24 114:20
  124:22 171:19
  225:1 228:6 236:3

**analytics** 208:23
**analyze** 46:12
  124:21 147:12
  149:6 161:22
  164:24 225:10
**analyzing** 24:3
  165:8
**ancillary** 138:1
**angeles** 193:24
**ani** 142:3,23
**animals** 132:20
  242:10
**animated** 105:24
**annoyance** 65:5
**annoying** 120:1
**anomalies** 201:3
**ansi** 4:17 55:10 69:3
  76:1 124:5
**answer** 5:22 16:1
  17:13 19:9 32:19
  36:25 45:8 48:15
  56:14 68:15 69:20
  112:1 127:23 132:6
  148:9,20 152:23
  154:22 155:25
  156:13 157:19
  160:21 164:17
  197:18 206:16
  211:8 214:25 216:7
  216:11,21 225:2,15
  239:9,11 240:17
**answered** 32:1,18
  83:7 132:12 169:4
  169:11 170:6 176:6
  208:4,8 209:1 211:2
  236:11 241:15
**answering** 111:23
  240:8
**answers** 12:16 169:7
  169:12 206:15
  209:12 211:7
**anticipate** 10:4
  139:2
**anticipated** 61:15
  168:6 173:6

**anticipation** 62:18
**anybody** 25:15
  51:17 111:14
  151:19
**anymore** 120:17
**anytime** 127:17
**anyway** 71:19
**apart** 45:20 118:14
**apologize** 181:19
**apparent** 74:5
  136:16
**apparently** 78:24
  198:16 199:24
  211:4 230:1
**appeal** 42:4,22
  184:1
**appealed** 183:25
**appeals** 57:1 175:2
**appear** 8:10 98:23
  150:7
**appearance** 6:22
  8:14 230:10 232:3
**appearances** 2:6 3:1
**appeared** 2:4 89:17
  89:18
**appears** 11:14 97:9
  97:12 98:17 107:23
  166:11 222:1
**appellate** 40:20
  41:14 42:21 153:17
  154:21 155:5,13
  175:24 183:24
**appendix** 8:11 39:7
**applicability** 171:13
  174:16 176:2
**applicable** 64:25
  180:12
**application** 15:18
  66:12 92:14 142:15
  161:19 179:6
  190:16
**applications** 12:23
  15:22,24 18:20 49:2
  120:14

**applied** 61:25 63:4
  125:5 172:12 174:6
  175:23 176:16
  179:7 239:14
  251:21
**applies** 169:3 176:4
  181:12
**apply** 117:8 171:6
  171:19,23 239:22
  241:5
**applying** 66:22
  175:16 181:9
**appreciate** 37:8
  166:4
**appropriate** 164:14
  164:16
**approximately**
  212:4
**april** 121:4 122:13
  230:23
**aptly** 53:23
**arbitrarily** 173:20
**architect** 141:13
**architecture** 15:20
  27:2 29:12 48:4
  77:10,12 140:15,18
  140:25 141:11
  248:24
**area** 56:23 74:4,18
  75:19 76:3 150:5
**areas** 70:22,24 74:5
  164:9 208:20,20
**argue** 190:14
**argued** 168:17
  200:12
**arising** 35:1 37:14
**arrangements** 64:1
**article** 207:1
**articles** 39:25
**arts** 59:24
**aside** 10:9 11:23
  40:16 106:12 214:2
**asked** 34:18,24
  36:13 38:3 43:24
  52:20 53:9 84:17

96:6 100:24,25
132:5 133:14
134:14 140:20
148:11 155:18
156:6,11 157:11,21
160:19 181:18
211:25 216:18
220:1 224:4,11
235:6,8,9 236:10,22
237:1 241:15
**asking** 23:12 49:8
100:17 127:25
134:15 145:5
146:17,18,20 150:1
152:18 195:22
207:11 225:9
227:14
**aspect** 189:20
**aspects** 22:11 30:19
**assemble** 101:14
**assembled** 101:5
**assembler** 20:24,25
21:9
**asset** 207:3
**assets** 206:24
**assignments** 252:6
**assist** 190:14 218:23
**assistance** 37:8
**assisted** 51:14,17
**assists** 209:23
**associated** 67:13
71:20 94:23 113:4
113:10 248:19,25
**association** 10:1
54:23 55:3 60:25
66:1 120:12 122:25
220:16
**assume** 10:20 12:19
12:21 17:2 26:12
32:10 56:19 83:13
83:14 112:15,16
176:18 181:15
199:7 223:6 230:20
241:6 250:24

**assumed** 71:17
144:10
**assuming** 138:23
157:14 207:3
**astrology** 30:23 31:1
31:6 47:19
**astronomy** 31:1,2,4
31:6 47:20
**asynchronous** 145:8
**atds** 38:23 40:16,19
41:8,11,15 44:2,11
45:7,12,19,21,24
46:8 48:10,11,19,22
49:4,7,20 50:5,22
50:23 51:2,8,23
52:2,3,19 53:13,16
54:7,8,11,12 57:24
68:13,22 84:14 85:7
85:10 115:24
119:19 132:8,10
146:16,23 147:7,8,8
148:18,24 149:2,4
149:12 150:16
151:7,12,17,18,19
154:5,11,13,24
156:23 157:20
160:18,24 161:4,6
161:13 162:2,4
163:13 166:13,16
166:24 167:8
174:15 178:10
179:22 181:2,5,14
181:16 187:5
191:20 194:7
196:22 197:8,22
198:6,9,13,18 199:3
199:7,16,20,22
200:7 203:20
204:17 211:1,3,9
230:18 235:24
236:5 248:21,22
249:12
**atdss** 48:15,17 50:1
51:25 151:12
158:17 161:9,11

**atlanta** 2:22 7:3
**attached** 33:13 34:3
86:13 94:7 98:2
100:5 209:22
232:19 243:10
**attachment** 4:19
**attain** 73:25
**attempt** 238:4
**attempting** 30:3,5
**attended** 126:2
**attendees** 138:22
**attention** 221:17,21
**attenuated** 189:17
**attorney** 2:15,20 3:3
6:23 50:16 142:18
232:19 236:20
244:18
**attorney's** 231:14
**attorneys** 2:9 36:14
36:16,23 39:24 42:3
114:17 141:1
153:18 190:14
192:22 214:1
229:17 230:5
231:10 234:12
**attract** 30:17
**audio** 6:13
**august** 97:8,17
100:15
**authentic** 34:9
**authored** 55:5
**authoring** 55:4
**authoritative**
118:12 119:3
**authority** 162:9
173:17 184:4,8,12
233:11
**authorized** 6:17
**auto** 162:11 199:13
**autobytel** 85:3
**autodialer** 142:6,9
167:22
**autodialing** 173:10
**autographed** 117:6

**automated** 13:24
14:6,14 15:10 22:4
22:7,10,10 29:10
30:9 38:15,20 44:1
48:25 93:8 101:6
114:1 139:21 156:3
160:17 161:12
168:4 174:1 179:1
190:10 193:6
207:21 208:6 215:5
**automatic** 38:8
43:20 44:10,16,17
44:23,25 45:10
50:12 52:18 57:18
57:21 73:11 78:3
110:17 132:24
148:5 155:23
159:12,18 160:12
163:2 167:19
168:13,25 169:15
173:12 175:10
188:3,6 189:5,15
208:13,14 209:17
226:24
**automatically** 29:18
87:15 101:7 102:1,4
103:4 119:21,21
127:9 139:11 146:1
147:1,5 149:10
159:2 169:1 178:21
178:24 182:19
207:25 211:2 222:3
224:4 236:8
**autonomously** 161:2
199:13
**av** 103:24 104:5
**available** 25:17 26:4
33:19 38:6 118:11
142:22 169:8 208:9
208:10,19 209:24
**average** 190:12
**avoided** 61:22
**awaiting** 141:2
**award** 59:24

**aware** 13:9 18:25
　19:15,17 56:25 57:5
　61:25 66:18 70:25
　75:16,20 100:9,10
　100:21 103:13
　124:7,16 206:7
　207:13 224:3
　228:16
**awareness** 27:18

**b**

**b** 87:25 101:24
　162:25 163:9,25
　233:15
**ba** 47:18
**back** 14:16 17:7
　36:15 41:6,12 42:6
　42:23 56:24 63:9
　68:9 80:18 93:18
　94:2,22 99:2,13,17
　99:23 101:3 109:5
　111:24 113:15
　122:1 138:12 148:1
　153:17 165:23
　166:14 176:2 177:9
　177:21 180:20
　181:13 183:25
　205:5 208:8 223:22
　228:23 232:13
　238:15,17,25 239:4
　239:20 240:14
　242:14
**background** 31:11
　31:14 45:17 47:18
　164:20,23 174:13
**bad** 50:1 151:12,20
　232:9
**bailey** 2:9 7:8 33:14
　33:17 52:14 242:24
　243:5,15,24 244:12
　245:6 246:7
**baileyglasser.com**
　2:12,12
**baird** 145:22,24
　191:19 193:3,7,10

193:12
**baird's** 193:14
**bama** 82:9 91:10,13
　101:24 106:3,7,15
　107:17,19,20,20,20
　108:2,22,22,22
　109:1 115:16 116:5
　117:5,15 126:4,7,9
　126:12 128:17,19
　128:23 136:11,12
　136:21 137:7,10
　138:11,14,15 139:8
　139:12,24 143:22
　144:10,12,23
**band** 58:17
**bandwidth** 66:15
　110:12
**bank** 233:2
**barrett** 88:2
**basdekis** 2:8 7:10,10
　239:9 240:6
**base** 155:2 162:6
　164:21 222:18
**based** 25:23 29:19
　40:12 45:17 50:5,11
　59:7 60:22 61:2
　64:14 84:16 92:18
　108:16 110:21,22
　114:25 115:3
　125:21,22 134:21
　134:24 148:6,23
　161:3 162:4 163:22
　163:23 167:18
　169:25 177:24
　185:11 186:18
　191:22,25 192:1
　202:5 208:19
　215:25 216:1,2
　221:9,11,24 237:2
　238:14 248:6
**basic** 29:11 59:7
　168:1 173:24
　223:11
**basically** 110:8
　111:10 136:22

147:20 192:12
　229:22 230:8 237:1
**basis** 42:11 57:14
　81:9 82:8 125:18
　177:23 189:7 231:6
**basketball** 103:24
　104:1,2
**batch** 93:20
**bates** 25:5 80:10
　87:23 88:5,11 97:3
　122:23,24
**bateses** 88:7
**battery** 50:10
**bears** 189:21
**becoming** 57:11
　135:19
**began** 66:4
**beginning** 6:23
　14:22 27:1 64:12,19
　88:19 186:16
**begins** 84:7 165:20
**behalf** 1:4 30:11
　84:13 203:23
　222:12 223:14
　229:13
**behavior** 125:23
　145:21
**beings** 103:8 110:16
**belief** 83:25
**believe** 11:3 15:5,14
　15:14 32:18 33:17
　50:19 68:19 70:3
　72:2 83:13 84:22
　88:9,9,11 90:21
　91:1,7,15 94:5
　105:23 117:25
　125:1 152:16 153:2
　169:25 170:14
　171:19 172:9,10,13
　172:24 174:8,10
　176:7,7 190:2,21
　216:22 219:16,24
　220:23 222:23
　237:5 242:23 247:3
　248:9

**beneficial** 158:8
**beneficiary** 233:19
**benefit** 114:18 234:3
**benefiting** 234:1
**benzion** 131:14
**best** 4:20,22 10:2
　64:10 116:1 121:3
　122:25 124:8
　211:24 220:22
　237:24
**better** 81:8,8 211:5
　249:15
**beyond** 160:23
　192:17
**bias** 196:1 232:3
　246:4
**biased** 152:1
**big** 89:2 104:18
**billed** 77:7
**billing** 66:10,11
**birth** 107:8 108:24
　117:23 126:6 137:9
　138:1,13 140:4
　248:4
**births** 140:9,10
**bit** 9:11 28:7 47:4,17
　59:3 96:25 114:6
　147:23 151:25
　158:13 247:15
**bkimrey** 2:18
**black** 194:21
**blain** 19:3 47:3
　228:23 242:14
**blaine** 2:14 6:24
**blast** 40:18 214:22
　215:4
**blasted** 40:13
**blasting** 215:17
**blatant** 44:20
**blessed** 41:24
**blocked** 143:16
**board** 221:1
**body** 118:12 119:2
**bolster** 191:4

**book**  68:25 70:14,19
71:10,14,22 72:9,21
72:25 73:6,7,18,21
74:8 75:2 76:17,22
77:22
**booked**  193:4
**books**  69:7,13,14,15
69:19 70:8 74:25
75:6,11 78:6
**booth**  103:24 104:5
**bother**  65:6
**bottom**  73:22 97:12
239:13
**bought**  192:11
**box**  88:22,24
**brain**  188:12
**branded**  14:5 18:3,4
29:11 30:8 79:6
222:10 223:14
**break**  9:14 47:7,8
68:4,6 84:11 112:14
112:17 126:15
204:25
**bridge**  44:8 167:6
**brief**  56:25
**brings**  18:5
**broad**  45:5 204:1
**broader**  169:24,25
170:2 177:14
222:17
**broke**  86:8 112:16
**broken**  124:11
**brought**  8:12 11:13
66:6 123:22
**browsers**  66:14
**build**  66:6 139:2
**building**  28:21
220:25
**built**  150:22 208:22
**bullet**  70:22 72:10
72:23
**bunch**  124:12
188:19 215:5
**bundled**  77:7
239:16

**business**  8:17 24:21
222:22 244:24
**businesses**  27:14
**buy**  151:14,15 192:5
**buzzword**  74:1

**c**

**c**  1:22 2:3,14 20:24
21:4,9 85:4 253:4
253:25
**ca**  1:23
**cab**  4:25 157:8
159:2
**cache**  185:5
**cain**  85:4
**california**  2:4 66:5
194:5 229:4
**call**  14:22 35:25
36:17,23 37:5 42:20
58:18,19,23 75:17
75:20 76:5,6,23
105:17,20 108:7
113:22 119:21
127:20 130:13,14
130:16 137:19,22
139:6 141:18 143:7
143:17 147:1,2,3
148:2,4,4,12,14,15
148:17 149:8
158:14 159:18
169:4,8,11,18 170:6
192:10 203:16
208:6,7,11 209:11
209:16 210:6 211:2
211:7 216:2,3 217:1
217:14 240:12,21
242:4 244:17
**called**  2:4 52:22
54:3 58:15 62:10
82:14 109:14 110:7
130:15 141:22,25
149:21 155:6
157:17 158:4 163:4
166:25 170:5
178:20 184:11

193:5 203:22
208:17 218:24
238:6,14 244:21
**caller**  130:10 142:3
142:4,23 143:2,13
143:16 199:11
**caller's**  142:2
**calling**  48:16 75:7,9
75:10 76:5,6,12
77:11 130:12,17
141:24 143:10
158:10,15 159:18
167:8 208:20 242:1
**calls**  40:25 41:4,5
99:14,15 114:1
127:24,25 130:7,11
130:20,25 132:10
133:1 137:3 142:7,7
142:8,10 143:5,20
148:17 149:9 158:6
168:14 169:10,17
171:7,7,24,24 175:7
175:23 178:24
182:19 200:12
204:19 208:1,2,4,18
208:25 209:24
210:4,17,18 241:10
241:21 243:14
245:10
**campaign**  28:21
82:25 95:19 102:2,3
102:4 103:1,3
106:14,16 109:8
111:4,15 113:24
**campaigns**  14:6
29:22
**canada**  119:3
**capabilities**  189:8
**capability**  109:24
150:17,18
**capable**  179:15,17
**capacity**  50:18,18
50:21,22 52:21,25
54:2 150:18,20
151:3 153:19 154:3

154:11,17,25 155:6
155:7 157:17
160:10 163:3 168:2
173:13,25 178:16
179:11,21 180:2,15
180:18 183:1,3
196:24 247:5
**capitol**  2:10
**caption**  6:10 175:4
**capture**  58:7 130:16
144:19,25 145:17
241:13
**captured**  127:9,18
128:6,6,11,18 129:3
142:2,7 145:10,13
192:18 199:11
241:20
**captures**  146:1
**capturing**  129:7,11
129:18 130:1 145:1
145:20
**car**  159:2
**career**  212:20
**carrier**  61:12,24
74:18 79:17 90:20
91:5,6,14,25 92:3,5
93:9 109:4 111:6
113:1 120:14 121:9
125:22 130:12
**carriers**  18:21,21
29:16,17 56:10
59:15 62:11 64:2,5
65:7 74:15,16,18
79:18 90:20 91:1
109:12 110:1,9
120:16 135:4
**carry**  120:23
**carryover**  122:17
**case**  1:6 4:23 6:11
6:12 7:23 8:3,4
10:13 11:25 12:7
13:6 17:9,16,23
21:17,21 24:11
25:25 26:2 27:22,23
28:12 32:3 33:12,25

| | | | |
|---|---|---|---|
| 34:3,20 38:4 39:5 | 218:3,6,9,23 220:1 | **cellular**   6:17 40:12 | 168:2 173:25 |
| 39:17 40:11,19 41:3 | 221:9 222:1,14 | 40:16 54:22 67:10 | 208:24 222:24 |
| 41:8,11,24 42:3,5 | 226:4 228:8 229:4,7 | 70:24 73:24 76:3,25 | 223:3 |
| 43:10,19 45:9,18 | 229:12,17 230:18 | 90:14 101:9,10 | **changes**   89:2 125:15 |
| 46:13,24 49:2 52:19 | 230:19 231:3,17 | 113:22 127:8,10,12 | 125:17 168:7 |
| 56:17,19 57:3 58:8 | 232:14,17 233:24 | 127:18 133:8 | 173:17 |
| 60:6 61:20 63:7 | 234:11 235:20 | 134:20 135:1,3,13 | **changing**   111:14 |
| 67:5,25 68:1,11,15 | 236:15,17,19 237:9 | 146:2 171:7,24 | **channels**   58:17 |
| 69:19,25 78:16,25 | 241:17,19 242:19 | 179:4,5,5,8 192:6,8 | 82:15,17 93:6 |
| 84:12 85:9,18 86:18 | 242:25 243:1,3,11 | 222:3 224:5 243:14 | **chapter**   75:2 76:17 |
| 87:6,11 93:16 94:4 | 243:20,21 244:3,4,4 | **center**   90:24 135:2 | 194:24 |
| 94:16,19 95:23 | 244:5,7,22 245:2,5 | 135:16,20 196:8,15 | **character**   123:25 |
| 97:25 98:18 99:4,16 | 245:8,11,14,16,21 | 208:3,9 209:1 | **characteristics** |
| 99:19 100:11 | 246:3,4,14,15,20,22 | **central**   83:14 194:5 | 214:16 |
| 101:23 102:24 | 246:24,25 247:5,7,7 | **cents**   239:17 | **characterization** |
| 110:22 114:12 | 247:18,20 248:22 | **certain**   17:15 22:11 | 71:20 73:2 181:20 |
| 115:13 125:5 | 249:21 250:3,14 | 25:20 44:6 59:10,11 | 183:14,18 237:4 |
| 127:17 130:24 | 251:16,17 | 60:13 61:16 81:10 | **characterizations** |
| 131:15,19,22,24 | **cases**   27:21 34:25 | 82:13,16 89:17 95:2 | 46:9 |
| 132:7 133:16 | 36:10 37:12,23,25 | 111:3 147:13 | **characterize**   21:15 |
| 136:25 141:9 146:9 | 42:12,16 50:4 67:10 | 161:23 164:25 | 99:2 111:8,9 138:18 |
| 146:10,11,21 | 67:11,12,15,19 68:7 | 196:16 209:22 | 144:24 201:1 |
| 150:11 152:15 | 68:16,21 84:12,13 | 223:24 234:2 252:2 | **characterized**   53:6 |
| 153:18 155:15 | 84:15,18,23,24 85:6 | **certainly**   13:22 | 117:17 208:16 |
| 156:20,22 158:25 | 94:12 143:12,15 | 14:10 43:6 46:18 | **characters**   124:3,4,6 |
| 159:9 162:24 | 147:21 152:19,24 | 64:18 94:17 109:22 | 155:10 |
| 165:15 168:17,18 | 168:12 188:24 | 125:5 150:23 184:5 | **charges**   238:21 |
| 168:21 174:19 | 197:10,11,12,15 | 186:20 211:16 | **charleston**   2:10 7:9 |
| 175:4,7,14,16 177:7 | 201:5,6,16,18 | 215:2 223:12,24 | 7:11 |
| 177:8,18 179:14 | 202:13 212:6,7,10 | 225:21 226:23 | **check**   8:16 25:19 |
| 180:6 181:1,12,16 | 212:23 213:19 | 230:16 252:3 | 244:19 |
| 184:17,19 187:13 | 214:11,13,13,17,21 | **certified**   2:3 | **checked**   69:9 |
| 187:15,18 188:11 | 228:16 232:3 | **cetera**   19:23 54:3 | **chicago**   2:16 3:5 |
| 189:4 190:19 191:2 | 242:22 244:20 | 65:16 93:21 195:10 | 6:25 7:6 185:1,25 |
| 191:14,24 192:16 | 245:23 249:1 | 248:20 | 200:4 |
| 193:18 194:3,6 | **cast**   215:10 | **chain**   93:7 | **circle**   201:10 |
| 195:20 196:3 197:8 | **casts**   241:1 | **challenged**   196:4 | **circuit**   41:10 42:21 |
| 197:22 199:25 | **catch**   118:8 | **chance**   56:16 | 57:1,12 133:5 143:9 |
| 200:7,11 201:10,19 | **catchup**   118:6 | **change**   62:11 77:2 | 153:21 154:6,14,18 |
| 201:21,24 202:3 | **caught**   251:25 | 124:19 219:10 | 154:23 155:3 |
| 203:8,18 204:15,24 | **ccr**   1:23 253:4,25 | 234:9 235:20 236:7 | 159:19 175:3 |
| 206:21 213:3,6,7,25 | **cdma**   74:15 | 249:9 252:2 | 177:20 178:7 181:5 |
| 213:25 214:7,8,14 | **cecilia**   5:10 229:5 | **changed**   15:6 28:1 | 182:15,22 183:5 |
| 214:15,18,24 215:2 | **cell**   93:14 113:6 | 28:10 105:23,24 | 242:9 |
| 215:23 217:4 218:1 | 193:3,8,10,13,14 | 123:14,20 158:12 | |

circuits 75:17
citation 182:21
cite 172:7,9 173:3
194:24
cited 174:23 175:1
citing 175:6
claim 168:22 230:18
247:23
claims 52:17 190:25
clarification 152:18
234:14 236:21
clarified 65:11
clarify 28:17 38:10
48:14 53:17 81:4
87:20 88:13 156:14
211:4,6 234:9
236:13 238:1
clark 4:19 80:9
97:14 253:3
class 1:7 191:1
229:7 232:1
classes 54:17
clean 112:9 185:19
cleaned 185:23
clear 40:24 88:22
101:17 105:25
144:25 145:1
173:14 183:1
205:10,16 211:15
214:5 227:19 228:7
240:19
clearly 168:6 177:4
249:9
click 148:4,17
clicked 155:14
192:5
client 48:11,18
51:14 92:14 189:6
232:13,19
clients 70:9 110:3
214:6
close 82:19 108:16
162:16
cloud 16:19,21,25
17:2,11,23,25 18:7

18:9,12,14,23
235:12 248:19
coauthor 68:25
coauthored 70:14
coca 1:7 2:19 7:3
10:8 102:25 105:7
105:21,21 218:7
222:10,13 223:16
223:19 224:4
252:11
code 20:21,23 21:8
21:17,19,21,23 22:5
22:7,11,14 101:21
101:23 102:17
105:11 106:2
112:20 139:8 222:4
224:6 235:12
248:20,23 249:18
coded 21:11 22:3
coder 20:21 21:13
21:15
codes 61:2 64:11
coding 21:4 103:6
136:22
coffee 185:22
cofounder 60:21
cofounders 220:14
coke 105:25 107:7
108:25 116:13
117:7 138:21 244:4
246:25
cola 1:7 2:19 7:3
10:8 102:25 105:7
105:21,21 218:7
222:10,13 223:16
223:19 224:4
252:11
collection 84:25
208:1
collections 158:17
collective 32:21
86:12
college 31:16 233:4
233:5,8,10,17

column 80:21 93:19
94:22 95:7 178:13
186:3,16
come 49:9 53:11
68:9 79:8 101:21
111:19 138:12
215:1
comes 53:12 92:15
209:13
comfort 217:6
coming 132:25
230:17 235:3
comma 164:6
commencing 2:2
253:7
commentator
173:21
commercial 30:12
120:19
commission 141:18
167:15,17,23 168:3
173:9
committee 124:8
220:21 221:13
common 196:10
217:3 233:2
communication
30:10 54:22 59:12
communication's
143:12
communications
15:21 73:8 75:1,13
75:14,14,22 93:7
130:5 134:10,21,24
134:25 135:12
143:11 246:5 251:7
companies 12:19
14:4,5 17:6 19:17
19:21,25 21:1 24:15
24:22 29:9,9,11
30:1,8 59:15,16,18
60:22 118:13,20,21
119:25 134:19
136:2 158:9 218:13
223:14 230:4,9

company 1:8 2:19
7:4 18:3,4,4,7 19:1
20:7,8 29:21 61:13
79:6,6 85:2 101:1
109:5 135:1,20
147:23 157:8
179:12 207:8 222:2
222:10,11 223:13
229:15 235:17
250:11
comparing 51:5
complained 112:12
complaining 100:16
complains 97:19
98:14 185:1
complaint 5:11 80:1
80:5,7,19 83:3
86:10,16 96:18
98:13 100:1,3,6
114:12,14,19,22
115:2,8 191:1 229:7
229:7 230:21,22
248:6
complaints 151:19
complete 12:11,14
87:10 101:5 124:24
125:1 169:1,2,8
217:13 253:15
completed 215:16
215:16
completely 29:19
119:18 130:9
132:16,19 133:12
140:6 159:17,20
169:5 190:25 242:1
completion 253:17
complex 111:10,12
158:25
compliance 51:15
51:18,21 52:4,8
55:17 61:7,10 62:4
62:5,6 63:12
complied 221:10
complies 34:15

**comply** 52:6,6 120:7
224:25 226:5
**component** 22:7
137:24
**components** 19:13
23:18
**comprehensive**
37:23
**computer** 16:4 22:3
22:5 44:1 103:17
112:16 132:25
149:24 150:5,21
164:9 198:24
209:22 253:13
**computerized** 29:10
132:21 133:2,3
135:15 156:3
**concede** 43:4
**conceding** 26:20
**conceivable** 93:10
**concern** 231:25
**concerned** 41:4
56:23 115:17
118:19
**concert** 120:11
**conclude** 121:19
196:20 236:4
**concludes** 196:4
**conclusion** 46:25
53:18,24 186:19
188:2,12 189:14
190:9,24 228:13
**conclusions** 115:22
164:16,21,22
187:22
**condone** 226:24
**condoned** 227:4,7
**conduct** 64:11
**conference** 76:6
245:9
**conferences** 54:20
**confidentiality**
166:2
**confirm** 100:10

**confirmation** 98:20
107:2,4 108:6
116:19 238:10
**confirmatory** 114:1
117:18 121:20
128:21,24 129:22
138:5,6 196:13,17
217:7
**conflict** 183:23
**conflicting** 179:23
183:4
**conforms** 189:13
**confuse** 30:25
**confused** 104:6
134:15 247:15
**confusing** 24:14
96:6 145:6
**congress** 54:6,8
56:12 167:23 168:5
173:16
**congressional**
142:20
**conjunction** 246:7
**connect** 12:20 13:7
13:19 15:1,13 16:6
16:10,14,18,24 17:8
17:10,24 18:15
19:19 23:20 25:16
26:5,9,19 27:25
28:9,15,19 29:3,7
29:15 32:16 45:19
45:24 46:7 53:15
58:13 90:13 92:19
92:21 95:8 96:13
110:11 120:17
133:19 136:13
159:16 217:21
235:7 248:18
**connected** 20:6
130:14 210:7
**connecting** 134:20
**connection** 136:1
215:22 247:12
**connections** 93:7
134:21

**connectivity** 18:20
18:22
**connects** 29:17
**connelly** 68:17 85:1
85:8,14 159:5
165:23 204:14
**consent** 58:4 119:22
126:12,14 144:25
145:1,5,12,14,18
161:8 191:22,23
192:1,18,19,22,23
193:15 194:11,13
224:15,22,25
225:13,14 228:9,15
**consented** 144:20
193:10 196:12
**consequence** 120:8
120:10
**consider** 59:12
147:6 168:7 173:17
185:7 214:13
**consideration** 41:13
**considered** 15:21
48:17 49:4 77:6
123:24 125:6 142:5
173:12 179:22
215:4
**considering** 142:14
**consistent** 117:19
197:4 209:4,25
223:12 224:19
225:7,15 228:15,18
**consistently** 237:17
**constantly** 118:3
**constitute** 154:12
199:20
**constituted** 115:24
**constitutes** 45:7
46:21
**constituting** 167:8
**constrained** 19:4
**construction** 157:14
164:19
**constructs** 179:2

**construed** 36:2
**consultant** 52:13
59:14
**consulting** 67:9
85:13
**consumer** 4:20,22
10:2 52:16 55:17
57:16 59:20 73:8
77:25 121:2 122:25
124:8 160:14
180:25 239:2
243:13
**consumers** 61:16
66:9 208:5 215:14
216:2 227:1 238:6
**contact** 27:24 36:9
158:20 166:8 208:3
208:9 209:1
**contacted** 193:10
**contacting** 61:16
**contacts** 64:1
**contain** 108:5
**contemplates**
173:10 239:2
**content** 59:25 66:6,8
79:19,23 102:20
103:7 128:5 145:11
209:8
**contents** 196:7
**contest** 43:3 117:6
**context** 15:25 44:24
63:6 71:7,15 72:21
131:2 156:2,8 157:1
195:15,18,19
204:16
**continue** 168:5
174:2 182:5 195:9
**continued** 3:1 5:2
31:15
**continuing** 31:15
**contract** 19:1 20:11
223:15,23 251:6
**contracted** 18:8
**contracts** 18:3 64:1

**contrary** 39:10
141:23 200:20,25
237:12
**contributions** 55:3
**control** 29:20 35:21
36:3 37:5 109:13,14
205:13
**controlled** 135:3
**conversations** 6:16
236:17
**convey** 30:4,5
194:13
**conveyance** 33:16
**conveyed** 58:22
128:5,6 143:23
144:11 192:21
**conveys** 31:18,22
32:6,9 58:25
**convinced** 43:11
**copied** 171:17
**copies** 8:12 36:1,11
37:6 69:6 85:25
120:22
**copy** 8:3 11:11
35:13,14 36:6,6
42:15 73:5 85:24
88:2 131:21 162:17
162:21 165:24
166:9 224:10
**copying** 172:4
174:13
**copyright** 70:13
**corner** 104:15
**corp** 243:8
**corporate** 19:6
80:17 206:20
**corporations** 119:20
**correct** 9:3,9 11:19
11:21 13:16 22:8
26:16 27:7,12 29:4
30:15,18 33:9 35:22
35:23 36:3 37:16
38:5 39:15 42:1
43:21 45:13 46:10
46:25 47:1 51:8

53:8,16 57:12 59:1
62:22 65:19 69:4
73:4,19 76:22 80:2
80:6 84:21 85:7
87:6 89:13,16 90:6
91:11,14,17,19,22
91:25 92:3,8,9 95:8
96:4,8,9 97:9,11,15
98:11 99:8,21
102:18,21 103:2,10
105:2,12,18 106:3,8
106:10,15,19
107:15,17 108:10
108:14,17 111:5
112:14,21,24 113:2
113:7 115:19 116:1
117:12,20,21,23
118:1 121:21
122:10 124:1,4
128:7,12,25 129:4,5
129:9,12,20 130:2,3
133:24 138:16
139:18 141:4
145:15 146:14
147:18,19 149:1
153:24 154:7,18
155:16 159:13
161:14 162:3 163:9
165:12 168:14
172:8,9 178:17
181:2 182:3,5
184:17 186:19
188:13 191:17,20
193:19 194:8,11,15
198:18 199:4
200:22 202:11
203:14 210:5 213:9
218:5,8,11,15 220:2
221:6,7,14 222:15
224:2 227:22
230:23 234:2
239:13 243:16,18
244:7,9,10,12,15,16
245:3,16 246:22
247:14,18 248:12

251:14
**correcting** 35:18
**correctly** 77:16
222:5
**correlates** 34:13
106:2
**correlation** 44:21
**correspondence**
34:5
**corroborating**
190:25
**cost** 158:8 168:1
173:24 239:17
241:6
**couch** 51:23 227:23
**counsel** 6:7 7:13
10:3 36:19 43:11
46:4,9,16 78:24
144:8,8,8 159:8
201:23 204:19
218:16,18,21
236:14 242:24
243:17 244:21,22
245:2 246:14,15,22
247:16
**counted** 85:3
**counterintuitive**
72:18
**county** 253:3
**couple** 9:23 42:16
132:1 206:2 234:16
**coupon** 229:20
**course** 177:15 191:9
**court** 1:1 2:3 6:5
32:20 40:20,21,22
42:6,21 43:12 57:1
103:24 104:1,2
112:11 146:5
150:15 152:20
153:16,17,22 154:7
154:15,15,19,20,21
154:23 155:5,13
157:9,15 166:18
175:2,25 179:25
180:5,20 181:4,5,10

181:19 183:1,2,5,8
183:8,20,23,24
184:19 187:20,22
188:5 189:19,23
191:3,15,19 193:1
194:14 196:3,4,20
197:7,12,16,21
198:1,7,14,17,21,22
199:3,6,16,18,22
200:9,14,20,23,25
201:11 228:16
**court's** 19:5 41:14
154:9 183:6 185:25
194:25 197:25
**courteous** 238:9
**courtesy** 122:2
217:3,5
**courts** 151:24
152:11,14,19
163:16 177:22
194:21 201:1,6
**cover** 33:14 34:5
70:13 122:24
**coverage** 70:24
**craig** 2:2
**crammed** 124:14
**create** 101:14
173:19
**created** 38:12 93:11
101:5,8 103:5
198:23 236:9
**creates** 102:4
**creation** 103:6
**credibility** 191:5
**criswell** 201:21
213:6
**criteria** 44:9 45:6
46:14 53:22 133:12
147:13 149:11
161:24 162:1
163:17 165:2 176:1
211:1,9
**critical** 111:1 251:1
**criticism** 168:16

criticized   42:7 43:1
   43:8 181:19 187:15
crm   147:18
cross   121:8
crr   1:22 253:25
csr   1:23
ctia   54:23 56:4,5,16
   56:24,25 57:11
   59:14 64:3 120:11
   120:12
ctia's   57:8
curl   60:25
current   167:20
currently   24:3
curriculum   38:4
cursor   148:16
custody   35:21 36:2
   37:5 205:13
customer   102:24
   147:18 148:2
customers   30:17
   199:10
cut   60:10,13 206:11
cv   1:6 4:23 6:12
   67:24 68:1,5 131:24
   174:18,21 177:10
   177:15 194:3
   198:20 199:20
   202:1 229:6 243:10
   244:9 246:11

**d**

d   151:1
d45   193:1
daily   57:14
damages   201:17
darcy   63:9
data   59:9 66:15
   80:17 117:8 130:14
   136:12 189:22
   239:14,21,22
   241:12 242:6
database   22:17
   52:24 87:13,16,18
   89:23,24 90:3 92:19

94:1 95:1,3 112:20
   136:13 139:23
   140:2,3 148:1,1,3
   148:15,16 179:6,8
   180:24 235:12
   248:24 249:7,7,8
   251:7
databases   19:23
   140:7,11,14 141:9
datagram   210:8
date   79:22 81:21
   98:7,9 107:8 108:24
   117:23 123:2 126:6
   137:9,25 138:13
   140:3,9,10 159:24
   248:4 251:17
dated   80:9 97:17
   178:7 253:23
dates   25:20
day   52:4 72:7 74:9
   74:10 97:24 103:12
   103:20 138:22
   208:21,21 235:4
days   90:23
dc   57:1,12
deal   12:17 39:1 62:8
   109:6
dealers   170:1
dealing   62:25
deals   225:25
debt   158:17 208:1
december   1:15 2:2
   6:3 84:8 97:20 98:5
   98:14,16 99:18
   100:16 165:21
   184:21 185:25
   206:6,10 207:5,15
   253:8,23
deception   183:19
deceptive   182:21
   183:15
decide   196:19
decided   42:4 214:7
   230:9

decision   41:14 42:21
   42:24 153:15 154:1
   155:13 183:21
   184:7 195:24 197:5
   198:10 201:11
decisions   40:2 42:12
   42:15 194:21
declaration   4:13 8:4
   8:21 9:24,25 10:12
   11:7,12,13,16 24:10
   25:2 26:2 28:11,15
   28:24 34:20 37:24
   42:13 46:24 48:1
   52:11 53:7 54:16
   58:8 59:13 60:5
   67:8 68:24 69:16
   78:9,21 79:25 84:12
   94:7 101:3 102:23
   113:15 115:13
   127:7 130:8 134:8
   138:10 141:15
   145:25 159:6,11,23
   164:15,20 165:25
   166:10,17 171:4
   172:15 173:2
   174:18 182:9,10,14
   191:2 201:9 221:18
   221:19 237:20
   243:11 253:1
declarations   37:12
declaratory   5:6
   167:1,11 169:21
   170:10 175:6
declare   253:4,20
declared   179:10
   182:25
dedicated   75:2
deduce   249:16,18
deem   115:17
deemed   231:25
defendant   2:4,13,19
   3:2 6:8 7:1 52:24
   67:20 68:8 84:14,20
   146:10,12 196:21
   196:23,25 200:14

203:6 222:2,8,9,14
defendant's   193:7
   199:19 203:21
   204:19
defendants   1:9
   13:23 14:17 15:3
   19:7 23:21 24:2,16
   24:23 25:15 52:18
   52:21 67:15 68:2
   78:25 79:1 106:7
   114:2 203:16 205:9
   206:14 221:9 223:6
   226:15 228:8
defense   36:19 43:11
   200:12
define   29:14 64:13
   224:15 227:21
defined   52:19 56:2
   58:21 146:17
   151:24 161:24
   175:7 189:16
   226:18,23
defines   58:13
definitely   41:15
   166:11 177:2
   191:15
definition   18:6
   45:12,20 46:5 53:13
   53:15 119:19
   132:24 151:23
   152:10 154:5
   156:23 157:20
   160:18,24 161:4,13
   162:4 163:1 166:16
   166:24 167:18,22
   170:1,5 173:9
   174:15 175:10
   180:13 188:3,5
   193:2 199:15
   210:21 211:3
   250:25
definitions   53:19,21
   170:18
degree   16:17 17:8
   17:23 19:14 22:15

30:20 203:4 234:2

**delay** 113:10

**delays** 112:18,23
113:1,4

**delivered** 101:25
121:15 123:10
127:13 133:9 135:5

**delivery** 101:9
160:12 179:4
215:22

**demand** 113:12

**demographic**
158:14

**demonstrate** 154:2
174:14

**demonstrated**
137:21 194:23

**demonstrates**
179:19

**demonstrating**
195:25

**denise** 33:18

**deny** 100:10

**depend** 151:9

**depending** 79:7

**depends** 15:18
49:22,24,25 50:6
52:7,9 90:20 94:25
119:10 140:15
146:24 150:14
151:8,10 152:9
195:15,18

**deposition** 1:14 4:12
4:14,24 5:4 6:4,9
8:19,21 9:6,9,22
10:5 11:6,8,17
12:18 13:10,13,16
32:22,23 33:11
34:24 35:4,9,12,20
36:1,11 37:3,9,10
37:23 42:13 52:12
70:3,5,12 73:14,15
77:21 84:8 86:4,5
87:25 93:18 96:3,7
96:9,19,20 97:3

100:2,7 106:23
120:21,24 121:7
122:13,19,20 123:8
125:11 131:6,11,19
131:22,23 132:6
133:15 155:16,18
156:20 157:2,3,6,6
157:7,12 160:5,8
162:14 164:14
165:21 166:19,20
166:25 169:21
170:12 178:3,6
181:23,24 182:7
185:16,24 195:20
205:11,12,18
212:24 219:5 221:4
221:16 228:25
229:1 235:5 252:10
252:16 253:6,15

**depositions** 2:1 12:6
12:14 17:2,4,14,16
17:22 35:7,21
217:25

**derive** 212:10

**describe** 26:5,19,20
59:2 203:18

**described** 13:23
39:25 44:23 46:21
49:21 50:18 52:15
69:21 111:11
203:19

**describes** 28:18

**describing** 15:20
72:9,21 114:16
135:9,10 153:18
241:6

**description** 14:9,10
14:15,18 16:3
141:11,11 148:6,23
149:13 222:22

**descriptions** 15:9
25:11 53:20 209:10
210:24 223:5

**design** 15:19,20
29:14 48:4 66:6

**designed** 48:25 60:1
61:15 110:18
134:25 135:14
138:25 139:19
149:20 161:1

**designing** 28:21
62:12 137:17

**desired** 250:23

**destination** 102:10
102:11 127:10
143:6,8 179:8 242:5

**detail** 14:12 38:16
56:14 72:22 86:24
100:7

**detailed** 58:11,14

**details** 13:23 149:7
166:5 223:25

**determine** 52:20
115:20 165:1
179:25

**determined** 181:16

**determines** 102:1

**determining** 13:18
21:24 53:14

**develop** 19:24 168:5
174:2

**developed** 135:12

**developing** 54:25
137:17

**device** 22:6 49:25
50:21 92:3 94:5
142:3,23 199:17

**devices** 66:7

**devise** 49:9,13,14

**diagram** 15:22
28:19 30:4,6 32:12

**dial** 52:25 147:1
149:10 163:6 168:2
173:19,19,25
196:25

**dialed** 158:7 169:19
178:20 199:14
200:12 209:11
210:16 211:2

**dialer** 133:19,21,24
133:25 159:18
162:11 167:12,21
168:19,24 169:15
169:23 170:5
207:19,20,24 209:3
209:5,7,17,18,21
210:1,4,22

**dialers** 168:18,25,25
169:14,24 170:4

**dialing** 38:9,21
43:20 44:10,16,17
44:23,25 45:11
50:13 52:18 57:19
57:22 73:11 78:3
132:25 133:4
146:23 148:5
155:23 159:13
160:13 163:2,21,25
167:19,25 168:2,4
168:13,25 169:1,6,9
169:17 173:12,19
174:1 175:8,10,22
180:22,23 181:11
188:3,7 189:5,16
193:6 207:21
208:13,14,15 209:9
209:13,15 210:11
210:15,15

**dialogs** 14:14

**dialogue** 226:25
227:5,15

**dials** 39:2 147:4
207:25 209:21

**diego** 66:5

**differ** 45:4 152:21
159:15

**difference** 132:10
132:13 178:25
182:20

**different** 43:2 72:8
74:24 76:11 77:11
77:17 82:17,18 93:6
130:25 132:16,17
132:18,19 133:8,12

151:23,24 159:17
163:16 186:10
194:20,20 215:3
241:11 242:1,2,10
246:18
**differently** 75:5,11
163:16
**differs** 44:3
**difficult** 15:25 82:12
196:15
**digit** 173:20
**digital** 58:17 59:5,6
**direct** 139:3 158:12
197:2 221:16,20
**directed** 28:22
167:12
**directly** 29:16 36:19
53:12 80:15 199:10
**disagree** 19:10
148:22 183:13
191:8 192:14 199:2
**disagreed** 152:11
159:4 188:15
191:15 198:21
**disagreeing** 201:2
**disclaimer** 239:12
**disconnect** 225:8
**discover** 25:24
**discovered** 24:17,21
25:11 62:13 230:8
**discovery** 19:5
87:21 141:5 206:13
**discredit** 197:16
**discuss** 36:23
194:25 209:14
**discussed** 24:22
150:16 159:20
172:13 189:10,13
241:14
**discussing** 235:24
**discussion** 157:1
185:20 228:21
**discussions** 124:7,16
124:18 245:9 247:8
247:10

**disguise** 185:3
**disingenuous**
197:14
**disk** 84:7 88:10
165:20
**dismissal** 5:11 229:8
**dismissed** 40:23
42:3 231:3
**dispatcher** 199:12
**display** 14:21 196:7
196:14
**displayed** 143:14,18
**displays** 10:22
**dispute** 182:24
202:9
**disregarded** 43:8
**distinct** 146:19
169:5,16
**distinction** 16:21
18:8 178:25 182:20
**distribution** 60:1
66:7
**district** 1:1,1 40:21
40:22 41:7,23,25
42:6 153:22 154:7,9
154:15,15,16,18,20
154:23 157:9,9
177:22 179:25
180:20 181:5 183:2
183:6,8,24 184:20
184:21 187:16
191:14 194:5 200:3
**division** 1:2
**dob** 117:5
**dobbin** 199:25
**docket** 5:11 131:24
166:10 167:2 194:7
199:20 229:4
**document** 10:2 15:6
15:7 30:16,18,21,24
31:5,10,18,22 32:6
32:9 64:22 70:4
80:13 86:3 97:6
122:18 124:21,23
124:24 125:2,9,15

172:10 174:10,14
177:16 220:7 224:3
250:17,21
**documentary** 193:2
**documentation**
221:25
**documented** 126:2
**documents** 8:7,18
11:15 12:11 26:18
29:25 30:1 33:11,15
33:18,20 34:11 36:6
36:16 55:5 88:11
170:18 172:22
198:3 237:7 249:22
250:19
**doing** 51:3 53:25
57:5 118:15,16,18
118:20 170:13
171:15 193:5
204:12
**dollars** 231:9,15
**dominguez** 5:8
42:22 152:15 153:1
153:22 155:15
182:2 183:13
191:13
**donovan** 2:8 4:7 7:8
7:8 19:3 20:14 28:3
31:25 33:3,6 47:3
47:10 77:13 83:6
87:20,23 88:1,4,12
88:16 99:9 100:18
111:21 112:6,9
131:9 134:5 141:4
143:25 150:1
152:17 156:13
162:16 163:14
164:12 166:5
172:19 176:22
185:18 186:8
194:17,23 195:5,8
201:13 205:1,15
206:11 213:10,13
215:24 216:6,9,13
234:15,18 235:2,3

239:10,25 240:7,17
240:23 241:9,18
242:12 247:24
248:14 250:1 252:9
**dorian** 87:24
**double** 145:16
**doubt** 104:7 114:18
**download** 33:19,21
**downloads** 66:8
**dozen** 9:7 188:14
**drafted** 220:21
222:24 230:21
**drafting** 122:12,18
221:5
**drew** 205:21
**drive** 3:4
**driver** 159:2
**driving** 188:16
**dropped** 109:18
**dropping** 72:3,5
**duly** 7:15 253:10

---

**e**

**e** 41:18,18 59:5
253:19
**earlier** 48:10 94:2
123:15,16 172:14
236:10
**early** 64:20 207:1
220:24
**earn** 212:14
**easily** 139:7
**eastern** 191:14
**easy** 36:9,12
**ecosystem** 18:18
**edification** 24:13
**editing** 55:4
**edition** 4:17 69:3
**education** 31:11,14
47:21 56:1 69:22
**effect** 20:16 141:21
237:11
**effective** 121:4
123:2 158:8 168:1
173:24

efficient 158:8 208:3
  208:25
effort 62:3
eight 152:3
either 24:18 27:21
  29:16 35:15 36:6
  39:9 40:17 43:9
  50:25 78:5,6 79:5
  80:14 83:23 89:23
  111:5 149:20 150:7
  161:2 173:10 181:4
  198:14 208:1 228:4
elaborate 112:4
  170:2
electrical 54:21
electronic 88:10
  175:9 180:24 249:8
electronically
  176:11
electronics 54:21
email 80:9 86:13
  223:22
emails 223:24
emanuel 193:23
  217:4
embedded 44:7
emmet 41:16,17
  179:12 180:7,8
emmy 59:24
emphasize 177:17
  210:13
employ 52:18
employed 60:1
  189:15 220:20
  222:2,9
employee 253:21
employees 12:19
  218:1
en 138:10,18 139:9
  222:3 224:5
enable 29:15 75:23
enabled 121:19
enables 49:15
enabling 58:12
  130:15

encroaches 187:25
ended 137:2 231:5
  245:12
engage 113:23
  244:18
engagement 243:12
engineering 48:4
engineers 54:21
english 46:17 50:20
  54:5 211:13,14
enjoyed 55:12,14
ensure 62:3 119:25
enter 108:24 117:6
  230:10
enters 179:3
entire 174:9,9,9
  194:18 210:21
entirely 223:12
entities 80:15,17
  135:2
entity 244:23
entriq 60:2 66:5
entry 131:24 194:7
  199:21 246:11
eprize 1:8 3:2 7:7
  13:1 15:8 24:17,17
  79:16 86:18,21
  87:13,19 88:7
  205:25 206:7,20,25
  207:4,13 218:10
  223:2 235:18
equally 171:6,23
  205:16
equipment 16:24
  19:23 23:15 52:3,21
  52:25 103:17
  112:17 133:3
  157:16 163:3
  164:24 168:2
  173:10,13,19,24
  178:15 179:11
  180:1 182:25
  189:12 209:21
errata 35:14,15

erroneous 62:21
error 213:5
escalated 250:20
escalation 110:22
  236:23 250:16,25
escalations 109:7
escapes 63:21,24
especially 42:17
  92:13 119:2 215:25
essential 163:12
essentially 12:11,15
  16:25 29:21 30:12
  30:16 33:15 40:13
  56:9 75:12 101:19
  102:7 106:25
  109:13 111:1
  119:13 130:10
  150:7 154:8 172:1
  175:25 177:20
  201:7,18 207:24
  218:22 229:12
  233:15 251:19
established 60:24,25
  193:7
estimate 9:6 68:20
  104:18 160:1
  202:23 203:25
estimated 56:22
et 6:11 7:23 19:23
  52:17 54:3 65:16
  93:20 195:10
  248:20
ether 217:9
europe 170:22
european 76:9
evans 230:14
event 113:5 250:25
events 240:22
everybody 70:8
evidence 12:16
  20:15 99:4 100:11
  100:12,21 112:15
  140:19 166:10
  190:15 193:7
  199:12,16 200:13

200:15 206:7
  207:13 236:3 237:6
  237:7,11,18 239:8
  240:16 247:17,19
  249:5,9,16
evolution 65:15,15
  65:16 118:4 167:23
  173:21
evolve 27:16 65:14
  65:18 118:7 125:19
  125:21,22,24
evolved 76:7
exact 74:3 199:5
  202:21
exactly 30:2 72:18
  116:25 127:21
  171:16 203:20
  213:24
examination 4:4,5,6
  4:7,8 7:13,18 127:4
  205:22 211:19
  228:22 235:1
  242:16
examined 7:16
  253:9
example 49:11,12
  153:4,6,13,14 185:3
examples 123:21,23
excel 86:17,21
  150:25
excepting 213:4
excerpt 4:15
excerpts 4:16
  124:25
exchange 98:6
exclude 188:5
  189:19
excluded 39:9
excuse 19:22 56:11
executed 215:21
  228:12
exemptions 142:9
exhibit 4:13,14,15
  4:16,18,19,20,22,23
  4:23,24 5:5,6,7,8,9

5:10 11:6,8,17 15:6
24:10 25:2,5 26:12
26:13 28:24 29:23
32:21,22,23 37:23
52:12 70:3,5,13,19
73:14,15 77:21
78:21 79:24 80:1,4
80:19,19 83:3 85:21
85:23 86:4,5,9,12
86:16 87:2 93:19
94:14,17 96:19,20
97:3 99:17 100:2,5
100:7 115:1,7,11,12
116:5,12 120:21,24
121:7 122:14,19,20
123:8 125:11 131:6
131:10,11,23 157:2
157:3,6 162:14,21
166:19,20,25
169:21 170:12
178:1,3,6 181:23,24
182:7 185:16,24
219:20 221:4
226:21 228:25
229:1 237:21
**exhibits**  4:10 5:1
8:24 9:25,25 26:1,7
28:14 88:3 213:11
213:12 226:20
**exist**  50:1 170:19,24
**existed**  15:4 16:6
24:3 25:18 26:20
28:1 32:16 54:9
65:21
**existing**  142:8
**exists**  49:10,12
74:13,14
**expanded**  76:4
126:1 154:20,21
175:5 177:11
**expect**  174:1 239:23
**expectation**  117:2
238:8,15,23 239:20
**expectations**  65:16

**expected**  168:4
**experience**  31:14
48:3 56:1 69:22
72:6 150:21
**expert**  8:1,4,19 9:24
10:12 11:7 24:8
37:12 48:5 52:14
54:24 55:19 56:17
60:11 67:9,14 69:23
85:13 114:11
131:14 134:2
144:14,15,16
145:22 146:13,21
152:25 160:11
164:13,18 165:15
168:11,11 175:5
178:16 181:7 182:2
182:16 184:14,16
187:17,21,23 191:4
191:11 193:23
200:6 201:18
202:20 203:5,5,10
204:1,8,12 212:5,11
212:14,17,22 214:3
214:12 232:4
242:21 243:12
244:6 245:12,15
246:20,21 247:12
251:15
**expertise**  30:9 32:6
48:9 51:25 56:23
139:1 190:16
**explain**  44:3 88:18
211:4
**explained**  46:3,16
**explanation**  32:11
209:3 216:20,23
**explicitly**  39:9 43:9
**express**  135:16
193:15 228:9
240:12
**expressed**  160:11
218:12
**expressly**  196:12
239:2

**extended**  159:1
166:23
**extent**  26:18 33:10
46:6 166:3 180:7
194:24
**externally**  17:11,25
158:2
**extra**  108:7
**extraneous**  98:24
99:3 108:7 113:20
123:24 169:9
214:21 248:8
**eyes**  162:17,18

**f**

**f**  2:5,13 3:2 182:9
**fac**  196:21,22
**face**  118:10
**faced**  168:16
**facie**  196:14
**facilitate**  166:4
**fact**  13:25 14:2 15:4
22:3 26:25 34:21
42:10 46:11 48:15
60:12 79:20 81:23
90:15 99:1 107:23
122:1 126:5 136:25
137:1,18,19 138:5
146:8 158:17
160:16 164:18
169:7 175:24
178:15 179:20
183:1 185:8 196:22
201:15 202:10
208:15 217:15
234:5 237:12 248:2
248:7 249:5,6,9
250:18
**factfinder**  190:15
**factor**  40:16
**factors**  208:22
**factory**  51:1
**facts**  177:7 180:19
187:25

**factual**  189:6
**failed**  111:2 196:9
196:21
**failure**  110:23 111:3
236:23 237:2,9,18
**failures**  111:12
**fair**  26:13 155:20
157:15 186:17
212:16,19 219:1
237:3
**fairly**  19:5 25:24
54:4
**fall**  142:8 160:17
161:13
**falls**  167:21 175:9
**false**  114:14 202:8
**falsifying**  114:15
**familiar**  9:8 14:2,11
23:6 29:24,25 41:20
41:21 63:11 69:11
137:18 167:3 187:9
199:25 227:4
**fan**  10:19 106:1
**far**  13:3 19:15 92:5
104:3 115:16 118:5
118:19 143:4
167:25 173:23
183:20 191:21
214:2 246:23
**fargo**  200:1
**fashion**  101:6
133:15 155:19
158:4 199:18
**fast**  107:19 189:6,12
**favor**  201:17
**favorite**  105:11
116:14
**fax**  2:11,17,23 3:6
**fcc**  5:6 42:11 50:19
56:13 57:2 142:13
142:14 150:14
162:7,8 163:23
165:16 166:23
167:1,7 168:6
169:20 170:13

171:5,14,18,22
172:8,11 173:16
174:6 175:6,19
176:3,15 177:4
184:4,8,12 209:4,7
209:20 210:14,20
211:10
**fcc's** 141:17 172:16
173:8 175:16 193:2
193:9
**feature** 76:24 77:6
**features** 74:22 76:5
76:7 77:9
**february** 172:8,11
**fed** 179:16
**federal** 46:14 64:25
125:21 183:24
**feeding** 240:4
**feel** 12:2 47:25
219:9
**feeling** 217:6
**fees** 231:14
**feet** 104:24
**fell** 193:14
**fennemore** 2:2
**fewer** 74:11
**field** 48:5 55:25
**figure** 90:19 114:17
**file** 22:23 23:6,7,11
**filed** 96:18 229:12
230:22 232:2,16
**files** 83:22
**filing** 56:25
**filled** 189:18
**final** 8:15
**financially** 6:19
253:22
**find** 15:3 40:19
161:25 176:14
178:14 199:16
243:4
**finding** 163:12
194:25
**finds** 185:3 199:19

**fine** 151:18 161:11
204:2
**finish** 176:22 216:6
216:7,13,13
**finite** 109:15
**fired** 215:6
**firm** 16:1 33:14,20
230:13 243:15,22
243:25 244:11,19
**firms** 40:1
**first** 5:11 7:15 8:9
14:22 15:7 16:3
39:17 41:2,3 60:21
61:19 64:6 70:22
72:14,16 79:25 80:1
80:5,19 81:24 82:9
82:24 83:3,4 86:9
86:16,20 88:20
91:11 100:6 106:5
108:5 114:12 115:2
115:7,8,15 136:11
138:5 164:4 170:22
172:13,17,24 176:7
176:15 177:3,18
186:3 206:4 209:9
210:14,21 211:5
220:24 222:7 227:5
229:6,13 230:22
235:14
**fit** 18:17
**five** 67:21,21 152:2
188:21,21
**flash** 25:22
**flight** 192:10 193:11
193:13
**flip** 80:8 178:10
**floodgates** 177:24
**florida** 187:16
**flow** 15:22 28:19
86:12,15,18,21
100:4 107:21
109:13 115:1 136:9
192:2
**flows** 4:18 86:9 87:2
87:4 92:17,17 115:4

**fly** 132:20,20
**flying** 132:14
**fms** 243:5,8 244:7
245:2 247:7,13
**focused** 174:16
183:2 210:20
**focuses** 206:4
**folder** 9:1,2
**follow** 76:1 118:14
**followed** 115:25
175:6
**following** 28:4,7
118:18 145:25
152:6,6 235:8
**follows** 7:17 129:16
182:16 197:19
253:5
**footage** 10:25 11:2
**football** 103:25
107:7 108:25 117:7
**footnote** 167:15
182:7
**force** 118:24 119:5
**forced** 192:2,6,10,24
**forecasting** 139:1
**forensic** 236:3
**forget** 229:21
**form** 12:10 28:3
77:14 83:6 98:16
99:9 100:18 134:5
143:25 163:14
201:13 215:24
247:24 248:14
250:1
**formal** 59:4 175:6
218:22
**formally** 43:17
**formed** 64:5 65:8
**formerly** 7:7 30:3
222:25
**forth** 58:8 109:5
119:17 223:22
250:17
**forward** 135:4

**forwarding** 76:6
**found** 41:7,10 68:21
167:18 174:6
183:22 193:1 199:3
207:1
**foundation** 189:6
241:3
**founded** 60:24
63:17
**founder** 27:5 220:18
**founders** 63:18 64:9
220:15,17
**four** 67:21 84:22
85:4 104:15 117:5
151:25 152:2,3
155:10 197:11
212:24
**fourth** 2:2 6:10
**franklin** 47:20,22
**frcp** 253:19
**free** 47:25 107:7
**frequency** 59:11
121:13
**frivolous** 70:10
**front** 8:7 60:14
115:8 185:13 239:3
**ftp** 23:3,5 235:13
**fulfill** 45:6 154:5
161:4 162:1 165:2
199:15
**fulfilled** 176:1
**fulfilling** 160:23
**fulfills** 46:14 54:1
147:13 151:3
161:24
**full** 8:14 51:4 71:14
138:23 164:15
186:3 189:24
197:15,24,24
220:12
**fully** 30:2 55:8
174:1 190:25 198:1
**function** 20:13
72:15 110:18,19
149:19,20 150:8

151:1 168:1 169:1
173:24 179:1 236:7
**functional**  141:10
235:25
**functionality**  13:19
15:1,12 18:10,19
21:24 46:12 50:7
72:19 111:11,15
138:1 161:3 249:4
249:19
**functioning**  110:17
**functions**  15:23
22:10,10 27:13 49:3
150:23 236:1,2
**fundamentally**
29:20
**further**  4:8 41:12
86:24 228:20,22
242:16 252:4,11,12
253:20
**future**  142:19
**fuzzy**  223:10

**g**

**gallagher**  70:14
**game**  11:1,4 26:15
83:22,25 97:25
98:20 103:12,14
113:5 144:9 223:20
**gap**  189:18
**general**  26:6 27:2
62:5 64:19 65:1
76:25 125:16,17,23
146:18,25 158:24
168:23 197:9
225:16
**generally**  30:7 48:24
124:2 167:14
189:24 193:17
197:6 201:4 203:11
215:13
**generate**  149:20
151:2 154:17,25
196:24 199:14,18

**generated**  40:18
82:16 93:11 147:3,4
152:5 158:10,20
178:22,23 182:17
182:18 198:24
**generates**  39:2
**generating**  179:17
**generation**  150:25
**generator**  52:23
149:16,18 150:10
150:20 151:4,5,7,21
152:7,12 153:3,20
154:3,4 157:18
158:1,2 163:5,12
164:6,11 165:4,5,11
166:15 191:16
**generators**  150:22
164:8
**gentlemen**  211:25
**genuine**  178:14
179:20
**geographic**  208:20
**georgia**  2:22
**gerzhom**  2:5,13 7:1
7:23 13:1 24:16
79:16 87:25 206:18
207:18 223:8,9
235:18
**getting**  216:9 250:22
**give**  15:25 24:20
36:17,21 49:11,12
114:18 131:19
132:6 137:25
144:22 156:7,11,20
157:11,21 164:23
202:24 204:1
216:23 217:6
219:17 232:2
249:13
**given**  9:6 42:13
63:18 109:17
141:21,22 142:5
158:14 160:7 165:2
175:13 179:22
191:24 203:12

237:8
**gives**  184:12 249:3
**giving**  9:9,17 11:16
**glasser**  2:9 7:9 33:15
33:18 52:14 242:24
243:5,15,24 244:12
245:6 246:7
**globally**  119:3
**glossary**  73:6 77:23
**go**  6:15 8:14 17:20
34:12 36:15 59:13
60:14,19 68:5 77:4
78:22 80:18 81:18
82:17 84:3 86:24
89:9 90:4 93:5 95:5
96:24 102:25
111:24 112:4
116:11 123:7 143:4
145:8 146:8 165:23
171:20 176:2
185:18 188:20
194:24 195:1 205:7
214:23 216:16
231:22 233:2,8
234:15
**goal**  65:3 73:24
**goals**  118:19
**goes**  11:21 123:16
183:9 210:9 233:16
246:4
**going**  14:16 19:3
36:21 47:3,11 53:7
54:13 75:22 77:13
84:4 87:9 88:9 99:2
99:13,17,23 101:3
106:21,22 117:14
126:16 139:2
144:22 165:17
168:21 177:9
188:19,20,25 189:1
192:4 195:2,8 205:2
205:7 208:25
211:18 219:7
221:16,23 252:13

**good**  6:2 7:20,21
24:24 47:6 61:21
65:4 74:1 119:24
120:2 211:21,22
**google**  155:9,11
**gotten**  42:16 70:7
229:24 231:22
**governed**  251:20
**governing**  2:1 119:2
**gragg**  4:25 156:20
156:22 157:7
158:21 160:4,8
198:17,18
**grammatical**  164:13
**grammatically**
164:10
**grand**  68:17 85:1,8
**grant**  183:6
**granularity**  81:8
**graphical**  147:24
148:14
**great**  12:17 51:25
62:8 68:23 161:7,10
197:11 201:4
**greatly**  175:5
177:11
**group**  56:9 63:19
64:5 119:4 187:10
220:25 225:3
**gsm**  76:9 124:5
170:22
**guess**  13:2 31:19
56:22 69:20 94:9,24
114:17 132:1 197:9
201:15 225:13
230:14 244:21
**guideline**  121:18
225:15
**guidelines**  10:2 61:2
66:19 115:18 116:1
116:4,6,17,18,22
117:12,19,20 118:1
118:3,6,8,11,24
119:7,8,10,12,16,23
120:2,4,6,7,8,13

121:3,9,13,21
122:13 123:1
124:20 128:12,25
216:1 217:10 220:5
220:22 221:3,6,11
221:12 224:8,11,15
224:19,20,21,25
225:2,17 226:1,6,17
227:3,19,22 228:18
240:19 251:11,13
251:15,20,22,24
**gun** 151:13,14,14,15
151:16,16
**guy** 152:1
**guys** 33:2 120:16
166:2

**h**

**h** 24:10 26:1,12
28:14
**half** 155:12
**hand** 89:5 179:12
186:3,16
**handbook** 189:6,10
189:11,14,15
**handed** 224:10
**handful** 64:4 67:21
**handing** 32:20
71:12 73:13 86:3
228:24
**handle** 109:16 208:4
**handling** 8:19
**hands** 230:15
**handset** 91:14 92:10
126:5
**handsets** 72:15,16
72:19 200:13
**happen** 35:17 42:18
75:15 112:19
114:16 169:13
189:2
**happened** 139:17
181:20 207:4 215:8
227:16 232:9
237:16

**happening** 75:21
**happens** 138:13
169:11,18 170:6,17
208:6,12 209:11
210:12,16
**happy** 120:3 165:25
**harassing** 120:1
**harassment** 65:6
**hard** 19:20 35:13,14
36:6 82:11 118:21
141:10 147:10,10
148:7 158:23
202:21
**hardware** 23:1,15
50:6 149:19
**haskins** 2:20 4:6 7:2
7:2 33:4 70:9
162:18 205:21
211:20 213:12
216:4,8,11,15
228:20 239:6
252:11
**hate** 206:11 216:5
**hats** 61:13
**hawaiian** 193:4,8,11
**head** 49:9,13,14
**headings** 93:19 95:7
**hear** 71:13
**held** 6:9 171:5,22
172:11
**helicopter** 132:14
**helloworld** 3:2 7:6
13:2 15:5 23:22,23
24:2,18,24 25:4,6,8
25:13,14 26:4,8
28:18 29:1 30:3,5
30:13 79:16 206:1,8
207:14 218:10
222:25 235:18
**help** 164:23 166:4
**helped** 25:25 48:11
48:16,18
**helpful** 71:11
**helps** 195:2

**henry** 3:3 7:5
205:25 206:11
**hey** 47:3
**high** 28:19 43:5
**higher** 110:12
**highlighted** 195:25
**hikert** 3:7
**hilkert** 6:5
**hill** 68:25
**hilton** 68:17 85:1,8
85:15 159:5 165:24
204:15
**hire** 30:8 56:17
**hired** 59:14 61:19
115:22 218:25
245:11
**history** 167:20
173:15 206:21
**hmm** 203:7
**hobbs** 184:12
**hold** 123:6 179:23
**holding** 69:14
189:23
**holistic** 24:20 55:20
69:24 249:13
**home** 74:4 213:7
**homework** 252:6
**honestly** 148:19
206:1
**hope** 233:9
**host** 17:5
**hosted** 16:18,18,23
17:4,9,11,24 235:11
**hosting** 248:19,20
248:23
**hour** 47:4 229:23
**hours** 150:2
**house** 251:8
**hover** 148:3,16
**hpietrkowski** 3:6
**html** 25:23
**human** 22:12,15
49:17 53:1 58:1
101:6,15,17 102:14
102:17,21,24 103:8

106:10 110:16
147:5 149:11
156:10 168:3 174:1
178:21 182:14
187:6 199:1 208:8
237:1,10
**humans** 156:4 210:7
**humor** 157:13
**hundreds** 118:13
**husband** 232:20
233:10
**hypothetical** 32:3
49:24 148:7 149:13
176:19
**hypothetically**
125:9
**hypotheticals** 148:9

**i**

**i.e.** 74:4 101:8
130:13,15
**idea** 13:15 73:23
75:25 76:1 101:16
105:5 165:14
193:20,22 208:2
210:10
**identification** 11:9
32:24 70:6 73:16
86:6 96:21 120:25
122:21 131:12
157:4 162:15
166:21 178:4
181:25 185:17
229:2
**identified** 102:3
**identifier** 94:1
**identifiers** 93:24
94:22
**identify** 67:23 68:5
68:7 84:13,15
212:23
**ieee** 56:20
**ignoring** 118:21
**ii** 2:20

**illegally** 151:15
**illinois** 2:16 3:5
   184:21 200:4
**illusive** 73:25
**image** 94:13
**images** 45:1 94:5,15
   104:12
**imagine** 196:16
**immediately** 90:3
**impact** 180:24
**impacted** 201:18
**impermissible** 191:4
**implemented**
   109:12
**implicate** 185:10
   190:11
**implication** 39:10
   188:4
**implications** 187:24
   207:8
**implicitly** 43:9
**imply** 81:11
**important** 216:10
**impossible** 31:24
   157:16
**improper** 99:21
   185:3
**improperly** 50:2
   52:5
**inaccurate** 183:18
   184:23
**inaccurately** 190:5
**inadmissible** 188:1
**inapplicable** 168:20
**inappropriate**
   179:24 246:10
**inappropriately**
   192:18
**incidents** 206:22
**include** 10:25 11:1
   129:6
**included** 33:3 57:2
   59:3 77:22 87:2
   145:25 230:18

**includes** 8:23 133:8
**including** 8:10 10:1
   67:11 86:9 140:1
   205:12
**income** 203:1 204:4
   204:11 212:4,10,13
**incoming** 29:18 93:9
   101:20 102:8
   139:18 161:3
**incomplete** 37:7
   124:12
**incongruous** 164:9
**incorporated** 16:10
   16:14 85:3,5
**incorrectly** 161:7
**incremental** 153:7
**incrementing** 153:7
**incur** 238:21
**independent** 52:12
**index** 4:1 33:19
   34:10 37:15,22
   39:15 73:7 77:22
   85:25
**indicate** 68:24
**indicated** 36:18
   195:24
**indicates** 196:11
**indicating** 24:6 72:4
   134:2 186:13
**indication** 237:8
**indirectly** 61:8
**individual** 49:15
   50:7 55:21 65:10
   93:24 139:20
   214:24 225:17,17
   231:6 241:1
**individualized**
   179:9
**individually** 1:3
   179:3
**individuals** 1:4
   49:15
**industry** 27:1,20
   29:8 55:2 56:8 64:2
   74:1 118:4,7,15,22

158:12 167:20,24
   173:22 183:21
   227:10 252:1
**infancy** 62:9 72:13
**inform** 29:6 100:14
   238:17 239:21
   240:25
**information** 5:17
   10:6,23 12:10,13,17
   13:21 24:8,25 25:5
   25:10,21,22 26:4
   27:22 64:11 78:16
   79:11,14 80:6 87:9
   87:10,16,18 89:1
   90:11,17 91:2,7
   92:6 93:25 95:2,3
   99:6,7 100:4,7
   114:15 130:23
   141:2,5 143:14
   148:19,21 149:14
   153:18 159:21
   164:8 174:13
   193:13 206:17
   213:14 232:21
   235:8,11,15,17,19
   241:20 249:2,3,14
   251:9
**informative** 110:25
**informed** 26:9 55:25
   69:24 87:5 240:21
**informs** 10:12 249:2
**inherently** 129:25
**initial** 63:13 64:6
   215:9 226:25
   238:18
**initially** 91:9
**initiate** 49:16
   227:15
**initiated** 14:23
   29:15 101:1 123:11
   209:16 210:17,19
   215:17
**initiating** 169:10,17
   197:3

**initiation** 99:14
   227:5
**input** 238:11,13,23
**inputted** 199:11
**inquiry** 183:3
**inside** 8:25 9:2
**instance** 77:8 90:21
   100:5 109:15
   187:20 209:12
   244:17
**instances** 128:10
   202:12
**instantaneously**
   75:24
**instantly** 229:14
**institute** 54:21
   55:10
**institute's** 55:1
**instruct** 187:22
**instruction** 59:19
**instructions** 5:22
   141:23
**insufficient** 189:7
   189:21
**insynchronous**
   210:9
**integrate** 22:12
**intend** 158:14
   219:12
**intended** 34:13
   65:12,13,18 127:13
   237:3
**intending** 54:10
**intent** 161:20
   167:22 224:18
**intentions** 122:5
**interaction** 91:11
   98:14,16 101:15
   123:11 210:7 217:7
**interactions** 15:23
**interconnection**
   55:7
**interested** 6:19
   253:22

**interesting** 151:22
**interface** 147:25
  148:15
**interfaces** 59:5,6
**interference** 6:17
**interim** 55:6 57:15
**internal** 16:21,22
  18:7,9 95:1 102:5
  140:15,18,24
  151:11
**internally** 16:18
  17:10,24 235:11
  248:20
**international** 38:7
  85:5
**internet** 54:23 133:6
  134:21,24
**interpose** 152:17
**interpret** 29:18 44:5
  142:18 162:9
  164:21 184:5,8
  210:23 211:4
  227:25
**interpretation** 43:20
  56:6,21 170:14
  186:21 193:9 227:3
  227:22
**interpreted** 228:17
**interpreting** 46:18
  165:7 170:12 181:9
**interrogatories**
  12:17 13:22 14:17
  222:21 223:7
**interrupt** 47:5 216:5
**interrupted** 111:23
**interruption** 187:1
**interruptive** 112:8
**intervention** 53:1
  58:1 101:7,17 147:6
  149:11 168:3 174:1
  178:21 182:14
  187:7 237:2,10
**introduction** 60:8
  220:8

**introductory** 71:8
**inundated** 70:10
**inventions** 38:12
**invitation** 108:24
  141:21 142:5
**invocation** 49:17,18
**invoice** 8:13,16
**invoke** 49:16
**involve** 46:2 47:22
  61:6 168:19
**involved** 63:9,13
  64:15 66:20,21
  80:16 110:16 111:4
  111:14 122:12,16
  122:17 125:10
  132:18 133:12
  147:21 159:1 199:1
  206:21 207:5,14
  229:17 230:1,4,16
  232:17 234:5 243:6
  244:21 249:4 250:3
  250:22 253:21
**involvement** 65:25
  66:16,24 67:2 206:9
  232:1
**involves** 240:12
**involving** 147:21
  218:4,7,10
**ip** 77:2
**iphone** 49:20 50:10
  50:12 51:1,2,8
  151:4,6 229:14
**irrelevant** 168:20
**issue** 26:15 43:25
  44:1 46:13 49:1
  54:1 57:14 74:8,9
  74:10,11 82:12
  87:11 93:16 95:23
  97:25 98:18 99:11
  99:15,19 117:22
  138:8 145:4 147:12
  150:10 156:9 158:5
  159:12 178:14
  179:20,24 187:3,4
  192:23 196:19

205:12,13 211:11
  231:23 237:4
  240:25 241:13,24
  247:18
**issued** 163:24
  184:19 187:12
**issues** 56:13 62:17
  72:5,24 119:18
  120:20 145:19
  180:25 183:22
  201:8 236:19,23
  237:18
**item** 68:1 72:10
**items** 50:11 60:18
  205:11
**ivisionmobile** 5:10
  229:5,16

## j

**j** 115:10,10
**jacket** 96:23
**january** 167:2
  175:14 209:20
**jason** 80:9 86:13
**jay** 41:16,17 63:7
  179:12 180:7,8
**jeo** 1:6 6:12
**job** 1:24 44:7 114:19
  115:20 147:12
  161:22 210:23
**joel** 3:7 6:5
**john** 88:2
**johnson** 1:22 2:3 5:9
  6:6 184:14 186:1
  253:4,25
**join** 98:21,22 107:7
  108:25 117:7
**joined** 248:4
**joint** 5:11 229:8
**jointly** 233:12
**jones** 243:4,7,20
  244:7 245:2 247:7
  247:12
**judge** 31:17,19,21
  32:3 39:10 40:6,9

40:19,21,22 41:7,23
  41:25 42:7 134:1
  153:3 158:21
  183:13,22 184:4,25
  184:25 185:25
  186:17 188:11
  189:3 190:8,17
  192:12 193:18,19
  200:4 228:14
**judge's** 154:16
  183:17
**judges** 42:12 188:14
  188:25 190:7
  195:22
**judgment** 114:13,24
  146:8 179:24 183:7
**july** 57:2 172:16,24
  173:8 176:4
**jumbotron** 10:20
  14:21 104:8 105:10
  105:17 196:15
  240:24,25 241:4
**jumbotrons** 104:10
  104:18
**june** 178:7
**jury** 32:8 187:23
  188:1 190:14

## k

**k** 2:5,13 3:2 78:21
  79:24 85:2 115:10
  115:11,12
**keep** 27:20 35:8
  37:10 62:11 79:11
  106:25 116:13
  118:3 188:19 240:8
  252:5
**keeping** 66:18
  205:10 206:15
  224:17 252:10
**kennelly** 200:4
**key** 101:22,24
**kimrey** 2:14 4:4,8
  6:24,24 7:19 11:5
  11:10 17:19 19:10

20:18 28:8 32:4,20
32:25 33:5,7 37:2
47:8,16 70:2,11
73:13,17 77:18,20
83:10 84:3,10 86:3
86:7 87:22,24 88:2
88:6,14,17 96:19,24
97:2 99:12 100:20
112:3,7,11 120:21
121:1 122:19,22
126:15 127:5
129:14,24 131:6,8
131:10,13 134:7
141:3,7 144:3 150:3
152:23 153:9
156:19 157:2,5
162:13,20 163:19
164:15 165:23
166:7,22 173:1
176:24 178:1,5
181:23 182:1
185:15,22 186:10
187:8 194:22 195:3
195:6,12 197:17
198:4 201:20
204:25 205:7,19
212:3 228:23,23
229:3 234:17 235:6
236:10,23 239:7
240:2,15 241:3,15
241:23 242:14,14
242:17 248:10,17
250:4 252:4
**kind** 16:2 20:12
22:20,23 23:10
42:22 63:19 64:10
67:3 75:15 105:24
118:6 145:6,7 166:2
177:23 192:13
222:15 229:19
237:10 240:12
**kinds** 183:22
**king** 2:21 7:2
**knew** 143:21 235:9
235:10,10,12

**know** 7:22 9:15
10:15 12:13,20 13:4
13:5,6,10 15:15
16:9,13,17 17:5,7
17:21,23 18:10,23
20:3,8,19,20 22:17
22:20,23 23:5,10
26:23 27:23,25 28:9
31:23 32:10 33:10
36:4,7,12,25 40:23
41:6,9,9,10,12,16,21
42:2,3,9,10 43:7,10
50:1 51:19,21 56:5
56:7,7,20 57:7,11
61:18 64:24 72:6
73:6,10 79:1 80:5,7
81:7 83:11 85:19
88:6 90:11,15,18
92:5,8 93:23 94:8
94:12 95:7,10,11,13
95:15,18,19,21,24
96:17 104:10,20
107:10 108:16
109:3,5,11,23 114:9
114:17 118:5,7,10
123:20 124:22
125:14 126:1 131:4
133:10 134:6
135:24 136:6,11,15
138:21 139:23
140:5,17 142:14
143:21 144:4,15,16
147:11,15,23 148:6
148:8 158:11
163:15 165:3,4,5,6
165:10 166:7 173:2
176:6 180:7,19
181:21,21,22
184:13 186:22
188:23,24 189:9
191:12,21 194:19
195:11,12,14
201:14 202:6,15,17
202:21 203:7,11
204:9 206:20,24

210:11,20 213:4,25
214:2,9 218:21,23
219:14 226:22
229:17,21 230:4,5
230:12,14 231:7,8
232:22 235:4 238:4
239:16 244:16
246:23 248:5 250:5
250:9,11,12,14,15
250:16,18,21
**knowing** 62:8 236:5
249:16
**knowingly** 141:20
193:3
**knowledge** 56:1
**known** 7:7 14:1
60:23 134:22
144:13 206:1,8
207:14 247:25
**kramer** 85:2
**kslaw.com** 2:23

**l**

**labeled** 79:25
**lack** 153:24 241:3
**lacks** 189:5
**lakers** 193:24 196:3
196:6,8,13,17 197:1
197:5 198:9 217:4
**language** 20:25 21:4
21:4 22:2 46:17
53:11 123:15,15
153:5 156:18
168:10 173:15
211:13,15 235:10
249:17
**languages** 16:13
21:8
**large** 14:21 62:23
104:20 105:1 113:5
177:22 181:17
202:24
**larger** 19:25
**las** 1:16 2:3 6:10

**lasalle** 2:16
**late** 83:21,25
**latent** 155:6
**latest** 150:14
**law** 2:9,15,20 3:3
33:14,20 40:1 65:15
115:21 118:25
119:5 187:23 224:8
224:19 230:13
243:15,22,25
244:11,19
**laws** 2:1 60:16 64:25
142:20 224:19
**lawyer** 43:14,15
115:22 144:5
153:25 164:13
184:13
**lawyers** 35:25 36:10
37:6 42:14 166:8
205:9
**lay** 30:25 50:17
147:8,11 161:19
184:9
**layman's** 54:5
**layperson** 72:4
190:12
**layperson's** 211:14
**lead** 201:23 232:20
246:13
**leading** 240:3
241:23
**leads** 236:4 240:16
**learn** 63:3 90:12
**leased** 16:24 17:10
17:25
**leave** 65:22 205:18
**led** 175:16 237:9
245:22
**left** 31:15 65:24 66:4
66:25 89:5 154:10
186:3,16 230:15
**legal** 6:7 43:12,16
46:2,5,6,11,19,25
53:18,24 114:11
115:22 120:20

| | | | |
|---|---|---|---|
| 145:4,7 147:9 | **list**  11:18 12:3 37:22 | **long**  59:16 135:10 | 208:21 |
| 153:24 161:18,21 | 40:12,15 52:24 | 176:10 185:10 | **love**  196:14 |
| 164:15,19,22 | 59:16 67:25 84:12 | 186:23 200:2 | **lsu**  97:25 105:12 |
| 165:13 170:15,16 | 107:7 108:25 117:7 | 201:22 208:12 | 113:5 139:15 |
| 171:12 177:16 | 147:2 158:3,7 | 235:4 236:18 | 223:20 |
| 181:8,9 184:9,10 | 163:21 164:1 169:2 | **longer**  25:17 72:1,1 | **lunch**  126:18 |
| 185:2 186:19 | 169:17 174:14 | 155:12 | **lying**  114:15 |
| 187:22,24 188:3,4 | 175:9,21,22 176:1 | **look**  12:18 25:14 | |
| 191:10 207:7,11 | 180:23,23 181:11 | 33:2 34:12 36:20 | **m** |
| 211:11 228:13 | 187:7 201:6 202:1 | 46:12 50:11 52:9 | **m**  27:5,9,12,15,19 |
| **legalese**  211:16 | 203:8 213:3 244:11 | 64:22 69:11 80:18 | 38:13 41:18,18 |
| **legally**  151:15 | 244:14,23 246:12 | 87:9 94:2,10,14 | 60:21,23 61:6,25 |
| 184:13 | 246:17,17,18 | 114:12 115:7 | 62:4 63:9,14 65:22 |
| **legg**  187:9 189:3 | **listed**  10:11 38:3 | 123:21 132:16 | 65:24 66:4,25 |
| **legg's**  190:13 | 44:8 45:6 46:14 | 149:7,8 157:23 | 101:24 110:2 |
| **legislative**  167:20 | 147:14 172:15 | 161:22,22 164:18 | 119:12 220:14,14 |
| 173:15 | 225:4 243:15,17 | 167:3 174:17 203:8 | 220:17,18,20 |
| **legitimate**  114:19 | 244:5 246:10 | 212:22 219:15,16 | **machine**  25:19,22 |
| 152:4 | **listing**  172:22 | 219:17 220:9 221:3 | 102:5,6,7 103:5 |
| **legitimately**  151:16 | 243:18 | 225:11,16,22 226:7 | 111:20 132:22 |
| **length**  143:11 | **lists**  149:10 158:13 | 226:19 227:11 | 149:8 151:11 152:5 |
| **letter**  4:19 33:14 | 167:25 173:23 | 228:5 229:22 | 156:10 159:3 193:6 |
| 97:8 100:1,3 | 180:22 | 231:18 232:7,8 | 207:24 |
| **letters**  56:12 63:1 | **literally**  172:4 | 237:20 | **machines**  51:25 |
| **level**  28:19 82:8 | 229:23 | **looked**  15:2,5,9 16:5 | 132:9,10,15,20 |
| 110:14,20 111:5,6 | **litigated**  177:18 | 25:13 92:18 99:6 | 161:7 |
| 112:23 113:1 | **litigation**  177:25 | 217:20,24 | **magic**  199:13,19 |
| **levels**  111:3 | 180:10 183:21 | **looking**  24:10 25:2 | **main**  65:8 234:3 |
| **lexis**  40:4 184:20 | **little**  9:11 28:7 42:19 | 26:1 28:24 78:21 | **maintained**  135:3 |
| **liberal**  112:3 | 47:4,17 71:7 96:25 | 79:24 85:25 86:8 | **maintains**  59:9 |
| **library**  69:10 | 114:5 151:25 204:9 | 89:13 107:22 | **major**  150:1 251:1 |
| **light**  66:14 | 219:4 223:9 247:15 | 115:12 138:20 | **majority**  68:23 |
| **limitation**  124:1,9 | **llp**  2:9,21 3:4 | 147:24 165:7 198:2 | 203:13 |
| **limited**  19:5 169:23 | **load**  113:6 | 219:24 222:22 | **making**  53:18,24 |
| 179:19,23 183:4 | **loaded**  207:25 215:5 | 243:10 | 58:19 143:16 |
| 205:12 210:4 | **lobbied**  56:12 | **looks**  123:14 | 160:22 234:6 |
| **line**  47:5 68:1 | **lobby**  56:9 | **los**  193:24 | **management**  147:19 |
| 125:20 132:7 | **lobbying**  57:9 | **lost**  70:25 | **manner**  51:11 52:2 |
| 157:12 160:9 | **local**  62:22 83:15 | **lot**  19:21 64:18,18 | 189:11 |
| 194:18 | 84:1 89:19 125:20 | 94:12 106:23 | **manual**  199:17 |
| **lines**  124:4 | **locale**  89:16 | 120:23 154:9 | **manually**  200:12 |
| **link**  135:15,19 | **log**  78:19 | 177:21 184:2 | **manufacturer**  23:2 |
| 143:12 | **logs**  78:23 137:19,19 | 245:22,23 | 72:14 |
| **lips**  63:1 | 137:22 237:12 | **lots**  30:25 52:3 93:6 | **manufacturers** |
| | | 125:23 141:12,12 | 72:13 |

map 15:15,17 16:2,6
248:25
maps 15:19
march 121:4
marked 11:5,8,17
32:21,23 70:3,5
73:15 86:4,5 96:20
120:24 121:7
122:20 131:11,23
157:3 162:14
166:18,20 178:3
181:24 185:16
228:24 229:1
market 30:7 54:13
134:18
marketer 227:12
marketers 21:5
marketing 10:1 14:4
15:10 18:4,19 19:20
20:1 21:1,25 24:15
25:12 29:8,9,21
30:1,10,16 38:18
60:22,24 61:12,24
63:19 65:4,25 79:6
101:1 109:5 118:4
119:25 120:12
121:2 122:25
134:19,25 135:20
136:2 139:1,3 158:9
158:12 192:12,25
215:12 220:15
222:2,11 223:13
235:17
marketplace 54:9
marking 90:16
marshall 47:20,22
masse 138:10,18
139:9 222:3 224:5
massive 132:12,13
match 11:12
material 18:15
19:11 21:23 26:8
78:16 162:23
178:15 179:20
249:11

materials 12:3
85:17 189:17
204:23 217:22,23
221:25 229:9
math 30:20 150:1
152:1
mathematics 47:19
matter 11:6,12 25:9
50:2 128:4 165:25
166:2,8 186:22
196:1 230:11
243:13 249:12
matters 8:2 190:11
193:11
max 110:9
maximum 110:9
mblox 179:12,16
180:9
mccune 2:8
mcgraw 68:25
mcguire 230:7,10,13
232:6,24
mean 18:17 21:13
50:23 52:5 53:21
72:4 92:24 94:25
95:7 103:25 111:13
130:4 145:11,14
151:7,16 154:20
159:3 170:4 177:16
186:23 202:17
214:23 224:21
239:5 240:18
241:13 243:19
249:15
meaning 44:11 65:5
126:14 151:25
167:22 188:7
meaningful 42:18
meanings 194:20
means 22:3 46:5
50:17 51:20,22
72:25 82:17 93:23
111:1 151:23
152:10 163:3 165:5
165:6 168:24

169:15 195:13,14
195:17 199:8
211:10 225:13
238:6
meant 150:6 192:22
241:6
mechanism 66:10
130:9 145:7,7
media 59:25 187:9
189:4
medications 9:19
meeting 64:3,4
126:2
meetings 64:6
220:24
meets 44:8 53:22
member 67:1,3
members 124:8
memory 34:13 88:9
185:6
mention 174:11
176:8 210:25 220:4
mentioned 23:18
130:7 205:14 213:6
224:12,12,20
merely 171:14
message 4:18 14:6
38:11 40:14,18
48:19,21 49:5,16,17
49:19 59:8 60:22
61:2 67:12 72:12
75:25 76:8 78:23
79:20 82:21 86:9
89:22 90:1,10,21,24
90:25 91:8,13,24
92:2,15,16 93:9
95:19 97:20 98:6
101:6,22,25 102:5,6
102:8,10,12,20
103:7 106:5 107:8
109:14 113:21,23
113:25 114:10
115:15 116:11,19
116:20,20 117:4,8
121:14,14 122:6,8

123:9,17 124:10,10
124:14 126:6,6
127:8,9,11,11,13
128:4 129:3 130:2
132:22,23 133:3
134:10,10,16,23
135:1,11,15,20
136:9,12,21 137:4
137:10 138:6,6,11
138:12,13 142:6,10
143:3,6,7,10 145:2
155:21 160:25
161:3,10 171:7,24
179:3,9 193:14
196:4,7,11,13,17
198:23 199:2 210:8
210:10,12 214:21
214:22 215:4,6,18
217:2,8,14 226:5,16
237:13 238:10,19
239:3,4,4,14,15,17
239:22 240:14,20
241:2,5,7 242:4
251:12,12
messages 29:19,19
38:19 40:11,25 62:1
62:14 63:4 72:17
79:5,19 81:1,5,18
82:1,9,12,15 83:2,5
83:18 89:19 90:18
92:12,25 93:16 94:6
94:15,19 95:22
96:12,16 97:23
98:10,16,18,20,21
98:24 99:5,7,8,18
99:18,25 100:12,16
100:23,24 101:1,8
101:15,21 103:4
106:18 108:5,6,8
109:3,8,15,17
112:19 114:2,22
115:21,23 116:21
116:23,24 117:8,17
117:18,23 119:21
119:22 121:19,21

122:9 123:10,18,23
124:13 126:7,8,10
126:11 129:12,20
129:23 130:21
132:9 134:19 135:5
136:19 137:3,8,9,11
138:2,10,12 139:10
139:20 140:10
142:15,24 148:13
156:4,5,9 161:2,8
170:19,23,24 171:1
171:13 172:12,17
174:7,11,17 175:7
175:17,24,25 176:3
176:5,16 177:5
179:2,14,15 180:11
182:13 187:6
190:10 192:12,19
192:25 198:13
206:5,9 207:6,15
210:5 214:21 215:6
215:12,13,19,22
217:17 222:3
223:22 224:5,23
226:25 227:5,13
228:10 229:15,18
230:17 231:23
234:4 236:8 237:12
237:14,15 238:8,15
238:17,20,21,25
239:20,23,24
247:18,22 248:3,8
**messaging** 4:22
12:23 14:1,12 29:22
30:10 41:4 48:14,25
49:1,3 61:17 66:10
69:23 92:14 110:10
113:8,10 121:13
123:1 125:7 132:21
135:17 158:18
172:25 177:18,24
210:18 221:10
230:1
**messenger** 14:1
18:20,25 19:16 20:8

27:10,21 38:14
60:23 78:10,17
79:15 80:16 90:2
91:16 93:9 101:9
135:25 136:3 250:8
250:9
**met** 10:3 205:24
**meta** 242:6
**methodology** 61:1
194:13
**methods** 225:4
**meyers** 230:14
**michael** 70:14
**michelle** 1:22 2:3
6:6 253:4,25
**microphones** 6:15
**microsoft** 249:7
**miles** 230:7,10 232:6
**milhoan** 33:18
**millisecond** 185:5
**mind** 54:8 96:22
142:19 206:15
215:1
**mine** 85:22,22 88:21
162:19 186:11
**minor** 30:23 31:2
47:19 251:1
**minority** 197:12
201:4
**minute** 62:13 81:18
82:8 107:24,25
108:2,13
**minute's** 81:9
**minutes** 10:21 77:19
111:22 234:16
**mirror** 45:1
**mischaracterizes**
156:17 239:7
240:15
**mislead** 204:21
**misnomer** 207:22
**missing** 25:21
**mistake** 213:8
**misunderstanding**
168:23 182:11

**misunderstood**
236:20
**mma** 4:20,22 63:12
63:13 66:16,20,21
66:25 115:18 116:3
116:4,6,17,18
117:12,18,20 118:1
118:3,6,8,10,16,17
118:19,24 119:8,12
119:16,23 120:4,6,7
121:21 122:3,13
123:22 124:9
125:11 128:12,25
216:1 217:10 220:5
220:15,18 221:6,10
221:11,12 224:8,11
224:15,18,21,25
225:2,8,15,19 226:1
226:15,17,23 227:3
227:19 228:11,18
237:24 238:9
240:18 251:11
**mma's** 220:21
**mmb** 4:23
**mmddyyyy** 117:5
**mobile** 4:15,16 10:1
14:1,3 15:10 18:4
18:19,20,25 19:15
19:20,25 20:8 21:1
21:5,25 24:15 25:12
27:9,9,12,21 28:22
29:8,9,21 38:13,18
60:22,23,24 61:2
65:25 66:7 69:1
70:15 72:13 77:4
78:9,16 79:5,15
80:16 90:2,15 91:16
93:9 101:1,9 107:7
108:25 117:7 118:4
119:24 120:11
121:2 122:25
134:18,18,25 135:6
135:20,25 136:2,3
136:16 137:2 138:7
155:21 217:13

220:15 222:1,11
223:13 227:12
235:16 250:6,8,9
251:4
**model** 23:13
**modem's** 199:17
**modified** 65:11
164:5
**modifies** 165:11
**modify** 60:14
164:11
**modules** 20:4 21:15
**moment** 130:20
157:13
**money** 110:11
177:23 203:9 204:7
233:14,16,21 234:5
245:15,18
**monitronics** 85:5
**month** 42:20 155:12
155:12
**months** 24:7 42:4
64:7 220:24
**morning** 6:2 7:20,21
219:5 235:6
**motion** 196:20
**mouthful** 55:13
**move** 74:17
**moved** 76:3
**moving** 72:6 130:7
**moz** 4:19 80:10,10
97:4 122:23,23
123:5
**mozes** 1:7 2:5,13
6:11 12:20 13:1,1,1
13:3,7,19 15:1,13
16:6,10,14,17,24
17:8,10,24,25 18:9
18:12,15,18,21 19:1
19:18,19,21 20:11
22:18,20,24 23:19
24:16 25:16 26:5,9
26:19 27:25 28:9,15
28:19 29:3,7 30:3
32:16 45:19,24 46:7

53:14 78:12 79:16
80:15,16 89:24
90:13 91:19,21
92:19,21 93:8,11
95:1,7 96:12 97:14
98:13 100:3,8 101:2
101:4,7,14 103:13
109:23 112:19
115:4 125:6 128:19
128:19 129:10,18
133:18 136:13
137:21 144:23
159:15 206:8,19,19
207:6,18 215:21
217:21 218:1,4
222:1,22,25 223:1,9
223:16,19 224:4
235:7,18 248:18
250:9,14
**mozes's** 90:1 206:24
**multifrequency**
58:15 59:10
**multiple** 82:15
133:1 149:9 197:10
**multithreaded**
82:14 93:5
**myspace** 201:23

**n**

**n** 85:4 151:1
**name** 6:5,24 12:21
20:9,17 41:20 44:16
63:11,21,24 64:21
205:25
**narrower** 177:13
**national** 55:1,9,9
59:23
**nature** 39:14 123:25
127:19 128:5 145:2
169:3,14,16 203:17
209:13 229:19
235:25 248:23
**nearly** 17:16 75:23
**necessarily** 81:11
92:24 111:13

121:23 145:8
155:22 197:25
238:8
**necessary** 137:24
**need** 9:14 12:2,18
30:20,23 31:2,9
32:5 68:6 148:21
162:17 168:6
173:13,17 185:12
196:19 213:2
219:10 232:22
**needed** 12:16 60:14
**nefarious** 129:25
**negated** 154:9
**negative** 37:1
145:16
**neither** 164:12
**network** 15:15,17
15:19 16:2,6 48:3
54:19 58:12,13 72:5
73:24 74:5 75:13
90:24 91:1,3 133:5
133:6,8 135:2
143:15,17 159:19
248:25
**network's** 135:1
**networking** 4:15,16
48:6 69:1,2 70:15
**networks** 15:21
54:24 55:8 74:24
101:10 120:14
130:12 134:20
135:4,13 179:4
**nevada** 1:16 2:3,4
6:10 253:2
**never** 21:11 33:22
96:13,16 161:20
179:10 180:14
218:3,6,9,12 227:4
236:16 245:12
246:24 247:1,22
**new** 10:10 102:5,10
102:11 217:14,15
217:18

**news** 24:21 43:2
57:13 207:1
**nine** 108:5
**ninth** 41:10 175:2
177:20 178:7 181:5
182:15,22
**nokia** 72:14
**nomenclature** 54:11
**nominated** 59:23
**nonadverse** 240:16
**nonparty** 179:14
**nonrefundable**
245:25
**normal** 217:6
**normally** 204:24
**north** 2:16 60:22
61:3
**northeast** 2:21
**northern** 1:1 184:20
200:3
**notably** 55:5
**note** 6:13 69:14
112:11 180:8
202:10 243:9 246:9
**noted** 167:23 168:4
177:10 182:24
252:7
**notes** 253:13,16
**notice** 25:5 42:5
74:25 142:3
**noticed** 247:1
**noticing** 6:23
**notion** 58:7 73:22
166:14 167:12
**novel** 38:12
**november** 11:1,3
16:7,11,15,19 18:13
19:2,19 20:12 21:2
21:5 22:18,21,24,25
26:16,21 28:1,10
29:4,7 32:16 73:3
78:13 92:11 97:24
99:5,25 100:13,22
103:12 106:6,14
113:6 114:10,10

128:16 135:21
136:10 143:22
144:9,17 206:6,10
207:5,15 223:20
231:4 247:22 250:5
**nuance** 238:5
**number** 4:11 5:3
52:23 58:25 62:10
62:11,15,22 68:20
102:9 109:15
115:24,24 127:8,12
127:18 128:5,10,18
129:2,7,11,19 130:1
130:14,17 136:17
137:2 138:7 139:25
141:22,24 142:2
143:22 144:11,19
144:20,23,24,25
145:2,10,13,17,20
148:3,17 149:15,18
149:22,23 150:10
150:20,22,24 151:4
151:5,6,21 152:7,12
153:3,7,20 154:3,4
157:18 158:1,1
163:5,12 164:6,8,11
165:3,4,11 166:15
179:6,9 191:16
192:7,8,16,18,24
193:4,6,8 198:8,9
208:19 227:12,13
229:24 241:11
249:10
**numbered** 88:11
**numbering** 123:14
**numbers** 39:2 40:13
40:14,17 52:22,24
53:1 54:3 64:23
79:22 87:23 88:5
137:20,22 141:20
142:8 146:2 147:1,2
147:3,4 148:1
149:10,21,21 150:6
150:6 151:2 152:4,6
154:25 157:17,25

158:3,7,10,11,13,19
161:1 162:11 163:4
163:6,21 164:1
165:6 166:24 167:7
167:8,25 168:3,14
168:14 169:2,10,17
171:8,25 173:11,14
173:20,23 174:15
175:8,9,22,22 176:1
178:20,21,22,22,23
179:5,16,18 180:23
181:12 182:13,13
182:17,18,18 185:4
185:9 187:7 196:25
199:9,14,18 202:22
207:25 209:21
210:16 215:5,7
241:12 249:5
**numerous** 54:20
**nv** 1:23

**o**

**oath** 6:18
**object** 19:3 28:3
77:13 83:6 100:18
134:5 163:14
164:12 194:17
195:2,7,8,9 201:13
215:24 239:7 240:2
247:24 248:14
250:1
**objection** 31:25 99:9
143:25 152:18
195:6 239:6 240:6
240:15 241:3,15,23
252:9
**objections** 6:21
20:14
**objectively** 52:8
**obtain** 36:7,11 37:6
71:15 74:2 130:16
166:9
**obtained** 25:7 26:8
26:12 144:24
145:11,14

**obtaining** 37:9
**obvious** 223:4
**obviously** 14:9
95:18 156:2
**occasion** 36:13
**occasions** 43:2
**occur** 71:5 72:24
111:12 112:23
113:1 240:22
**occurred** 40:2 84:2
98:6 114:20 175:14
175:19 177:8
180:19 200:16
206:22 223:5 233:7
236:8 246:24 247:2
**occurring** 10:8
211:1 250:23
**occurs** 36:8 106:5
120:3 242:4
**october** 123:2
141:18
**odd** 100:15
**offensive** 229:15,18
**offer** 14:5 46:6
187:22 188:2
193:12 200:24
**offered** 74:22 194:6
194:10 200:6,19,23
**offering** 221:8 226:4
226:8 228:8
**offers** 187:24 190:13
**office** 166:8
**official** 214:4 218:24
221:1
**oh** 64:16 84:25 85:4
104:4,6 132:12
156:15 190:4 202:6
214:20 222:9
**okay** 8:18,25 9:3,21
17:20 27:7,15 32:8
32:13 34:17 47:2
63:3 66:24 68:4,10
69:13,18 71:16,25
72:3 73:5,10 74:25
76:14 77:20 78:8

79:9,24 80:8,18
81:3,22 83:11 86:14
86:25 87:4,8,12
88:1,12,17,21,25
89:3 92:21 96:11
103:6,18 106:1
107:16 108:12,21
109:3 112:13
113:18 114:25
116:2,9,22 117:4,14
120:21 122:12
123:7,17,18 124:7
126:15 128:2 132:4
134:1,18 140:17
141:7 147:24 153:2
160:6 163:1 165:16
170:12 171:20
173:7 176:23 177:6
183:10 185:22
186:12,14 192:5,9
193:21 194:14
199:3 200:5,19
201:23,25 202:8,12
203:9 206:3 214:11
216:18,23,24
217:10,11,12
219:23 220:11
221:22 225:9,24
226:10 232:11,12
232:23,25 233:13
237:23 240:9 243:1
245:7 251:10 252:4
**old** 38:13 66:13
158:15 162:18
231:24
**once** 52:9 161:21
168:25 169:2,4
205:24 211:6 215:9
215:9,15 217:12
**one's** 242:8,9
**ones** 42:17,18 64:17
64:19 98:24 99:2,3
198:25 214:18
251:21

**ongoing** 126:11
**online** 25:11,18 40:1
155:5
**open** 37:10 154:10
205:11,18 252:5,10
**opened** 177:23
**operability** 13:7
14:25 15:13 21:24
29:3 32:15
**operate** 15:10,22
137:18
**operated** 13:24
14:11,16 19:12
26:10 52:21,25
149:7,9 189:15
251:18
**operates** 14:13 18:6
23:8 25:12 28:20
51:4 72:22 130:11
151:11 249:14
**operating** 103:17
236:5
**operation** 13:3 14:3
38:17 223:13
**operations** 38:19
**operator** 95:18
**opine** 43:24 53:9
94:18 100:24,25
115:23 126:14
145:4 185:4
**opined** 43:25 178:19
179:1 241:10,16
**opining** 142:13
192:23
**opinion** 5:7,8,9
10:12 11:25 12:4,7
15:12 17:9 18:16
23:19 25:16 26:9
29:3 31:23 32:15
35:1 37:13,24 39:17
39:18 40:7,9,23
41:9,24 42:2,8,10
43:12,23 44:20 45:9
45:12,18,23 46:10
55:19 57:4,9 68:8

68:12 70:1 85:7,11
87:6 98:15 99:20
113:19 114:14
115:25 117:11,16
118:9 125:8 126:13
129:22 133:18
134:2 145:24 146:7
152:10,12,21 154:7
154:16 155:2,3,8,24
156:17 157:15,19
158:22,24 159:4
160:11,16 161:5,18
161:19,21 162:1
163:11 166:12
167:11 168:19
169:20,22 170:15
170:16 171:12
175:5 177:10,13,21
178:7 180:6 181:1
184:3,19,25 185:12
185:25 186:18
187:24 189:8,25
190:5,13 191:7,20
191:21,23,25 192:1
192:15 193:16
194:6,10 197:25
198:18 199:6 200:6
200:10,19,23,24
201:12 205:17
215:20 217:19
218:12 220:6 226:4
226:8 228:8 235:20
241:19 248:21
249:3,12,12,21
251:15
**opinions** 12:11
14:25 19:11 39:5,8
39:11,19 40:3 42:25
43:7 52:15 53:6
56:12,14 57:6,7,8
60:16 67:5 69:19,24
78:15 94:3 128:18
141:9 150:15
154:10 162:23
181:8,9 182:23

183:23,24,25 185:2
185:2,8 187:5,12,15
188:25 195:21,23
197:8,10,13,21
198:6,7,14 201:2,7
220:2 221:8 235:20
**opportunity** 234:13
237:1
**opposed** 41:4 53:24
120:20 206:8
**opposing** 159:8
**opposite** 168:20
205:17 227:11
**opt** 194:10,12,12
197:8,21 198:6,8,11
198:12 214:22
215:14,18 217:14
217:17 226:9
227:14 238:14
**opting** 217:18 225:5
225:5 226:2 238:16
238:19
**optional** 116:18
**oracle** 249:6
**oral** 75:1,5,8,9
**orange** 4:25 157:8
**order** 19:5 30:8
37:19 38:1 57:2
59:10 81:10,12,20
81:21 82:1,16,18
85:20 86:1,2 93:12
93:13 95:22 107:11
116:12 141:17
154:24 166:1
170:11 172:8,10,14
172:16 173:3,8,11
175:20 176:4 192:3
209:20 211:10
225:6
**orders** 39:8 162:7
**ordinary** 50:20
**organization** 55:2
56:9 63:17 119:6
**orientation** 89:6

**original** 80:7 196:11
207:12
**originally** 76:8
102:15 136:10
230:21
**originate** 178:24
182:19
**originated** 79:4 80:6
100:8
**originating** 58:18,20
102:8 130:13 143:3
**origination** 143:5,7
242:5
**originator** 58:25
64:10
**outcome** 6:20
**outgoing** 29:19
102:11,12
**outlier** 183:21
188:17 195:25
**outline** 64:8
**outlying** 184:6
**outset** 206:12 235:5
**outside** 44:12,24
45:11 66:5 190:11
**outstanding** 59:24
**overall** 69:22,24
135:18 138:20
187:5 203:1 204:4
249:3
**overengineered**
139:4
**overlaid** 133:7
**overload** 109:14,21
**oversaw** 55:6
**oversee** 103:16
**overstating** 153:23
**overturned** 153:16
153:22
**overview** 29:2

**p**

**p.m.** 108:14 126:18
127:1 252:17

**pacer** 39:23 199:21
**pacing** 208:17,17
**package** 77:7 242:9
**packet** 58:22,25
59:7,11,12 133:6
139:25 143:10
210:9
**page** 4:3,11 5:3
11:18,21 28:18,25
48:1 52:11 54:16
59:17,22 60:20 67:7
70:13,18,19 71:15
71:15 73:21,23 78:8
79:25 83:4 88:20
89:8 101:4 113:15
113:19 121:8,8,12
122:24 123:5 125:2
127:6 130:8 132:3
134:8,13 141:14
157:10,12 160:4,8
167:16 171:4,9,21
171:22 173:6,7
174:21 175:1
178:11 186:2,6,15
192:5 219:23 220:9
221:16 243:10
244:9
**pages** 1:25 15:8
88:24 199:21
**pagination** 186:10
**paid** 245:6,14,21
**panelist** 54:20
**paragraph** 11:18
43:11,12 48:2 53:5
53:6,24 54:17 56:4
59:17,22 60:15,20
67:7 71:8 78:8
101:4 113:16,19
114:25 127:7 130:8
132:7 134:9,13
141:14 167:16,17
171:5,10,20,21,22
172:21 173:6,7
174:13 186:3,12,15
219:16,24,25 220:4

220:10,12,13
221:21 222:18
225:23,25 226:11
226:14 237:21,24
238:2 241:21
**paralegal**  33:17
**parameter**  81:20
**parameters**  93:25
103:1,8 208:24
**parcel**  128:3 166:16
**parroting**  171:14,18
**parses**  102:1
**part**  10:23 19:7
27:22 29:2 40:9
44:7,17 48:9 58:20
62:14 68:1 71:9
77:7 81:19 102:2
127:9,14 128:3,8
130:5 135:17
136:17 139:25
153:16 162:22
166:15 186:18
187:4 209:9 210:15
210:21 211:6 214:4
217:9 231:15
238:24
**partial**  128:3
**partially**  40:8
175:18 239:13
**participating**  98:25
**particular**  22:10
52:20 55:19,21 56:2
72:11 82:13 94:24
95:3 102:2 103:1
125:25 146:8
**particularly**  55:18
56:7 72:14,23 74:14
78:7 122:17
**parties**  6:14 17:4
79:10,13,21 90:10
**partners**  20:1
**parts**  16:17 46:10
**party**  6:18 17:11,25
19:1,13,22 20:2
27:22 56:18 57:12

58:19 130:13,15,15
130:17 141:25
180:9 207:9 251:7
253:21
**party's**  130:12
**pass**  205:8,19
211:18
**passed**  54:6 167:6
242:6
**passengers**  146:2
**passive**  102:14
**paste**  60:13
**pasted**  60:10
**patents**  38:3,8 39:4
**path**  133:8
**patient**  111:21
**pay**  66:9 110:11
**paying**  233:8 245:5
**payment**  233:1
**pc**  2:2,15
**pdf**  86:17,20
**peachtree**  2:21
**peer**  132:23,23
134:11,11,23,23
156:5,5
**penalized**  233:16
**pending**  205:11
252:6
**pennsylvania**
154:15 191:15
**people**  27:23 30:25
64:2 65:6 72:25
74:20 103:19 105:1
110:14,18 111:3
119:20 120:1,1
133:10 138:23
139:7,10,20,22
151:24 158:9,11,13
158:20 159:18
194:20 207:22
215:18 228:14
250:22
**people's**  65:16
**perceived**  178:25
180:25 182:20

192:17 246:13
**percent**  89:20
212:15
**percentage**  139:3
203:1 204:4,11
212:13
**perception**  126:10
**perfect**  45:1
**perfectly**  130:21
237:17
**perform**  12:22 14:5
20:12
**performed**  125:6
219:2 246:6 249:20
**period**  79:20 109:20
137:5 139:11
**perjury**  60:17
**permission**  141:21
142:5 193:5 226:16
226:18,23 227:20
228:3,17
**permitted**  37:20
227:7,25 228:2
**perpetuity**  137:22
**person**  143:16
151:14 158:15
211:1 224:22
253:22
**person's**  145:20
**personal**  54:22
**personally**  2:4 42:18
153:14 174:23
175:1 184:2 218:18
234:14
**persons**  119:22
141:20
**perspective**  147:8,9
147:11 209:16
**phenomenon**  72:8,9
**phillips**  1:3 4:19
6:11 7:23 89:16
90:6 91:10 92:3,11
94:3 95:21,24 96:1
96:13 97:11 98:19
100:3,25 105:14

106:7 115:5,16
126:4 128:17
136:10 137:13
140:1 143:21
144:22 206:5
207:16 236:11,16
242:18,20 244:2,14
245:1,8 246:8,10,12
247:4,8,11,21
**phone**  50:7 58:25
62:15 63:22 72:13
75:20 77:5 79:22
90:22,25 92:11,15
93:10,14 94:3,11,13
94:15,20 95:13 98:3
98:5,10 136:17
137:2 138:7 141:20
143:14,18 159:19
179:6,8 187:1 193:4
193:8,11,13,14
229:24,24 245:9
**phones**  66:13 92:13
155:21
**phony**  31:7
**php**  21:19,21
**phrase**  195:10
**physics**  132:17
**pick**  6:16
**piece**  60:15
**pieces**  13:21 60:13
**pietrkowski**  3:3 4:5
7:5,5 88:8 205:20
205:23,25 206:23
211:17 252:12
**ping**  136:20,20,23
137:6,7,10 138:11
138:14,15
**place**  6:14 109:6
148:2 172:17
226:22
**placed**  142:7
**places**  111:13
**plain**  50:20
**plaintiff**  1:5 2:7 7:9
7:11 8:2 33:14

52:17 82:5 91:10
106:6 113:20,24
114:15 144:2
146:11,13 182:3
184:16 187:17
192:3 194:1 196:5,9
196:12,14 197:1
199:12 200:17
206:22 215:10,13
215:23 220:1
232:20 236:16
237:13 243:17,19
243:21 246:20,21
246:22
**plaintiff's** 46:4,9,16
78:24 83:3 102:9
144:4,8 191:5
196:22 197:3
201:17 202:20
203:10,13 204:12
218:20 245:2,15
247:16
**plaintiffs** 10:3 67:15
68:2 80:1
**plan** 239:16
**platform** 25:12
29:13,14 179:2
**platforms** 30:10
**players** 18:18
**plead** 196:21
**please** 6:13,22 9:13
45:15 111:24 112:1
129:15 157:10
160:4 185:14 216:6
216:7,7,23 246:17
**plus** 128:23
**point** 26:13 28:11
47:6 52:7 65:12
70:22 72:23 89:9
94:2 98:23 107:5
109:17 132:1
154:23 160:22
167:24 168:16
173:22 174:12
175:21 177:15,17

180:22 181:13
197:9 212:20 215:9
216:10 220:13
245:25 247:11
248:5 251:21 252:1
**pointing** 172:19
**points** 173:21
196:25
**policy** 246:19,23
247:1
**pong** 136:21,23
137:7,7
**poorly** 231:20
**portability** 62:10,22
**portal** 102:24,25
**porter's** 87:25
**portion** 62:23 73:18
131:22 169:6
226:25
**portions** 76:13,15
77:16,16,17 118:17
164:19 181:7
183:12 228:6
**position** 22:6 35:8
35:24 37:3 39:10
46:23 54:8 61:11
129:10,17
**positive** 201:19
**possession** 35:9,21
36:2 37:4,4 205:13
**possible** 26:24 31:21
82:7,9 83:1,4,8,9,17
92:10 93:4,13 94:10
96:11 99:24 108:21
109:2 111:18 113:9
113:13 119:8
124:18,22,23 125:8
125:8 126:10 131:3
136:24 137:6,9,15
140:6 144:19
202:16,18,18 225:6
251:24 252:2,3
**possibly** 49:3 112:22
124:21 149:2,3
164:7 222:10

**posted** 155:11
**potential** 8:13 50:18
50:21,22 150:18,19
151:3 153:19 154:2
154:11,12 155:6
204:16 242:21
**potentially** 10:3
30:7 36:20 50:14
82:23 110:11
144:18 151:2,20
152:9 153:23 161:9
163:17 166:15
**power** 233:13
**practice** 167:20
**practices** 4:20,22
10:2 57:9 64:11
116:1 119:24 121:3
123:1 124:8 220:22
237:24
**preceded** 250:7
**preceding** 156:1
**predicted** 211:7,8
**predicting** 209:23
**predictive** 133:4,19
133:21,23,25
167:12,21 168:18
168:19,24,24 169:2
169:14,16,23,23
170:1,5,8 207:19,20
207:24 208:14
209:3,5,7,13,13,15
209:18,21 210:1,4
210:10,15,22
**predicts** 169:7
208:10
**preexisting** 54:11
**preface** 60:8
**prefer** 148:10
**prejudice** 5:12
229:8
**premise** 18:5 198:1
**premium** 66:9
**prepaid** 8:13
**preparation** 9:21
219:4

**prepare** 10:3
**prepared** 213:20
214:6 219:3
**preprogram** 103:3
**prerecord** 103:4
**prerecorded** 102:6
142:6,10
**present** 3:7 103:14
**presented** 100:11
204:16 206:18
**presenting** 70:2
**preserved** 25:23,24
58:19 143:11
**preserves** 59:8
**president** 61:11,23
179:12
**pressure** 132:18
**prevent** 9:16
**prevented** 183:5
**previous** 17:14
85:20 214:12
242:23,25
**previously** 47:18
50:4 51:7 88:15
219:25 229:25
**price** 2:15 6:25
**primarily** 14:7
51:24
**primary** 30:17
134:9,16,22 160:22
179:1 234:5
**printed** 86:22
**printout** 82:23
**prior** 17:3 41:1
193:15 228:9 253:9
253:17
**private** 6:16
**privilege** 232:19
**probable** 113:13
**probably** 25:9 46:3
56:18 94:13 95:13
123:22 139:4
156:16 171:3
176:10 202:24
204:9 223:23

231:20,21
**problem** 9:14 50:3
71:20 72:1 111:5
115:16 237:18
**problematic** 62:19
**problems** 61:15,16
71:5 109:7 112:20
**procedures** 250:17
**proceeding** 6:21
**proceedings** 6:1
253:18
**process** 22:4 36:5
110:17 198:23
208:12
**processed** 103:5
237:14
**produce** 34:14
52:22 54:3 165:6
173:14
**produced** 34:11,21
79:7 85:18 86:18,21
87:24 88:7,10,14
141:2 157:25 163:4
250:13
**produces** 173:11
**product** 12:22 29:1
44:16 45:11,19
48:11 54:9 64:15
66:23 234:10
**products** 44:18,22
48:10
**professional** 212:20
**professionally**
231:19
**program** 10:23
14:10,16,23 29:14
29:15 62:15 82:6,25
83:15 84:1 98:22,22
98:25 102:15 103:8
106:2 108:7 116:8
121:14,23 122:5
123:9 125:7 137:4
138:20 139:2,3
199:13,19 215:16
215:17,19 217:10

217:15,16,18
221:10 222:12
223:23,25 224:24
225:12 226:5
227:14 228:12
237:25 238:4,6,12
238:13,22 239:1,5
239:12 240:11,11
248:4 251:18,22
**programatically**
82:15
**programmatic**
29:20
**programmatically**
101:5
**programmed**
101:20 102:14
199:17 215:11
**programs** 12:23
14:6,11,12 15:10
30:11 49:1 64:24
65:4,4 120:3 150:24
158:18 215:14,21
216:19 217:20
230:2 236:4 238:16
239:19 240:20
251:18
**progressed** 167:24
173:22
**prohibitions** 141:19
171:6,23
**project** 105:10
**promotion** 10:7,8,21
105:25 219:7
223:20 240:25
**promotions** 218:13
**promulgated** 34:19
**pronouncing** 131:17
**pronunciation**
41:19
**proof** 248:11,15
**proper** 183:2 198:8
198:11,12
**properly** 52:6
103:17 139:5 225:5

228:12
**proposed** 55:4 188:6
**proposition** 173:3
**propriety** 98:15
**proscribed** 119:16
**prosecuting** 242:22
**protection** 52:16
55:17 57:16 59:20
73:8 77:25 160:14
243:13
**protective** 37:19
38:1 85:20 86:2
166:1
**protocol** 22:24 23:7
23:7,11 58:11,14,16
59:7,8 66:12,13
127:14 128:8,9
130:6 134:9,11,16
134:22,23,24
135:10,14,18 136:7
136:17 143:5
**protocols** 58:18,21
133:6,7 134:22
135:12 143:4
**proud** 42:19
**provide** 8:15 10:4
13:12 14:13 24:8
25:10 29:10 36:18
37:8 39:18 42:14
43:13 46:11 49:10
51:24 52:14 53:7
57:6 59:6 81:8
85:12,14 110:7
127:12 150:24
160:8,19 193:12
220:2 224:22 236:1
**provided** 11:11
12:17 18:19,20,22
24:7,24 25:4,7
27:22 38:5 39:16
56:11 59:19 74:4
78:23,24 79:1 87:21
89:1,5 100:6 115:1
115:4 122:1 131:21
132:19 140:19

141:25 145:18
148:24 149:13
152:19 153:4,6,17
155:15 158:3 159:8
162:21 189:11
191:23 193:8
199:10 200:15
213:13,14 214:6,12
218:2 221:25
224:24
**provider** 110:4,5
**providers** 17:12
18:1,12 73:24
**provides** 58:11
119:6 120:12
173:11 189:7
**providing** 43:19,23
45:18 46:19,20 55:3
55:7 76:8 166:18
**provision** 45:24
123:6 140:3 165:12
**provisions** 250:22
250:24
**pseudo** 149:21
**public** 25:10
**publicly** 37:21 38:6
**publish** 40:1
**published** 69:3
71:22 72:25 74:9
**pull** 148:3
**pulled** 87:18
**pulses** 58:15 59:10
**punitive** 120:20
232:1
**purchase** 48:11,16
48:18 251:8
**purchased** 19:21
20:4
**purchases** 18:5
**purely** 164:20
**purportedly** 63:4
**purpose** 21:25 30:17
135:16
**purposes** 140:7
150:8 176:18 252:6

pursuant 2:1 253:18
pursue 232:7
put 20:5 60:7 61:20
64:8 139:6 164:19
170:7 184:2 185:12
192:6,8,24 209:10
putting 174:12
231:24

**q**

qualification 51:8,9
51:10,11
qualifications 60:9
qualified 43:13 44:1
126:14 145:4
161:21 165:2
191:11
qualifier 170:7
qualifies 46:7
qualify 22:1 49:4
146:23 157:24
qualifying 40:15,16
qube 27:5,9,12,15
38:13 60:21,23 61:6
61:25 62:4 63:9,14
65:22,24 66:4,25
110:2 220:14,14,17
220:18,20
qube's 27:19
question 9:13 16:20
17:7,13,19 19:9
28:4 32:1 41:6 45:5
51:23 56:14 77:16
99:23 100:14
103:18,22 104:14
111:24 112:1
127:22 128:15
129:13,14,15,17
132:5,8 133:14
134:15 144:21
148:11,20 151:22
152:24 154:22
155:19,20 156:6,8,8
156:11,14 157:11
157:13,21,24 160:7

160:10,14,19
164:17 176:22
184:9,9,10 191:10
197:17,20 206:4,16
207:12 213:17,22
213:24 214:25
216:12,17,21 222:7
222:17 227:17
235:14 236:15,20
239:9
questioning 47:5
112:7 194:18
247:16
questions 10:4
100:19 149:17
156:1 204:19,21
206:2 211:17,23,24
212:3 221:24
228:20 234:13
235:4,6 236:22,25
252:5
queue 179:3
queued 109:19,21
queueing 112:18
quick 107:20
quickly 237:17
quite 17:18 36:4
114:7 128:13
147:23 158:13
207:22
quote 38:20,21,23
38:24 39:7,11 48:2
53:2,3 54:17 59:13
67:7,16,17 68:25
70:21 71:1 73:22
127:7 130:9 132:11
132:12 133:13
134:18 142:10,11
145:25 146:1,3
155:20 160:18
168:7 171:5 173:9
174:3,5 175:1
179:10 180:3 185:1
186:1 194:22
209:19

quoted 182:16,22
quotes 172:7
quoting 190:5

**r**

r 151:1
radio 198:25
ram 185:6
rand 151:1
randall 1:14 2:4 4:2
4:13,24 6:4 7:14
84:8 165:21 178:17
253:7
random 52:23
149:15,18,20,21,22
149:23 150:6,7,8,10
150:20,22,24 151:2
151:4,5,6 152:3
153:19 154:3
157:18 158:1,10
163:5,11 164:6,7,10
165:3,10 166:14
179:17 185:5
randomly 39:2
40:17 147:2 154:17
154:25 158:19
178:22 182:17
196:25 197:2
199:14
randy 156:13
172:20
range 67:22 202:24
204:2
rapid 190:9
rarely 194:21
rate 66:9 116:23,24
121:9 123:6 208:18
245:24
rates 117:8 239:14
239:22 241:5
rdonovan 2:12
reach 158:9 196:19
reached 142:1
188:13

reaction 248:2
read 21:14 35:2
39:12,25 44:6 48:7
55:11 57:7,13,13
60:3 61:4 71:2 72:4
74:6 101:12 114:3
116:15 117:9 125:4
127:15 129:15,16
130:18 135:7 146:7
155:2,4,4,14 163:7
168:8 171:9 176:9
176:11 177:16
180:5 183:12
185:11 186:4,21
194:25 197:19
211:13 217:25
221:23 222:5
readability 124:15
reading 29:25 38:16
55:14 111:25
142:17 181:8,8
190:21,22 196:10
210:24 221:11
223:4,21 227:10
230:20
reads 210:10
real 133:11 210:6
241:24
reality 171:1 200:22
realize 250:2
really 65:1 72:10,10
75:16 77:1,3 81:25
82:24 112:5 119:3,5
119:24 122:2 125:4
125:7 135:17 141:3
144:21 153:5
169:15 180:12,24
181:22 186:22
193:22 204:9
208:14,18,23 209:9
209:10,14,15
210:11 216:19
217:2 230:12 234:3
235:25 238:3,12

**reason** 78:18 82:23
93:12 103:18,22
104:7,14 114:21,23
125:25 184:3,22
189:20 190:2,21
214:1 248:8
**reasons** 40:24
125:24 141:12
**recall** 17:14 41:13
71:9 88:12 97:7
105:22 110:21
131:1,4,5 156:25
159:24 190:23
197:4 198:22 199:5
200:9,11 214:24
232:21
**recasting** 119:13
**receipt** 90:6,14 91:7
92:6,8,12 93:16
94:19 98:8 126:7,11
130:1 247:17
250:22
**receive** 35:12 37:10
72:17 99:24 108:24
114:22 117:2
134:19 136:23
139:19 142:6 156:4
196:10 217:17
224:23 238:17,20
240:13 248:9
**received** 10:6 43:16
47:21 78:19 82:2,18
82:22,24 89:22
90:10,18 92:25
93:12 95:23 96:13
96:16 98:20,21,25
99:3,5 100:12,22,25
106:12,13,13
113:20,25 114:6,9
126:5,8,9 127:11
196:17 197:1
198:13 212:4 236:9
238:9 247:22 248:3
248:5

**receives** 210:12
**receiving** 96:18
97:20 116:21
130:16 192:11,25
196:12 229:14
234:4 238:15,24
239:20,23 241:2
**reception** 99:14
**recess** 47:13 84:6
126:18 165:19
205:4 234:22
**recharacterize** 22:9
**recipient** 127:13
128:6,7
**recipient's** 143:18
**recognition** 167:7
**recognize** 131:25
229:9
**recognized** 251:25
**recollection** 26:3
38:17 190:1 212:2
**record** 6:3,15 8:15
24:9 25:1 28:23
33:8 37:2 47:11,14
50:9 69:14 78:20
84:3,4,9 90:13 91:1
91:7 95:2,2 112:9
126:16 127:2
129:16 137:19
165:17,22 178:14
179:19,23 183:5
185:18,20,21
197:19 205:2,5,16
219:19,20 227:18
228:21,23 234:15
234:20,23 235:3
242:15 243:9 246:9
252:7,13
**recorded** 6:4 10:20
83:22 87:15
**recording** 6:13
**records** 102:3 149:8
190:25
**recount** 182:23

**recurring** 215:19
217:15,16,18
227:14
**redirected** 208:8
211:8
**redundant** 9:11
**reed** 3:4 7:6
**reedsmith.com** 3:6
**refer** 16:22,25 28:15
38:17 47:25 54:10
57:15,18,21,24 58:1
58:4,7 70:18 73:10
78:9 97:23 106:22
127:6 156:9 163:25
166:17 174:18
210:11 240:19
**reference** 77:24
78:2 162:10 183:19
187:21 222:7
236:15
**references** 138:9
182:15
**referred** 11:15
23:21 48:10 56:4
58:2,4 69:13,15
73:7 102:23 107:1
121:20 128:20
223:24 229:16
**referring** 12:25
14:19 16:2 17:1,15
18:24 20:3,5,7 23:1
23:2,3 83:2 88:18
142:24 152:24
154:6 156:3 158:16
222:8
**refers** 74:1 170:5
**reflect** 24:9 25:1
50:9 78:20 80:25
81:1 89:18,21,22
93:15 231:20
**reflected** 31:11
86:15 89:8 90:8
124:19
**reflects** 89:15 123:2
182:9,10 219:25

**refresh** 26:2
**refund** 8:16
**refused** 36:14
**regard** 125:9 130:22
178:15 185:8
**regarding** 19:12
67:10,11,13,15
124:9,23 183:3
189:8 197:5 200:6
223:22 235:24
236:17 251:11
**regardless** 22:2 23:8
127:19 169:18
209:17 251:4,5
**register** 90:25
**regulation** 172:6
176:8
**regulations** 34:18
34:21 41:1 42:11
50:19 64:25 67:13
142:17 150:15
163:23 171:18
172:23 174:10
177:3,4 209:7
210:24 211:5
**reiterate** 247:16
**reiteration** 172:3
**reject** 158:21 194:19
195:10,12,14,17
198:7 203:21
**rejected** 39:9 43:1,9
191:19 195:22
198:1 199:6 200:9
**rejecting** 186:18
**rejection** 196:2
197:16
**relate** 38:14 225:6
228:13
**related** 6:18 19:18
26:3 35:1 37:13,25
38:11 52:15 56:13
57:1 59:19 68:8,12
87:11 92:6 99:6,7
100:4 106:14
116:23 134:3

136:12 137:12
139:24 145:20
167:7 184:11
193:11 204:12
210:14 212:9 219:3
225:4 226:8 243:14
246:5 248:21
250:13
**relates** 223:19
**relating** 145:6
195:21 246:16
**relation** 188:5
**relationship** 19:18
24:14 28:20 147:19
189:21 206:14
210:18 223:9
244:17,24
**relationships** 19:6,6
24:20
**relative** 36:12
253:20
**relayed** 79:3
**release** 36:21 37:20
141:20
**released** 167:2
193:3 251:23
**relevance** 142:24
148:11
**relevant** 60:5 73:3
228:6
**reliability** 196:1
**reliance** 42:8
**relied** 11:16,25 12:3
14:24 29:2 32:14
34:19 57:3 70:1
**relief** 120:20
**religious** 229:19,20
**relinquishes** 62:15
**rely** 13:18 57:8
69:18 168:10 196:2
**relying** 46:8
**remains** 88:24
**remand** 179:25
183:7

**remanded** 41:12
42:5,23 153:17
154:7 177:21
180:20 183:25
**remanding** 181:13
**remember** 86:10
88:4 95:25 152:15
188:9 189:23,24
190:17,20 191:5,6
193:16 201:21
223:21 230:20
**remembered** 2:1
**remembers** 95:21
95:24
**remind** 19:4 206:12
**reminded** 236:14
**renamed** 24:18
**render** 32:15 68:8
69:19 85:6,10
117:16 125:7
145:24 149:5,12
161:20 162:1
197:10 249:11
**rendered** 17:9 18:16
34:25 37:13,24
68:12 98:15 99:20
134:2 152:21
162:23 169:22
**rendering** 11:25
12:4,7 14:25 15:12
23:19 25:16 29:2
39:5 45:9,23 57:4,9
67:5 78:15 94:3
161:18 170:15,16
171:12 248:21
249:21 251:15
**rendition** 87:10
**repeat** 17:19 45:14
129:13 211:24
**repeatedly** 240:3
**rephrase** 9:13

**reply** 117:5,22
**report** 24:8 85:12,14
131:2 141:17
152:20 154:10
165:15 168:11
170:11 172:14,16
172:22 173:8 176:4
182:16,23,25 185:2
197:24 209:20
212:22,23 213:11
213:12,20 214:2,10
214:12,25 219:3,9
219:13,15 220:10
221:19 222:24
225:23 226:7,8,12
234:9 245:10,13
**reported** 1:22 253:6
**reporter** 2:3 6:6
32:21 112:12
129:16 131:7
166:18 197:19
**reporter's** 253:1
**reports** 37:12 60:8
60:11,12 168:12
197:14 213:23
214:3,6
**repositories** 135:5
**represent** 6:25 7:3,6
33:1,2,8 34:8 81:5
87:8 99:25 197:15
201:16 203:2
205:25
**representation** 68:3
71:4 218:24
**representations**
110:3,15 213:8
**representative** 54:5
118:22
**representatives** 64:4
103:13
**represented** 82:4
103:15 200:17
218:16
**representing** 56:10
87:17

**request** 6:7 36:14
166:3 170:9
**requested** 253:19
**requesting** 36:16
215:18
**requests** 141:5
246:17
**require** 182:12
247:19
**required** 12:10 22:5
31:10 119:14
121:25 144:16
183:7 199:15
**requirement** 125:25
225:11,12 227:24
228:1
**requirements** 54:2
61:14,21,21 62:18
65:2,9 66:19 118:14
119:23 125:19
182:11 225:3,17,25
227:10 228:15
**requires** 55:20
144:15 150:8
**requisite** 178:16
179:11,21 180:2
183:1
**reread** 9:23,24
129:14 197:17
**rereading** 197:24,24
**research** 230:6
**reservation** 146:3
192:3,7
**residential** 142:4
**residing** 179:5
**resolve** 71:25 111:4
**resolved** 202:14
**respect** 9:9 10:15
20:21 38:19 54:7
55:24 63:12 110:1
117:1 120:4 121:13
136:9 170:13 221:2
226:2 237:25
240:24 241:11,13
241:20 248:18

251:10
**respectively** 69:4
**respond** 101:20
  133:10,15 139:5
  144:2 205:15
**responded** 106:16
  113:22 155:19
  209:1 223:6 248:2,7
**respondents** 139:4
**responds** 169:3
**response** 13:22
  33:16 34:11,14,22
  37:7 85:18 91:21
  93:8 100:14 106:18
  121:24 122:1,1
  124:13 136:11
  137:10 139:12,12
  139:17,22 140:3
  156:7,12 157:11,22
  157:24 160:8,15,20
  161:2 168:22
  196:10,18 197:2
  212:2 237:15
  238:11,13,23
  239:23,24 241:2
  250:13 251:12
**responses** 14:17
  102:20 222:21
**responsibilities**
  188:1
**responsible** 179:13
  207:10
**responsive** 123:17
  124:10,10 137:25
  140:10 141:5
**rest** 156:17 157:1,23
**restrictions** 142:9
**result** 175:4 177:10
  219:8
**resulted** 124:19
  236:4
**resulting** 183:4
**results** 121:14 123:9
**resumed** 127:4

**retain** 92:6,7
**retained** 8:1 35:25
  36:10 37:6 42:14
  52:14 63:6 67:9,14
  67:19 68:7,12,21
  84:18 114:11
  131:14 203:4
  222:11 236:18
  243:1,5 244:6,12,15
  244:23 246:21,25
**retainer** 244:19,25
  245:19,25
**retention** 175:13
  204:17 246:6
  247:12
**return** 35:15,15
**reveal** 22:14
**reversing** 183:6
**review** 12:6 22:14
  23:23,24 39:4 78:16
  84:16 96:3,7,9
  172:15 189:14
  221:25 224:1
  249:11,22 251:14
  253:18
**reviewed** 9:24 10:5
  10:10,11,16 11:16
  11:24 12:12,14
  15:11 21:17,21
  23:19 24:1 26:3
  32:15 84:11 94:20
  99:4 172:23 174:8
  223:15,18 237:8
  248:22
**reviewing** 10:1
  66:22 178:13
**revising** 221:5
**revisions** 219:13
**rfp** 250:13
**rickenbacker** 84:24
**rider** 33:13 34:2,17
  37:12 39:7
**right** 26:5,21 27:5
  27:10 34:22 35:10
  35:14 41:6 43:14

45:21 66:5 68:6
  75:3,17 81:23 82:19
  84:19 86:20 89:2,9
  89:10 95:13 97:25
  99:13,22 104:8
  105:4,7,8,15,15
  107:19 108:1,13
  110:6,19 111:7
  116:23 117:4
  118:18 128:1,21
  129:8 130:4,22
  131:17 132:17,18
  133:3 134:14
  137:20 153:11
  154:8 162:7 167:9
  167:13 172:2,5,10
  174:16 177:11
  180:17 187:18
  192:20 193:24
  198:21 200:17
  204:21 207:11
  208:13,15 212:5
  214:8 215:4 218:1,4
  218:7,10,14 220:5
  220:16 222:14
  227:16,20 230:19
  231:2,2 232:5,8
  233:23,25 236:12
  237:22 244:19
  248:13 251:2,16,17
**ringing** 187:1
**rise** 232:2
**road** 9:8
**roam** 70:22 75:18
  76:2
**roaming** 71:6,21
  73:22 74:3,17,21,23
  75:21
**role** 182:5 183:15
  221:5
**rolling** 64:10
**roof** 111:20
**royalty** 69:8
**rpr** 1:22 253:25

**ruled** 163:16 217:4
**rulemaking** 173:17
**rules** 9:8 61:3 119:7
  119:23 120:5,5,13
  141:24 209:10
  251:20
**ruling** 5:6 167:1,11
  169:21 170:10
  175:24
**rulings** 175:6
**run** 19:22 30:10
  77:20 82:25 83:15
  83:16 120:14
  150:23 151:1
  222:11 236:6
**running** 10:21 63:19
**runs** 101:19
**rural** 74:18,21
**ryan** 2:8 7:8 235:3

                  **s**

**s** 2:20
**sabre** 145:22,24
  146:1 191:19
  193:12
**safe** 232:22
**sales** 209:23
**salesforce** 147:15,16
  147:22 148:2
**salesforce.com**
  147:25
**sample** 77:21
**san** 66:5
**satisfied** 45:13
**satisfies** 45:20,24
  53:15 174:15
**satterfield** 5:7 39:16
  39:18 40:6 41:23
  42:8,10,19 63:7
  174:19 175:1,3,14
  177:9 178:6 181:20
  182:15,21,22
  183:14 215:2
**satterfield's** 178:16

**save** 35:19 80:17
**saved** 138:7
**saw** 102:4 110:2
  132:1
**saying** 29:1 33:15
  33:18 45:16,17 73:2
  89:15 100:9 166:23
  171:16 175:15
  180:10 188:16
  192:23 212:1
  227:23,25 228:11
  238:10 244:5
**says** 15:8 29:23 39:7
  70:21 73:22 89:12
  106:24 107:3
  116:13 117:5
  121:12 122:24
  123:8,16,17 125:2
  134:18 141:17
  163:1 167:16 173:7
  174:23 178:13
  181:13 182:8
  187:20 189:3,4
  190:2 199:6,9
  221:24 223:2
  226:14 227:24
  228:1 240:13
  243:12,22
**scanned** 10:20
**scenario** 49:21
  137:8 149:4,5
**scenes** 75:15
**schema** 95:3
**scheme** 95:2
**scholarship** 233:9
**schuster** 5:7 175:3
  180:2
**science** 31:6 149:24
  150:5 164:9
**scope** 53:5 192:17
  193:15
**scoreboard** 196:8
**scratch** 67:6 113:14
  115:5 167:15

**screen** 14:20 98:2
**seal** 36:22
**seamless** 73:23
  74:23
**seamlessly** 76:4
**seamlessness** 73:25
**seams** 74:5
**search** 159:19
  176:11
**second** 4:17 69:3
  80:20 82:21 83:1,5
  167:17 178:13
  185:19 219:17
  226:7 228:12
**secondary** 115:25
  234:6
**seconds** 81:7,19
  82:7 108:17,18,19
**section** 52:16 71:18
  162:11 163:2 172:3
  178:10 186:5
**sections** 171:17,18
  209:6 210:14,25
**see** 8:3 34:18 37:15
  44:8 46:13 50:12
  53:21 54:1 64:23
  69:6 70:12,16 71:10
  71:14 77:24 78:2
  80:8,11,20 87:23
  88:5,21,22 89:7,9
  89:10 93:19 97:19
  97:21 98:3,7,9
  105:1 107:21
  114:20,21 117:14
  121:5,10,16 123:3,6
  123:12,18 125:2,4
  147:13 148:10
  149:7 161:23
  162:16 166:9,11
  173:4 175:11 178:8
  182:7,8 185:14
  186:9 195:1 225:8
  225:12,14 243:4
**seeing** 51:4 110:21
  141:10 165:8

  197:24
**seeking** 36:19 196:6
**seen** 33:23,23 34:5,6
  35:7 42:24 87:1,4
  97:6 104:8,12
  109:25 183:11
  204:15 237:6
**sees** 105:17
**select** 73:18
**semantics** 25:9
**seminars** 54:18
**send** 29:19 35:14
  49:15,16 72:17
  90:21 119:20,21
  121:25 130:12
  132:9,23 133:2
  134:19 136:18
  137:2 139:21 149:9
  156:4 161:1,8
  182:13 192:19
  215:12 226:16
  227:12 228:10
  239:3,3,4 244:18
**sender** 127:11
**sender's** 127:8
**sending** 62:14,16
  93:8 137:25 148:12
  170:23 179:15
  196:11 199:1 206:9
  207:14 217:13
  226:24 227:4
  239:15 241:7,7
**sends** 90:24 98:13
  101:16
**sense** 19:14 81:12
  82:5,24 125:16,17
  140:13 156:23
  157:20 196:2,10
  215:15 225:16
**sensitive** 6:15
**sent** 40:11,12 49:19
  59:10 79:20,21 81:2
  81:6,6,12 82:1,10
  82:16,19 83:5,18
  89:20 91:21 96:17

  100:3 101:7 103:5
  114:2 115:23
  123:23 127:9
  130:23 132:22
  135:6 138:2,5,6
  139:9 143:19
  155:21,23 156:10
  159:22 176:1
  180:11,12 187:6
  192:20 193:14
  196:6 198:25 206:5
  207:6 214:21 236:9
  237:13 238:18
**sentence** 60:16
  122:16 167:17
  220:8 226:14
**sentences** 156:2
**separate** 45:19 65:9
  76:17 77:6 83:22
  118:14 119:18
  133:13 140:7,11,14
  141:9 145:19
  146:18 159:20
  169:5,16 215:21
  216:19
**separately** 75:1
  76:16,21
**separating** 17:21
**seq** 52:17
**sequence** 92:25
  151:23 152:3,6
  179:7
**sequential** 52:23
  149:15 151:21
  152:7,12 153:3,19
  154:4 158:1 163:5
  163:12 164:6,11
  165:4,11 166:15
  179:17 191:16
**sequentially** 39:2
  40:18 147:3 154:17
  154:25 158:10,20
  178:23 182:18
  196:24 199:14

**series** 235:6 236:22
**serve** 179:8 182:5
  220:21 246:20
**served** 33:11,24
  141:6 152:25
  187:17 203:5
**server** 23:5,8,10
  38:18 112:20,20
  148:16 151:1
  248:19
**servers** 16:9,23
  22:17,20,24 23:3
  235:9,13,13 236:7
  248:22,24 249:17
  249:19
**service** 17:11 18:1
  18:12 38:12 67:12
  71:1 72:12 73:24
  74:4,5 75:25 76:3,8
  76:24,25 77:1 90:24
  110:4,5,8,14,20
  134:17 135:1,11,16
  135:20 212:14
  221:12
**services** 14:5 29:11
  74:3 75:16 77:4
  84:25 135:17
**serving** 160:10
  202:20 203:10
  204:8 242:21 245:1
  245:15 247:4
**session** 127:1
**set** 58:7 75:17 103:1
  110:24 119:17
  155:9 250:17
**setting** 103:7 106:12
**settle** 202:14
**settled** 177:22
  181:16 201:16
  202:3,13,14 231:7
  231:14 245:11,13
**settlement** 231:15
  233:22 234:1
**settling** 231:5

**seven** 54:25 152:2
**shadow** 88:22,24
**shah** 184:25 185:25
  186:17
**shared** 234:10
**shaskins** 2:23
**sheet** 246:1
**shelf** 19:23 51:2,13
**shifted** 44:18
**short** 38:11 47:10
  61:2 67:11 72:12
  75:25 76:8 90:23
  101:21,23 105:11
  106:2 134:10,16,23
  135:1,11,15,19
  139:8,10 222:4
  224:6
**shorthand** 106:22
  253:13,16
**shot** 10:16 98:2
  137:11
**shots** 14:20
**show** 10:18 14:21
  131:1 137:19
  224:11 237:12
**showed** 10:22 94:6
**showing** 50:10
**shown** 120:15
**shows** 28:19 29:24
  82:23 98:5 248:2
  249:9
**shuster** 180:1
**sic** 11:3 69:2 132:7
  134:9 171:9
**side** 38:18 89:5
  143:23 144:12
  180:8 198:3,3
**signaling** 58:14,16
  58:16 59:6 75:13,14
  127:14 130:14
  143:4,4 159:21
  241:12 242:6
**signature** 97:12
  253:24

**signed** 223:23
  244:25
**significance** 141:8
**similar** 49:1 69:21
  110:12 123:15
  146:22 191:1
  214:13,19 215:3,15
  238:22
**similarities** 214:16
  242:3,3,11
**similarly** 1:4 196:20
**simon** 5:7 175:3
  180:1
**simple** 150:25 249:8
**simply** 37:5 46:12
  46:20 59:9 60:9
  63:18 76:2,23 81:10
  85:13 116:19
  132:25 137:23
  143:13 157:16
  158:8 165:7 171:17
  180:8,9,10 182:12
  210:8,9 217:3 230:3
  238:7 241:4
**simultaneous** 82:11
  137:11
**simultaneously**
  82:10 83:5 107:14
  253:12
**single** 46:25 124:14
  135:14,19 193:13
  201:10 217:2
**sir** 226:12
**sit** 12:2 13:15 49:6
  50:25 107:10
  125:14 195:16
**site** 33:19,21 38:7
  64:4
**sites** 25:23 38:7
**sitting** 105:14
  195:19 218:21
**situated** 1:4
**situation** 110:23
  206:21 223:5
  246:24 247:2

**situations** 114:16
  129:2,6
**six** 67:21 152:3
**slight** 238:5
**small** 21:14 61:13
  74:18,20
**smaller** 74:11,16
**smart** 92:13
**smartphone** 50:5
  51:13
**smith** 3:4 7:6
**smpp** 134:23,23
  135:18
**sms** 28:22 29:16
  38:15,19 67:12
  70:23,24 71:6,20
  72:15,20,24 75:2,2
  75:5,10 76:11,19,21
  77:6,12 79:8 93:20
  101:8 109:12
  123:25 128:8 130:5
  130:21,25 135:18
  136:17 171:7,24
  180:11 241:25
**smsc** 135:2
**smscs** 135:2
**snyder** 1:14 2:4 4:2
  4:13,24 5:10 6:4
  7:14,20 11:11 28:23
  33:9 34:19,25 37:13
  47:17 50:10 70:12
  71:14 73:13 78:21
  84:8,11 86:3 111:23
  121:5 123:3 127:6
  157:10 165:21
  166:17 178:8,17
  179:10 185:4,24
  188:2 189:9,11
  195:1 205:7,24
  211:21 213:15
  216:5 218:16
  221:15 225:18
  228:24 229:5,9
  243:10,16 246:6
  253:7

**snyder's** 11:6 38:4
  39:8,11 115:13
  157:7 165:24 182:8
  182:10,14,16,22,24
  183:8 185:2,8 189:4
  189:8,14,18,20
  190:8,12 199:6
**society** 54:22
**soft** 36:6
**software** 12:23
  14:13 16:13 18:5
  19:22,24,24 20:2,4
  21:23 22:5 49:25
  50:6 51:12 111:10
  111:12 149:19
  151:10,11 209:22
  217:21,24 235:10
  248:19,23 249:17
  251:6,8
**solely** 221:11
**solutions** 6:7 17:5
**somebody** 23:24
  33:17 62:14,16
  111:16,19 126:2
  127:18 145:17
  169:12 231:22
**someone's** 144:19
**somewhat** 209:6
  214:15
**son** 229:13,23
  230:17 231:23
  233:5 234:3
**son's** 233:3,3,10
**soon** 139:6 213:7
**sorry** 30:25 31:2
  69:10 76:20 78:22
  104:6 120:22 123:7
  154:21 171:21
  186:24 219:19
  220:12 221:19
  224:21 243:21
**sort** 22:17 94:23
  110:1 136:23
  142:24 245:7

**sorts** 16:9 222:16
**sought** 196:14
**sounds** 25:13
**source** 26:11 249:18
**sources** 80:14
**south** 2:2 3:4 6:9
**southern** 1:2 187:16
**space** 14:4 16:23
  17:10,24 20:1 30:2
  149:24,25
**spalding** 2:21 7:3
**speak** 32:3 227:19
**speaker** 54:20
**speaking** 124:2
  167:14 195:6
  251:12
**special** 32:5 102:2
  208:14
**specific** 17:14 20:4
  24:1 49:5 51:11
  57:21 64:23 69:25
  95:1 101:21,22
  168:18 179:6
  225:10 236:5,6
  249:17
**specifically** 20:17
  23:21 26:11 56:15
  61:10 62:4,7 64:21
  66:21 70:1 71:9
  84:16 134:24 155:5
  158:19 175:22
  179:10 182:24
  206:18 221:2,20
  224:4,20 237:21
**specification** 174:9
**specifications**
  172:22 189:13
**specifics** 190:20
  191:6 235:7
**specify** 124:5
**speculate** 95:10
  100:17
**speculation** 189:19
**spend** 212:16

**spent** 54:24 212:3
  230:4
**spill** 185:22
**spoken** 96:1 236:11
  236:16 242:18
**sponsored** 105:25
  138:21
**spreadsheet** 86:17
  89:2
**spreadsheets** 86:21
**spring** 63:1
**sprint** 74:15 91:14
**sql** 148:1,16 249:7
**ss** 253:2
**stack** 108:22
**stadium** 10:7,9
  14:21 89:19 103:23
  104:3,11,16 105:4
  138:22,24 219:6
**stamp** 25:6 81:14,15
  81:17,21 83:11,23
  83:25 89:25 98:9,10
  108:13 122:23,24
**stamped** 80:10 90:2
  92:18 97:3
**stamps** 81:17 90:4
  108:1
**standalone** 101:20
**standard** 23:7 50:10
  55:6,9 57:15 58:11
  58:21 60:8,18 66:13
  72:11 76:9,9 116:7
  116:23,24 121:9
  123:6 128:8 129:4
  135:11,19 136:1
  245:24 251:9
**standardization**
  55:6
**standards** 54:25
  55:1,5,9 63:14
  64:14 65:12,13,14
  65:21 66:19,23
  75:12,12 76:1 121:9
  124:5 135:18
  226:15

**standing** 189:7
**standpoint** 46:5
  132:15 165:13
**stands** 10:19 94:1
  105:14
**stapled** 32:25
**staples** 196:8,15
**star** 186:1,8,9
**start** 61:13 212:1
**started** 64:12 76:2
  76:10 170:23 171:3
  192:11,25 229:14
**starting** 77:2 132:7
**state** 6:22 125:20
  187:23 201:19
  219:20 240:6 253:2
**stated** 93:4 141:18
  149:12 152:22
  156:18 173:9
**statement** 176:14
  180:15 191:2
  222:18 223:18
  224:1 229:20
  240:12
**statements** 41:13
**states** 1:1 2:4 56:10
  60:17 62:10 119:2
  155:22 157:8 171:2
  174:23 175:2
  217:15
**static** 65:13 142:21
**statute** 44:6,9,21
  45:6 46:15,15,17,19
  46:19,22 53:18
  54:14 62:6 142:19
  142:21 147:14
  153:5 161:25 162:9
  162:22 165:1,3,9
**statutes** 44:5 125:21
**statutory** 53:12,15
  164:19 165:11
  167:18 173:9,15
  182:11 199:15
  201:17

**step**  217:2
**stewart**  2:20 7:2
  211:18 213:10
**stick**  100:19
**stipulation**  5:11
  229:8
**stop**  194:17 230:3
  230:17 234:6
**stopped**  111:20
  234:4
**stopping**  47:6
**storage**  81:14 93:25
  136:24 137:24
  162:11 167:7 185:6
  185:9 186:23,24
**store**  52:22 54:2
  79:10,13,18,19
  102:9 135:4 157:17
  157:25 161:1 163:4
  164:4,5,8 165:5
  173:14 182:12
**stored**  51:12 79:17
  81:10,19,20 90:3
  102:6,7 109:20
  136:16 137:4,20,21
  158:2,3 163:21
  164:1 166:24 175:8
  178:19,22 179:7
  181:11 182:17
  185:4,9 186:23
  187:3 249:6,6,10
**stores**  168:13
  173:10
**stories**  24:21
**storing**  137:2,12
  138:3
**straws**  205:21
**street**  2:3,10,16,21
  6:10
**stretch**  21:16
**struck**  43:1,8,11
**structure**  13:19 15:1
  15:13 16:4,4 19:11
**study**  124:24

**stuff**  190:23 231:19
  251:8
**styled**  229:5
**sub**  59:4,5
**subject**  37:25 60:16
  141:19 166:1
**submit**  159:5,23
  214:7
**submitted**  42:13
  46:24 160:2 199:12
  201:10 214:4,10
**subpoena**  4:14 8:9
  33:4,10,13,16,23,24
  34:3,12,14 37:7
  85:18,21
**subscribe**  143:13
**subscriber**  39:23
  70:23 74:2 90:14
  109:4 122:2 125:23
  142:4 229:25
  239:21 241:7
**subscriber's**  238:24
**subscribers**  18:22
  65:7 70:22,25 74:12
  101:11 120:2 135:6
  140:1 143:13
  180:25 217:6
  227:13 238:7
  240:21
**subsequent**  114:1
  179:4
**subsequently**  60:25
  101:10 178:20
**subsidiary**  55:1
**subtab**  93:18
**succession**  107:21
**sue**  207:8 230:9
**sued**  203:17 204:20
**sufficient**  185:6
  224:23
**suggested**  196:23
**suggestions**  226:1
**suggests**  152:23
  190:10

**suit**  207:9
**suite**  2:3
**suits**  70:10
**sum**  181:17
**summarization**
  119:13
**summarize**  117:15
**summary**  13:12
  53:8 60:9 179:24
  183:6
**supp**  182:9
**supplement**  12:3
  213:2
**supplementary**
  76:24 77:9
**supplied**  5:17
**support**  72:20 74:20
  236:1
**supported**  70:23
**supports**  22:9
**supposed**  81:5
  169:13 208:2
  238:17 239:21
  240:20
**supposition**  199:7
**sure**  16:20 17:13
  23:2 34:12 43:5,6
  45:14 49:2,8 64:16
  64:18 65:3,9 71:17
  73:12 78:18 83:14
  89:20 103:16
  104:25 109:25
  111:25 116:14
  122:15 153:21
  181:14 205:1
  213:22 214:5
  217:23 227:18
  228:7 234:17
  240:10
**surprise**  90:12
**switch**  133:5,6
  143:10,10 165:16
**switched**  242:9,9
**sworn**  7:13,15
  253:10

**symmetry**  45:1
**sync**  118:5
**system**  13:8,20,24
  15:1,13 16:4,6,10
  16:14,18 17:8,24
  18:15,21 19:11,12
  19:13,19 20:5 21:25
  23:20 25:16 26:5,9
  26:19,20 27:25 28:9
  28:16,20 29:7 30:13
  32:16 38:15,21 41:7
  41:11 43:21,25 44:1
  44:8,11,16,17,25
  45:11,19,24 46:7,13
  46:21,22 48:3,19,22
  49:6,14 50:13 52:9
  52:19 53:15,22 54:1
  57:19,22 58:16 59:6
  61:15 62:12 66:7
  68:13,22 73:11
  75:22 82:13 84:14
  85:7 90:1,13,16
  92:19,22 93:8,11
  95:8 96:13 101:19
  101:25 102:14,15
  107:12 109:23
  111:1 112:14
  115:23 116:21
  132:25,25 135:15
  136:21,22 137:5,11
  138:2 139:4,9,19
  140:16,18 146:23
  146:24,25 147:5,6
  147:12,18,19 148:5
  148:13 149:6
  150:16,19 154:3
  155:23 159:12,13
  159:15,17 160:12
  160:13 163:3 165:2
  165:8 166:24
  167:19 168:12,13
  169:3,7 173:13
  175:10 178:19
  179:15,16,21
  180:15,16,18

182:12 188:4,7
189:5,16 190:10
192:4 196:22,23
199:10 204:14,15
204:16 208:10,19
210:17 215:6,11,17
223:7,11 235:7,25
236:6,9 237:2,19
238:11 241:8
248:18,24,25 249:4
249:14
**system's** 29:3 183:3
**systems** 24:4 26:25
38:9 44:15,23 45:5
47:23 48:15,16,23
51:5 55:21,22 61:17
62:8 78:3 82:14
83:24 90:9 93:5
109:6,11,16 133:13
137:16,17,23
138:25 147:11
150:21 156:3
159:20 160:17,25
161:4,10,13 169:6
170:22 188:4 189:9
189:10 198:24
207:21 208:16
242:1,8 251:6,7,7

**t**

**t** 41:18
**tab** 86:15,17,17 87:2
87:5,5,9 88:18,19
93:18
**table** 228:14 249:8
**take** 6:14,14 9:14
35:7,24 37:2 96:22
102:7 117:22
126:15 201:9
204:24,25 205:17
208:10 209:24
219:15,15 220:9
225:1,22 237:20
**taken** 4:24 13:10
47:13 84:6 126:18

156:2 165:19
192:13 205:4 219:6
221:3 234:22
253:16
**talk** 47:17 58:24
76:24 110:9 116:4
126:3 128:16
147:11 166:5
169:10 170:17
177:4 231:22
234:18
**talked** 39:24 47:18
114:5 191:13 232:5
232:6,6 242:20,25
247:4
**talking** 15:19 16:22
40:21 50:8 62:5
72:11,23 75:7 77:1
77:3 82:12 89:8
106:23 148:12
149:24,24 150:4
186:12 209:8,15
210:8 213:10 214:8
225:11 230:5 244:4
251:13
**talks** 119:19 169:9
206:18 237:24
**tape** 77:18
**taps** 22:15
**task** 63:18
**tasks** 9:23
**taught** 54:17
**taxi** 199:13,15
**taxicab** 198:25
**tbasdekis** 2:12
**tcp** 174:6 203:5
**tcpa** 27:21 34:19
35:1 37:14,25 39:17
41:1,3 43:1,21 44:2
44:12,21,24,25 45:6
45:11,12,21,25 46:8
50:17 51:14,17,21
52:8,17,19 54:6
56:3,6,13,17,19,21
56:23 58:2,5 61:7

61:10,20,22,25 62:5
62:20,24 63:1,4
67:13,15,19 68:8,12
70:10 84:23,24
115:18 119:9,14,17
119:19 129:8 134:3
142:15 144:4
146:17,19,24
151:20 154:13
155:9,10 156:23
160:18,22 161:9,14
161:19,25 162:3,5,6
162:9,10,22 163:13
166:16 167:2,6
169:9,9 170:14
171:6,13,23 172:12
173:16 174:6,17
175:5,8,16 176:3,4
176:16 177:11,13
177:19,24 179:22
183:22 184:5,9
185:7 188:8 189:16
193:10 195:21
196:5,10 201:2,11
202:20 203:5,10,12
204:1,8,12,20 212:6
212:7,10 214:11
224:10,16,20,24
225:7,14,20 228:3,9
228:15 230:19
232:1 236:19
242:22 247:20,23
**tcpa's** 167:19
**team** 105:11 108:23
116:14 139:14
**technical** 30:18,19
45:17 55:3 178:24
182:19 190:16
194:13
**technician** 103:16
**technological** 46:21
46:22 77:10,12
192:2
**technologies** 54:19
59:3 125:22 173:18

242:2
**technology** 14:3,4
17:5,17 27:15,19
39:1 44:7 48:4,6
52:9,13,15 53:19
55:7,19,21,23 56:2
58:12 59:25 60:1
61:1,12,24 65:15
67:11,12 69:22,23
72:22 74:16 76:11
76:12 83:24 132:15
136:1 142:22
144:14 145:3,7,19
146:18 147:13
149:25 152:4 159:1
161:23,23,24
167:21 168:5,7
170:17,18 174:2
207:23 228:6
**teeth** 120:6,19
**telecom** 58:12
**telecommunication**
54:19 74:2
**telecommunications**
4:15 29:10 47:22
48:3,6 52:13 53:19
54:23,24 55:2,4,25
67:10 69:1,2 70:15
127:14 130:11
**telemarketers**
141:23 173:18
209:23
**telemarketing**
113:21,25 158:18
208:1
**telephone** 38:9,21
40:13,14,17 43:20
44:10,16,23,25
45:10 50:13 52:16
52:18,22 53:1 54:3
55:17 57:16,18,22
59:20 73:7,8,11
77:25 78:3 101:10
102:9 113:22 127:8
127:10,12,18 130:1

130:13,17 132:24
133:5 139:25 142:4
143:3 146:2 148:5
155:23 157:17
159:12 160:13
161:1 163:2,4 165:6
167:19 168:13
171:7,25 173:12,14
173:20 175:9,10
178:19 179:5,16,18
179:21 182:13
188:3,7 189:5,16
192:6,8 199:9
200:13 243:13,14
**telephones** 28:22
**telephoning** 160:13
**teleservices** 167:24
173:22
**television** 59:23
**tell** 7:15 8:8 56:8
104:15 120:17
209:19 217:20
219:19 222:17
226:17 227:6,8
232:10
**telling** 103:22
239:17 240:11
**template** 40:14 60:7
60:18 102:5
**temporary** 185:5
**ten** 43:2,5 77:19
117:8 173:20
217:17
**tended** 181:11
**tenets** 65:8
**tens** 139:5
**tenth** 201:5
**term** 38:20,23 44:10
44:24 57:21 73:11
163:2 168:24
180:17 207:20
226:18 227:20,20
227:21 228:3,17
**terminated** 217:14

**terminology** 17:3,16
18:3,17 44:19 51:20
54:4,7 153:24 155:6
218:22
**terms** 48:14 50:18
51:23 142:23
**testified** 7:17 9:3
11:23 13:7 17:1,22
32:13 35:22 36:11
50:4 51:7 84:13
131:3 134:8 152:19
179:14 192:15
210:3 212:2,24
218:3,6,9 219:25
**testify** 7:22 8:2
130:24 156:22
203:19,23 204:22
253:10
**testifying** 67:9
160:11 195:3
213:21 245:12
**testimony** 9:17
85:13 179:23 183:4
187:25 188:6 189:4
189:20 201:18
213:23 214:4,10
225:19 234:8,9
240:4 251:10
**testing** 120:13
**text** 4:18 12:23
13:25 14:6,12 29:22
30:9 40:11,14,18,25
41:4 48:14,18,21,25
48:25 49:3,5,16,19
58:23,24 61:1,17,25
63:4 66:9 69:23
72:17 78:23 79:19
79:20 82:10,12 86:8
86:18,20 87:2 90:1
90:21 91:11 92:14
95:19,22 97:20,23
98:6,10,16 99:17,18
99:25 100:4,12,16
100:22 101:6,8,14
101:21 102:20

103:7 105:10 106:5
106:7,18,24,24
107:7,21 109:3,8
113:8,10,21,23,25
114:2,10,25 115:4
116:5,11,17 117:23
119:20,22 121:20
124:13,14 125:6
127:17,19 128:4,21
128:24 129:3,12,20
129:22 130:2 132:9
132:21,22,23 133:2
133:4 134:10,19
135:5,17 136:9,11
136:19,21 137:3,8,9
137:11 139:9,18,19
139:20 140:10
142:15,24 143:3,6,7
143:10 145:2
148:12 155:21
156:4,5,9 158:18
160:12,25 161:1,10
170:19,23,24 171:1
171:7,13,24 172:12
172:17,25 174:7,11
174:17 175:7,16,23
175:25 176:3,5,16
177:5,18,24 179:2,9
179:13 190:9
192:25 193:14
196:4,6,13,15 197:2
197:3 206:5,9 207:6
207:15 210:4,8,12
210:18 214:20,22
215:4,5,18,22 217:2
217:8 221:10 222:3
223:22 224:5,23
226:5,24 227:4
228:10 229:15,18
230:1,17 234:4
239:21 240:13,20
241:2,5,7,7 242:4
247:17
**texted** 91:10 106:15
126:4,7,9 128:17,19

136:10 143:22
144:10,23
**texting** 139:8
**textopoly** 229:6
**texts** 69:25 87:11
106:1 241:10,21
**textural** 209:8
**thank** 7:12 33:6
55:14,15 69:8
106:24,25 107:3
117:17 121:19
122:8,9 126:5
128:20,24 129:12
129:19 137:8,25
138:12 140:8,8
216:25 217:7
226:10 238:10
242:12
**thanks** 116:13
**thanos** 2:8 7:10
**thereof** 2:2
**thing** 37:11 39:16
48:21 54:12 65:6
110:1 114:12 133:4
151:12 170:4 172:1
176:12 186:21
223:21 247:1
**things** 15:24 33:5
35:16 39:25 40:1
50:1 52:1 57:3
60:15,18 64:10,13
64:24 65:1 75:17,21
77:2 78:5 93:11
95:20 110:4 112:19
118:12,18,18
151:23 161:10
165:8 234:6 236:2
241:25 246:17,18
252:2
**think** 8:3 11:18
15:17 17:1 31:17,21
31:25 32:5,8 42:17
48:23 49:5 51:5
56:16 80:13 81:13
82:3 83:6 87:1 88:8

93:4,14 94:16,16
96:14,15 104:12
112:3,5 120:22
128:17 131:18
134:14 144:15
145:5 149:17 152:9
153:4 154:1 155:5
158:23 159:1 161:9
164:16 170:3,7
172:17 178:1 181:7
183:17 184:10,22
187:2 197:7,14,20
200:11 204:18,22
205:24 210:3 214:3
214:18 217:8
222:23 223:1,2,8,24
225:8 226:19 231:1
231:5,9 237:21
241:20 242:23
243:5,6 245:10,19
245:22 246:9 247:2
247:15,21 248:1
**thinking** 144:2
192:8 231:8
**third** 17:4,11,25
19:1,13,22 20:2
42:21 82:22 83:2,5
116:11,12 153:21
154:6,14,18,22
155:3 251:7
**thirds** 203:3,12
204:6,13 212:4
**thoroughly** 9:23
**thought** 85:3 177:3
184:4 204:17 225:1
236:15
**thousand** 74:19
231:9,15
**thousands** 118:13
139:6,20,22 208:7
**three** 8:12 76:5
81:25 90:23 98:19
98:20,21 107:23
108:6,6,7 109:1
111:22 113:24,25

117:22 122:9
129:12,19 151:25
152:2,2 159:25
187:12 197:11
237:14,16
**throttle** 109:14
**throttling** 109:24
112:18
**throughput** 109:16
110:10
**throw** 35:16
**thrown** 111:19
**tia** 55:3
**ticket** 192:11
**tickets** 193:5
**time** 6:22 8:14 9:14
15:7 24:3,5,5,20
35:22 40:25 52:8
61:11,19 62:9,12
64:5 65:14,18 66:17
71:22 72:15,19,24
73:1 79:20,22 80:20
81:1,5,6,8,11,14,15
81:16,17,21 82:18
83:11,12,14,15,17
83:23,25 84:1 89:16
89:18,19,21,22,25
90:2,4,13 92:8,12
92:16,18 93:15
98:10 105:15 108:1
108:13 109:17,20
109:21 113:22
116:7,24 118:23
121:13,24 122:6
123:9,10 124:12
125:6,19,21,22
133:11 137:5 139:8
139:11,21 142:13
142:22 144:5
149:10 155:10
176:10,15 177:3
187:3 200:2 201:22
203:16 207:17
208:7,21 210:6
212:17 220:19,20

220:23 221:1
222:23,24 223:3
227:13 230:5 233:6
237:25 238:4,12,13
238:16,18,18 239:1
239:4,5,13,19
240:10,11,20 246:1
246:2 247:11
251:21 253:17
**times** 9:5 80:20 89:7
90:6 98:19 107:16
107:24 108:9 109:1
111:22 113:24
195:9 237:16
**timing** 92:24 94:18
95:22
**title** 59:4
**titled** 70:14
**today** 7:22,24 9:17
9:22 11:13 12:2
13:2,15 31:15 32:14
49:6 51:1 62:10,24
69:7 76:25 92:14
107:10 125:14
155:22 158:5,17
195:17,20 212:15
218:17,21 221:3
234:8
**tokoph** 80:9 86:13
**told** 36:15 42:25
103:19 136:22
144:6,7 202:8
231:11,16 239:2
**top** 70:21 83:4 93:20
116:5
**torrey** 4:25 157:7
**tower** 113:6
**tracking** 140:7
**trade** 56:8 57:9
63:19 119:4 220:25
**traffic** 109:13,21
**trained** 181:8
**training** 43:16
**transaction** 93:20
207:3 217:2,13

**transactions** 38:14
**transcribed** 253:12
**transcript** 96:4,7,10
131:22,25 156:16
157:7 160:5 253:14
253:18
**transcription**
253:14,16
**transcripts** 34:25
35:4,9,12,20 36:1
37:3,9
**transfer** 22:23 23:7
23:11
**transition** 128:4
**transmission** 58:23
58:24 81:15,16
89:23 91:4,6 92:18
92:20,21 94:24 99:6
108:9,12 128:23
138:10,19 139:24
140:9 143:24
144:12 179:13
190:9 242:4,7
**transmissions** 62:21
138:15,16 250:23
**transmit** 92:7 110:6
129:11,19 222:3
224:5
**transmittal** 109:8
**transmitted** 90:1,11
91:2 96:12 106:19
107:11 241:12
**transmitting** 38:19
110:5
**travel** 109:4
**traveled** 91:13
**traversed** 143:15,17
**treat** 75:5,10
**treated** 76:16,21
**trial** 212:24
**trouble** 28:4,7
**true** 29:21 127:23
149:20 180:14
208:23 227:11
241:25 242:8 251:5

253:15
**truly**   150:7 214:25
**truncated**   124:11
  157:24 160:21
**truth**   7:15,16,16
  253:10,11,11
**truthful**   9:17 248:7
**try**   28:5 64:9 73:25
  112:2 158:9 197:16
  202:18 204:20
  214:24
**trying**   18:10 19:14
  53:25 54:1 108:22
  111:21 166:8
  203:15 211:4,6
  215:13
**tuesday**   1:15 2:2
  253:8
**turn**   34:17 65:7
  90:23,25 120:16,18
  120:18 121:8 123:5
  132:3 157:10 160:4
  221:15 226:11
**turned**   24:18 28:11
  90:22
**turning**   93:18
**tweaked**   208:24
**two**   8:18 26:7 28:14
  50:4 59:2,3 69:13
  69:15 74:23 79:10
  79:13 80:14 82:9
  103:19 106:18
  107:16 111:22
  115:25 119:18
  120:22 123:9,18
  124:11,13,15 126:7
  126:8,9,11 132:11
  132:19 137:8,11
  138:2,12,14,15
  139:9 140:6,11,14
  141:9 143:19
  145:19 149:17
  151:25 152:2,3
  159:19,24 164:4
  188:14 197:11

198:3,9 203:3,12
  204:6,13 210:7
  212:4 215:20
  216:19 217:19
  237:15
**type**   18:14 22:2 23:8
  29:14 66:8 80:17
  159:21 243:12
**types**   15:9 60:17
  65:1,4 94:15 95:20
  132:17 143:19
  158:6,25
**typewriting**   253:13
**typewritten**   253:14
**typical**   89:25 250:19
  251:2,3
**typically**   20:25 21:5
  42:14 60:7 79:18
  90:9 92:13 107:1
  109:11,17 110:3,7
  110:21,22 113:8,9
  138:25 146:22
  149:23 155:25
  244:23 247:19
  249:1
**typo**   35:18 213:5
  222:15

| u |
| --- |

**ubiquitous**   73:23
**ultimately**   200:20
  233:1
**um**   53:17 63:21 95:9
  194:16
**umbrella**   65:2
**unbeknownst**
  192:24
**underlying**   189:17
  189:22
**understand**   9:12,12
  16:20 17:18 21:14
  24:14,19 30:2,20,24
  31:5,10,17,20,22
  32:6,9 36:4 41:19
  45:14,16 46:17

53:20 63:3 77:15
  83:21 89:4 112:1
  128:13 132:8 141:1
  144:21 146:20
  167:5 183:20 207:7
  211:16 213:17,22
  218:20 222:13
  227:9 234:12
  240:10 245:4
**understanding**   7:24
  18:2 29:6 37:20
  41:3 50:17,20 54:4
  54:15 55:20 56:2
  71:5 81:23 82:21
  84:17 91:9 98:18
  99:10,15,19 142:16
  142:20 146:6,7
  154:9 162:7,8
  163:15 164:24
  180:21 181:10
  184:6 185:12
  190:12,15 195:16
  202:4 206:19
  207:17 209:25
  211:14 216:18
  223:8 224:17 227:2
  232:18 235:16
**understood**   152:24
  236:25
**undisputed**   193:3
**unduly**   112:8
**unexpected**   113:21
**unique**   17:17,17
  59:25 94:23 214:15
**united**   1:1 56:10
  60:17 62:10 119:2
  155:22 157:8 171:2
  174:23 175:2
**unlawful**   243:14
**unnecessary**   170:8
**unpack**   102:13
**unsolicited**   113:21
  113:25
**upper**   52:19

**usc**   52:16 243:13
**uscs**   5:5 162:22
**use**   2:1 12:22 17:15
  30:9 38:20,23 52:5
  52:6 55:22 59:9
  60:18 61:1 72:12
  73:1 74:16 82:14
  102:10 106:21
  114:6 133:5 151:15
  151:19 155:21
  158:19 161:7
  163:11 164:7 167:6
  178:22 180:17
  182:17 189:18
  190:10 191:4 195:9
  196:23 200:7 208:3
  208:25 227:20
  242:2
**user**   75:16 121:15
  123:10 147:25
  148:15
**users**   29:13
**uses**   133:6 135:25
**uspto's**   38:7
**usual**   245:19
**usually**   110:23,23
  110:25 213:23
**utilized**   199:9

| v |
| --- |

**v**   7:23 145:22,24
  189:3 243:7
**vacations**   68:17
  85:2,9
**vague**   190:1
**valid**   114:23 123:22
**validated**   41:24
**value**   135:16
**variety**   15:24 35:16
  40:24 76:7 111:13
  133:11 150:23
**various**   8:2 17:5
  19:7 38:7 92:17
  103:1 112:13 140:1
  205:11 252:6

vast  203:13
vastly  130:25
vedder  2:15 6:25
vedderprice.com
2:18
vegas  1:16 2:3 6:10
vendor  193:12
venue  218:13
verisign  249:23,24
249:25 250:2,5,6,13
veritext  6:6
verizon  74:15,22
verse  194:25
versed  207:23
version  4:21,22
38:13 86:18 88:10
121:3 123:1,15
125:11
versions  44:18
versus  241:25
vgm  189:15
vi  131:17
vice  61:11,23
video  6:4,13 10:7,9
10:15,16,18,25
11:23 105:24 219:6
videographer  3:7
6:2 7:12 47:11,14
77:19 84:4,7 126:16
127:2 165:17,20
185:21 205:2,5
234:20,23 252:13
vie  131:18
view  24:20 249:13
viewed  119:1 219:5
views  57:8 183:9
209:4
vint  131:17,18
violate  116:6,17
119:8,9 121:21
141:24
violated  117:11
violates  151:20
violating  119:11
161:9

violation  118:1
128:11 129:3,7
160:23 225:19,20
violations  61:22
120:15
violative  115:18,21
117:18 128:24
virginia  2:10 7:11
vitae  38:4
vivint  130:24 131:15
133:16
vmg  188:6 189:4,9
vmg's  188:4 189:8
190:9
voice  41:4 48:16
75:7,9,10 76:12
77:1,2,3,11 102:14
127:20,24,25 130:7
130:11,20,25 133:1
142:6 143:5,9
148:12,14 159:18
171:6,24 175:23
187:9 189:3 207:21
210:4,6 241:25
242:4
voicemail  77:8
voluntarily  193:9
196:6
vote  10:22 105:11
106:25 108:23
113:23 116:7,13,19
121:24 139:7,13
215:10,16 217:1,1,3
238:7 239:12 241:1
241:5 248:3
voted  98:19 106:16
107:16,23 108:21
109:1 113:24 216:2
votes  108:2,6 126:11
140:8
voting  14:11 106:17
106:25 107:19
116:14,25 121:23
121:23,25 217:17
238:6,22

vs  1:6 4:25 5:7,8,9
5:10 6:11 42:22
68:17 84:24 85:1,2
85:4,8,14 131:15
152:15 157:8 159:5
165:24 175:3 182:2
184:14 186:1 187:9
191:13,19 193:23
199:25 201:21
204:14 213:6 217:4
229:5 243:4 244:7
245:2 247:7,12

**w**

wacker  3:4
wait  62:13 112:2
113:16 162:18
waiting  76:6
waive  35:13
want  24:9 25:1 33:2
47:4 48:1 50:9,11
70:18 78:20 100:10
105:7 107:21
110:18 111:25
112:9 148:2,4,17
165:23 166:2,11
192:5 194:17,24
196:2 204:2,21
205:10 216:16
221:20 227:18
231:19 232:7
234:14 243:9
251:19 252:5
wanted  24:19 65:7
71:17 88:13 90:18
216:8 230:3,3,16
wants  110:5
wap  66:10,12
warm  96:25
warn  196:9
washington  157:9
way  6:20 15:19
21:23 28:2 50:5,25
69:24 74:3 76:5
77:11 80:23 90:4,19

96:6 97:9 99:21
110:5,17,18,25
111:7 130:10 131:3
133:2,9,10,18
137:23 141:13
151:20 186:20
195:4 209:4 225:18
227:15 241:11,20
wayback  25:19,21
ways  112:13 132:16
132:18 133:1
145:17 246:18
we've  47:3 77:19
114:5 205:24
wearing  97:1
web  22:20 102:24
102:25 112:20
155:11
website  15:5 23:22
23:23,24 24:1 25:14
192:2 222:23,25
websites  15:2,3
23:20 24:23 25:14
25:15 146:3
wedd  63:9
weight  184:3
wells  200:1
went  81:25 82:3
91:22 190:8 217:8
233:3,24
wes  236:16
wesley  1:3 6:11
91:10 105:14 106:7
128:17 136:10
137:12 140:1
242:18,20 244:2,14
246:7
west  2:10 7:11
western  157:9
westlaw  39:22,23
whatsoever  20:13
22:7 157:20
whispers  6:16
white  194:21

**wife** 229:12,16
230:4,15 231:16
232:2,6,16 233:2,12
**win** 107:6 108:23,25
116:14 146:10,11
**windows** 151:1
**wireless** 4:16 48:6
54:18 55:8 58:12,23
59:15,25 61:12,24
66:12 69:2 74:2
75:1 77:11
**wireline** 48:5 54:18
55:7 58:13 59:15
**wish** 70:7
**wished** 141:25
**withdraw** 233:13,16
**withdrawn** 214:1,9
**witness** 2:4 4:2 7:12
20:15 24:10 25:2
28:6,23 32:2 34:15
47:9 70:2,7 77:15
83:8 96:22,25 99:10
129:21 134:6 144:1
153:2 156:15
163:15 172:21
176:23 186:9 187:2
187:21 197:23
201:14 205:8
206:17 212:5,11,14
212:17,20 215:25
240:3,16,18 241:4
241:16,23,24
242:21 244:6
247:25 248:15
250:2 253:7,9
**won** 42:22 146:12
**wonderful** 51:25
**wondering** 16:5
**word** 36:12 101:22
101:24 114:6 120:5
154:12 186:22
194:19 251:19
**worded** 53:23
**wording** 65:10
199:5

**words** 16:3 46:15
58:22 109:7 117:19
117:25 122:8,15
124:12 128:14
164:4,25 180:21
181:10 194:20
**wore** 61:13
**work** 14:12,13
17:17 27:23 55:22
55:24 59:18 61:6
64:2,15 109:10
132:16 137:16,23
147:12 161:11
175:13,15 203:12
203:12,14,21 204:1
204:12 212:5,9
219:2,8,12 223:19
224:1 231:19
234:10 237:3 245:7
245:22 246:6
**worked** 27:20 39:17
48:24 62:9 223:7
237:16
**working** 26:25 66:4
244:20
**works** 72:23 120:11
130:4 145:16
**world** 25:8
**worth** 35:17
**wrap** 234:19
**write** 224:18
**writing** 30:1 89:23
92:19 139:23 140:2
245:12
**written** 21:14 22:2
56:12 71:13 102:17
102:21 136:12
140:2 142:19,21
214:2 249:18,22
**wrong** 33:9 52:1
129:11,18,22 152:1
161:6 176:20,25
178:2 192:9 226:20
**wrote** 15:7 214:24
245:10

| **x** | **z** |
|---|---|
| **xml** 21:11,14,17 | **zero** 105:21,25 |
| **y** | 107:7 108:25 |

**y's** 117:6
**yada** 175:3,3,4
**yahoo** 5:8,9 42:22
152:15 182:2
184:14 185:1,3,7
186:1 191:13
201:21 213:6
**yeah** 19:10 23:6
28:6 32:2 36:24
41:9 44:5 47:9
54:12 60:12 64:16
73:9 75:9 77:15
78:9,23 83:8 85:1,4
86:1 88:6 94:15
104:6 107:23 108:3
108:4 113:13
119:18 127:25
140:19 144:1
145:16 146:6 151:5
153:2 186:7 191:25
200:2 201:4 202:2
207:1,7 213:13
218:2 230:20 231:5
231:18 233:15
236:14 239:12
240:18 241:24
243:4,23 244:3
250:24
**year** 27:16 160:1
202:19 203:12
231:24
**years** 48:2,24 54:25
61:18 65:10 118:11
131:4 132:1 137:17
158:6 159:24,25
163:24 202:7
212:25 213:19
**yous** 140:8

**z** (column header, continued)
116:13 117:7
138:21
**zone** 83:12,17